**RECORD NO. 22-1071**

ORAL ARGUMENT HAS NOT YET BEEN SCHEDULED

*In The*

# United States Court of Appeals

### For The District of Columbia Circuit

## SECRETARY OF LABOR,
## MINE SAFETY AND HEALTH ADMINISTRATION,

*Petitioner*,

**v.**

## KC TRANSPORT, INC.;
## FEDERAL MINE SAFETY AND HEALTH REVIEW
## COMMISSION,

*Respondents.*

### ON PETITION FOR REVIEW OF A DECISION OF
### THE FEDERAL MINE SAFETY AND HEALTH REVIEW
### COMMISSION

———————————

### PAGE-PROOF BRIEF OF RESPONDENT KC TRANSPORT, INC.

———————————

**James P. McHugh (D.C. Bar No. 56277)**
**Christopher D. Pence (D.C. Bar No. 53362)**
**HARDY PENCE, PLLC**
**10 Hale Street, 4th Floor**
**Charleston, West Virginia  25301**
**(304) 345-7250**
**jmchugh@hardypence.com**
**cpence@hardypence.com**

*Counsel for Respondent KC Transport, Inc.*

## <u>CERTIFICATE OF PARTIES, RULINGS AND RELATED CASES</u>

Pursuant to Rule 28(a)(1), I hereby certify the following:

### I.      Parties

The parties appearing in the administrative proceedings before the Federal Mine Safety and Health Review Commission and this Court are:

1.      Secretary of Labor, Mine Safety and Health Administration, the Petitioner ("Secretary");

2.      KC Transport, Inc., a Respondent ("KC Transport"); and,

3.      Federal Mine Safety and Health Review Commission ("Commission"), a Respondent.

No intervenors or amici appeared.

### II.      Ruling Under Review

This matter is before the Court on the Secretary's petition for review of a final Decision of Commission, issued on April 5, 2022, in the matter captioned *Sec'y of Labor (MSHA) v. KC Transport, Inc*., Docket No. WEVA 2019-458, 44 FMSHRC 211 (Rev. Comm. Apr. 2022) [JA___]. The Commission Decision reversed the March 3, 2020 Decision issued by Administrative Law Judge John K. Lewis ("Judge Lewis") or ("ALJ"), in the matter captioned *Sec'y of Labor (MSHA) v. KC Transport, Inc*., Docket No. WEVA 2019-458, 42 FMSHRC 221 (Mar. 2020) (ALJ) [JA___]. The Commission Decision held that the Mine Safety and Health

Administration ("MSHA") did not have jurisdiction to issue Citation Nos. 9222038 and 9222040 to KC Transport, involving trucks parked at KC Transport's Emmett, West Virginia maintenance facility.

## III.   Related Cases

This case has not previously been before this Court or any other court, and no related cases are currently pending in this Court or any other court.

## **RULE 26.1 CORPORATE DISCLOSURE STATEMENT**

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, KC Transport, Inc. is a privately owned non-governmental corporation, with no parent corporation. No publicly held entity holds a 10% or greater interest in KC Transport, Inc.

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

CERTIFICATE OF PARTIES, RULINGS AND RELATED CASES.....................i

RULE 26.1 CORPORATE DISCLOSURE STATEMENT................................. iii

TABLE OF CONTENTS.........................................................................iv

TABLE OF AUTHORITIES ................................................................vi

GLOSSARY OF ABBREVIATIONS AND ACRONYMS ..................................xi

STATEMENT OF THE ISSUES...........................................................1

PERTINENT STATUTES AND REGULATIONS.........................................1

STATEMENT IN SUPPORT OF ORAL ARGUMENT .........................................1

INTRODUCTION ...........................................................................2

STATEMENT OF THE CASE...............................................................6

    I.    Factual Background.................................................6

    II.    Procedural History...............................................10

        A.    ALJ Proceedings ..........................................10

        B.    Commission Decision .................................12

STANDARD OF REVIEW ...............................................................14

SUMMARY OF THE ARGUMENT ....................................................18

ARGUMENT ..............................................................................22

I.    Equipment and facilities "used in, or to be used in mining" must have both a functional and locational connection to the extraction, milling and preparing of coal to be a "mine." ..................22

    A.    MSHA Does Not Have Jurisdiction Over the Off-Site Emmett Facility or the Trucks while at the Emmett Facility ..................................................................................22

    B.    The Secretary's Interpretation of Section 3(h)(1)(C) in Isolation Improperly Seeks to Expand MSHA's Jurisdictional Reach Beyond the Limits of Section 3(h)(1)(C) ............................................................29

    C.    The Legislative History Supports the Commission's Textual Analysis of Section 3(h)(1) ..........................33

    D.    Previous Interpretations of the Definition of a "coal mine" under Section 3(h) are consistent with the Commission Decision ..................................................................37

    E.    The Commission's Interpretation of the Mine Act Facilitates the Protective Purpose of the Mine Act .................43

II.    The Secretary's Interpretation of Sections 3 and 4 of the Mine Act are Unreasonable and not Entitled to Deference ..........................44

III.    When finding that Independent Contractors are only operators when performing services at the Mine, the Commission was merely quoting the Mine Act for Context ..........................................48

CONCLUSION ..................................................................................51

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

ADDENDUM

v

# <u>TABLE OF AUTHORITIES</u>

<u>Pag(s)</u>

## <u>CASES</u>

*AFGE v. FLRA*,
       25 F.4th 1 (D.C. Cir. 2022)................................................................16

*Akzo Nobel Salt, Inc. v. Fed. Mine Safety & Health Review Comm'n*,
       212 F.3d 1301 (D.C. Cir. 2000)........................................................15

*Alaska, Dept. of Transp.*,
       38 FMSHRC 122 (ALJ Feldman Jan. 2016)................................41, 42

*American Mining Congress v. EPA*,
       824 F.2d 1177 (D.C. Cir. 1987)........................................................16

*Brown v. Gardner*,
       513 U.S. 115, 115 S. Ct. 552, 130 L. Ed. 2d 462 (1994) ..............25

*Bush & Burchett, Inc. v. Reich*,
       117 F.3d 932 (6th Cir. 1997) ...........................................................38

*CalPortland Co. v. Fed. Mine Safety & Health Review Comm'n*,
       839 F.3d 1153 (D.C. Cir. 2016)...........................18, 25, 26, 27, 47

*Chevron U.S.A. v. Natural Resources Defense Council, Inc.*,
       467 U.S. 837 (1984)...........................................17, 21, 28, 45

*Christopher v. SmithKline Beechum Corp.*,
       132 S. Ct. 2156 (2012).....................................................17

*City of Arlington v. FCC*,
       133 S. Ct. 1863 (2013)................................................17, 28

*Dir., Office of Workers' Comp. Programs,*
*United States Dep't of Labor v. Ziegler Coal Co.*,
       853 F.2d 529 (7th Cir. 1988)...................4, 12, 13, 14, 19, 38

*Donovan v. Carolina Stalite*,
 734 F.2d 1547 (D.C. Cir. 1984) ............................................................... 35, 40

*Financial Planning Ass'n v. S.E.C.*,
 482 F.3d 481 (D.C. Cir. 2007) ................................................................... 22, 30

*Gutierrez-Brizuela v. Lynch*,
 834 F.3d 1142 (10th Cir. 2016) ........................................................................ 28

*Harman Mining Corp. v. FMSHRC*,
 671 F.2d 794 (4th Cir. 1981) ...................................................................... 40, 41

*Herman v. Associated Electric Cooperative, Inc.*,
 172 F.3d 1078 (8th Cir. 1999) .................................................................... 37, 38

*INS v. Cardoza-Fonseca*,
 480 U.S. 421 (1987) .................................................................................... 16, 33

*Jim Walter Resources, Inc.*,
 22 FMSHRC 21 (Rev. Comm. Jan. 2000) ..................... 10, 11, 13, 31, 32, 46

*Kinder Morgan, LP*,
 23 FMSHRC 1288 (Rev. Comm. Dec. 2001) ............................................... 39

*Martin v. Occupational Safety & Health Review Comm'n*,
 499 U.S. 144 (1991) .................................................................................... 15, 46

*Maxxim Rebuild Co., LLC. v. FMSHRC*,
 848 F.3d 737 (6th Cir. 2017) ............................................... 3, 4, 5, 12, 13, 19,
                                                                                                          25, 26, 27, 28, 29, 30,
                                                                                                          32, 37, 45, 47

*Michigan v. EPA*,
 135 S. Ct. 2699 (2015) ..................................................................................... 28

*Musser Eng'g, Inc.*,
 32 FMSHRC 1257 (Oct. 2010) ................................................................... 49, 50

*North Fork Coal Corp. v. FMSHRC*,
 691 F.3d 725 (6th Cir. 2012) .......................................................................... 17

*Oliver M. Elam, Jr. Co*.,
    4 FMSHRC 5 (Rev. Comm. 1982)...............................................23, 30, 37, 39

*Pennsylvania Electric Co. v. FMSHRC*,
    969 F.2d 1501 (3d Cir. 1992) ..........................................................23, 24, 30

*Pereira v. Sessions*,
    138 S. Ct. 2105 (2018)..................................................................................28

*Sec'y of Labor v. Cranesville Aggregate Cos*.,
    878 F.3d 25 (2d Cir. 2017) ...........................................................................39

*Sec'y of Labor v. Keystone Coal Mining Corp*.,
    151 F.3d 1096 (D.C. Cir. 1998)....................................................................14

*Sec'y of Labor v. Nat'l Cement*,
    30 FMSHRC 668 (Rev. Comm. Aug. 2008), *overruled on other grounds in*
    *Sec'y of Labor v. Nat'l Cement Co. of Cal., Inc*.,
    573 F.3d 788 (D.C. Cir. 2009)....................................................20, 24, 39, 40

*Sec'y of Labor v. Nat'l Cement Co. of Cal., Inc.*,
    494 F.3d 1066 (D.C. Cir. 2007)..............................................5, 15, 19, 20, 24,
                                                                                                            25, 28, 39, 44, 46

*Sec'y of Labor v. Nat'l Cement Co. of Cal., Inc.*,
    573 F.3d 788 (D.C. Cir. 2009).................................. 19, 24, 25, 28, 29, 39, 40

*Sec'y of Labor v. Twentymile Coal Co*.,
    456 F.3d 151 (D.C. Cir. 2006)......................................................................14

*Skidmore v. Swift & Co*.,
    323 U.S. 134 (1944)......................................................................................17

*State of Alaska, Dept. of Transp*.,
    36 FMSHRC 2642 (Rev. Comm., Oct. 2014) ..............................................41

*US Steel Mining, Co. Inc.*,
    10 FMSHRC 146 (Rev. Comm. Feb. 1988)...........................................13, 42

*Westar Energy, Inc. v. Fed. Energy Regulatory Comm'n*,
    473 F.3d 1239 (D.C. Cir. 2007).......................................................................33

*Westwood Energy Products*,
    11 FMSHRC 2408 (Rev. Comm. Dec. 1989) .........................................16, 43

*Williams v. Taylor*,
    529 U.S. 362 (2000)..............................................................................22, 30

*W.J. Bokus Indus. Inc.*,
    16 FMSHRC 704 (Rev. Comm. Apr. 1994)....................................13, 41, 46

## <u>STATUTES</u>

29 U.S.C. § 653(b)(1).......................................................................................44

30 U.S.C. §§ 802-803.........................................................................................5

30 U.S.C. § 802 ...........................................................................27, 44, 45, 47

30 U.S.C. § 802(d) .........................................................................................48, 49

30 U.S.C. § 802(h) ...........................................................................................1, 27

30 U.S.C. § 802(h)(1)........................................... 2, 3, 5, 9, 18, 21, 22, 23,
    24, 25, 37, 38, 39, 44, 48

30 U.S.C. § 802(h)(1)(A) ................................................1, 11, 22, 24, 27,
    29, 32, 39, 47

30 U.S.C. § 802(h)(1)(B) ...................................................11, 22, 24, 25,
    27, 29, 32, 39

30 U.S.C. § 802(h)(1)(C) ........................... 11, 12, 14, 15, 16, 18, 19, 20, 21, 22, 23
    24, 25, 26, 27, 28, 29, 30, 31, 32, 33,
    34, 35, 36, 37, 39, 40, 41, 44, 45, 51

30 U.S.C. § 802(i) ......................................................................23, 37, 41

30 U.S.C. § 803 ........................................................................2, 3, 18, 44, 45, 47

30 U.S.C. § 823(d)(2)................................................................49

30 U.S.C. § 823(h)(1)................................................................49

## **REGULATION**

30 C.F.R. § 75.1200 ................................................................50

## **OTHER AUTHORITY**

S. Rep. No. 95-181 (1977), reprinted in Senate Subcomm. on Labor,
Comm. on Human Res., Legislative History of the Federal Mine Safety and
Health Act of 1977 (1978) ........................................................35

## GLOSSARY OF ABBREVIATIONS AND ACRONYMS

| | |
|---|---|
| A | Appendix |
| ALJ | Administrative Law Judge |
| Commission | Federal Mine Safety and Health Review Commission |
| Jt. Stip. | Joint Stipulation |
| KC Transport | KC Transport, Inc. |
| Mine Act | Federal Mine Safety and Health Act of 1977, as amended |
| MSHA | Mine Safety and Health Administration ("MSHA"), United States Department of Labor |
| P. Br. | Brief for the Petitioner, Secretary |
| JA | Joint Appendix |
| Secretary | Secretary of Labor, United States Department of Labor |

## STATEMENT OF THE ISSUES

The issues presented in this case are:

1)    Whether the Commission correctly held that:

an independent repair, maintenance, or parking facility not located on or appurtenant to a mine site and not engaged in any extraction, milling, preparation, or other activities within the scope of subsection 3(h)(1)(A) is not a mine within the meaning of section 3(h) of the Mine Act.

*KC Transport, Inc.*, 44 FMSHRC 211, 225 (Rev. Comm. Apr. 2022) [JA___].

2)    Whether the Commission correctly held that:

tools, equipment, and the like [including trucks] not on a mine site or any appurtenance thereto and not engaged in any extraction, milling, preparation or other activities within the scope of subsection 3(h)[1](A) are not mines within the scope of subsection 3(h) of the Mine Act.

*Id.*

## PERTINENT STATUTES AND REGULATIONS

The texts of pertinent statutes and regulations are set forth in the addendum at the end of this brief.

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

KC Transport, Inc. ("KC Transport") respectfully requests oral argument. This case presents significant legal issues that will affect KC Transport and other independent trucking companies and contractors. KC Transport believes that oral argument would be of value to the Court given the fundamental importance of jurisdiction.

1

**INTRODUCTION**

This case calls upon the Court to determine whether MSHA, by its authorized representative, had jurisdiction pursuant to Section 4 and 3(h)(1) (30 U.S.C. § 803 and 30 U.S.C. § 802(h)(1)), of the Federal Mine Safety and Health Act of 1977 (the "Mine Act"), as amended, to issue two citations to Respondent KC Transport, an independent contractor trucking company, for conditions related to trucks parked at KC Transport's Emmett, West Virginia maintenance facility ("Emmett facility").

KC Transport's Emmett maintenance facility was located over a mile from Ramaco Resources LLC's ("Ramaco") Elk Creek coal preparation plant and 1000' from a coal haulage road. Jt. Stip. 4 [JA __]. Trucks from KC Transport's facility either worked at the various Ramaco mines or crossed the haul roads to work elsewhere for various other mining and non-mining companies. Jt. Stip. 15 [JA __].

When the Citations were issued, the Secretary did not seek to assert MSHA jurisdiction over KC Transport's Emmett facility. Rather, the Secretary only sought jurisdiction over the trucks. Secretary of Labor's Motion for Partial Summary Decision, pp. 14, 20 [JA___]. KC Transport asserted that MSHA lacked jurisdiction to issue citations on the conditions of the trucks, while those trucks were parked at KC Transport's off-site maintenance facility. KC Transport's Motion for Summary Decision, p. 11-12 [JA ___].

2

For MSHA to have jurisdiction to issue the citations, the trucks and/or KC Transport's maintenance facility would have to be deemed a "coal mine" pursuant to Section 4 and Section 3(h)(1) of the Mine Act.

Section 3(h)(1) of Mine Act (30 U.S.C. § 802(h)(1)) states that "coal or other mine" means:

> (A) an area of land from which minerals are extracted in nonliquid form or, if in liquid form, are extracted with workers underground, (B) private ways and roads appurtenant to such area, and (C) lands, excavations, underground passageways, shafts, slopes, tunnels and workings, structures, facilities, equipment, machines, tools, or other property including impoundments, retention, dams, and tailings ponds, on the surface or underground, used in, or to be used in, or resulting from, the work of extracting such minerals from their natural deposits in nonliquid form, or if in liquid form, with workers underground, or used in, or to be used in the milling of such minerals, or the work of preparing coal or other minerals, and includes custom coal preparation facilities. In making a determination of what constitutes mineral milling for purposes of this chapter, the Secretary shall give due consideration to the convenience of administration….

By drawing upon the unambiguous language of the Mine Act, its purpose, and logically examining the facts, the Commission aptly determined that neither KC Transport's facility, nor the two trucks while parked at the facility, were a "coal mine," as that term is defined in the Mine Act. *KC Transport, Inc*., 44 FMSHRC at 225. [JA___].

The Commission's determination that the trucks and the facility were not a "mine" at the time they were cited was consistent with the Sixth Circuit's decision in *Maxxim Rebuild Co., LLC. v. FMSHRC*, 848 F.3d 737, 744 (6th Cir. 2017)

("*Maxxim*") ("Once [MSHA] tries to extend its jurisdiction to **off-site shops** and **off-site equipment**, the language of the statute provides **no stopping point**, leaving the scope of its jurisdiction to the **whims** of the Secretary.") (emphasis added) and the Seventh Circuit's decision in *Dir., Office of Workers' Comp. Programs, United States Dep't of Labor v. Ziegler Coal Co.*, 853 F.2d 529, 533-34 (7th Cir. 1988) (The statutory definition of a coal mine…. contains a geographical component") ("*Ziegler*").

The Secretary now advances a fluid and limitless concept of jurisdiction that is entirely unpredictable and arbitrary. This small portion of the Secretary's Appeal Brief demonstrates that the Secretary does not want to be bound by any predictable geographic limitations of the Mine Act:

> Just because an item was once used in mining does not mean that MSHA retains permanent jurisdiction over that item; whether an item is "used in" (or "to be used in") mining is a fact-bound inquiry that must be addressed—and that MSHA does address—on a case-by-case basis. And the Secretary's interpretation is not that location is irrelevant to that fact-bound inquiry; the Secretary's interpretation is that location on an extraction site, for purposes of subsection (C), is not necessary. ….
> MSHA is necessarily constrained by practical realities. MSHA is required by statute to inspect each "mine" in its entirety multiple times each year, 30 U.S.C. § 813(a); MSHA does not have the unlimited resources that would be required to scour the nation's homes for any tool that might be connected to a mine. Rather, MSHA commits its resources where they are most needed and effective.

P. Br., pp 45-46 [JA __].

Such an *ad hoc* approach to jurisdiction cannot be reconciled with the 30 U.S.C. §§ 802-803. In *Sec'y of Labor v. Nat'l Cement Co. of Cal., Inc.*, 494 F.3d 1066, 1076 (2007) ("*National Cement* I"), this Court previously rejected such an approach to jurisdiction and required the Secretary to be precise as to the limits of jurisdiction, holding:

> This vague, open-ended (and unenforceable) representation offers scant comfort to the various road users who would be subject to liability under the Secretary's expansive construction of Mine Act jurisdiction. In any event, the Mine Act itself does not authorize such prosecutorial discretion…

*Id.*

The Secretary's refusal to set a clear locational limitation on its jurisdiction; first in *National Cement* I, then in *Maxxim* and now here, demonstrates why the Sixth Circuit's holistic view of Section 3(h)(1) (in *Maxxim*) is appropriate.

Without judicial oversight, the Secretary may continue to try to keep jurisdiction vague and unpredictable. This case presents the Court with an opportunity to affirm the Commission's sound decision analyzing Mine Act jurisdiction in relation to both function and location. Here, neither KC Transport's maintenance facility nor the trucks parked there are a "mine" under the Mine Act.

# STATEMENT OF THE CASE

## I.    Factual Background

KC Transport is an independent contractor trucking company that provides various types of hauling services to its customers including: coal hauling, earth hauling and gravel hauling services. Jt. Stip. 7, 14 [JA __].  To service and maintain its large truck fleet, KC Transport owns and operates maintenance and storage facilities at five (5) locations in two different states. KC Transport maintains one facility in Tazewell, Virginia; one facility in Bluefield, West Virginia; one facility in Man, West Virginia; two facilities in Princeton, West Virginia; and the facility at issue here, in Emmett, West Virginia. Jt. Stip. 9. [JA __].

KC Transport elected to construct the Emmett facility to serve as a convenient and centralized location for the maintenance, repair and staging of its truck fleet that provides hauling services to customers located in the area around Logan County, West Virginia. Jt. Stip. 16. [JA __].  KC Transport solely purchased all the materials for the construction of the Emmett facility and insures the property. Jt. Stip. 4. [JA __].  Overall, KC Transport operates approximately thirty-five (35) trucks from the Emmett facility consisting of both on and off-road trucks. Jt. Stip. 30. [JA __].

Certain trucks maintained at the facility, including the two trucks which were cited, provide coal hauling services to the five (5) nearby Ramaco owned mines and to other nearby mines owned by different operators. Jt. Stip. 14, 15 [JA __]. The on-

6

road trucks maintained at the facility provide coal, earth and gravel hauling services to other, coal and non-coal mining customers in the area, including American Electric Power ("AEP"). Jt. Stip. 7, 8, 14, 15. [JA __].

MSHA regularly inspects Ramaco's Elk Creek plant as well as the five (5) mining operations owned by Ramaco in the vicinity of KC Transport's Emmett facility, including, three deep mines, one surface mine and one highwall miner and the haul roads. Jt. Stip. 14. [JA __]. Each of these seven facilities provides ample opportunities for MSHA to inspect KC Transport's trucks, without the need to also leave the mines and follow the trucks to KC Transport's maintenance facility.

The land where KC Transport's Emmett facility is located it is not permitted or bonded for mining. Jt. Stip. 17. [JA __]. Ramaco has no personnel or equipment at this location, nor is it used by Ramaco for mining operations. Jt. Stip. 13, 18. [JA __]. Further, Ramaco has no plans to operate any mine at or near the location of the where KC Transport's Emmett facility is located. Jt. Stip. 18. [JA __].

The Emmett facility is across a creek from a haulage road and well up a hollow along Right-Hand Fork Road, which branches off from the main haulage road running by the Elk Creek Plant. Jt. Stip. 25 [JA___]. It is located more than one (1) mile from Ramaco's Elk Creek Plant (i.e. the nearest coal extraction/preparation facility), approximately four (4) to five (5) miles from the three Ramaco deep mines,

approximately six (6) miles from the Ramaco strip mine/highwall miner and is on the other side of a creek, approximately 1000' away from a coal haulage road.

On the day the citations were issued, the materials for KC Transport's planned 60' x 70' metal maintenance building, were on location but were temporarily stored on pallets awaiting construction. Jt. Stip. 6. [JA __].  However, the adjacent truck parking lot (where the trucks referenced in Citation Nos. 9222038 and 9222040 were located) had already been completed and the area was being actively used by KC Transport and an unaffiliated logging company to park their logging trucks. Jt. Stip. 6, 13. [JA __].  At the time, KC Transport had two shipping containers there and two maintenance trucks which it used to maintain its trucks. Jt. Stip. 23. [JA __].

Prior to March 11, 2019, MSHA had never previously attempted to enter KC Transport's Emmett facility parking lot. Jt. Stip. 21. [JA __]. Similarly, MSHA has not cited any trucks at this facility since Citation Nos. 9222038 and 9222040 were issued. *Id.* [JA __]. With the exception of these two citations, MSHA has shown no interest in inspecting the area where the maintenance facility was located.

Previously, on April 3, 2018, MSHA had issued Citation Nos. 9174394 and 9174395 to KC Transport on a work trailer and a muddy parking area that was located on bonded, permitted property, directly adjacent to where the main haulage road intersects with Right-Hand Fork Road. Jt. Stip. 22.  [JA __]. In April of 2018, KC Transport was utilizing this area for its truck fleet prior to re-locating the facility

8

off the bonded, permitted mine and up a hollow where there was no mining taking place. *Id*. [JA __]. MSHA ultimately vacated these citations. *Id.* [JA __].

With respect to the citations at issue, Inspector Smith was conducting inspection activities at the Elk Creek plant and then attempted to locate certain trucks to terminate a previously issued citations. Jt. Stip. 5. [JA __]. To locate those trucks, he traveled more than one mile along the haulage road, turned off of the haulage road, crossed the creek and traveled up Right-Hand Fork Road through an opened gate to where the Emmett facility is located. Jt. Stip. 5, 24. [JA __]. Upon arrival, Inspector Smith discovered maintenance work being performed on two other KC Transport's trucks in the Emmett facility parking lot and issued Citation Nos. 9222038 and 9222040. Jt. Stip. 5. [JA __].

While the two cited trucks are routinely inspected by MSHA when performing hauling services at the nearby Ramaco mines and the Elk Creek plant, they were never inspected at this KC Transport maintenance facility location before or after the citations. Jt. Stip. 21. [JA __]. KC Transport contends that the trucks are not subject to inspection while parked at the Emmett facility and neither the trucks nor the facility were a "coal or other mine" as defined in Section 3(h)(1) of the Mine Act.

## II.    Procedural History

### A.    ALJ Proceedings

In response to the issuance of Citations Nos. 9222038 and 9222040, the Secretary and KC Transport prepared a joint set of factual stipulations and moved for summary decision. The Secretary asserted that the definition of "coal or other mine" included the *trucks*, making them subject to MSHA jurisdiction. The Secretary did not seek jurisdiction over the KC Transport *facility*. Secretary of Labor's Motion for Partial Summary Decision, pp. 14, 20 [JA____]. The Secretary emphasized the "function" of the trucks. *Id.* at 15-16 [JA ___]. The Secretary declined to set any geographic limit on when the trucks are "mines." *Id*. at 17. [JA ___]. KC Transport asserted that the trucks were located at the facility of an independent trucking company serving both mining and non-mining businesses and it was not subject to MSHA jurisdiction. KC Transport's Motion for Summary Decision, p. 11-12, [JA____]. KC Transport emphasized the "location" of the trucks at the time of the citations. *Id.* [JA____].

On March 3, 2020, ALJ John Kent Lewis issued his Order Denying Respondent's Motion for Summary Decision and Granting Secretary's Motion for Summary Decision. *KC Transport, Inc*., 42 FMSHRC 221, 231 and 237 (Mar 2020) (ALJ). The ALJ followed the purely functional analysis of the Commission described in *Jim Walter Resources, Inc.*, 22 FMSHRC 21 (Rev. Comm. Jan. 2000)

("*Jim Walter*"), which does not identify a geographic limit for facilities "used in, or to be used in" mining. *KC Transport*, 42 FMSHRC at 234 [JA___].

Interestingly, the ALJ found that the Secretary's assertion of jurisdiction over the trucks based on function alone was unreasonable, noting "the Secretary's idea of the trucks being rolling mines would lead to an absurdity." *Id.* at 237. [JA___]. The ALJ specifically held that there was no jurisdiction under Section 3(h)(1)(A) (extraction areas) and 3(h)(1)(B) (appurtenant ways and roads). *Id.* at 232. [JA___]. Rather, the ALJ found jurisdiction over the facility, pursuant to Section 3(h)(1)(C) and the trucks while at the facility, notwithstanding that the Secretary did not request jurisdiction over the facility. *Id*. at 229. [JA___]. The ALJ also held, "Respondent is correct that the *location* of the trucks and the maintenance facility matter…" *Id.* at 237. [JA___]. The ALJ noted various cases where Courts found geographic limits to MSHA jurisdiction. *Id.*  [JA___].

Without explaining or reconciling how the facility and the trucks that are not located at a mine met the statutory definition of a "mine," the ALJ still found jurisdiction over the facility and the trucks based merely on their "proximity" to the mine, coupled with their purpose. (i.e., they were closer to the mine than the distance found acceptable in *Jim Walter*.) *Id.* at 238 [JA___]. It appears the ALJ simply felt constrained by the limitless approach of *Jim Walter*. Without some explanation of

how this "proximity" rule was consistent with the Mine Act, the ALJ's decision was as arbitrary and unpredictable as the Secretary's own description.

The ALJ acknowledged a geographic limitation to jurisdiction over the trucks when he called the concept of "rolling mines" absurd. *Id.* at 237. [JA___]. Inexplicably, the ALJ did not find any similar geographic limitation for MSHA jurisdiction over a "facility."

## B.      Commission Decision

Upon discretionary review, the Commission reversed the Decision of the Administrative Law Judge. The Commission majority relied extensively on the Sixth Circuit's decision in *Maxxim* and the Seventh Circuit's decision in *Ziegler*. *KC Transport, Inc*., 44 FMSHRC at 233. [JA___].

The Commission majority held that Subsection 3(h)(1)(C) is dependent on location, holding:

> an independent repair, maintenance, or parking facility not located on or appurtenant to a mine site and not engaged in any extraction, milling, preparation, or other activities within the scope of subsection 3(h)(1)(A) is not a mine within the meaning of section 3(h) of the Mine Act. We further hold that tools, equipment, and the like not on a mine site or any appurtenance thereto and not engaged in any extraction, milling, preparation or other activities within the scope of subsection 3(h)(A) are not mines within the scope of subsection 3(h) of the Mine Act.

*Id*. at 225 [JA ___].

12

The Commission agreed with the ALJ that the concept of the trucks as "rolling mines" "was absurd." *Id.* at 213 (*quoting KC Transport*, 42 FMSHRC at 231, 237). The majority noted that it was departing from prior Review Commission precedent, including *Jim Walter* (dealing with central machine and supply shops *owned and operated by the coal mine operator* and dedicated "*only to JWR's mines* and related facilities." 22 FMSHRC at 22), *W.J. Bokus Indus. Inc*., 16 FMSHRC 704 (Rev. Comm. Apr. 1994) (dealing with equipment in a storage facility *owned and operated* by the mine operator, where employees of the mine operator worked. *Id*. at 705), and *US Steel Mining, Co*., *Inc*., 10 FMSHRC 146 (Rev. Comm. Feb. 1988) (dealing with a central supply shop having a Mine I.D. Number and *owned, operated and managed* by the coal mine operator. *Id*. at 147.) *See, KC Transport*, 44 FMSHRC at 225, n. 8 [JA___].

The Commission relied on a functional and locational analysis. *Id.* at 225. [JA___]. Departing from the concept of jurisdiction without locational limit, the Commission noted that "the circuit courts had recognized the jurisdictional precepts" that the majority was following. *Id.* at 223. [JA__]. In that regard, the majority found that extending jurisdiction off the site of a mine to an independent facility where equipment was stored or serviced, would create "no stopping point." *Id*. at 226, citing, *Maxxim*, 848 F.3d at 743 [JA___]. The majority also pointed to *Ziegler* and

13

its emphasis on "the geographical component of the situs of a facility." *Id*. at 223, *citing, Ziegler*, 853 F.2d at 533-34.

The majority also offered several examples of why Section 3(h)(1)(C) includes a locational limit, such as manufacturing facilities, trucks leaving the site, equipment and tools being taken off site, etc., referring to this as "common sense." *KC Transport*, 44 FMSHRC at 225-226. [JA ____]. The Commission majority concluded that neither the trucks nor the facility are a "mine" if not located at the mine site and engaged in extraction, milling and preparation. *Id.* at ____. [JA ____].

## STANDARD OF REVIEW

This Court reviews the Commission's legal conclusions related to jurisdiction, *de novo*. *Sec'y of Labor v. Twentymile Coal Co*., 456 F.3d 151, 156 (D.C. Cir. 2006); *Sec'y of Labor v. Keystone Coal Mining Corp*., 151 F.3d 1096 (D.C. Cir. 1998). Here, the parties stipulated to the material facts. Jt. Stip. [JA____].

The Secretary implies that review is limited because this case purportedly involves a "disagreement over policy" between the Secretary and the Commission, rather than a *de novo* legal dispute. P. Br., p. 20, [JA____] (citing *Twentymile Coal Co*., 456 F.3d 151, 160-161 (D.C. Cir. 2016)). However, unlike *Twentymile Coal Co*., this case does not involve the interpretation of a regulation or policy promulgated by the Secretary. Rather, here, the Commission was determining whether the statute was clear and reviewing the reasonableness of the Secretary's

14

exercise of *jurisdiction* under the Mine Act. Previously, this Court has reviewed the reasonableness of the Secretary's interpretation of jurisdiction under the Mine Act. *See, National Cement* I, 494 F.3d at 1076.

Congress defined the limits of jurisdiction in the statute, not the Secretary, in a regulation or policy. It would be ridiculous to assert that the Secretary can somehow enforce its way into jurisdiction, where the jurisdictional statute does not allow. Even if the Secretary somehow had discretion to alter its interpretation of its own jurisdiction at a whim, it is also clear that in those cases where the Secretary has discretion, such as in interpreting its own regulations, or drafting policy, this Court does not tolerate "flip-flops" and "*post hoc* rationalizations" in connection with such interpretations. Such unpredictability impugns the "reasonableness" of the Secretary's position. Neither the Commission nor the Courts are obligated to defer in these circumstances. *Akzo Nobel Salt, Inc. v. Fed. Mine Safety & Health Review Comm'n*, 212 F.3d 1301, 1304-05 (D.C. Cir. 2000) (*citing Martin v. Occupational Safety & Health Review Comm'n*, 499 U.S. 144, 157 (1991)).

Prior to this case, the Secretary did not assert jurisdiction over the KC Transport facility or the trucks while off the mine site. Jt. Stip. 21 [JA___]. Now in this case, the Secretary adopted one position before the ALJ-that the Secretary had jurisdiction over the trucks pursuant to Section 3(h)(1)(C). Secretary of Labor's Motion for Partial Summary Decision, pp. 14, 20 [JA___]; *KC Transport*, 44

FMSHRC at 211 [JA, ___]. Then, before the Commission, the Secretary asserted jurisdiction over both the trucks and the KC Transport facility pursuant to Section 3(h)(1)(C). Secretary of Labor's Response Brief before the Commission, p. 12-15. [JA, ___]. Now the Secretary wants to assert jurisdiction over facilities and equipment, without regard to location (if "used in, or to be used in" mining) at its discretion, and as its resources allow. P. Br., pp 45-46 [JA __].

Without judicial review, it is impossible to analyze whether the statute is clear or ambiguous and, if ambiguous, the reasonableness of the Secretary's cascading interpretations (from initially not exercising jurisdiction to now seeking jurisdiction over facilities and trucks wherever they may be, subject to available resources). Here, MSHA's evolving and inconsistent interpretations of jurisdiction lack "a reasoned analysis indicating that prior policies and standards are being deliberately changed." *AFGE v. FLRA*, 25 F.4th 1, 5 (D.C. Cir. 2022).[1] The Commission has held that the Agency's position is unworthy of deference where it deviates from its prior positions. *See, e.g., Westwood Energy Products*, 11 FMSHRC 2408, 2424 (Rev. Comm. Dec. 1989) (Comm. Doyle dissenting), *See, also, e.g. INS v. Cardoza-Fonseca*, 480 U.S. 421 (1987); *American Mining Congress v. EPA*, 824 F.2d 1177, 1182 (D.C. Cir. 1987). Here, the Secretary's changing position constitutes *post hoc*

---

[1] When there is a change in policy, "[T]he agency must also show that "the new policy is permissible under the statute, that there are good reasons for it, and that the agency believes it to be better" than the previous policy. *FLRA*, 25 F.4th at 5.

rationalizations advanced through litigation. Deference to that is improper. *Christopher v. SmithKline Beechum Corp.*, 132 S. Ct. 2156, 2166-67 (2012).

As the Commission noted, such changing positions are, at best entitled to analysis under *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944). Under *Skidmore*, the Secretary's position does not have the "power to persuade" because it lacked "thoroughness evident in its consideration…validity of its reasoning [and] … consistency with earlier and later pronouncements." *North Fork Coal Corp. v. FMSHRC*, 691 F.3d 725, 743 (6th Cir. 2012).

Without full judicial review, considering all the tools of statutory construction as the Commission did here, it is impossible to determine if "the agency has stayed within the bounds of its statutory authority." *City of Arlington v. FCC*, 133 S. Ct. 1863, 1866 (2013). In *City of Arlington*, the Supreme Court held that "[w]here Congress has established a clear line, the agency cannot go beyond it; and where Congress has established an ambiguous line, the agency can go no further than the ambiguity will fairly allow." *Id.* at 1874.

Of course, before reverting to ambiguity, it is always the best course to see if the statute's meaning is apparent since the statute's plain meaning is conclusive. *Chevron U.S.A. v. NRDC, Inc.*, 467 U.S. 837, 842-43 (1984).

## SUMMARY OF THE ARGUMENT

In this case, KC Transport is an independent contract trucking company that does not extract, mill or prepare coal and is not a "coal mine." The Commission properly determined that KC Transport's facility and trucks were not a mine under Section 3(h)(1) of the Mine Act. The activities of the KC Transport facility are not mining, but rather the maintenance and repair of trucks. The Commission also properly concluded that MSHA's attempted exercise of jurisdiction over the trucks while at KC Transport's facility improperly expanded the jurisdiction of MSHA beyond Section 3(h)(1)(C), with "no stopping point." *KC Transport*, 44 FMSHRC at 226. [JA___].

Section 3(h)(1)(C) must be read in the context of the remainder of Section 3(h)(1) and Section 4 of the Mine Act using the tools of statutory construction. It is a fundamental rule of statutory construction that a Court must consider the text itself and the "language and design of the statute as a whole" and in reliance on the "devices of judicial construction." *CalPortland Co. v. Fed. Mine Safety & Health Review Comm'n*, 839 F.3d 1153, 1163 (D.C. Cir. 2016).

As the Commission noted: "all three subsections [of Section 3(h)(1)(C) include a locational connection to working mines." *KC Transport*, 44 FMSHRC at 219 [JA ___]. Congress never intended that every piece of equipment or every facility having once been "used in, or to be used in…the work of extracting…or the

18

work of preparing coal…," without any reference to location, would be deemed a mine as asserted by the Secretary. P. Br., p. 16. For equipment and facilities to be a mine, they must have both a functional and locational connection to the extraction, milling and preparation areas to be a mine. Using the tools of statutory construction, the Commission, in this case, eliminated possible ambiguities so that the clear test of the statute could be applies as intended by Congress.

In addition to examining the language and structure of the Mine Act, the Commission also used another important device of statutory construction, Legislative history. The Commission examined that history and determined that Section 3(h)(1)(C) was added by Congress in the Mine Act to clarify the definition of "coal mine" from the prior Coal Act to include a list of facilities and equipment that are used for extraction, milling and the work of preparing coal. *KC Transport*, 44 FMSHRC at 219.

The Sixth Circuit Court decision in *Maxxim*, 848 F.3d at 744 and the Seventh Circuit's decision in *Ziegler Coal Co.*, 853 F.2d at 533-34 considered and rejected the idea and problems of a statutory scheme that defines the term "coal or other mine" without geographic limits. *Maxxim* and *Ziegler* are well-founded and apply both a functional and a geographic limit to the definition of "coal or other mine."

Both *Maxxim* and *Ziegler* are consistent with the approach previously taken by the Secretary in *National Cement* I and *National Cement* II. In *National Cement*

I, this Court rejected a limitless definition of the term "coal or other mine" (subject to the Secretary's nebulous charging discretion) and required the Secretary to fashion a workable and limited definition of "mine" in lieu of an ad hoc, unworkable and limitless definition. *National Cement* I, 494 F.3d at 1076. On remand from *National Cement* I, the Secretary offered a new interpretation of the term "mine," under Section 3(h)(1)(C) limiting its assertion of jurisdiction to vehicles to those on a mine access road *and* engaged in mining activities. *Sec'y of Labor v. National Cement*, 30 FMSHRC 668, 672 (Rev. Comm. Aug. 2008), *overruled on other grounds in Sec'y of Labor v. Nat'l Cement Co. of Cal., Inc*., 573 F.3d 788, 795 (2009). In other words, the vehicles (equipment) must both be on the mine access road *and* engaged in mining activities. This prior position by the Secretary demonstrates that the Secretary has applied both a functional and geographic limit on MSHA jurisdiction, notwithstanding that the Secretary now wants to assert jurisdiction over equipment and facilities that are removed from the "coal mine" wherever they may be.

As this Court has noted, Mine Act jurisdiction has important consequences because the Mine Act "mandates that a citation issue when its provisions or the regulations promulgated thereunder are violated by a party within Mine Act jurisdiction." *Sec'y of Labor v. Nat'l Cement Co. of Cal*., 494 F.3d 1066, 1076 (2007). The Mine Act also mandates quarterly inspections. *KC Transport*, 44

20

FMSHRC at 215-16 [JA___]. The sobering consequences of overly expansive jurisdiction are what likely led the Secretary to self-limiting jurisdiction in *National Cement*.

Prior interpretations of the definition of "coal mine" by the Commission and courts (as well as the Secretary) make it clear that the definition of "coal mine" has both a functional and locational component and it makes no sense to read Section 3(h)(1)(C) in isolation. The Secretary now wants to repeat prior errors and keep jurisdiction broad and uncertain, subject to its individual discretion, on a "case-by-case basis, as resources allow. P. Br., pp 45-46 [JA __]. This exceeds the limits of Section 3(h)(1)(C) and is unreasonable. It also exposes a myriad of independent businesses, far from the mining site to unexpected and unreasonable inspections and citations. *KC Transport*, 44 FMSHRC at 226 [JA ___].

Finally, in this case, the Secretary has failed to identify any ambiguities with Section 3(h)(1) which might even give rise to a *Chevron* Step 2 reasonableness analysis. Of course, if the Secretary did identify ambiguities, its interpretation of the statute is not consistent, precise or reasonable.

KC Transport, as an independent contract repair and maintenance facility, not located on or appurtenant to a mine site and not engaged in any extraction, milling, or preparation work, is not a mine under Section 3(h)(1)(C) of the Mine Act.

### **ARGUMENT**

**I.    Equipment and facilities "used in, or to be used in mining" must have both a functional and locational connection to the extraction, milling and preparing of coal to be a "mine."**

Both this Court and the Commission follow the "cardinal principle" of statutory interpretation that courts "must give effect, if possible, to every clause and word of a statute." *Williams v. Taylor*, 529 U.S. 362, 404 (2000); *Financial Planning Ass'n v. S.E.C.*, 482 F.3d 481, 492 (D.C. Cir. 2007) (recognizing a court's duty to give each word in a statute meaning).

The Commission correctly held that to be considered a mine under Section 3(h)(1)(C), a facility or equipment must be engaged in mining activities and be located appurtenant to a mine site. *KC Transport*, 44 FMSHRC at 216 [JA __].

**A.    MSHA Does Not Have Jurisdiction Over the Off-Site Emmett Facility or the Trucks while at the Emmett Facility.**

Here, KC Transport's facility is not a mine under Section 3(h)(1)(C). The facility is not used in the process of extracting, milling or preparing coal. Rather, the facility is an independent trucking company. Jt. Stip 7. [JA ___].  Moreover, the trucks and other equipment are not on a mine site or any appurtenance thereto. Jt. Stip 10-11, 17. [JA ___].

The definition of "mine" in Section 3(h)(1) has been interpreted in various contexts. Over time, it has become apparent that Subsections A-C must be read *in Pari Materia*, and not in isolation, as the Secretary suggests. An early Commission

22

case interpreting Section 3(h)(1)(C) was *Oliver M. Elam, Jr. Co.*, 4 FMSHRC 5 (Rev. Comm. Jan. 1982). That case dealt with the issue of whether a commercial dock loading coal and other cargo was a mine. *Id.* at 5. The coal was delivered to the facility by truck, crushed to uniform size, and loaded onto barges. *Id.* When examining Section 3(h)(1)(C), the Commission interpreted the terms "work of preparing coal" as described in Section 3(i) (30 U.S.C. § 802(i)). In determining that the facility was not a mine, the Commission adopted a two-part inquiry: "(1) does the operation perform one or more of the activities listed in Sect. 3(i) and (2) what is the nature of the operation performing such activities." *Id.* at 8. The Commission concluded that Elam's coal-related activities were undertaken for its own purpose of being able to load the coal for shipment and consequently that "Elam does not prepare coal to market specifications or for particular uses." *Id.*

Later, the Third Circuit introduced a similar "functional analysis" test for determining jurisdiction under Section 3(h)(1). *Pennsylvania Electric Co. v. FMSHRC*, 969 F.2d 1501 (3d Cir. 1992). In *Pennsylvania Electric*, the Court considered the applicability of the Mine Act to guarding on conveyors delivering coal directly from the minehead scales to a power plant processing station. The Court found that the work on the conveyor was "usually done by the operator of a coal mine" rendering it a mine. *Id.* at 1503. In that instance, the conveyor was an

integrated portion of the mine's operation and necessary to deliver raw coal to a processing facility. *Id*. at 1504.

Then in *National Cement* I and *National Cement* II, this Court rejected a limitless definition of the term "coal or other mine" and required the Secretary to fashion a workable and limited definition of "mine" instead of an ad hoc, unworkable definition.

On remand from *National Cement* I, the Secretary offered the following interpretation of the term "mine," under Section 3(h)(1)(C) that was not as broad and uncertain as what was initially offered.

> [t]he Secretary interprets the definition of "mine" in Section 3(h)(1)(B) of the Mine Act to encompass the [A]ccess [R]oad in this case. The Secretary, however, interprets Section 3(h)(1)(C) of the Act to exclude from the definition of "mine" vehicles on the road that are not related to National Cement's mining operations.

*Sec'y v. National Cement*, 30 FMSHRC 668, 672.

This marked a clear point at which even the Secretary agreed that Subsection (C) must be read together with another Subsection of Section 3(h)(1). At the time of *National Cement* II, it seemed clear that the Secretary had no intention of seeking to exercise jurisdiction over those vehicles "used in, or to be used in…the work of extracting…or the work of preparing coal…," once those vehicles left the "coal mine" as delineated as the Section 3(h)(1)(A) extraction/preparation area, or the haul roads, as defined in Section 3(h)(1)(B). In essence, the Secretary applied both a

24

functional and geographic limit on MSHA jurisdiction, notwithstanding that the Secretary now wants to interpret Section 3(h)(1)(C) in isolation.

KC Transport acknowledges that in *National Cement* I and *National Cement* II, this Court found Section 3(h)(1)(B) to be ambiguous. However, perhaps this Court will find the more recent "lens" analysis of the Sixth Circuit in *Maxxim Rebuild*, 848 F.3d 737 (6th Cir. 2017), as described *infra*, to be compelling and persuasive in relation to Section 3(h)(1)(C). If there is no ambiguity, there is no deference, and the statute is simply applied. The Supreme Court has noted, "Ambiguity is a creature not of definitional possibilities but of statutory context," *Brown v. Gardner*, 513 U.S. 115, 118, 115 S. Ct. 552, 130 L. Ed. 2d 462 (1994). The *Maxxim* Court's opinion aptly describes how Section 3(h)(1)(C) works within the statute as a whole.

All of these efforts to apply Section 3(h)(1) of the Mine Act were based on the language and structure of the Mine Act. This Court has noted the importance of the plain language of the statutory text and its relation to the overall statutory design. *CalPortland Co.*, 839 F.3d at 1163. This Court has cautioned against rushing to find ambiguity without a full analysis of the statute using the traditional tools of statutory construction to determine Congressional intent:

> To determine whether the meaning of a statutory provision is plain, the court's analysis begins with the most traditional tool of statutory construction, reading the text itself."…. In making this determination, we consider "the particular statutory language at issue, as well as the

25

language and design of the statute as a whole."…."Ambiguity is a creature not of definitional possibilities but of statutory context," …and "the presence of a difficult question of statutory construction does not necessarily render that provision ambiguous,"….In short, we defer to an agency's interpretation of a statute "only when the devices of judicial construction have been tried and found to yield no clear sense of congressional intent."….

*Id*. (citations omitted).

More recently, in *Maxxim*, 848 F.3d 737 (6th Cir. 2017), the Sixth Circuit Court of Appeals faced a situation similar to the one at hand. In that case, MSHA asserted jurisdiction over an independent maintenance shop that repaired, rebuilt and fabricated mining equipment and parts that did not extract or prepare coal. *Id.* at 738. The *Maxxim* Court applied the traditional rules of statutory construction and rejected the Secretary's assertion that MSHA had jurisdiction over any facility that makes and repairs equipment that is used in coal extraction and coal preparation activities, even when that facility is not adjacent to or part of a working mine. *Id.* at 744. The Court held that an off-site shop was not a "coal or other mine" within the meaning of the Mine Act. *Id*. at 744. In reaching this conclusion, the Court noted that Section 3(h)(1)(C) is "locational" because it involves "land and things in or connected to a mine. *Id.* at 740. The *Maxxim Rebuild* Court noted:

The definition [Section 802(h)(1)(C)] is broad, sure enough. It's as if the author went to a mine and wrote down everything he saw in, around, under, above, and next to the mine. Even then, the definition still extends only to everything that one would see in or around a working mine. It does not cover mining "equipment" or for that matter mining

"machines, tools, or other property" wherever they may be found or made.

*Id*. (emphasis added).

To explain its conclusion, the *Maxxim* Court used a creative approach of "pulling back the lens" to demonstrate that MSHA jurisdiction extends only to facilities and equipment that are "in or adjacent to-in essence part of-a working mine." *Id* at 740. The *Maxxim* Court first examined the facilities and equipment in the context of Section 3(h)(1)(C) to show that all of the items listed are located at a working mine. *Id.* at 740-41. (Words "are known by their companions"). The *Maxxim* Court then looked at Subsection (C) in relation to Subsections (A) and (B) to demonstrate that all subsections relate to "a place." *Id.* at 741. Then, the *Maxxim* Court pulled the lens out farther to compare Section 3(h) with the other definitions in Section 3 to show that all are connected with a working mine. *Id*. at 742. The *Maxxim* Court concluded that even if the definition may appear ambiguous when viewed in isolation and close up, it does not from afar, considering the statute at these different levels. *Id.* The obvious point being that if the definition is not ambiguous, it is applied, without deference, similar to how this Court ruled in *CalPortland Co*., 839 F.3d at 1164-65.

The Secretary asserts that *Maxxim* conflicts with this Court's holding in *National Cement*, P. Br., p. 29 [JA___], but this is not the case. In both *Maxim* and *National Cement*, the Courts were simply performing their role of determining if

27

"the agency has stayed within the bounds of its statutory authority." *See, City of Arlington v. FCC*, 569 U.S. 290, 297 (2013) (applying the framework of *Chevron, U.S.A., Inc. v. NRDC, Inc*., 467 U.S. 837 (1984)).

Where, as here, the agency seeks to exceed such bounds, Courts of Appeal are authorized to and even required to intervene. In *National Cement* I, this oversight resulted in a truncated and precise jurisdictional statement by the Secretary, which was approved in *National Cement* II, 573 F.3d at 797. In *Maxxim*, the Court of Appeals complied with *Chevron* and found that Section 3(h)(1)(C) of the Mine Act was clear and found the Secretary's interpretation of jurisdiction over an off-site repair and fabrication shop to be unreasonable because "it had no stopping point," and applied the Mine Act as written. *Maxxim*, 848 F.3d at 743. In the process, the *Maxxim* Court noted: "[a] provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme." *Id.* at 742 (6th Cir. 2017).

Several Justices have even found that, regardless of potential ambiguities, courts still have the primary role in interpreting a statute and not the executive branch agency. *e.g., Michigan v. EPA*, 135 S. Ct. 2699 (2015) (Thomas, J., concurring); *City of Arlington*, 569 U.S. 290, 327 (Roberts, C. J., dissenting); *Pereira v. Sessions*, 138 S. Ct. 2105, 2121 (2018) (Kennedy, concurring); *Gutierrez-Brizuela v. Lynch*, 834 F.3d 1142, 1149 (10th Cir. 2016) (Gorsuch, J., concurring). This view is particularly compelling where the issue is jurisdiction, something not within

MSHA's agency expertise. At a minimum, this is a good reason to fully consider the tools of statutory construction to eliminate unnecessary ambiguities.

Regardless, the end result of both *National Cement* and *Maxxim* was the same. The Secretary's jurisdiction was not as extensive as initially asserted and was properly limited and fully analyzed, through the Court review process. In this important respect, *Maxxim* and *National Cement* are entirely consistent.

In this case, the Commission complied with the appropriate methods of statutory construction in determining that MSHA did not have jurisdiction over KC Transport's offsite trucking maintenance facility and trucks.

**B.    The Secretary's Interpretation of Section 3(h)(1)(C) in Isolation Improperly Seeks to Expand MSHA's Jurisdictional Reach Beyond the Limits of Section 3(h)(1)(C).**

The Secretary now argues that the use of the conjunction "and" supports its theory that Subsections (A), (B) and (C) are equal and independent. P. Br. 22 [JA___]. Of course, this argument runs headlong into the Secretary's own prior reasoning in *National Cement* II, where the Secretary linked Subsections (B) and (C). While Subsection (C) may not be subordinate to the other Subsections, all Subsections must still be read together and in the context of the overall statutory scheme, instead of in isolation.

The Secretary also takes issue with the Commission's finding that the words "on the surface or underground" in Subsection (C) indicate that the items listed in

Subsection (C) necessarily relate to the location of a mine. P. Br., p. 24, [JA___]. Of course, the Commission was just noting the obvious point that those words indicate a connection to the land where mining activity was occurring. The Secretary's proposed interpretation that the items listed in Subsection (C) can be cited anywhere they may be found gives no meaning to the words "on the surface and underground" and makes them mere surplusage. This violates the tenets of statutory construction to give every word meaning. *Williams*, 529 U.S. at 404 (2000) and *Financial Planning Ass'n*, 482 F.3d at 492 (D.C. Cir. 2007).

The Commission, in this case, rightly applied the persuasive reasoning of *Maxxim* to the facts of this case and rejected MSHA's efforts to interpret Section 3(h)(1)(C) in isolation. Here, unlike earlier cases interpreting Section 3(h)(1)(C), the Secretary does not even attempt to argue that KC Transport itself was engaged in the "work of extracting coal" or the "work of preparing coal." Rather, MSHA relies on the "used in, or to be used in…the work of extracting…or the work of preparing coal" to contend that MSHA jurisdiction is based simply on the fact that the trucks and KC Transport's Emmett facility previously facilitated the mining operation, regardless of whether KC Transport's work of repairing those vehicles at its off-site shop is customarily performed by a coal mine or not. P. Br., p. 22. [JA___].

Unlike in *Elam* or *Pennsylvania Electric*, the Secretary apparently no longer deems itself constrained to conduct an actual "functional analysis" of the KC

Transport facility, which is an independent trucking company. Rather, the Secretary now wants the Court to interpret Section 3(h)(1)(C) in isolation and so broadly that it covers all facilities and equipment that are or will be "used in, or to be used in…the work of extracting…. or the work of preparing coal," no matter how distant the facility or the equipment is from the actual mining activities. The Commission was wholly correct that such a broad reach has "no stopping point," and is inconsistent with the text of the statute as a whole.

In seeking to interpret Section 3(h)(1)(C) in isolation and without a locational limit, the Secretary continues to rely on the Commission's earlier decision in *Jim Walter*, 22 FMSHRC 21 (Jan. 2000), which dealt with the assertion of jurisdiction over an off-site Central Supply Shop owned by the mine operator and serving only the mine operator and *not* serving any members of the public. *Id.* at 22. However, the Commission in *Jim Walter* expressly never expressly decided "whether an off-site supply warehouse operated by a vendor, equipment manufacturer or distributor would be covered under the Act, or even whether an off-site facility operated by a mining company or a subsidiary that is open for "commercial' business would be covered." *Id.* at 25, n. 7. Here, 40% of KC Transport's business from this facility was for commercial customers other than Ramaco, including non-mining customers, like AEP. Jt. Stip. 15 [JA___]. The Commission found that *Jim Walter* was no longer precedential in this context. *KC Transport*, 44 FMSHRC at 225, n. 8. The Sixth

31

Circuit in *Maxxim* also stated the reasons why they found *Jim Walter* unpersuasive. *Maxxim*, 848 F.3d at 744.

The Commission in this case and the Sixth Circuit in *Maxxim* were correct that Subsection (C) must always be read with Subsections (A) and (B) and can never be read in isolation. Otherwise, as the ALJ noted here, every truck will become a "rolling mine" and the "rolling mines" could be cited at the local diner. *KC Transport*, 42 FMSHRC at 231. [JA__]. Moreover, commercial facilities having no role in the "work of extracting coal" or the "work of preparing coal" would be unexpectedly exposed to MSHA jurisdiction. *KC Transport*, 44 FMSHRC at 225-226. The text of Section 3(h)(1)(C) necessarily refers to equipment and facilities at the mine, but not those located away from the mine.

The Secretary's broad and overly inclusive reading of the word "facility" to apply to an independent trucking company's facility is every bit as "absurd" as the Secretary's attempt to make the trucks "rolling mines," an attempt rejected by both the ALJ and the Commission. Under the Secretary's overly broad theory, all "equipment" and "facilities," once used in support of the extraction and preparation, would forever retain that status, no matter the location and even if all mining that provided the original status was abandoned.

Since the citations involve an independent trucking company performing trucking maintenance operations at its own facility, not appurtenant to the location

of coal extraction or preparation, with no miners around, the situation falls squarely outside the limitations of the jurisdictional statute. Merely performing activities which fortuitously fall under the tasks listed in Section 3(h)(1)(C) does not mean that the facility or equipment is a "mine."

It is important to recall that MSHA never contended that the Emmett facility was a mine until the ALJ unexpectedly said that it was. *KC Transport*, 44 FMSHRC at 214 (referring to MSHA's "unrequested prize") [JA___]. The Secretary's approach, before the issuance of these citations of electing not to exercise jurisdiction over this facility, any of KC Transport's other four facilities and any trucks that are not on the mine site and engaged in mining activities, was the correct approach, and consistent with the Mine Act. That *status quo ante* should be preserved.[2]

### C.    The Legislative History Supports the Commission's Textual Analysis of Section 3(h)(1).

Legislative history, like textual analysis and statutory design, is just one tool of statutory construction which can be consulted during the *Chevron* analysis. Of course, it is always presumed that whatever Congress' intent, the final statute reflects that intent. *INS v. Cardoza-Fonseca*, 480 U.S. 421, 431, (1987) ("we have

---

[2] Consistency of an agency's application of a statute may be relevant to a question of jurisdiction. *Westar Energy, Inc. v. Fed. Energy Regulatory Comm'n*, 473 F.3d 1239, 1243 (D.C. Cir. 2007) ("a fundamental norm of administrative procedure requires an agency to treat like cases alike.")

considered ourselves bound to 'assume that the legislative purpose is expressed by the ordinary meaning of the words used.'").

The Secretary now asserts that the Commission's view of the legislative history was erroneous and that the Legislative history demonstrates that "Congress did not intend to limit MSHA's jurisdiction to *extraction* sites alone." (emphasis added) P. Br., p. 30 [JA___]. Of course, the Commission did not limit the definition of mine to *extraction sites* alone. Instead, the Commission held that jurisdiction was limited to facilities and equipment "on or appurtenant to a mine site" and "*engaged in any extraction, milling, [or] preparation.*" *KC Transport, Inc*., 44 FMSHRC at 225 (emphasis added).

In support of its analysis of the text of the Mine Act, the Commission noted that the Legislative history indicated Congress' intent to "clarify" that the items in Subsection (C) were always intended by Congress to be included in the definition of mine. The Commission added that nothing in the Legislative history indicates an intention to expand the geographical scope of jurisdiction to independent trucking companies or other lands or areas removed from the mine. *KC Transport*, 44 FMSHRC at 219.

The Secretary then asserts that Congress intended "to define as 'mines' the items listed in Subsection (C), *regardless of their location* relative to any 'such land.'" P. Br. 31 [JA___]. In support of this limitless proposition, the Secretary cites

34

to *Donovan v. Carolina Stalite*, 734 F.2d 1547, 1554 (D.C. Cir. 1984). However, in

*Carolina Stalite*, the materials were delivered from the Quarry to the facility directly

by conveyor. *Id.* at 1548. The mineral processing facility had integrated and unified

operations with the quarry supplying the minerals for processing. *Id.* at 1551 and

1553. The interpretation of this Court in *Carolina Stalite* which necessarily relies on

location and function, does not support the Secretary's view that Section 3(h)(1)(C)

can be applied without reference to location of the activity or equipment.

As the Commission noted here, the Legislative history shows that Congress

always intended for *processing facilities* to be deemed mines and that the purpose of

Subsection (C) was to make this prior intent clear. *KC Transport, Inc.*, 44 FMSHRC

at 225. The Commission quoted this portion of the Legislative history:

> [T]he definition of 'mine' is clarified to include the areas, both
> underground and on the surface, from which minerals are extracted. . .
> Also included in the definition of 'mine' are lands, excavations, shafts,
> slopes, and other property, including impoundments, retention dams,
> and tailings ponds. These latter were not specifically enumerated in the
> definition of mine under the Coal Act. It has always been the
> Committee's express intention that these facilities be included in the
> definition of mine and subject to regulation under the Act, and the
> Committee here expressly enumerates these facilities within the
> definition of mine in order to clarify its intent.

*KC Transport*, 44 FMSHRC at 219, *citing* S. Rep. No. 95-181, at 14 (1977),

reprinted in Senate Subcomm. on Labor, Comm. on Human Res., Legislative History

of the Federal Mine Safety and Health Act of 1977, at 602 (1978) (emphasis added)

[JA___].

The Secretary complains that the mere fact that the Coal Act was different from the Mine Act evidences intent to broaden jurisdiction and asserts that subsection (C) contains no reference to "such land." P. Br., p. 31 [JA ___]. However, the Secretary does not offer any portion of the Legislative history to support this claim, nor does the Secretary offer any Legislative history to demonstrate that Congress intended to expand jurisdiction to off-site independent trucking companies. Moreover, Subsection (C) uses the words "on the surface or underground," so there is a direct connection to the lands where the mining occurs, in the statute.

In *KC Transport*, the Commission noted:

> While the legislative history concludes with the statement that "doubts" regarding jurisdiction should "be resolved in favor of inclusion of a facility within the coverage of the Act," MSHA cannot create jurisdiction by wrongly asserting jurisdiction and then arguing that there exists a "doubt" about it. In this case, MSHA either did not think it had jurisdiction over the Emmett facility or at least did not act on such a thought or seek jurisdiction over the facility until after the Judge's decision.

*KC Transport*, 44 FMSHRC at 219, n. 14 [JA___].

In this case, the Commission's holding is entirely supported by the Legislative history.

D.    **Previous Interpretations of the Definition of a "coal mine" under Section 3(h) are consistent with the Commission Decision.**

Contrary to the assertions of the Secretary, the Decision of the Commission in this case is not an outlier. P. Br., p. 14 [JA___]. Aside from the Sixth Circuit's Decision in *Maxxim Rebuild*, other Circuits have also determined that the three subsections of Section 3(h)(1) must be read together and not in isolation. Merely performing some tasks or being a facility/equipment, as listed in Section 3(h)(1)(C) in relation to mining does not equate to jurisdiction. Courts necessarily look at the location of the work, the entity and employees performing the work, the nature of the work and the nature of the operations.

For example, in *Herman v. Associated Electric Cooperative, Inc.*, 172 F.3d 1078 (8th Cir. 1999) the Eighth Circuit considered whether a utility fell within the definition of Section 3(h)(1)(C) as a "mine" if it performed some coal processing tasks. The Court noted, "not all businesses that perform tasks listed under 'the work of preparing coal' in section 802(i) can be considered mines. The Act was designed primarily to protect miners, not employees of coal purchasers such as electric utilities and steel mills." *Id.* at 1082. The *Herman* Court also noted: "Inherent in the determination of whether an operation properly is classified as 'mining' is an inquiry not only into whether the operation performs one or more of the listed work activities, but also into the nature of the operation performing such activities." *Id.* (*citing Elam*, 4 FMSHRC 5, 7 (Rev. Comm. 1982)). The important point from

37

*Herman* is that there is more to being a mine than simply performing some tasks listed in the Mine Act. This analysis would certainly apply to an independent trucking company.

In *Bush & Burchett, Inc. v. Reich*, 117 F.3d 932, 937 (6th Cir. 1997), OSHA issued citations involving deaths of construction workers on a bridge intended to be used to access a mine. The Sixth Circuit considered whether MSHA jurisdiction preempted OSHA on the road and bridge. *Id.* at 936. The Court noted that the MSHA statute was intentionally broad, but the Court determined that such a reading would lead to "bizarre results" where "highway maintenance workers would be subject to MSHA regulations…" *Id*. The Court concluded that "[w]ithout some limitation on the meaning of [Section 3(h)(1)] MSHA jurisdiction could conceivably extend to unfathomable lengths…a result Congress clearly did not intend." *Id.*

In *Ziegler Coal Co*., 853 F.2d at 533-34 (7th Cir. 1988), the Seventh Circuit held:

> [t]he statutory definition of a coal mine plainly contemplates that the facilities used in the work of extracting coal must be located on or below the area of land where the coal is actually extracted from its natural deposit. Section 802(h)[2] speaks in terms of "an area of land" and facilities "placed upon ... the surface of such land" used "in the work of extracting in such area [coal] ... from its natural deposits." The statutory definition therefore contains a geographical component; the facility must be on or below the area of land where coal is naturally found and is being extracted."

*Id.* (emphasis added). *See also, Sec'y of Labor v. Cranesville Aggregate Cos*., 878 F.3d 25, 28 (2d Cir. 2017) ("Under the Mine Act, MSHA has jurisdiction to regulate the working conditions at mines, that is, *sites used for extracting, milling and preparing minerals*.")(emphasis added).

There are also Commission cases which are consistent with the Commission's Decision here. For example, in *Elam*, 4 FMSHRC 5 (Rev. Comm. Jan. 1982), the Commission refrained from exercising jurisdiction over a commercial dock on the Ohio river, holding that while Elam handles coal, Elam did not engage in the "work of preparing coal" under Section 3(h)(1) and declined jurisdiction. The test developed in *Elam* has been applied in later cases. *e.g. Kinder Morgan, LP*, 23 FMSHRC 1288, 1293 & 1296 (Rev. Comm. Dec. 2001).

The Secretary leans strongly on this Court's Decision in *National Cement* II to support its position that Subsections (A), (B) and (C) of Section 3(h)(1) must be read independently. P. Br., p. 26 [JA___]. However, there is more to the *National Cement* cases.  In *National Cement* I, this Court actually rejected the Secretary's initial interpretation of the Mine Act as limitless. See, *National Cement* I, 494 F.3d at 1075, 1076. This Court required the Secretary to fashion a workable and limited definition of "mine." *Id.* at 1077.

On remand, from *National Cement* I, the Secretary altered its approach to Section 3(h)(1)(B) and (C). See, *National Cement*, 30 FMSHRC at 672 (Rev. Comm.

39

Aug. 2008), *reversed on other grounds* in *National Cement* II, 573 F.3d 788 (2009).[3] Practically, in *National Cement*, the Secretary applied both a functional and geographic limit on MSHA jurisdiction, notwithstanding that the Secretary now wants to assert jurisdiction over equipment and facilities that are removed from the "coal mine" wherever they may be. The Court should reject this *ad hoc* approach to jurisdiction, which this Court has previously disallowed.

The Secretary also cites to *Carolina Stalite Co*., 734 F.2d 1547 (D.C. Cir. 1984) in support of the proposition that a gravel processing facility adjacent to an extraction facility is a mine. P.Br., 27. [JA___]. However, in *Carolina Stalite*, this was a gravel *processing facility* immediately adjacent to the quarry and was engaged in mineral *processing* under Section 3(h)(1)(C). *Carolina Stalite*, 734 F.2d at 1548. The Court also held that *Carolina Stalite* was engaged in "a unified mineral processing operation with Young Stone." [the quarry]. *Id*. at 1551. This case is different from the facts here. Unlike *Carolina Stalite*, KC Transport was not engaged in mineral extraction, milling or processing. It was an independent contract trucking company, separate from the mine.

Similarly, in *Harman Mining Corp. v. FMSHRC*, 671 F.2d 794 (4th Cir. 1981), the Court considered a car dropping facility at Harman Mining Corp.'s

---

[3] In *National Cement* II, this Court was simply determining if the Secretary's proffered interpretation was consistent with the statute. *National Cement* II, 573 F.3d at 797.

preparation plant. *Id*. at 794. The Court determined that the car dropping facility located at Harman's preparation plant was "part of Harman's mine" pursuant to Section 3(h)(1)(C) and 3(i) because "Harman's car dropping activities are carried on incident to the loading and storage of its coal and therefore are part of the work done by Harman in preparing its coal for market." *Id.* at 796. This is hardly comparable to an independent trucking company not affiliated with the extraction or preparation facilities of Ramaco.

The Secretary also cites a series of Commission cases that are entirely distinguishable from this case. In *W.J. Bokus Indus., Inc*., 16 FMSHRC 704, 708 (Rev. Comm., Apr. 1984), the facts were different. There, the mine operator *owned* the "equipment" and the operator's *miners were working in the garage* with the cited equipment.

The Secretary also cites to *State of Alaska, Dept. of Transp.*, 36 FMSHRC 2642 (Rev. Comm., Oct. 2014). P. Br. 27 [JA ___], where the Commission found that certain trucks, conveyors, cited loaders and a screener which were all *owned and used by the operator* as a mobile "borrow pit" were a sand and gravel mine. *Id* at 2645. However, when courts cite the *Alaska, Dept. of Transp.* case, they often fail to note the rest of the story. On remand, in *Alaska, Dept. of Transp*., 38 FMSHRC 122 (ALJ Feldman Jan. 2016), the Secretary vacated a total of five citations, noting:

> The disposition of this remand matter was delayed to give the Secretary and Alaska the opportunity to resolve conflicts of jurisdiction between MSHA and the Alaska Occupational Safety and Health Administration. On November 18, 2015, the Secretary moved to vacate the five citations at issue…

*Id.* at 123.

The ALJ further noted, "I trust that the parties have resolved this issue through mutual agreement." *Id*. at n. 2.

The Secretary also cites *U.S. Steel Mining Co*., 10 FMSHRC 146, 149 (Feb. 1998), but that case is different from this case since the shop in *U.S. Steel* had a Mine I.D. number, which means the operator had declared it to be a mine. Moreover, it was *owned, supervised and manned by miners employed by the coal operator*. It was also regularly inspected by MSHA and USSM conceded the shop was subject to the Mine Act. *Id*. at 149. Here, the equipment (trucks) and facility were owned, operated and maintained by KC Transport and no miners from Ramaco worked at the facility. Hence, the U.S. Steel case was not at all analogous, and this explains why the Commissions departed from it. *See, KC Transport*, 44 FMSHRC at 324, n. 11.

Giving meaning to each word in the Mine Act, the overall structure of the Mine Act, the Legislative history and the precedent, the Commission appropriately rejected the Secretary's contention that the KC Transport facility and trucks are a mine.

42

**E.      The Commission's Interpretation of the Mine Act Facilitates the Protective Purpose of the Mine Act.**

Having a bright line limit of Mine Act jurisdiction is the best way to ensure that the protective purposes of the Mine Act are fulfilled. Here, the Secretary seeks to assert jurisdiction over an off-site trucking company on a "case-by-case basis," as its resources allow. P. Br., pp. 45-46 [JA __].  Such a fluid approach is inconsistent with the protective purpose of the Mine Act because the regulated community does not know which regulations to follow.

The Commission noted the importance of exercising Mine Act jurisdiction in cases involving mining hazards. Here, KC Transport is an independent trucking company. The Commission aptly held:

> Congress tailored the Mine Act to protect against dangers that arise from handling coal and other minerals, not generic risks associated with making or repairing equipment…. (emphasizing that employees deserve the same protections as miners if they are subject to the same risks). Jurisdiction over an independent and offsite truck repair facility, not exposing employees to any hazards associated with the mining process, does not serve the Mine Act's purpose.

*Id.* at 226 (citations omitted).

The Occupational Safety and Health Act ("OSH Act") is the most broadly applicable statute regarding the safety and health aspects of working conditions of American workers. *See, e.g., Westwood Energy Properties*, 11 FMSHRC 2408, 2412 (Rev. Comm. Dec. 1989). It gives OSHA jurisdiction over virtually all workplaces,

43

except those where it is preempted by another federal agency that has statutory authority over matters of occupational safety and health. 29 U.S.C. § 653(b)(1).

Section 3(h)(1) of the Mine Act (30 U.S.C. § 802(h)(1)) defines "coal or other mine." Despite the Mine Act's Broad definition of "mine," MSHA's jurisdiction is limited, however, by the language of the Mine Act to those locations and activities discussed in the Mine Act. Outside of those limitations, OSHA has jurisdiction. Here, MSHA never previously exercised jurisdiction over KC Transport, an independent trucking company. Nor is there any evidence that MSHA sought jurisdiction over the adjacent logging company sharing the parking lot with KC Transport. The protective purpose of the Mine Act is best facilitated when the regulated community clearly knows which set of regulations apply.

## II.   The Secretary's Interpretation of Sections 3 and 4 of the Mine Act are Unreasonable and not Entitled to Deference.

Section 3(h)(1)(C) of the Mine Act is not ambiguous as to the issues before this Court. Nor does the Secretary identify any particular ambiguities in Section 3(h)(1), merely asserting "[i]f Section 3(h)(1) is ambiguous…" P. Br. 38. Asserting the possibility of ambiguity is not the same thing as identifying it. Moreover, K C Transport cannot respond to an alleged ambiguity that is not identified. This Court has noted that "Chevron step 2 deference is reserved for those instances when an agency recognizes that the Congress's intent is not plain from the statute's face." *National Cement* I, 494 F.3d at 1075 (citations omitted). Thus, absent the

44

identification of actual ambiguities, this Court should not even consider the reasonableness of an agency's position.

Even if Section 3(h)(1)(C) is ambiguous, for the reasons apparent throughout this Response, the Secretary's interpretation of Section 3(h)(1)(C) is unreasonable and not entitled to deference. In the most recent iteration of the Secretary's version of MSHA's jurisdiction in this case, the Secretary contends that all facilities and equipment "used in, or to be used in mining" remain subject to MSHA jurisdiction without regard to location. P. Br., p. 31 [JA___]. Since this interpretation is limitless, unreasonable and unworkable and since it conflicts with the expressed intent of Congress found in the text of Sections 3 and 4 of the Mine Act, it is unreasonable and not entitled to deference. See *Chevron, U.S.A., Inc. v. NRDC, Inc.*, 467 U.S. 837, 842–43 (1984) ("If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."). The Commission (and the Sixth Circuit in *Maxxim*) correctly found that such a broad and limitless approach leads to absurd results concerning both facilities and equipment. *KC Transport*, 44 FMSHRC as 225-226. [JA ___].[4]

The Secretary attempts to ameliorate the potential for boundless jurisdiction by assuring this Court that, consistent with past practice, it will exercise discretion

---

[4] The ALJ also found that this interpretation was absurd, but only as to the trucks. *KC Transport, Inc*., 42 FMSHRC at 237. [JA___].

45

and MSHA inspectors will not be "descending on private toolsheds, independent hardware stores, or diner parking lots…" P. Br. 34 [JA___]. The Court may note that conspicuously absent from the list of places Inspectors will not visit are off-site manufacturing facilities, off-site independent trucking companies and off-site trucks. As noted *supra*, this Court previously rejected such an *ad hoc* and imprecise approach. *See, National Cement* I, 494 F.3d at 1076. The Secretary's fluid interpretation of the Mine Act is *prima facie* unreasonable.

In its Brief, the Secretary asserts that its view of jurisdiction is "distinct from 'lands' and 'roads,'" that it advances the protective purpose of the Mine Act, that it is consistent with the Commission's holdings in *W.J. Bokus*, 16 FMSHRC at 708 and *Jim Walter*, 22 FMSHRC at 21 and, that the MSHA can express its views through its citations. P. Br., pp. 39-41. [JA___]. All but the last of these points has already been addressed above.

As to the last point, if the Secretary's limitless approach is correct, MSHA could simply decide at a whim to cite itself into the "private toolsheds, independent hardware stores, or diner parking lots" it now disclaims. Also, in *Martin*, the Supreme Court only addressed the issuance of a citation interpreting a regulation promulgated by the Secretary and not the jurisdictional statute promulgated by Congress. *Martin*, 499 U.S. at 150.  Rather, where the Secretary seeks to interpret the Mine Act, this Court analyzes the effort using the "two step Chevron standard."

46

*CalPortland Co.*, 839 F.3d at 1162.  If the statute is unambiguous, using the traditional tools of statutory construction, it is applied by the reviewing court. *Id.* at 1162-65. If the statute is ambiguous, then courts consider if the Secretary's interpretation is reasonable. *Id.* This Court has noted that "[a]n agency has no power to 'tailor' legislation to bureaucratic policy goals by rewriting unambiguous statutory terms." *Id.* (citations omitted). Here, where the Secretary's proffered interpretation is contrary to the statute and unreasonable, it cannot receive deference, nor can the Secretary express an unreasonable view through enforcement.

The Commission and the Sixth Circuit in *Maxxim* appropriately analyzed the unambiguous text and structure of Sections 3 and 4 of the Mine Act and determined that the Mine Act includes both a functional and locational aspect when requiring the equipment and facilities to be: "located on or appurtenant to a mine site and … engaged in any extraction, milling, preparation, or other activities within the scope of subsection 3(h)(1)(A)" *KC Transport, Inc.*, 44 FMSHRC at 225.

The Commission did not improperly substitute its own competing view for that of the Secretary. Rather, the Commission simply declined the effort to expand the statutory definition of "mine" outside the bounds of the Mine Act. It is neither the law nor the intent of the law that any equipment or facility "used, or to be used in mining" is a "mine," regardless of its location.

Therefore, the Commission correctly rejected the ALJ's unreasonable definition of the term "mine."

## III. When finding that Independent Contractors are only operators when performing services at the Mine, the Commission was merely quoting the Mine Act for Context.

The Secretary now complains that the Commission "lacked jurisdiction to conclude that independent contractors could be considered operators only when physically performing services at a mine." P. Br., p. 44 [JA___].  In this regard, the Commission noted:

> Operators" fall into two categories, as noted above. An entity that does not own, lease, operate, control, or supervise a coal or other mine is an "operator" only when that entity, acting as an independent contractor, physically performs services at a mine. 30 U.S.C. § 802(d).

> When KC Transport's trucks are at its parking area off the mine site, the trucks are not performing services at a mine, and KC Transport is not an "operator" for the Act's purposes.

*KC Transport*, 44 FMSHRC at 221-222.

It is clear that the Commission was simply quoting from and applying 30 U.S.C. § 802(d), which provides:

> (d) "operator" means any owner, lessee, or other person who operates, controls, or supervises a coal or other mine *or* any independent contractor performing services or construction at such mine;

The Commission did nothing wrong by quoting a related statute to help explain the meaning of a nearby subsection 30 U.S.C. § 802(h)(1). The Commission cannot conduct statutory analysis without examining the surrounding regulations.

48

The Commission's point was simply that for § 802(d) to have meaning, there must be a difference between an operator of a coal mine--Ramaco here and an independent contractor--KC Transport here.

If the off-site facilities and equipment of independent contractors automatically become a "mine" once their equipment or services are "used in, or to be used in mining," then the second clause of 30 U.S.C. § 802(d) ("when performing services or construction at the mine") becomes meaningless because every independent contractor would become an operator, even when not performing services at the mine.

The Commission makes the valid point that this distinction explains why an independent contractor, like KC Transport is not an operator when not performing services at a mine and why jurisdiction is locational. In no way did this observation run afoul of 30 U.S.C. § 823(d)(2).  No doubt the meaning of 30 U.S.C. § 823(h)(1) and its relationship to nearby statutes was before the Commission. Also, unlike a contractor performing services at the mine site, where the operator has control, it would not be appropriate for Ramaco to be held liable for an independent off-site trucking company's maintenance and repair facility, over which it has no control or expertise.

It appears that the Secretary is primarily sensitive to the Commission's comments on § 802(d) because of *Musser Eng'g, Inc*., 32 FMSHRC 1257, 1266-69.

P. Br., p. 46 [JA____]. Nothing in the Commission decision overruled *Musser*. In *Musser*, the Court found Musser to be an independent contractor performing services "at the mine." In that case, Musser

> prepared the original permit application including the maps that were an integral part of securing a mining permit from state and federal authorities. … Once Musser engineer Secor certified the state permit application map that indicated the boundaries of the Harrison No. 2 Mine, all future mine maps, including mine maps submitted to MSHA, were prepared using that map as the "base map."

*Id*. at 1267.

Thus, Musser was acting as the mine engineer and performing duties normally performed by the operator. *See, e.g*., 30 C.F.R. § 75.1200 ("The operator of a coal mine shall have in a fireproof repository located in an area on the surface of the mine… an accurate and up-to-date map of such mine drawn on scale. Such map shall show: (a) The active workings…")

Importantly, the *Musser* Court held:

> there is substantial evidence to support the finding that Musser's work was performed, in part, *at the mine site*. This conclusion is supported by Musser's time records contained in Musser Exhibit 4. These time records indicate *repeated visits to the mine site for work related to the permitting process, including surveying, field investigations, and water sampling*.

*Id*. at 1269 (emphasis added).

The Commission's comments on the distinction between operators and independent contractors was simply to provide additional support for the

Commission's interpretation of the Mine Act and Section 3(h)(1)(C). There is no basis for the Court to disregard the Commission's limited comments on the distinction between an operator and an independent contractor.

## **CONCLUSION**

For all of the reasons stated above, KC Transport respectfully requests that this Court affirm the Decision of the Commission that Section 3(h)(1)(C) of the Mine Act requires both a functional and locational nexus to the extraction, milling or preparation of coal in order to be a mine. Under the facts of this case, neither the Emmett facility nor the trucks at this off-site independent trucking facility were a "mine." Therefore, this Court should affirm the Commission's well-reasoned decision.

Respectfully submitted,

KC TRANSPORT, INC.
By Counsel:

/s/ James P. McHugh
James P. McHugh (D.C. Bar No. 56277)
Christopher D. Pence (D.C. Bar No. 53362)
HARDY PENCE, PLLC
10 Hale Street, 4th Floor
Charleston, WV 25301
304-345-7250 (office)
304-553-7227 (fax)
jmchugh@hardypence.com
cpence@hardypence.com

## <u>CERTIFICATE OF COMPLIANCE</u>

1.   This brief complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. R. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

[ X ] this brief contains [*12,366*] words.

[    ] this brief uses a monospaced type and contains [*state the number of*] lines of text.

2.   This brief document complies with the typeface and type style requirements because:

[ X ] this brief has been prepared in a proportionally spaced typeface using [*Microsoft Word 365*] in [*14pt Times New Roman*]; *or*

[    ] this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].

Dated: <u>September 28, 2022</u>          <u>/s/ James P. McHugh</u>
                                                    *Counsel for Respondent*
                                                    *KC Transport, Inc.*

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on this 28th day of September, 2022, I caused this Page-Proof Brief of Respondent KC Transport, Inc. to be filed electronically with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users:

Susannah H. Maltz
Emily T. Scott
U.S. DEPARTMENT OF LABOR
MINE SAFETY & HEALTH ADMINISTRATION
201 12th Street South, Suite 401
Arlington, VA  22202

*Counsel for Petitioner Secretary of Labor,*
  *Mine Safety and Health Administration*

Thaddeus Jason Riley
OFFICE OF GENERAL COUNSEL
  FEDERAL MINE SAFETY AND HEALTH REVIEW COMMISSION
1331 Pennsylvania Ave., NW, Suite 520N
Washington, D.C.  20004

*Counsel for Respondent Federal Mine Safety and*
  *Health Review Commission*

/s/ James P. McHugh
*Counsel for Respondent*
  *KC Transport, Inc.*

# **ADDENDUM**

# TABLE OF CONTENTS

**Addendum Page**

30 U.S.C. § 802 ................................................................................Add1

30 U.S.C. § 803 ................................................................................Add3

30 U.S.C. § 823 ................................................................................Add3

30 C.F.R. § 75.1200 .........................................................................Add7

**30 U.S.C. § 802. Definitions**

For the purpose of this chapter, the term—

(a) "Secretary" means the Secretary of Labor or his delegate;

(b) "commerce" means trade, traffic, commerce, transportation, or communication among the several States, or between a place in a State and any place outside thereof, or within the District of Columbia or a possession of the United States, or between points in the same State but through a point outside thereof;

(c) "State" includes a State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, American Samoa, Guam, and the Trust Territory of the Pacific Islands;

(d) "operator" means any owner, lessee, or other person who operates, controls, or supervises a coal or other mine or any independent contractor performing services or construction at such mine;

(e) "agent" means any person charged with responsibility for the operation of all or a part of a coal or other mine or the supervision of the miners in a coal or other mine;

(f) "person" means any individual, partnership, association, corporation, firm, subsidiary of a corporation, or other organization;

(g) "miner" means any individual working in a coal or other mine;

(h)(1) "coal or other mine" means (A) an area of land from which minerals are extracted in nonliquid form or, if in liquid form, are extracted with workers underground, (B) private ways and roads appurtenant to such area, and (C) lands, excavations, underground passageways, shafts, slopes, tunnels and workings, structures, facilities, equipment, machines, tools, or other property including impoundments, retention dams, and tailings ponds, on the surface or underground, used in, or to be used in, or resulting from, the work of extracting such minerals from their natural deposits in nonliquid form, or if in liquid form, with workers underground, or used in, or to be used in, the milling of such minerals, or the work of preparing coal or other minerals, and includes custom coal preparation facilities. In making a determination of what constitutes mineral milling for purposes of this chapter, the Secretary shall give due consideration to the convenience of administration resulting from the delegation to one Assistant Secretary of all

authority with respect to the health and safety of miners employed at one physical establishment;

(2) For purposes of subchapters II, III, and IV of this chapter, "coal mine" means an area of land and all structures, facilities, machinery, tools, equipment, shafts, slopes, tunnels, excavations, and other property, real or personal, placed upon, under, or above the surface of such land by any person, used in, or to be used in, or resulting from, the work of extracting in such area bituminous coal, lignite, or anthracite from its natural deposits in the earth by any means or method, and the work of preparing the coal so extracted, and includes custom coal preparation facilities;

(i) "work of preparing the coal" means the breaking, crushing, sizing, cleaning, washing, drying, mixing, storing, and loading of bituminous coal, lignite, or anthracite, and such other work of preparing such coal as is usually done by the operator of the coal mine;

(j) "imminent danger" means the existence of any condition or practice in a coal or other mine which could reasonably be expected to cause death or serious physical harm before such condition or practice can be abated;

(k) "accident" includes a mine explosion, mine ignition, mine fire, or mine inundation, or injury to, or death of, any person;

(*l*) "mandatory health or safety standard" means the interim mandatory health or safety standards established by subchapters II and III of this chapter, and the standards promulgated pursuant to subchapter I of this chapter;

(m) "Panel" means the Interim Compliance Panel established by this chapter; and

(n) "Administration" means the Mine Safety and Health Administration in the Department of Labor.

(*o*) "Commission" means the Federal Mine Safety and Health Review Commission.

(Pub. L. 91–173, §3, Dec. 30, 1969, 83 Stat. 743; Pub. L. 95–164, title I, §102(b), Nov. 9, 1977, 91 Stat. 1290.)

**30 U.S.C. § 803. Mines subject to coverage**

Each coal or other mine, the products of which enter commerce, or the operations or products of which affect commerce, and each operator of such mine, and every miner in such mine shall be subject to the provisions of this chapter.

(Pub. L. 91–173, §4, Dec. 30, 1969, 83 Stat. 744; Pub. L. 95–164, title I, §102(c), Nov. 9, 1977, 91 Stat. 1291.)

**30 U.S.C. § 823. Federal Mine Safety and Health Review Commission**

**(a) Establishment; membership; chairman**

The Federal Mine Safety and Health Review Commission is hereby established. The Commission shall consist of five members, appointed by the President by and with the advice and consent of the Senate, from among persons who by reason of training, education, or experience are qualified to carry out the functions of the Commission under this chapter. The President shall designate one of the members of the Commission to serve as Chairman.

**(b) Terms; personnel; administrative law judges**

(1) The terms of the members of the Commission shall be six years, except that—

(A) members of the Commission first taking office after November 9, 1977, shall serve, as designated by the President at the time of appointment, one for a term of two years, two for a term of four years and two for a term of six years; and

(B) a vacancy caused by the death, resignation, or removal of any member prior to the expiration of the term for which he was appointed shall be filled only for the remainder of such unexpired term.

Any member of the Commission may be removed by the President for inefficiency, neglect of duty, or malfeasance in office.

(2) The Chairman shall be responsible on behalf of the Commission for the administrative operations of the Commission. The Commission shall appoint such employees as it deems necessary to assist in the performance of the Commission's functions and to fix their compensation in accordance with the provisions of chapter 51 and subchapter III of chapter 53 of title 5, relating to classification and

general pay rates. Upon the effective date of the Federal Mine Safety and Health Amendments Act of 1977, the administrative law judges assigned to the Arlington, Virginia, facility of the Office of Hearings and Appeals, United States Department of the Interior, shall be automatically transferred in grade and position to the Federal Mine Safety and Health Review Commission. Notwithstanding the provisions of section 559 of title 5, the incumbent Chief Administrative Law Judge of the Office of Hearings and Appeals of the Department of the Interior assigned to the Arlington, Virginia facility shall have the option, on the effective date of the Federal Mine Safety and Health Amendments Act of 1977, of transferring to the Commission as an administrative law judge, in the same grade and position as the other administrative law judges. The administrative law judges (except those presiding over Indian Probate Matters) assigned to the Western facilities of the Office of Hearings and Appeals of the Department of the Interior shall remain with that Department at their present grade and position or they shall have the right to transfer on an equivalent basis to that extended in this paragraph to the Arlington, Virginia administrative law judges in accordance with procedures established by the Director of the Office of Personnel Management. The Commission shall appoint such additional administrative law judges as it deems necessary to carry out the functions of the Commission. Assignment, removal, and compensation of administrative law judges shall be in accordance with sections 3105, 3344, 5362 and 7521 of title 5.

**(c) Delegation of powers**

The Commission is authorized to delegate to any group of three or more members any or all of the powers of the Commission, except that two members shall constitute a quorum of any group designated pursuant to this paragraph.

**(d) Proceedings before administrative law judge; administrative review**

(1) An administrative law judge appointed by the Commission to hear matters under this chapter shall hear, and make a determination upon, any proceeding instituted before the Commission and any motion in connection therewith, assigned to such administrative law judge by the chief administrative law judge of the Commission or by the Commission, and shall make a decision which constitutes his final disposition of the proceedings. The decision of the administrative law judge of the Commission shall become the final decision of the Commission 40 days after its issuance unless within such period the Commission has directed that such decision shall be reviewed by the Commission in accordance with paragraph

(2). An administrative law judge shall not be assigned to prepare a recommended decision under this chapter.

(2) The Commission shall prescribe rules of procedure for its review of the decisions of administrative law judges in cases under this chapter which shall meet the following standards for review:

(A)(i) Any person adversely affected or aggrieved by a decision of an administrative law judge, may file and serve a petition for discretionary review by the Commission of such decision within 30 days after the issuance of such decision. Review by the Commission shall not be a matter of right but of the sound discretion of the Commission.

(ii) Petitions for discretionary review shall be filed only upon one or more of the following grounds:

(I) A finding or conclusion of material fact is not supported by substantial evidence.

(II) A necessary legal conclusion is erroneous.

(III) The decision is contrary to law or to the duly promulgated rules or decisions of the Commission.

(IV) A substantial question of law, policy or discretion is involved.

(V) A prejudicial error of procedure was committed.

(iii) Each issue shall be separately numbered and plainly and concisely stated, and shall be supported by detailed citations to the record when assignments of error are based on the record, and by statutes, regulations, or principal authorities relied upon. Except for good cause shown, no assignment of error by any party shall rely on any question of fact or law upon which the administrative law judge had not been afforded an opportunity to pass. Review by the Commission shall be granted only by affirmative vote of two of the Commissioners present and voting. If granted, review shall be limited to the questions raised by the petition.

(B) At any time within 30 days after the issuance of a decision of an administrative law judge, the Commission may in its discretion (by affirmative vote of two of the Commissioners present and voting) order the case before it for review but only upon the ground that the decision may be contrary to law or Commission policy, or

that a novel question of policy has been presented. The Commission shall state in such order the specific issue of law, Commission policy, or novel question of policy involved. If a party's petition for discretionary review has been granted, the Commission shall not raise or consider additional issues in such review proceedings except in compliance with the requirements of this paragraph.

(C) For the purpose of review by the Commission under paragraph (A) or (B) of this subsection, the record shall include: (i) all matters constituting the record upon which the decision of the administrative law judge was based; (ii) the rulings upon proposed findings and conclusions; (iii) the decision of the administrative law judge; (iv) the petition or petitions for discretionary review, responses thereto, and the Commission's order for review; and (v) briefs filed on review. No other material shall be considered by the Commission upon review. The Commission either may remand the case to the administrative law judge for further proceedings as it may direct or it may affirm, set aside, or modify the decision or order of the administrative law judge in conformity with the record. If the Commission determines that further evidence is necessary on an issue of fact it shall remand the case for further proceedings before the administrative law judge.

(The provisions of section 557(b) of title 5 with regard to the review authority of the Commission are expressly superseded to the extent that they are inconsistent with the provisions of subparagraphs (A), (B), and (C) of this paragraph.)

**(e) Witnesses and evidence; subpoenas; contempt**

In connection with hearings before the Commission or its administrative law judges under this chapter, the Commission and its administrative law judges may compel the attendance and testimony of witnesses and the production of books, papers, or documents, or objects, and order testimony to be taken by deposition at any stage of the proceedings before them. Any person may be compelled to appear and depose and produce similar documentary or physical evidence, in the same manner as witnesses may be compelled to appear and produce evidence before the Commission and its administrative law judges. Witnesses shall be paid the same fees and mileage that are paid witnesses in the courts of the United States and at depositions ordered by such courts. In case of contumacy, failure, or refusal of any person to obey a subpoena or order of the Commission or an administrative law judge, respectively, to appear, to testify, or to produce documentary or physical evidence, any district court of the United States or the United States courts of any territory or possession, within the jurisdiction of which such person is found, or resides, or transacts business, shall, upon the application of the Commission, or the

administrative law judge, respectively, have jurisdiction to issue to such person an order requiring such person to appear, to testify, or to produce evidence as ordered by the Commission or the administrative law judge, respectively, and any failure to obey such order of the court may be punished by the court as a contempt thereof.

(Pub. L. 91–173, title I, §113, as added Pub. L. 95–164, title II, §201, Nov. 9, 1977, 91 Stat. 1313; 1978 Reorg. Plan No. 2, §102, eff. Jan. 1, 1979, 43 F.R. 36037, 92 Stat. 3783.)


**30 C.F.R. § 75.1200 Mine Map.**

The operator of a coal mine shall have in a fireproof repository located in an area on the surface of the mine chosen by the mine operator to minimize the danger of destruction by fire or other hazard, an accurate and up-to-date map of such mine drawn on scale.
Such map shall show:
(a) The active workings;
(b) All pillared, worked out, and
abandoned areas, except as provided in this section;
(c) Entries and aircourses with the direction of airflow indicated by arrows;
(d) Contour lines of all elevations;
(e) Elevations of all main and cross or side entries;
(f) Dip of the coalbed;
(g) Escapeways;
(h) Adjacent mine workings within 1,000 feet;
(i) Mines above or below;
(j) Water pools above; and
(k) Either producing or abandoned oil and gas wells located within 500 feet of such mine and any underground area of such mine; and,
(l) Such other information as the Secretary may require. Such map shall identify those areas of the mine which have been pillared, worked out, or abandoned, which are inaccessible or cannot be entered safely and on which no information is available.