ORAL ARGUMENT SET FOR DECEMBER 15, 2022

# No. 22-1071

## UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————————————————

Secretary of Labor,
Mine Safety and Health Administration,

Petitioner

*v.*

KC Transport, Inc. and
Federal Mine Safety and Health Review Commission,

Respondents

———————————————————————

On Petition for Review of a Decision of the
Federal Mine Safety and Health Review Commission

———————————————————————

Deferred Joint Appendix

SEEMA NANDA
  Solicitor of Labor

APRIL E. NELSON
  Associate Solicitor

EMILY TOLER SCOTT
  Counsel for Appellate
  Litigation

SUSANNAH M. MALTZ
  Attorney

U.S. Department of Labor
Office of the Solicitor
 Mine Safety & Health Division
201 12th Street South, Ste. 401
Arlington, VA 22202
(202) 693-5393

# Table of Contents

Certified Index to the Administrative Record ...…………………………….. JA 1

Joint Stipulations
filed with the ALJ December 23, 2019 …………………….....…………..... JA 4

KC Transport's Motion for Summary Decision
filed with the ALJ December 23, 2019 ...……………………………….… JA 14

KC Transport's Memorandum of Law in Support of Motion for Summary
Decision filed with the ALJ December 23, 2019 ...…………………………. JA 16

Secretary's Motion for Partial Summary Decision
filed with the ALJ December 23, 2019 ...……………………………….… JA 30

      Secretary Motion Exhibit 1 ...………….………………………. JA 52

      Secretary Motion Exhibit 2 ...………….………………………. JA 54

      Secretary Motion Exhibit 3 ...………….…………………..……. JA 57

KC Transport's Response in Opposition to Secretary's Motion for Partial
Summary Decision filed with the ALJ January 20, 2020 ..……………….… JA 59

Secretary's Response to KC Transport's Motion for Summary Decision
filed with the ALJ January 20, 2020……………...………………………. JA 68

ALJ's Decision and Order Granting Secretary's Motion for Summary Decision
issued March 3, 2020………………..………………………………….….. JA 73

KC Transport's Petition for Discretionary Review
filed with the Commission April 2, 2020 ………………………..………. JA 93

Secretary's Response Brief
filed with the Commission June 4, 2020 …………………………………. JA 117

KC Transport's Reply Brief
filed with the Commission June 25, 2020 …………………………....…… JA 135

Commission's Decision issued April 5, 2022 ……………………………. JA 154

Secretary's Opening Brief
filed with the D.C. Circuit Court of Appeals August 29, 2022 ……..……… JA 181

KC Transport's Response Brief
filed with the D.C. Circuit Court of Appeals September 28, 2022 ………… JA 244

Secretary's Reply Brief
filed with the D.C. Circuit Court of Appeals October 19, 2022 ...……..……… JA 318

Certificate of Service…………………………..………………………………..… a

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

SECRETARY OF LABOR (MSHA)     :
     :
     Petitioner,     :
     :
     v.     :     No   22-1071
     :
     :
KC TRANSPORT, INC. and FEDERAL     :
  MINE SAFETY AND HEALTH     :
  REVIEW COMMISSION,     :
     :
     Respondents.     :

CERTIFIED INDEX TO MATERIALS COMPRISING
THE ADMINISTRATIVE RECORD FILED PURSUANT
TO RULE 17(b) OF THE FEDERAL RULES
<u>OF APPELLATE PROCEDURE</u>

<u>Contents</u>          <u>Pages</u>

<u>Docket No. WEVA-2019-0458</u>

Secretary of Labor's (Secretary) Petition for the Assessment of Civil Penalty filed May 23, 2019 ............................................................. 1-69

KC Transport, Inc. (KC Transport) Answer to Petition for Assessment of Civil Penalty filed June 6, 2019 ................................................. 70-72

ALJ's Order of Assignment and Prehearing Order issued June 13, 2019 ........ 73-76

ALJ's Notice of Hearing issued July 26, 2019 ................................................. 77-78

KC Transport's Response to Prehearing Order filed November 12, 2019 ........ 79-82

ALJ's Notice of Hearing Site issued November 12, 2019 .................................... 83

KC Transport's Prehearing Report filed November 13, 2019 .......................... 84-86

Secretary's Prehearing Report filed November 13, 2019 ............................... 87-105

ALJ's Amended Notice of Hearing issued November 14, 2019 .................. 106-107

ALJ's email log dated December 12, 2019 .......................................................... 108

ALJ's Second Amended Notice of Hearing issued December 17, 2019 ...... 109-110

Secretary's Motion to Approve Partial Settlement filed
    December 18, 2019 ..................................................................................... 111-119

Secretary's Proposed Order to Accept Appearance and Decision to Approve Partial
    Settlement filed December 18, 2019 .......................................................... 120-123

ALJ's Decision Approving Partial Settlement issued
    December 19, 2019 ..................................................................................... 124-126

KC Transport's Motion for Summary Decision filed
    December 23, 2019 ..................................................................................... 127-128

KC Transport's Memorandum of Law in Support For Motion for
    Summary Decision filed December 23, 2019 ............................................. 129-142

Joint Stipulations filed December 23, 2019 .................................................... 143-154

Secretary's Motion for Partial Summary Decision filed
    December 23, 2019 ..................................................................................... 155-185

KC Transport's Response in Opposition to Secretary's Motion for
    Partial Summary Decision filed January 20, 2020 ..................................... 186-194

Secretary's Response to Respondent's Motion for Summary Decision
    filed January 20, 2020 ................................................................................ 195-199

ALJ's Order Denying Respondent's Motion for Summary Decision and
    Granting Secretary's Motion for Summary Decision
    issued March 3, 2020 ................................................................................. 200-219

KC Transport's Petition for Discretionary Review filed April 2, 2020 ........220-243

Secretary's Entry of Appearance filed April 6, 2020 ....................................244-245

KC Transport's Designation of Petition for Discretionary Review
  as Opening Brief filed May 5, 2020 ............................................................246-247

Secretary's Response Brief filed June 4, 2020 ..............................................248-265

KC Transport's Reply Brief filed June 25, 2020 ...........................................266-284

Commission Meeting Notice issued November 5, 2020 ...................................... 285

Commissioners' Decision issued April 5, 2022..............................................286-312

<u>CERTIFICATE</u>

I, Thaddeus Jason Riley, attorney advisor, Federal Mine Safety and Health Review Commission, hereby certify that the foregoing is a true and correct Index to Materials Comprising the Administrative Record in the captioned proceeding.

/s/ Thaddeus Jason Riley
Thaddeus Jason Riley

UNITED STATES OF AMERICA
FEDERAL MINE SAFETY AND HEALTH REVIEW COMMISSION
WASHINGTON, D.C.

| | | |
|---|---|---|
| SECRETARY OF LABOR | : | CIVIL PENALTY PROCEEDINGS |
| MINE SAFETY AND | : | |
| HEALTH ADMINISTRATION (MSHA), | : | Docket No. WEVA 2019-0458 |
| Petitioner | : | A.C. No.  46-02444-487883 |
| | : | |
| v. | : | |
| | : | |
| K C TRANSPORT, INC, | : | Mine: Elk Creek Plant |
| Respondent | : | |
| | : | |

## STIPULATIONS

The Secretary of Labor and K C Transport, Inc., ("K C Transport") agree and stipulate as follows:

1. The Administrative Law Judge and the Federal Mine Safety and Health Review Commission have jurisdiction to hear and decide civil penalty proceedings pursuant to Section 105 of the Federal Mine Safety and Health Act of 1977.

2. On March 11, 2019, MSHA Coal Mine Inspector John M Smith was conducting inspection activities at the Elk Creek Prep Plant, Mine ID 46-02444.

3. The Elk Creek Prep Plant is owned and operated by Ramaco Resources, LLC.  ("Ramaco Resources").

4. After completing his activities at the Elk Creek Prep Plant on March 11, 2019, CMI Smith traveled more than a mile up the hollow along the haul-road and then turned off the haul-road at Right Hand Fork Road and followed Right Hand Fork Road across a creek about 1000 feet to a location where K C Transport had constructed a parking area with two

maintenance shipping containers.  K C Transport purchased the gravel and stone for the parking lot and constructed the parking area.  K C Transport also has commercial insurance to cover this facility.

5. Inspector Smith traveled up the haul-road and Right Hand Fork Road because he was looking for trucks to issue terminations for previously issued citations. When he reached K.C. Transport's maintenance lot, he observed the trucks cited in Citation Nos. 9222038 and 9222040.

6. At the time of the citations, K C Transport was in the process of constructing a new maintenance shop at that location. The construction materials for a planned approximately 60' x 70' metal building for the new maintenance shop had arrived at the site but were staged on pallets and the metal building had not yet been constructed.  The parking area for the planned maintenance shop had been constructed and K C was using two shipping containers and two service trucks for its maintenance needs.

7. K C Transport is an independent trucking company which provides hauling services to various businesses, including coal hauling, earth hauling and gravel hauling.

8. K C Transport provides coal hauling services to various coal mine operators, including, but not limited to Ramaco Resources.

9. K C Transport operates truck maintenance and storage facilities at five (5) locations, including one at Bluefield West Virginia, one at Tazwell, Virginia, two at Princeton, West Virginia, one at Man, West Virginia and the one at issue in this proceeding in Emmett, West Virginia.

10. The new K C Transport maintenance area is located on Right Hand Fork Road, which is a road off the haulage road, which runs past the Elk Creek Plant operated by Ramaco Resources.  It is located approximately 1000 feet from the haulage road.

11. The K C Transport maintenance facility is more than a mile up the hollow from the Elk Creek Plant.  The Elk Creek Preparation Plant is the nearest coal extraction/preparation facility to K C Transport's maintenance facility.

12. There is a gate at the entrance to the K C Transport facility on Right Hand Fork Road and there is no other way into the hollow where it is located. At the time Citation Nos. 9222038 and 9222040 were issued, the gate was in need of repair and was not operational.  KC Transport usually operates this maintenance facility on a 24-hour, 6 day a week basis.  Right Hand Fork Road dead ends on the other side of the KC Transport facility. The road into the K C Transport facility is not a coal haulage road but does branch off from a haulage road.

13. K C Transport shares the parking area for its maintenance facility with a logging company.  Ramaco Resources has no personnel or equipment at the facility.

14. K C Transport operates both on-road and off-road trucks out of this facility.  The off-road trucks provide haulage for five (5) nearby Ramaco Resources' mines.  The on-road trucks provide earth haulage services for

AEP, gravel haulage services to other customers and coal haulage services for customers other than Ramaco Resources.

15. KC Transport asserts that about 60% of the services from this K C facility are to the five (5) nearby Ramaco Resource mines, including the 3 deep mines, a strip mine and a highwall mine.  The other 40% of K C Transport's work from this location is to provide services for companies other than Ramaco Resources, including American Electric Power ("AEP") and other coal operators.   For example, for the past 4-5 months, K C Transport has been working on a large earth moving project for AEP and the trucks working on this project are parked and maintained at the Emmett shop. Although the Secretary has no knowledge of these facts, the Secretary does not dispute the company's assertions.

16. This facility provides a convenient centralized maintenance facility in Logan County for KC Transport.

17. Representatives of Ramaco told K C Transport they could use the area where the trucks referenced in Citation Nos. 9222038 and 9222040 were located for a maintenance facility and assured K C Transport that this area was not on permitted, bonded mine property, so Ramaco would not be operating there.  The Secretary has no evidence that K C Transports' facility is on permitted, bonded mine property.  Ramaco Resources has no plans to operate a coal mine at the location where K C Transport maintains its maintenance area/shop.  K C Transport uses the property for purposes of maintaining a portion of its truck fleet, including those trucks servicing

the Ramaco Resources mines and customers other than Ramaco Resources.

18. The haul trucks cited in Citation Nos. 9222038 and 9222040 were owned by K C Transport and were located at KC Transport's Emmett, West Virginia maintenance facility when cited.  The haul trucks referenced in Citation Nos. 9222038 and 9222040 were regularly used to haul coal from the five Ramaco mines to the Elk Creek prep plant at the time of the citations.

19. At the time that CMI Smith inspected the haul trucks referenced in Citation Nos. 9222038 and 9222040, the trucks were not hauling coal, were not on a haul-road and were parked at K C Transport's maintenance area for maintenance work to be performed on the trucks.

20. On March 11, 2019, K C Transport's maintenance/shop area, where the trucks referenced in Citation Nos. 9222038 and 9222040 were located, was property that was not permitted or bonded by the state of West Virginia.  See Respondent's Exhibit A (map).

21. Until the Citation Nos. 9222038 and 9222040 were issued, MSHA never sought to enter or inspect K C Transport's Emmett maintenance shop or parking area at any time, from the time  K C Transport constructed the parking lot  to the time the citations were issued.  MSHA has not attempted to enter or inspect this area or the trucks while at this location, since the citations.

22. On one occasion, on April 3, 2018, MSHA did cite a work trailer and muddy parking area that K.C. Transport had adjacent to where the haulage road intersects with Right Hand Fork Road. (Citation Nos. 9174394 and 9174395).   However, MSHA vacated the citations for the work trailer and muddy parking lot.   After this incident, K C Transport elected to construct the new facility approximately 1000 feet away from the haulage road up Right Hand Fork Road.

23. When Citation Nos. 9222038 and 9222040 were issued, MSHA did not attempt to inspect the shipping containers, service trucks or any other trucks at the location, nor did MSHA inspect the logging trucks which were located at K C Transport's maintenance area.

24. To get to KC transport's Emmett facility, it is necessary to pass along the Ramaco Resources, LLC's Elk Creek Plant haul-road until reaching the Right Hand Fork Road hollow where the facility is located.  Then it is necessary to cross a creek and drive 1000' up Right Hand Fork Road to the facility.

25.  KC Transport's maintenance facility where these trucks were inspected is located more than a mile from the Elk Creek Plant, approximately 4-5 miles from three (3) deep mines operated by Ramaco Resources, LLC and six (6) miles from a strip mines and highwall  mines operated by Ramaco Resources.  Thus, the closest location where coal is mined or prepared is more than a mile from this facility.

26. All of the Ramaco mines are accessed via the haul-road.  That haul-road is a public road for some distance. However, before reaching the Elk Creek Plant, there is a gate limiting public access to the haul-road beyond that location.  The gate is manned and only authorized persons are permitted beyond that point.  The haul-road beyond the gate is maintained by Ramaco Resources and is no longer a public road.  KC Transport's maintenance area is also accessed only by traveling through the gate and up the haul-road to the turn-off at Right Hand Fork Rd, although Right Hand Fork Road is not part of the haul-road.

27. At various times, the cited trucks have hauled coal from each of the Ramaco mines to the Elk Creek Plant.  The cited trucks were not licensed to haul products over public roads at the time the citations were issued, but they have been in the past and they may be in the future.

28. On or about March 11, 2019, the trucks referenced in Citation Nos. 9222038 and 9222040 were only being operated on private land, including haul-roads operated by Ramaco Resources.  There were other trucks parked at that same location which were used by K C Transport to haul coal and materials other than coal and for customers other than Ramaco.

29. The cited trucks are inspected regularly by MSHA when they are at the five (5) Ramaco Resources LLC mines and at the Elk Creek prep plant and along the haul-road.   They had never previously been inspected at K C Transport's maintenance facility/parking area.

30. K C Transport operates about 35 trucks from the Emmett, West Virginia, Maintenance Facility.

31. The proposed penalty amounts that have been assessed for the violations at issue pursuant to 30 U.S.C. Section 820(a) will not affect the ability of K C Transport to remain in business.

32. MSHA Coal Mine Inspector John M Smith was acting in his official capacity and as an authorized representatives of the Secretary of Labor when Citation Nos. 9222038 and 9222040 involved in this proceeding were issued.

33. True copies of each of the citations that are at issue in this proceeding along with all continuation forms and modifications, were served on K C Transport or its agent as required by the Act.

34. Each of the violations involved in this matter were abated in good faith.

35. Government Exhibit 1 is an authentic copy of Citation No. 9222038, with all modifications and abatements, and may be admitted into evidence for the purpose of establishing its issuance and not for the purpose of establishing the accuracy of any statements asserted therein.

36. Government Exhibit 2 is an authentic copy of Citation No. 9222038, with all modifications and abatements, and may be admitted into evidence for the purpose of establishing its issuance and not for the purpose of establishing the accuracy of any statements asserted therein.

37. Respondent's Exhibit A is a map of the area.  Neither party contests its authenticity and it may be admitted into evidence for the purpose of

demonstrating the layout of the area and the permitted, bonded areas for the Court as well as the location of K C Transport's facility in relation to the Elk Creek Plant.

38. With respect to Citation Nos. 9222038 and 9222040, K C Transport contests that MSHA had jurisdiction over the trucks referenced in the citations, while located at KC Transport's Emmett, WV maintenance facility.  K C Transport argues that both citations should be vacated for lack of jurisdiction at this location.

39. With respect to Citation Nos. 9222038 and 9222040, should the administrative law judge find that MSHA did have jurisdiction over the trucks, while at K C Transport's maintenance facility, K C Transport concedes that the conditions then present would violate 77.404(c) if the trucks had been subject to jurisdiction. With respect to Citation Nos. 9222038 and 9222040, should the administrative law judge affirm the finding that 77.404(c) was violated, the parties have agreed that the gravity findings set forth in the citations shall be affirmed.

40. With respect to Citation Nos. 9222038 and 9222040, should the administrative law judge find jurisdiction and affirm the finding that 77.404(c) was violated, the negligence for each citation shall be modified from moderate to low.

41. With respect to Citation No. 9222038, should the administrative law judge find jurisdiction and affirm the finding that 77.404(c) was violated, the parties agree that the appropriate penalty amount is $3,908.00.

42. With respect to Citation No. 9222040, should the administrative law judge find jurisdiction and affirm the finding that 77.404(c) was violated, the parties agree that the appropriate penalty amount is $4,343.00.

43. For purposes of Section 110(i) of the Act, the proposed penalty amounts are appropriate given the operator's history of violations and the size of the operator.

44. Government Exhibit 3 is a photograph depicting how the truck referenced in Citation No. 9222038 appeared at the time of inspection.

45. Government Exhibit 4 is a photograph depicting how the truck referenced in Citation No. 9222040 appeared at the time of inspection.

**UNITED STATES OF AMERICA**
**FEDERAL MINE SAFETY AND HEALTH REVIEW COMMISSION**
**WASHINGTON, D.C.**

| | | |
|---|---|---|
| **SECRETARY OF LABOR** | ) | **CIVIL PENALTY PROCEEDINGS** |
| **MINE SAFETY AND** | ) | |
| **HEALTH ADMINISTRATION (MSHA),** | ) | **Docket No. WEVA 2019-0458** |
| | ) | |
| **Petitioner,** | ) | **A.C. No. 46-02444-487883** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **K C TRANSPORT, INC.** | ) | |
| | ) | **Mine: Elk Creek Plant** |
| **Respondent.** | ) | |
| | ) | |

<u>**RESPONDENT KC TRANSPORT, INC'S MOTION FOR SUMMARY DECISION**</u>

COMES NOW Respondent, K C Transport, Inc. ("K C Transport") pursuant to 29 C.F.R.

§ 2700.67, and hereby respectfully moves the Court to grant summary decision in favor of K C

Transport on the grounds that the Mine Safety and Health Administration ("MSHA") was without

jurisdiction to issue Citation Nos. 9222038 and 9222040 to K C Transport for alleged violations

of 30 C.F.R. § 77.404(c). In support of its Motion, K C Transport refers the Court to its

Memorandum of Law attached hereto.

Respectfully submitted,
K C TRANSPORT, INC.,
By Counsel:


*/s/ James P. McHugh*
Christopher D. Pence, Esq.
James P. McHugh, Esq.
Hardy Pence PLLC
10 Hale Street, 4th Floor (25301)
Post Office Box 2548
Charleston, WV  25329
Phone:  (304) 345-7250
Fax:  (304) 553-7227

**UNITED STATES OF AMERICA**
**FEDERAL MINE SAFETY AND HEALTH REVIEW COMMISSION**
**WASHINGTON, D.C.**

| | | |
|---|---|---|
| **SECRETARY OF LABOR** | ) | **CIVIL PENALTY PROCEEDINGS** |
| **MINE SAFETY AND** | ) | |
| **HEALTH ADMINISTRATION (MSHA),** | ) | **Docket No. WEVA 2019-0458** |
| | ) | |
| Petitioner, | ) | **A.C. No.  46-02444-487883** |
| | ) | |
| v. | ) | |
| | ) | |
| **K C TRANSPORT, INC.** | ) | |
| | ) | **Mine: Elk Creek Plant** |
| Respondent. | ) | |
| | ) | |

## CERTIFICATE OF SERVICE

I hereby certify that a true and exact copy of the foregoing *"Respondent K C Transport, Inc.'s Motion for Summary Decision"* was served via electronic mail on the 20th day of December 2019, to the following:

Robert S. Wilson, Esquire
U.S. Department of Labor, Office of the Solicitor
201 12th Street South
Arlington, VA 22202-5450
wilson.robert.s@dol.gov


*/s/ James P. McHugh*
Christopher D. Pence, Esq.
Hardy Pence PLLC
10 Hale Street, 4th Floor
Post Office Box 2548
Charleston, WV  25329
Phone:  (304) 345-7250
Fax:  (304) 553-7227

2

UNITED STATES OF AMERICA
**FEDERAL MINE SAFETY AND HEALTH REVIEW COMMISSION**
**WASHINGTON, D.C.**

| | | |
|---|---|---|
| **SECRETARY OF LABOR** | ) | **CIVIL PENALTY PROCEEDINGS** |
| **MINE SAFETY AND** | ) | |
| **HEALTH ADMINISTRATION (MSHA),** | ) | **Docket No. WEVA 2019-0458** |
| | ) | |
| **Petitioner,** | ) | **A.C. No. 46-02444-487883** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **K C TRANSPORT, INC.** | ) | |
| | ) | **Mine: Elk Creek Plant** |
| **Respondent.** | ) | |
| | ) | |

**RESPONDENT KC TRANSPORT, INC'S**
**MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY DECISION**

K C Transport seeks summary decision from the Court on the grounds that the Mine Safety

and Health Administration ("MSHA") was without jurisdiction to issue Citation Nos. 9222038 and

9222040 to K C Transport for alleged violations of 30 C.F.R. § 77.404(c). Citation Nos. 9222038

and 9222040 were both issued for conditions on trucks owned by K C Transport that were in the

parking area of K C Transport's truck maintenance facility in Emmett, West Virginia (known as

the "Emmett facility" or "facility") at the time the citations were issued.

K C Transport's parking/maintenance area was not located at a coal mine. Rather, to issue

the citations, the Inspector had to leave the coal mine and find the trucks at K C Transport's

maintenance area. Because K C Transport's Emmett facility is not a "coal or other mine," as

defined in the Federal Mine Safety and Health Act of 1977 ("Mine Act"), the Court should find

that MSHA was without jurisdiction over the facility and that Citation Nos. 9222038 and 9222040

should be vacated.[1]

---

[1] Although the parties disagree about jurisdiction, the parties have stipulated that if the Court finds that MSHA had
jurisdiction to issue citations on the trucks at this location, the cited conditions would constitute violations of 30 C.F.R.

1

## I.     Summary of Argument

In determining whether MSHA has jurisdiction over an area or equipment in an area, "location" is a critical factor.  MSHA does not have jurisdiction beyond the authority granted it in the Mine Act.  MSHA cannot simply leave a coal mine and start inspecting the maintenance facilities of companies that do not operate mines.  For example, MSHA does not claim the right to inspect the logging trucks sharing the lot with KC Transport.  Moreover, with the exception of these two citations, MSHA has never previously or since sought to inspect the K C Transport maintenance facility at issue.  The reason is quite clear.  K C Transport's facility is not a "mine."

Apparently, in the Secretary's view, once a piece of mobile equipment is used in mining, jurisdiction attaches to that equipment and follows that equipment wherever it goes. If the Court accepts this view, there is nothing to prevent MSHA from simply following any equipment used in mining to any location where is being maintained or repaired and issuing a citation.  This broad approach has previously been rejected by the Sixth Circuit in *Maxxim Rebuild Co., LLC. v. FMSHRC*, 848 F.3d 737 (6th Cir. 2017).

There is no justification for MSHA to seek to expand its jurisdiction as proposed here. MSHA can cite K C Transport's trucks at any time when they are located *at* one of the five (5) Ramaco mines or the Elk Creek preparation plant, or even on the bonded, permitted haul road. However, to permit MSHA to follow mobile equipment away from the "coal mine" to the maintenance area of a trucking company would greatly expand MSHA's jurisdiction and conflict with the statutory limits of jurisdiction.

---

§ 77.404(c), both violations were abated in good faith, the gravity findings are accurate and the negligence for each citation should be modified from moderate to low. The parties further stipulated that the appropriate penalty amount for Citation No. 9222038 would be $3,908.00 and the appropriate penalty amount for Citation No. 9222040 would be $4,343.00.

JA 017

## II.     Factual Background

This proceeding stems from two citations, each alleging violations of 30 C.F.R. § 77.404(c), issued to K C Transport by MSHA Inspector John M. Smith ("Inspector Smith") on March 11, 2019 at K C Transport's maintenance facility located near the Elk Creek coal preparation plant ("Elk Creek plant') in Emmett, West Virginia. (Stip. Nos. 2, 3, 4, attached hereto as Ex. A.)[2] The Elk Creek plant is owned and operated by Ramaco Resources, LLC ("Ramaco"). (Stip. No. 3.) In addition to the Elk Creek plant, Ramaco also owns and operates five (5) mining operations in the vicinity of K C Transport's Emmett facility that are routinely inspected by MSHA; including, three deep mines, one strip mine and one highwall miner. (Stip. No. 14)

K C Transport is an independent trucking company that provides various types of hauling services to its customers; including, coal hauling, earth hauling and gravel hauling services. (Stip. Nos. 7, 14.) K C Transport provides its hauling services to a wide array of customers, including, but not limited to the Ramaco owned mines near the Emmett facility. (Stip. No. 8.) To service and maintain its large truck fleet, K C Transport owns and operates maintenance and storage facilities at five (5) locations in two different states. K C Transport maintains one facility in Tazewell, Virginia; one facility in Bluefield, West Virginia; one facility in Man, West Virginia; two facilities in Princeton, West Virginia; and the facility at issue here, in Emmett, West Virginia. (Stip. No. 9.)

K C Transport elected to construct the Emmett facility to serve as a convenient and centralized location for the maintenance, repair and staging of its truck fleet that provides hauling services to customers located in that area of Logan and Wyoming counties. (Stip. Nos. 16.) K C Transport solely purchased all the materials for the construction of the Emmett facility and insures

---

[2] This Motion is predicated, in part, of the parties' Stipulations, attached hereto and identified as Exhibit A. The stipulations constitute admissions by the parties thereby "dispensing with the need to prove formally uncontested factual issues." Black's Law Dictionary, 1415 (6th ed. 1990).

JA 018

the property. (Stip. No. 4.) Overall, K C Transport operates approximately thirty-five (35) trucks from the Emmett facility consisting of both on and off-road trucks. (Stip. No. 30.) The off-road trucks provide coal hauling services to the five (5) nearby Ramaco owned mines and to other nearby mines owned by different operators. (Stip. Nos. 14, 15.) The on-road trucks provide earth and gravel hauling services to other, non-coal mining customers in the area, including AEP. (Stip. Nos. 14, 15.)

The land where K C Transport's Emmett facility is located it is not permitted or bonded for mining. (Stip. No. 17.) Ramaco has no personnel or equipment at this location. (Stip. No. 13.) Nor is it used by Ramaco for mining operations. (Stip. No. 18.) Further, Ramaco has no plans to operate any mine at or near the location of the where K C Transport's Emmett facility is located. (Stip. No. 18.) The Emmett facility is across a creek from the haulage road and well up a hollow along Right-Hand Fork Road, which branches off from the main haulage road running by the Elk Creek Plant.[3] (Stip. No. 25.) It is located more than one (1) mile from the Elk Creek Plant (the nearest coal extraction/preparation facility), approximately four (4) to five (5) miles from the three Ramaco deep mines, approximately six (6) miles from the Ramaco strip mine/highwall miner and is on the other side of a creek, approximately 1000' away from the haulage road. The property is not bonded by the State of West Virginia. (Stip. No. 17.)

On the day the citations were issued, K C Transport was in the process of completing construction of its Emmett facility. (Stip. No. 6.) The materials for a planned 60' x 70' metal maintenance building, were on location but were temporarily stored on pallets awaiting final construction. (Stip. No. 6.) However, the adjacent truck parking lot (where the trucks referenced

---

[3] See the attached "Elk Creek Operations Area Map" attached hereto and identified as Respondent's Exhibit A to the Stipulations. The parties agree that this map accurately depicts the location of K C Transport's Emmett maintenance area and the nearest mine, which is the Elk Creek Preparation Plant.

in Citation Nos. 9222038 and 9222040 were located) had already been completed and the area was being actively used by K C Transport and an unaffiliated logging company to park their logging trucks. (Stip. Nos. 6, 13.) At the time, K C Transport had two shipping containers there and two maintenance trucks which it used to maintain its trucks. (Stip. No. 23.) Prior to March 11, 2019, MSHA had never previously attempted to enter K C Transport's Emmett facility parking lot. (Stip. No. 21.) Similarly, MSHA has not cited any trucks at this facility since Citation Nos. 9222038 and 9222040 were issued. (Stip. No. 21.) With the exception of these two citations, MSHA has shown no interest in inspecting this area.

Previously, on April 3, 2018, MSHA issued Citation Nos. 9174394 and 9174395 to K C Transport on a work trailer and a muddy parking area that was located on bonded, permitted property, directly adjacent to where the main haulage road intersects with Right-Hand Fork Road. (Stip. No. 22.) In April of 2018, K C Transport was utilizing this area for its truck fleet prior to the re-locating the facility off the bonded, permitted mine and up a hollow where there was no mining taking place. (Stip. No. 22.) The area cited in April was adjacent to the haulage road. (Stip. No. 22.). Notably, MSHA ultimately vacated these citations. (Stip. No. 22.) Despite the vacatur, that incident was a factor which lead to K C Transport's decision to construct a new facility distinctly separated from the haulage road in an attempt to make it clear that the K C Transport maintenance facility was separate from the mine. (Stip. No. 22.)

With respect to the citations at issue here, Inspector Smith was conducting inspection activities at the Elk Creek plant and then attempted to locate the trucks to terminate a previously issued citation. (Stip. No. 5.) To locate the trucks, he traveled more than one mile along the haulage road past the Elk Creek plant, turned off of the haulage road, crossed the creek and traveled up Right-Hand Fork Road through an opened gate to where the Emmett facility is located. (Stip. Nos.

5, 24.) Upon arrival, Inspector Smith discovered maintenance work being performed on two K C Transport's trucks in the Emmett facility parking lot and issued Citation Nos. 9222038 and 9222040. (Stip. No. 5.)

While the two cited trucks are routinely inspected by MSHA when performing hauling services to the nearby Ramaco mines and the Elk Creek plant, they were never inspected at this K C Transport maintenance facility location before or after the citations. (Stip. No. 21.) K C Transport contends that the trucks are not within MSHA jurisdiction and not subject to inspection while parked at the Emmett facility because the facility is not a "coal or other mine" as defined in the Mine Act.

## III.    Argument

### A.  Summary disposition of this case is proper because the parties have stipulated to all material facts and the only issue before the Court is purely a matter of law.

A court may grant summary decision where the "entire record…shows: (1) that there is no genuine issue as to any material fact; and (2) that the moving party is entitled to summary decision as a matter of law." 29 C.F.R. §2700.67(b); see also U*MWA, Local 2368 v. Jim Walter Res., Inc.*, 24 FMSHRC 797, 799 (July 2002); *Energy West Mining*, 17 FMSHRC 1313, 1316 (Aug. 1995) (citing *Celotex Corp. v. Catrett*, U.S. 317, 327 (1986)). Here, this case is ripe for summary decision because there is no genuine dispute as to any material fact. The parties have stipulated to all material facts used in support of their cross-motions for summary decision and there is no need for the Court to engage in additional fact finding. Therefore, all that remains for the Court to decide is the purely legal issue of whether MSHA had jurisdiction over K C Transport's Emmett facility.

### B.  K C Transport's Emmett facility is not within MSHA's jurisdiction because it is not a "coal or other mine," as defined in the Mine Act.

The Mine Act was enacted by Congress to ensure the safety and health of all miners

JA 021

working in the United States. 30 U.S.C. § 801. To achieve its stated purpose, Congress tasked the Secretary of Labor ("the Secretary") with promulgating mandatory safety and health standards pursuant to the Mine Act's requirements and to ensure compliance with these standards through regularly conducted administrative agency inspections. 30 U.S.C. § 811(a). Accordingly, the Mine Safety and Health Administration ("MSHA"), acting on behalf of the Secretary, carries out the Mine Act's enforcement procedures by conducting regular inspections.

Section 4 of the Mine Act states that its provisions, and the corresponding regulations promulgated by the Secretary, apply to each "coal or other mine …[.]" 30 U.S.C. § 803. Conversely, the Mine Act does not apply to an area that is not a "coal or other mine."  The terms "coal or other mine" are defined in Section 3(h)(1) of the Mine Act, in relevant part as:

> (A) an area of land from which minerals are extracted in nonliquid form or, if in liquid form, are extracted with workers underground, (B) private ways and roads appurtenant to such area, and (C) lands, excavations, underground passageways, shafts, slopes, tunnels and workings, structures, facilities, equipment, machines, tools, or other property including impoundments, retention dams, and tailings ponds, on the surface or underground, used in, or to be used in, or resulting from, the work of extracting such minerals from their natural deposits in nonliquid form, or if in liquid form, with workers underground, or used in, or to be used in, the milling of such minerals, or the work of preparing coal or other minerals, and includes custom coal preparation facilities…[.]

30 U.S.C. § 802(h)(1).

Thus, MSHA jurisdiction extends only to those areas that satisfy this statutory criterion. Although Congress intended the definition of what constitutes a "coal or other mine" for purposes of Mine Act jurisdiction to be broad, it is not limitless.  In fact, courts have commented on the ease of jurisdictional overreach by the Secretary under such a broadly worded statutory provision without appropriate judicial oversight. See *Maxxim Rebuild Co., LLC. v. FMSHRC*, 848 F.3d 737, 444 (6th Cir. 2017) ("Once [MSHA] tries to extend its jurisdiction to *off-site shops* and *off-site equipment*, the language of the statute provides *no stopping point*, leaving the scope of its

7

jurisdiction to the **whims** of the Secretary.")(emphasis added); see also *Bush & Burchett, Inc. v. Reich*, 117 F.3d 932, 937 (6th Cir. 1997) ("Without some limitation on the meaning of [Section 3(h)(1)] MSHA jurisdiction could conceivably extend to **unfathomable lengths** … a result Congress clearly did not intend.")(emphasis added).

Accordingly, both courts and administrative adjudicative bodies have found several instances where MSHA lacked jurisdiction over facilities and equipment despite the Mine Act's broad coverage. See e.g. *Maxxim Rebuild Co.*, 848 F.3d at 737; *Herman v. Associated Electric Cooperative, Inc.*, 172 F.3d 1078 (8th Cir. 1999); *Bush & Burchett, Inc.*, 117 F.3d at 937; *Lancashire Coal Co. v. MSHA*, 968 F.2d 388 (3rd Cir. 1992); *U.S. Dep't of Labor v. Ziegler Coal Co.*, 853 F.2d 529 (7th Cir. 1988); *Oliver M. Elam, Jr. Co.*, 4 FMSHRC 5 (Jan. 1982); *Powder River Coal, LLC*, 29 FMSHRC 650 (July 2007)(ALJ Manning); *Hobet Mining Co.*, 26 FMSHRC 890 (Nov. 2004)(ALJ Feldman).

## 1. Subsections (A) and (B) of 30 U.S.C. § 802(h)(1) do not provide Jurisdiction.

Here, the Secretary apparently contends that it is attempting to assert jurisdiction over two trucks (vehicles) rather than K C Transport's maintenance facility. No attempt was made to inspect the shipping containers or maintenance trucks being used for maintenance. Nor did MSHA attempt to inspect K C Transport's other trucks at this location. At the time of the citations, the cited trucks were undergoing maintenance, were not being used, were not located at any of Ramaco's five (5) mines or preparation plant, nor were they on a road or way appurtenant to any mine, they were in K C Transport's maintenance parking area, located 1000 feet off of a haul-road.

In this circumstance, there is no question that subsection (A) of 30 U.S.C. § 802(h)(1) does not apply. Subsection (A) refers specifically to an "extraction" area. In *Secretary v. National Cement Co. of Cal, Inc.*, 573 F.3d 788 (2009), the Court approved the Secretary's position that

8

subsection (A) refers "only to extraction areas, not roads appurtenant to such areas." *Id.* at 796 (emphasis added). The Secretary is judicially estopped from taking a different position here. The Secretary's position in *National Cement* is certainly consistent with the manner in which the statute is laid out. Every part of the statute must have meaning. For example, subsection (A) refers to the "extraction" site and subsection (B) refers to the appurtenant roads. Clearly, K C Transport's maintenance facility up this isolated hollow, 1000 feet from any haulage road is not an "extraction" site nor is it permitted as such. In this case, the "extraction" areas where Subsection (A) applies are the five (5) Ramaco mines and the Elk Creek preparation plant.

The K C Transport facility is also not a "way or road" "appurtenant to such" an extraction area as discussed in Subsection (B). Of course, even if K C Transport's facility was somehow deemed an "appurtenant" "way of road," the Secretary would nevertheless be precluded from relying on subsection (B) of 30 U.S.C. § 802(h)(1) because the Secretary has already taken the position that subsection (B) does not apply to vehicles.

In *Secretary v. National Cement Co. of Cal, Inc.*, 573 F.3d 788 (2009), the Secretary sought to require the installation of guardrails along a private road leading to a cement plant. The issue in the case was whether MSHA had jurisdiction over the road. On the first appeal in the case, the Circuit Court refused to defer to the Secretary's interpretation of subsection (B) of 30 U.S.C. § 802(h)(1). *Id.* at 791, holding that the "Secretary failed to recognize the ambiguity of subsection (B)." The Circuit Court remanded the case to the Commission "to obtain from the Secretary a Chevron step 2 interpretation" of subsection (B). *Id.*; *See also Pickett Mining Group*, 36 FMSHRC 2444, 2450 (Sept. 2014)(ALJ Rae)("A vehicle's mere presence on "private ways and roads appurtenant to" a mine site is not sufficient to bring the vehicle within the jurisdiction of the Mine Act.")

JA 024

On remand, in order to persuade the Court that it had jurisdiction over the road, so as to require the installation of guardrails, the Secretary took a unique and unmistakable judicial position on subsection (B) and specifically interpreted subsection (B) "to cover the access road **but not vehicles on it**." *National Cement*, 573 F.3d at 793 (emphasis added). Based on this interpretation of subsection (B) by the Secretary, the Court of Appeals approved of the Secretary's position— that subsection (B) applies to appurtenant roads and not the vehicles on them. The Respondents in the case challenged this interpretation and the Court of Appeals specifically held that it approved the Secretary's position that subsection (B)("appurtenant ways and road") only applies to the road itself and not vehicles. The Court found that this interpretation is "more consistent with the common meaning of "road," which is not normally used to refer to both the road itself and the vehicles traveling on it, see Webster's Third at 1963 (defining "road" as "an open way ... for vehicles [and] persons")." *Id.* at 794. Therefore, neither Subsections (A) or (B) provide a basis for the Secretary to assert jurisdiction here.

### 2. Subsection (C) of 30 U.S.C. § 802(h)(1) does not provide Jurisdiction.

One of the most recent Appeals Court cases interpreting Subsection (C) of 30 U.S.C. § 802(h)(1) is *Maxxim Rebuild Co., LLC. v. FMSHRC*, 848 F.3d 737 (6th Cir. 2017). In *Maxxim*, the Court recognized the problems with extending jurisdiction to repair facilities. The Court in *Maxxim* required a determination of location of the proposed enforcement in relation to an active mine. The Court of Appeals in *Maxxim* made it clear that subdivision (C) does not authorize MSHA to follow equipment used in mining anywhere it might be located and issue a citation.

MSHA only has jurisdiction under the Mine Act over facilities and equipment that are in or connected to a working mine. See *Id.* at 740. In *Maxxim*, MSHA issued citations at a mining equipment repair shop owned by a subsidiary of a large coal company, Maxxim Rebuild Company,

10

LLC, and located adjacent to a sealed and abandoned mine also owned by the same parent company, Alpha Natural Resources ("Alpha").[4] *Id.* at 739. Approximately 75% of the work performed at the shop was on equipment to be used by Alpha at its mining operations. *Id.* Additionally, Alpha owned the property where the repair shop was located and maintained an office on the top floor of the shop. *Id.* The shop at issue was one of six similar repair shops operated by Maxxim and was the only shop that MSHA had asserted jurisdiction over. *Id.* at 744.

 Maxxim challenged MSHA's authority to issue the citations for lack of jurisdiction over the repair shop. *Id.* The Secretary argued that the Mine Act granted MSHA jurisdiction over "any facility that makes or repairs equipment that is used in coal extraction or preparation activities." *Id.* at 740. An administrative law judge ("ALJ") agreed with the Secretary's interpretation and ruled that the shop was "a coal or other mine" within MSHA jurisdiction and the Commission affirmed the ALJ's ruling. *Id.* at 739.  Maxxim petitioned the Sixth Circuit Court of Appeals for review of the Commission's decision. *Id.* The Sixth Circuit reversed the Commission and held that the shop was not a "coal or other mine," as defined by the Mine Act. The court reasoned that the term "coal or other mine" in the Mine Act is "locational" and relates to things "in or connected to a mine." *Id.* at 740.  While acknowledging the breadth of the Mine Act's definition of "coal or other mine," the court posited that the definition extends only to those things that are in or connected to a working mine and does not cover "<u>machines, tools, or other property wherever they may be found or made</u>." *Id.* (emphasis added).

Here, the Emmett facility, like the shop at issue in *Maxxim*, is in or connected to a working mine. While the cited trucks are used in the process of hauling coal from active mines to the Elk Creek plant, the trucks were not being used for that purpose at the time the citations were issued.

---

[4] Maxxim Rebuild Company, LLC, the operator of the Sidney shop, was a wholly owned subsidiary of Alpha Natural Resources. 848 F.3d at 739.

11

Rather, they were being maintained at K C Transport's maintenance area which was located away from the permitted and bonded mine area. At this time, the trucks were co-mingled with other trucks which K C Transport uses to haul coal for other operators, as well as dirt and gravel for other customers. To be clear, K C Transport does not contend that MSHA has no jurisdiction over its trucks when hauling coal on permitted and bonded mine property. Rather, K C Transport contends that MSHA has no jurisdiction over its trucks while they are being maintained, repaired and parked at K C Transport's Emmett facility.

The Sixth Circuit in *Maxxim* made clear that the Mine Act contemplates only the location of facilities and equipment as it relates to active mines for purposes of MSHA jurisdiction. Whether equipment ***was or could be used in coal extraction and/or preparation activities is irrelevant*** to the analysis. The location of the Emmett facility clearly demonstrates that it is not a part of a working mine. As clearly depicted in Respondent's Exhibit A to Stipulations, the Emmett facility is set off from permitted, bonded mine property in a hollow where no mining activity occurs and is not within the area bearing MSHA Mine ID: 46-0244. The facility is located more than one mile from the Elk Creek plant and between four and six miles from any active underground or surface mine. The main haulage road is on the other side of a creek, approximately 1000' feet away at its nearest point, and runs away from the facility. Ramaco does not use the area where the facility is located for any purpose and has no plans to conduct any mining activity near the facility in the future. K C Transport shares the parking area with a logging company, whose trucks MSHA never seeks to inspect.

K C Transport's Emmett facility had never been inspected prior to March 11, 2019 and K C Transport immediately challenged MSHA's jurisdiction. Notably, MSHA has not inspected this area since the citations were issued. K C Transport even challenged MSHA's jurisdiction over the

12

area where it parked its trucks prior to the construction of the Emmett facility and MSHA ultimately vacated those citations. Therefore, under the circumstances of this case, Subsection (C) of 30 U.S.C. § 802(h)(1) does not confer jurisdiction on K C Transport's maintenance area.

## IV.    Conclusion

For the reasons set forth herein, K C Transport respectfully moves the Court to find that MSHA did not have jurisdiction over K C Transport's Emmett maintenance facility and vacate Citation Nos. 9222038 and 9222040.

Respectfully submitted,

K C TRANSPORT, INC.,

By Counsel:


*/s/ James P. McHugh*
Christopher D. Pence, Esq.
James P. McHugh, Esq.
Hardy Pence PLLC
10 Hale Street, 4th Floor (25301)
Post Office Box 2548
Charleston, WV  25329
Phone:  (304) 345-7250
Fax:  (304) 553-7227

JA 028

**UNITED STATES OF AMERICA**
**FEDERAL MINE SAFETY AND HEALTH REVIEW COMMISSION**
**WASHINGTON, D.C.**

| | | |
|---|---|---|
| **SECRETARY OF LABOR** | **)** | **CIVIL PENALTY PROCEEDINGS** |
| **MINE SAFETY AND** | **)** | |
| **HEALTH ADMINISTRATION (MSHA),** | **)** | **Docket No. WEVA 2019-0458** |
| | **)** | |
| **Petitioner,** | **)** | **A.C. No. 46-02444-487883** |
| | **)** | |
| **v.** | **)** | |
| | **)** | |
| **K C TRANSPORT, INC.** | **)** | |
| | **)** | **Mine: Elk Creek Plant** |
| **Respondent.** | **)** | |
| | **)** | |

**CERTIFICATE OF SERVICE**

I hereby certify that a true and exact copy of the foregoing *"Respondent K C Transport,*

*Inc.'s Memorandum of Law in Support of Motion for Summary Decision"* was served via

electronic mail on the 20th day of December 2019, to the following:

> Robert S. Wilson, Esquire
> U.S. Department of Labor, Office of the Solicitor
> 201 12th Street South
> Arlington, VA 22202-5450
> wilson.robert.s@dol.gov


> */s/ James P. McHugh*
> Christopher D. Pence, Esq.
> Hardy Pence PLLC
> 10 Hale Street, 4th Floor
> Post Office Box 2548
> Charleston, WV 25329
> Phone: (304) 345-7250
> Fax: (304) 553-7227

14

UNITED STATES OF AMERICA
FEDERAL MINE SAFETY AND HEALTH REVIEW COMMISSION
WASHINGTON, D.C.

| | | |
|---|---|---|
| SECRETARY OF LABOR | : | CIVIL PENALTY PROCEEDINGS |
| MINE SAFETY AND | : | |
| HEALTH ADMINISTRATION (MSHA), | : | Docket No. WEVA 2019-0458 |
| Petitioner | : | A.C. No.  46-02444-487883 |
| | : | |
| v. | : | |
| | : | |
| K C TRANSPORT, INC, | : | Mine: Elk Creek Plant |
| Respondent | : | |
| | : | |

## SECRETARY OF LABOR'S MOTION FOR PARTIAL SUMMARY DECISION

The Secretary of Labor, through the undersigned, hereby submits this Motion for Partial Summary Decision. For the reasons set forth below, the Secretary moves that summary decision be entered in favor of the Secretary affirming the findings set forth in Citation Nos. 9222038 and 9222040 of violations of 30 CFR §77.404(c) and assessing a total civil penalty of $8,251.00 for the two citations.

This docket involves twenty 104(a) citations and a total proposed civil penalty of $34,075.00. The parties have reached a partial settlement resolving 18 of the citations. A motion to approve partial settlement was filed addressing those citations. The two remaining citations, Nos. 9222038 and 9222040, both cite violations of 30 CFR 77.404(c) and both involve maintenance work being performed on coal trucks owned by the Respondent. The Respondent is challenging Mine Act coverage over the trucks and the work being performed. The parties agree that the only issue in dispute concerning the citations is whether the trucks are subject to MSHA coverage.

Citation No. 9222038 cites the following condition:

The red Mack tandem coal truck Co# 120 is jacked up with the wheels and tires off both back axles and is not blocked to prevent motion. The rear of the truck is jacked up by using blocking under the back end of the bed and using the motion of the bed when raised to lift the back wheels off the

ground. Work is being performed on the brakes located on the back axles of the truck. Standard 77.404(c) was cited 1 time in two years at mine 4602444 (0 to the operator, 1 to a contractor).

The gravity of the violation was designated as S&S, reasonably likely to result in a fatality and affecting one person.  The negligence was determined to be moderate.

The Secretary has proposed a penalty of $7,817.00 for the violation.

Citation No. 9222040 cites the following condition:

The bed on the Mack Co#5 coal truck is in the raised position and is not blocked against motion. A miner is observed standing on the frame of the truck under the raised unblocked bed. This citation was factor that contributed to the issuance of Imminent Danger Order No. 9222039 dated 3/11/2019. Therefore, no abatement time was set. Standard 77.404(c) was cited 2 times in two years at mine 4602444 (2 to contractor 77.404(c)).

The gravity of the violation was designated as S&S, reasonably likely to result in a fatality and affecting one person.  The negligence was determined to be moderate.  The Secretary has proposed a penalty of $8,686.00 for this violation.

Both citations cite violations of 30 CFR §77.404(c).  That mandatory standard provides: "Repairs or maintenance shall not be performed on machinery until the power is off and the machinery is blocked against motion, except where machinery motion is necessary to make adjustments."

29 C.F.R. Section 2700.67 provides that a motion for summary decision shall be granted if there is no genuine issue as to any material fact and if the moving party is entitled to summary decision as a matter of law.  As set forth in the stipulations agreed to by both parties there are no issues with regard to the facts surrounding the subject citations and the issue of coverage is a matter of law.  The parties have agreed that if the administrative law judge finds coverage that the citations shall be affirmed as issued other than the finding of

2

negligence which shall be modified from moderate to low. (Stipulations 39 and 40) The parties have also agreed upon appropriate penalty amounts should the judge affirm the citations. (Stipulations 41 and 42) Thus, the only issue remaining to be resolved is whether the cited trucks were subject to the requirements of the Mine Act and its regulations. Because the law supports a finding that the subject trucks were subject to MSHA coverage, the citations should be affirmed as a matter of law.

<u>Stipulations</u>

The parties have agreed to the following stipulations:

1.  The Administrative Law Judge and the Federal Mine Safety and Health Review Commission have jurisdiction to hear and decide civil penalty proceedings pursuant to Section 105 of the Federal Mine Safety and Health Act of 1977.

2.  On March 11, 2019, MSHA Coal Mine Inspector John M Smith was conducting inspection activities at the Elk Creek Prep Plant, Mine ID 46-02444.

3.  The Elk Creek Prep Plant is owned and operated by Ramaco Resources, LLC.  ("Ramaco Resources").

4.  After completing his activities at the Elk Creek Prep Plant on March 11, 2019, CMI Smith traveled more than a mile up the hollow along the haul-road and then turned off the haul-road at Right Hand Fork Road and followed Right Hand Fork Road across a creek about 1000 feet to a location where K C Transport had constructed a parking area with two maintenance shipping containers.  K C Transport purchased the gravel and

3

stone for the parking lot and constructed the parking area.  K C Transport
also has commercial insurance to cover this facility.

5.  Inspector Smith traveled up the haul-road and Right Hand Fork Road
because he was looking for trucks to issue terminations for previously
issued citations. When he reached K.C. Transport's maintenance lot, he
observed the trucks cited in Citation Nos. 9222038 and 9222040.

6.  At the time of the citations, K C Transport was in the process of
constructing a new maintenance shop at that location. The construction
materials for a planned approximately 60' x 70' metal building for the new
maintenance shop had arrived at the site but were staged on pallets and the
metal building had not yet been constructed.  The parking area for the
planned maintenance shop had been constructed and K C was using two
shipping containers and two service trucks for its maintenance needs.

7.  K C Transport is an independent trucking company which provides
hauling services to various businesses, including coal hauling, earth
hauling and gravel hauling.

8.  K C Transport provides coal hauling services to various coal mine
operators, including, but not limited to Ramaco Resources.

9.  K C Transport operates truck maintenance and storage facilities at five (5)
locations, including one at Bluefield West Virginia, one at Tazwell,
Virginia, two at Princeton, West Virginia, one at Man, West Virginia and
the one at issue in this proceeding in Emmett, West Virginia.

4

10. The new K C Transport maintenance area is located on Right Hand Fork Road, which is a road off the haulage road, which runs past the Elk Creek Plant operated by Ramaco Resources.   It is located approximately 1000 feet from the haulage road.

11. The K C Transport maintenance facility is more than a mile up the hollow from the Elk Creek Plant.  The Elk Creek Preparation Plant is the nearest coal extraction/preparation facility to K C Transport's maintenance facility.

12. There is a gate at the entrance to the K C Transport facility on Right Hand Fork Road and there is no other way into the hollow where it is located. At the time Citation Nos. 9222038 and 9222040 were issued, the gate was in need of repair and was not operational.  KC Transport usually operates this maintenance facility on a 24-hour, 6 day a week basis.  Right Hand Fork Road dead ends on the other side of the KC Transport facility. The road into the K C Transport facility is not a coal haulage road but does branch off from a haulage road.

13. K C Transport shares the parking area for its maintenance facility with a logging company.  Ramaco Resources has no personnel or equipment at the facility.

14. K C Transport operates both on-road and off-road trucks out of this facility.  The off-road trucks provide haulage for five (5) nearby Ramaco Resources' mines.  The on-road trucks provide earth haulage services for

5

AEP, gravel haulage services to other customers and coal haulage services for customers other than Ramaco Resources.

15. KC Transport asserts that about 60% of the services from this K C facility are to the five (5) nearby Ramaco Resource mines, including the 3 deep mines, a strip mine and a highwall mine.  The other 40% of K C Transport's work from this location is to provide services for companies other than Ramaco Resources, including American Electric Power ("AEP") and other coal operators.   For example, for the past 4-5 months, K C Transport has been working on a large earth moving project for AEP and the trucks working on this project are parked and maintained at the Emmett shop. Although the Secretary has no knowledge of these facts, the Secretary does not dispute the company's assertions.

16. This facility provides a convenient centralized maintenance facility in Logan County for KC Transport.

17. Representatives of Ramaco told K C Transport they could use the area where the trucks referenced in Citation Nos. 9222038 and 9222040 were located for a maintenance facility and assured K C Transport that this area was not on permitted, bonded mine property, so Ramaco would not be operating there.  The Secretary has no evidence that K C Transports' facility is on permitted, bonded mine property.  Ramaco Resources has no plans to operate a coal mine at the location where K C Transport maintains its maintenance area/shop.  K C Transport uses the property for purposes of maintaining a portion of its truck fleet, including those trucks servicing

JA 035

the Ramaco Resources mines and customers other than Ramaco Resources.

18. The haul trucks cited in Citation Nos. 9222038 and 9222040 were owned by K C Transport and were located at KC Transport's Emmett, West Virginia maintenance facility when cited.  The haul trucks referenced in Citation Nos. 9222038 and 9222040 were regularly used to haul coal from the five Ramaco mines to the Elk Creek prep plant at the time of the citations.

19. At the time that CMI Smith inspected the haul trucks referenced in Citation Nos. 9222038 and 9222040, the trucks were not hauling coal, were not on a haul-road and were parked at K C Transport's maintenance area for maintenance work to be performed on the trucks.

20. On March 11, 2019, K C Transport's maintenance/shop area, where the trucks referenced in Citation Nos. 9222038 and 9222040 were located, was property that was not permitted or bonded by the state of West Virginia.  See Respondent's Exhibit A (map).

21. Until the Citation Nos. 9222038 and 9222040 were issued, MSHA never sought to enter or inspect K C Transport's Emmett maintenance shop or parking area at any time, from the time K C Transport constructed the parking lot to the time the citations were issued.  MSHA has not attempted to enter or inspect this area or the trucks while at this location, since the citations.

7

22. On one occasion, on April 3, 2018, MSHA did cite a work trailer and muddy parking area that K.C. Transport had adjacent to where the haulage road intersects with Right Hand Fork Road. (Citation Nos. 9174394 and 9174395).   However, MSHA vacated the citations for the work trailer and muddy parking lot.   After this incident, K C Transport elected to construct the new facility approximately 1000 feet away from the haulage road up Right Hand Fork Road.

23. When Citation Nos. 9222038 and 9222040 were issued, MSHA did not attempt to inspect the shipping containers, service trucks or any other trucks at the location, nor did MSHA inspect the logging trucks which were located at K C Transport's maintenance area.

24. To get to KC transport's Emmett facility, it is necessary to pass along the Ramaco Resources, LLC's Elk Creek Plant haul-road until reaching the Right Hand Fork Road hollow where the facility is located.  Then it is necessary to cross a creek and drive 1000' up Right Hand Fork Road to the facility.

25.  KC Transport's maintenance facility where these trucks were inspected is located more than a mile from the Elk Creek Plant, approximately 4-5 miles from three (3) deep mines operated by Ramaco Resources, LLC and six (6) miles from a strip mines and highwall  mines operated by Ramaco Resources.  Thus, the closest location where coal is mined or prepared is more than a mile from this facility.

JA 037

26. All of the Ramaco mines are accessed via the haul-road. That haul-road is a public road for some distance. However, before reaching the Elk Creek Plant, there is a gate limiting public access to the haul-road beyond that location. The gate is manned and only authorized persons are permitted beyond that point. The haul-road beyond the gate is maintained by Ramaco Resources and is no longer a public road. KC Transport's maintenance area is also accessed only by traveling through the gate and up the haul-road to the turn-off at Right Hand Fork Rd, although Right Hand Fork Road is not part of the haul-road.

27. At various times, the cited trucks have hauled coal from each of the Ramaco mines to the Elk Creek Plant. The cited trucks were not licensed to haul products over public roads at the time the citations were issued, but they have been in the past and they may be in the future.

28. On or about March 11, 2019, the trucks referenced in Citation Nos. 9222038 and 9222040 were only being operated on private land, including haul-roads operated by Ramaco Resources. There were other trucks parked at that same location which were used by K C Transport to haul coal and materials other than coal and for customers other than Ramaco.

29. The cited trucks are inspected regularly by MSHA when they are at the five (5) Ramaco Resources LLC mines and at the Elk Creek prep plant and along the haul-road. They had never previously been inspected at K C Transport's maintenance facility/parking area.

9

30. K C Transport operates about 35 trucks from the Emmett, West Virginia, Maintenance Facility.

31. The proposed penalty amounts that have been assessed for the violations at issue pursuant to 30 U.S.C. Section 820(a) will not affect the ability of K C Transport to remain in business.

32. MSHA Coal Mine Inspector John M Smith was acting in his official capacity and as an authorized representatives of the Secretary of Labor when Citation Nos. 9222038 and 9222040 involved in this proceeding were issued.

33. True copies of each of the citations that are at issue in this proceeding along with all continuation forms and modifications, were served on K C Transport or its agent as required by the Act.

34. Each of the violations involved in this matter were abated in good faith.

35. Government Exhibit 1 is an authentic copy of Citation No. 9222038, with all modifications and abatements, and may be admitted into evidence for the purpose of establishing its issuance and not for the purpose of establishing the accuracy of any statements asserted therein.

36. Government Exhibit 2 is an authentic copy of Citation No. 9222038, with all modifications and abatements, and may be admitted into evidence for the purpose of establishing its issuance and not for the purpose of establishing the accuracy of any statements asserted therein.

37. Respondent's Exhibit A is a map of the area. Neither party contests its authenticity and it may be admitted into evidence for the purpose of

10

demonstrating the layout of the area and the permitted, bonded areas for the Court as well as the location of K C Transport's facility in relation to the Elk Creek Plant.

38. With respect to Citation Nos. 9222038 and 9222040, K C Transport contests that MSHA had jurisdiction over the trucks referenced in the citations, while located at KC Transport's Emmett, WV maintenance facility.  K C Transport argues that both citations should be vacated for lack of jurisdiction at this location.

39. With respect to Citation Nos. 9222038 and 9222040, should the administrative law judge find that MSHA did have jurisdiction over the trucks, while at K C Transport's maintenance facility, K C Transport concedes that the conditions then present would violate 77.404(c) if the trucks had been subject to jurisdiction. With respect to Citation Nos. 9222038 and 9222040, should the administrative law judge affirm the finding that 77.404(c) was violated, the parties have agreed that the gravity findings set forth in the citations shall be affirmed.

40. With respect to Citation Nos. 9222038 and 9222040, should the administrative law judge find jurisdiction and affirm the finding that 77.404(c) was violated, the negligence for each citation shall be modified from moderate to low.

41. With respect to Citation No. 9222038, should the administrative law judge find jurisdiction and affirm the finding that 77.404(c) was violated, the parties agree that the appropriate penalty amount is $3,908.00.

JA 040

42. With respect to Citation No. 9222040, should the administrative law judge find jurisdiction and affirm the finding that 77.404(c) was violated, the parties agree that the appropriate penalty amount is $4,343.00.

43. For purposes of Section 110(i) of the Act, the proposed penalty amounts are appropriate given the operator's history of violations and the size of the operator.

44. Government Exhibit 3 is a photograph depicting how the truck referenced in Citation No. 9222038 appeared at the time of inspection.

45. Government Exhibit 4 is a photograph depicting how the truck referenced in Citation No. 9222040 appeared at the time of inspection.

Argument

Section 4 of the Mine Act provides: "Each coal or other mine, the products of which enter commerce, or the operations or products of which affect commerce, and each operator of such mine, and every miner in such mine shall be subject to the provisions of this Act."  Section 3(h)(1) of the Act provides:

> "coal or other mine" means (A) an area of land from which minerals are extracted in nonliquid form or, if in liquid form, are extracted with workers underground, (B) private ways and roads appurtenant to such area, and (c) lands, excavations, underground passageways, shafts, slopes, tunnels and workings, structures, facilities, *equipment, machines*, tools, or other property including impoundments, retention dams, and tailings ponds, on the surface or underground, used in, or to be used in, or resulting from, the work of extracting such minerals from their natural deposits in nonliquid form, or if in liquid form, with workers underground, or used in, or to be used in, the milling of such minerals, or the work of preparing coal or other minerals, and includes custom coal preparation facilities. In making a determination of what constitutes mineral milling for purposes of this Act, the Secretary shall give due consideration to the convenience of administration resulting from the delegation to one

12

> Assistant Secretary of all authority with respect to the health and safety of miners employed at one physical establishment;

(emphasis added)

This definition is broader than the common usage of the term "mine" and includes things like equipment, machines and tools that are used in the mining process. The Commission and the courts have long recognized that the Mine Act sets forth a "sweeping definition" of the term "mine" and that Congress intended that "'what is to be considered a mine and to be regulated under [the] Act be given the *broadest possibl[e]* interpretation.'" *Donovan v. Carolina Stalite Co.*, 734 F.2d 1547, 1554-55 (D.C. Cir. 1984) (quoting S. Rep. No. 461, 95th Cong., 1st Sess. 37 (1977), U.S. Code Cong. & Admin. News 1977, 3401, 3414) (emphasis added); *Harman Mining Corp. v. FMSHRC*, 671 F.2d 794, 796-97 (4th Cir. 1981); *Marshall v. Stoudt's Ferry Preparation Co.*, 602 F.2d 589, 592 (2d Cir. 1979), *cert. denied*, 444 U.S. 1015 (1980). *See also Cyprus Industrial Minerals Co. v. FMSHRC*, 664 F.2d 1116, 1118 (9th Cir. 1981) (recognizing that Section 3(h)(1) should be interpreted "very broadly").

In one of the earliest cases determining jurisdiction under the Mine Act, the Third Circuit Court of Appeals pointed out that Congress intended that "'what is considered to be a mine and to be regulated under this Act' was to be given the broadest possible interpretation and that doubts were to be resolved in favor of inclusion of a facility within the coverage of the Act. See S.Rep.No.181, 95th Cong., 1st Sess. 1, 14, reprinted in [1977] U.S. Code Cong. & Admin. News, pp. 3401, 3414." *Marshall v. Stoudt's Ferry Preparation Co.*, 602 F.2d 589, 592 (3rd Cir. 1979). ("[T]he statute makes clear that the concept that was to be conveyed by the word ["mine"] is much more encompassing than the usual meaning attributed to it[.] [T]he word means what the statute says it means.").

13

Numerous cases involving the coverage issue have been resolved by the Commission in favor of finding coverage. In *Jim Walter Resources*, 22 FMSHRC 21 (January 31, 2000), the Commission held that a common supply shop for several mines that was not located at any of the mine sites was subject to Mine Act jurisdiction. The Commission reiterated prior holdings that the definitions of coal mine and coal preparation in sections 3(h) and 3(i) are "broad," "sweeping" and "expansive." *Citing, Marshall, Supra. See also, Maxim Rebuild*, 38 FMSHRC 605 (2016)[1]  The Commission stated in *Watkins Engineers & Constructors*, "Congress clearly intended that jurisdictional doubts be resolved in favor of coverage by the Mine Act." *Watkins Eng 'rs*, 24 FMSHRC at 675-676 (citing S. Rep. No. 95-181, 95th Cong., 1st Sess., at 14 (1977), *reprinted in* 1977 U.S.C.C.A.N. 3401, 3414, *and in Legislative History of the Federal Mine Safety and Health Act of 1977* at 602 (1978)).

Application of the above cited statutory language of the Mine Act and case law to the facts alleged in the citations and as stipulated to by the parties leads to the conclusion that the trucks referenced in the citations at issue are equipment that were used in the extraction and preparation of coal and are subject to Mine Act coverage. To the extent that the application of that language is in any way ambiguous, the Secretary's reasonable interpretation of that language should be accorded deference. The Secretary's reasonable interpretations of ambiguous statutory terms, including the Secretary's interpretations of Section 802(h)(1), should be accorded *Chevron* deference. *See Mutual Mining*, 80 F.3d at 115 (reasonable interpretation of the Act that the Secretary presents to the Commission is an exercise of delegated lawmaking authority and is therefore entitled to deference); *see also National Cement II* (deferring after remand and subsequent appeal to Secretary's reasonable

---

[1] Although the Commission's decision in *Maxxim Rebuild* was reversed by the Court of Appeals for the Sixth Circuit, 848 F. 3d 737 (6th Cir. 2017), that decision is not binding precedent in this case which arises in the Fourth Circuit. Nevertheless, the facts of the current case are distinguishable in that there is no dispute that the cited trucks are equipment used in and essential to the extraction and preparation of coal.

JA 043

interpretation of Section 802(h)(1)(B) because Secretary's interpretation reflected the agency's "expert policy judgment"); *Donovan v. Carolina Stalite Co.*, 734 F.2d 1547, 1552 (D.C. Cir. 1984) (according *Chevron* deference to Secretary's interpretation of Section 802(h)(1)). The Secretary's interpretation of an ambiguous statutory provision in litigation is owed *Chevron* deference without reference to whether it is embodied in the issuance of a citation. *American Coal Co. v. FMSHRC*, 796 F.3d 18, 24 (D.C. Cir. 2015) (*citing Secretary of Labor v. Excel Mining, LLC*, 334 F.3d 1, 6 (D.C. Cir. 2003)); *Secretary of Labor on behalf of Wamsley v. Mutual Mining, Inc.*, 80 F.3d 110, 113-14 (4th Cir. 1996).

Under *Chevron*, an agency's interpretation of an ambiguous statutory provision is entitled to acceptance as long as it is not "'arbitrary, capricious, or manifestly contrary to the statute.'" *Big Ridge*, 715 F.3d at 641 (quoting *Chevron*, 467 U.S. at 844). In determining whether the agency's interpretation is contrary to the statute, a reviewing court examines the statutory language, the legislative history, and the statutory structure and purpose as a whole. *Velasquez-Garcia v. Holder*, 760 F.3d 571, 577-78 (7th Cir. 2014); *Central States Southeast and Southwest Pension Fund v. O'Neill Bros. Transfer & Storage Co.*, 620 F.3d 766, 774 (7th Cir. 2010). To be accepted, the agency's interpretation need not be the only reasonable interpretation or even the most reasonable interpretation; it need only be a reasonable interpretation, i.e., it need only be permissible. *Chevron*, 467 U.S. at 843; *Velasquez-Garcia*, 760 F.3d at 578; *Castro v. Chicago Housing Auth'y*, 360 F.3d 721, 729 (7th Cir. 2004).

KC Transport was a contractor hired by Ramaco Resources to haul coal from its various coal mines to a preparation plant. (Stipulations 7, 8, 14, 15, 27 and 28) Independent contractors hired to haul coal have been held to be subject to Mine Act jurisdiction. *Bulk Transportation Services, Inc.*, 13 FMSHRC 1354, (September 20,

15

1991)  The cited trucks were regularly used to haul coal. (Stipulation 18)  The respondent

asserts that more than half of the work by its trucks serviced at the facility involves hauling

coal for Ramaco. (Stipulation 15)  There is no dispute that the mines and the prep plant are

subject to the provisions of the Mine Act. The transportation of the coal from those mines to

that prep plant is an integral part of the mining and preparation process. It would lead to an

absurd result to find that Mine Act coverage attaches to the trucks when they are at the mine

site or at the prep plant but does not attach at other times. The trucks are routinely inspected

by MSHA when they are hauling coal and the respondent apparently has no objection to

those inspections. (Stipulation 29)  The primary purpose of the trucks is to haul coal as part

of the mining and preparation process. Maintenance of the trucks is essential for the trucks to

carry out that task.  The purpose of maintaining the trucks is not an end to itself. The clear

purpose of maintaining the trucks is so that they are able to perform their essential function

which is to haul coal from the mine sites to the prep plant.

     The stipulations make clear that the cited trucks were regularly being used to haul

coal from various mine cites to the preparation plant facility. They operated on an essentially

private haul road between the mine sites and the prep plant. (Stipulations 26 and 28) They

were not licensed to operate on public roads. (Stipulation 27)  The fact that the respondent

had other trucks that may have been licensed to operate on public roads and that those other

trucks may have been engaged in activities unrelated to coal mining has no relevance or

bearing on whether the two trucks referenced in the citations were subject to MSHA

coverage.

     The respondent's apparent position that the trucks are only subject to MSHA

coverage when they are actually hauling coal would lead to an absurd result that would defeat

the purposes of the Act and the cited standard.  Maintenance work cannot be performed on

<center>16</center>

the trucks while they are in service and actually hauling coal.  In order perform repairs or maintenance on equipment that equipment must necessarily be taken out of service.  Pursuant to respondent's apparent position, Section 77.1725(c) would never apply to the cited trucks despite the fact that the trucks are clearly equipment that are essential to the extraction and preparation of coal.  Such a result is absurd and would defeat the purpose of the standard.

Respondent's argument that the subject trucks were subject to MSHA jurisdiction at times but not when the citations were issued would unduly narrow the scope of §3(d). *See Agapito Assocs., Inc.*, 34 FMSHRC at 3470 ("' [T]he totality of the work' performed upon the pertinent project, not just the work relating to the underlying citations, 'must be considered on the jurisdiction issue") citing *Musser Eng'g Inc.*, 32 FMSHRC at 1269.

The statutory definition of the phrase "coal or other mine" in the Mine Act specifically includes "equipment … used in, or to be used in…the work of preparing coal." Section 3(h)(1) of the Mine Act defines "mine" to include not only the "area of land from which minerals are extracted," but also any "equipment" or "machines" that are "used in, or to be used in …the work of preparing coal." The phrase "work of preparing coal" is then defined to include storing and loading of coal.  The Commission has affirmed MSHA's jurisdiction over various "equipment ... used in mining," including trucks and conveyors used in the screening process but located on a public road, *State of Alaska, Dep 't of Transp.*, 36 FMSHRC 2642, 2647 (Oct. 2014); a dragline being assembled at a site one mile from where coal was being mined, *Justis Supply & Machine Shop*, 22 FMSHRC 1292, 2000 WL 1682492 (Nov. 2000)

In this case, the coal could not be prepared at the preparation plant but for the transportation of the coal by the subject trucks from the various mine sites to the prep plant. Furthermore, the extraction of the coal would have no purpose if not for the ability to

17

transport that coal to the prep plant. Thus, the subject trucks are equipment that were used in and were essential to the work of extracting and preparing coal and were thus subject to MSHA coverage.

A Commission judge recently found that a contractor truck parked at a lot near a prep plant was subject to MSHA coverage. *Rain For Rent*, 40 FMSHRC 1267 (2018) In so holding, the judge noted that "[t]he Commission has interpreted the language of § 3(d) to include a wide array of services that need not be performed on mine property as long as the services are related to the mine site and its operations." Citing *Joy Techs., Inc.*, 17 FMSHRC 303, 307-08 (Mar. 1995) (Contractor that sold a continuous miner machine to a mine and performed maintenance services at the mine site on four occasions was an operator because its work was more than *de minimis* and essential to extraction at the mine); *Thompson Electric, Inc.*, 39 FMSHRC 1228 (June 8, 2017) (ALJ) (Contractor that provided electric services but was never present at the mine site for more than 5 consecutive days was an operator because the contractor was performing maintenance of mine equipment on mine property); *Agapito Assocs., Inc.*, 34 FMSHRC 3465 (Dec. 2012) (ALJ) (Consulting company that performed services remotely and spent only 27 days on mine site over a 12-year period and provided analysis of potential for retreat mining was an operator because its work influenced the mine's roof control plan). *Id.* At 1273.

In *Rain for Rent*, *Supra,* at issue was a citation issued a for contractor's truck brake not being set.  The contractor argued that MSHA did not have jurisdiction over the truck while it was in the parking lot.  The court found that "The office and parking lot are thus geographically and functionally related to the mining process at Natividad Plant and are subject to MSHA jurisdiction under the Act." *Id.* at 1272.  The facts in that case are

18

analogous to the facts in this case where the subject trucks were cited because they were not properly blocked against motion.

The company may argue that MSHA coverage should not be found because the type of work performed at the maintenance facility is not the type of work contemplated by the Mine Act. However, the Commission specifically rejected that very argument in *Maxxim Rebuild*.

> Finally, Maxxim argues that the Mine Act and its standards do not fit this facility because of the nature of the work completed at the site. This argument, however, is unavailing because it overlooks the policy choice made by Congress, as reflected in the language of the Act. Maxxim references particular MSHA requirements in attempting to show that they are inappropriate for the repair shop, and that Occupational Safety and Health Act standards are more appropriate. Given that the language of section 3(h)(l)(C) clearly places the shop under MSHA jurisdiction, Congress has expressed its preference, and that preference is dispositive. *Wolf Run Mining Co. v. FMSHRC*, 659 F.3d 1197, 1203 n.10 (D.C. Cir. 2011) (otherwise legitimate safety concerns cannot override "a policy choice made by the Congress," as expressed in the plain language of the statute). Accordingly, we conclude that the plain language of the Act qualifies the facility as a "mine."

*Maxxim Rebuild*, *Supra at 609.*  In the Maxxim case, if OSHA were found to be the proper agency to inspect the facility for health and safety violations, OSHA would have been solely responsible. In this case, because the trucks are unquestionably engaged in mining activities at times when they are hauling coal, the respondent's position would lead to a situation where OSHA would be responsible for inspecting the trucks part of the time and MSHA would responsible at other times.  Such a bifurcated coverage scheme would be impractical, if not impracticable, and would lead to confusion on the part of miners and the operator itself as to what standards were applicable at any given time.   Furthermore, the hazards cited in the citations at issue are exactly the type of hazards contemplated by the

19

Act as demonstrated by the fact that the company does not dispute that the substance of 77.404(c) was violated. (Stipulation 39)

The Fourth Circuit set forth in *Power Fuels*, 777 F.3d 214 (4th Cir. 2015), an explanation of the regulatory structure governing enforcement of workplace safety for American workers. *Id. at* 217.  Essentially, the Occupational Safety and Health Act (OSHA) applies to all workplaces unless coverage is displaced by the Mine Act.  Since both acts are administered by the Secretary of Labor, it is the Secretary of Labor who makes decisions of coverage in the first instance. So long as that determination is reasonable, that determination should be deferred to by the Commission and the courts. See *Beylund Constr.*, 31 FMSHRC 1410, 1415 (Nov. 2010) (ALJ)  As the Fourth Circuit found, "[w]ith the Mine Act, Congress fashioned a law that is not only tailored to a specific industry, but also comprehensive in its coverage." *Id.* at 217.  In deferring to the Secretary's coverage determinations, the Court stated: "The Secretary, after all, is the administrator charged with overseeing the borderline between the background regulations of OSHA and the specialized regulations of MSHA. We have been instructed not to 'waste [our] time in the mental acrobatics needed to decide whether an agency's interpretation of a statutory provision is 'jurisdictional' or 'nonjurisdictional.' … Instead we are asked to decide, "simply, whether the statutory text forecloses the agency's assertion of authority, or not.' In this instance, it does not." (citations omitted).  Likewise, in the present case, the statute does not foreclose MSHA's assertion of coverage over the trucks and the conditions cited in Citation Nos. 9222038 and 9222040.

Wherefore, for the forgoing reasons, the Secretary respectfully requests that the Court find that the trucks referenced in Citation Nos. 9222038 and 9222040 were subject

JA 049

to Mine Act coverage and affirm both citations.  Pursuant to the stipulations entered by

the parties, the Secretary requests that the citations be found to be S&S and that the level

of negligence be modified to low. The Secretary further requests that the Court assess

civil penalties of $3,908.00 for Citation No. 9222038, $4,343.00 for Citation No.

9222049 and that respondent be order to pay a total civil penalty of $8,251.00.


Mailing Address:                              Respectfully submitted,

Stephen S. Adkins                             /s/*Stephen S Adkins*
Conference and Litigation Representative      Stephen S Adkins
U.S. Department of Labor/
MSHA
4499 Appalachian Highway
Pineville, WV 24874


Samantha Thomas                               Kate S. O'Scannlain
Associate Regional Solicitor                  Solicitor of Labor
U.S. Department of Labor
201 12th Street South                         Oscar L. Hampton III
Suite 401                                     Regional Solicitor
Arlington, VA  22202-5450
(202) 693-9389                                /s/*Robert S. Wilson*
                                              Robert S. Wilson
                                              Regional Counsel

                                              U.S. DEPARTMENT OF LABOR
                                              Attorneys for Petitioner

CERTIFICATE OF SERVICE

I hereby certify that on December 20, 2019 a copy of the Secretary of

Labor's Motion for Partial Summary Decision was served by Electronic Mail on

the following:

Christopher Pence, Esq.
cpence@hardypence.com

Jim McHugh, Esq.
jmchugh@hardypence.com

                                        /s/Robert S. Wilson
                                        Robert S. Wilson
                                        Regional Counsel

JA 051

GOVERNMENT EXHIBIT 1

3-12-15D

Mine Citation/Order

**U.S. Department of Labor**
Mine Safety and Health Administration

Section I--Violation Data

| 1. Date | Mo Da Yr 3/11/2019 | 2. Time (24 Hr. Clock) 1200 | | 3. Citation/ Order Number | 9222038 |
|---|---|---|---|---|---|

| 4. Served To | John Uconis | 5. Operator | K C TRANSPORT, INC |
|---|---|---|---|

| 6. Mine | ELK CREEK PLANT | 7. Mine ID | 46-02444 | (Contractor) A8938 |
|---|---|---|---|---|

8. Condition or Practice                                                                                8a. Written Notice (103g) ☐

The red Mack tandem coal truck Co# 120 is jacked up with the wheels and tires off both back axles and is not blocked to prevent motion.  The rear of the truck is jacked up by using blocking under the back end of the bed and using the motion of the bed when raised to lift the back wheels off the ground.  Work is being preformed on the brakes located on the back axles of the truck.

Standard 77.404(c) was cited 1 time in two years at mine 4602444 (0 to the operator, 1 to a contractor).

| 9. Violation | A. Health ☐ Safety ☑ Other ☐ | B. Section of Act | C. Part/Section of Title 30 CFR 77.404(c) | See Continuation Form (MSHA Form 7000-3a) ☐ |
|---|---|---|---|---|

Section II--Inspector's Evaluation

10. Gravity:

| A. Injury or Illness (has) (is): | No Likelihood ☐ | Unlikely ☐ | Reasonably Likely ☑ | Highly Likely ☐ | Occurred ☐ |
|---|---|---|---|---|---|

| B. Injury or illness could reasonably be expected to be: | No Lost Workdays ☐ | Lost Workdays Or Restricted Duty ☐ | Permanently Disabling ☐ | Fatal ☑ |
|---|---|---|---|---|

| C. Significant and Substantial: | Yes ☑ | No ☐ | | D. Number of Persons Affected: 001 |
|---|---|---|---|

| 11. Negligence (check one) | A. None ☐ | B. Low ☐ | C. Moderate ☑ | D. High ☐ | E. Reckless Disregard ☐ |
|---|---|---|---|---|---|

| 12. Type of Action | 104(a) | 13. Type of Issuance (check one) | Citation ☑ | Order ☐ | Safeguard ☐ | Written Notice ☐ |
|---|---|---|---|---|---|---|

| 14. Initial Action A. Citation ☐ | B. Order ☐ | C. Safeguard ☐ | D. Written Notice ☐ | E. Citation/ Order Number | F. Dated Mo Da Yr |
|---|---|---|---|---|---|

15. Area or Equipment

| 16. Termination Due | A. Date | Mo Da Yr 3/11/2019 | B. Time (24 Hr. Clock) 1220 |
|---|---|---|---|

Section III--Termination Action

17. Action to Terminate
The truck is now properly blocked against motion.

| 18. Terminated | A. Date | Mo Da Yr 3/11/2019 | B. Time (24 Hr. Clock) 1220 |
|---|---|---|---|

Section IV--Automated System Data

| 19. Type of Inspection (activity code) | E16 | 20. Event Number 7003298 | 21. Primary or Mill |
|---|---|---|---|

| 22. AR Name | John M Smith | 23. AR Number 25096 |
|---|---|---|

MSHA Form 7000-3, Apr 08 (revised) established a National Small Business and Agriculture Regulatory Ombudsman and 10 Regional Fairness Boards to receive comments from small businesses about federal agency enforcement actions. The Ombudsman annually evaluates enforcement activities and rates each agency's responsiveness to small business. If you wish to comment on the enforcement actions of MSHA, you may call 1-888-REG-FAIR (1-888-734-3247), or write the Ombudsman at Small Business Administration, Office of the National Ombudsman, 409 3rd Street, SW  MC 2120, Washington, DC 20416.  Please note, however, that your right to file a comment with the Ombudsman is in addition to any other rights you may have, including the right to contest citations and proposed penalties and obtain a hearing before the Federal Mine Safety and Health Review Commission.

In accordance with the provisions of the Small Business Regulatory Enforcement Fairness Act of 1996, the Small Business Administration has

GOVERNMENT EXHIBIT 2

Mine Citation/Order

**U.S. Department of Labor**
Mine Safety and Health Administration

**Section I—Violation Data**

| 1. Date | Mo Da Yr | 2. Time (24 Hr. Clock) | | 3. Citation/ | |
|---|---|---|---|---|---|
| | 3/11/2019 | 1203 | | Order Number | 9222040 |

| 4. Served To | John Uconis | 5. Operator | K C TRANSPORT, INC |
|---|---|---|---|

| 6. Mine | ELK CREEK PLANT | 7. Mine ID | 46-02444 | (Contractor) A8938 |
|---|---|---|---|---|

**8. Condition or Practice**

8a. Written Notice (103g) ☐

The bed on the Mack Co#5 coal truck is in the raised position and is not blocked against motion. A miner is observed standing on the frame of the truck under the raised unblocked bed. This citation was factor that contributed to the issuance of Imminent Danger Order No. 9222039 dated 3/11/2019. Therefore, no abatement time was set.

Standard 77.404(c) was cited 2 times in two years at mine 4602444 (2 to contractor 77.404(c)).

See Continuation Form (MSHA Form 7000-3a) ☐

| 9. Violation | A. Health ☐ Safety ☑ Other ☐ | B. Section of Act | | C. Part/Section of Title 30 CFR | 77.404(c) |
|---|---|---|---|---|---|

**Section II—Inspector's Evaluation**

10. Gravity:

A. Injury or Illness (has) (is): No Likelihood ☐   Unlikely ☐   Reasonably Likely ☑   Highly Likely ☐   Occurred ☐

B. Injury or illness could reasonably be expected to be: No Lost Workdays ☐   Lost Workdays Or Restricted Duty ☐   Permanently Disabling ☐   Fatal ☑

C. Significant and Substantial: Yes ☑   No ☐   D. Number of Persons Affected: 001

| 11. Negligence (check one) | A. None ☐ | B. Low ☐ | C. Moderate ☑ | D. High ☐ | E. Reckless Disregard ☐ |
|---|---|---|---|---|---|

| 12. Type of Action | 104(a) | 13. Type of Issuance (check one) | Citation ☑   Order ☐   Safeguard ☐   Written Notice ☐ |
|---|---|---|---|

| 14. Initial Action A. Citation ☐   B. Order ☐ | C. Safeguard ☐   D. Written Notice ☐ | E. Citation/ Order Number | F. Dated   Mo Da Yr |
|---|---|---|---|

15. Area or Equipment

| 16. Termination Due | A. Date | Mo Da Yr | B. Time (24 Hr. Clock) |
|---|---|---|---|

**Section III—Termination Action**

17. Action to Terminate

| 18. Terminated | A. Date | Mo Da Yr | B. Time (24 Hr. Clock) |
|---|---|---|---|

**Section IV—Automated System Data**

| 19. Type of Inspection (activity code) | E16 | 20. Event Number | 7003298 | 21. Primary or Mill | |
|---|---|---|---|---|---|

| 22. AR Name | John M Smith | 23. AR Number | 25096 |
|---|---|---|---|

MSHA Form 7000-3, Apr 08 (revised) established a National Small Business and Agriculture Regulatory Ombudsman and 10 Regional Fairness Boards to receive comments from small businesses about federal agency enforcement actions. The Ombudsman annually evaluates enforcement activities and rates each agency's responsiveness to small business. If you wish to comment on the enforcement actions of MSHA, you may call 1-888-REG-FAIR (1-888-734-3247), or write the Ombudsman at Small Business Administration, Office of the National Ombudsman, 409 3rd Street, SW  MC 2120, Washington, DC 20416. Please note, however, that your right to file a comment with the Ombudsman is in addition to any other rights you may have, including the right to contest citations and proposed penalties and obtain a hearing before the Federal Mine Safety and Health Review Commission.

In accordance with the provisions of the Small Business Regulatory Enforcement Fairness Act of 1996, the Small Business Administration has

Mine Citation/Order
Continuation

**U.S. Department of Labor**
Mine Safety and Health Administration

Section I—Subsequent Action/Continuation Data

| 1. Subsequent Action ☑ | 1a. Continuation ☐ | 2. Dated (Original Issue) | Mo | Da | Yr | 3. Citation/ Order Number 9222040 - 01 |
|---|---|---|---|---|---|---|
| | | | 03/11/2019 | | | |

| 4. Served To John Uconis | 5. Operator K C TRANSPORT, INC |
|---|---|

| 6. Mine    ELK CREEK PLANT | 7. Mine ID 46-02444 | (Contractor) A8938 |
|---|---|---|

Section II—Justification for Action

The truck bed has been lowered and men have been trained on proper blocking.

Section III—Subsequent Action Taken

| 8. Extended To | A. Date | Mo | Da | Yr | B. Time (24 Hr. Clock) | ☐ C. Vacated | ☑ D. Terminated | ☐ E. Modified |
|---|---|---|---|---|---|---|---|---|

Section IV—Inspection Data

| 9. Type of Inspection E16 | 10. Event Number 7003298 |
|---|---|

| 11. AR Name John Smith | AR Number 25096 | 12. Date 03/12/2019 | Mo | Da | Yr | 13. Time (24 Hr. Clock) 10:30 |
|---|---|---|---|---|---|---|

MSHA Form 7000-3a, Mar 85 (revised)

GOVERNMENT EXHIBIT 3

Reset Form

Photo Mounting Worksheet

U.S. Department of Labor
Mine Safety and Health Administration

Mine ID Number: 46-02444

Event Number: 7003298

Date/Time: 03/11/2019  12:00

Inspector: John M. Smith

Citation/Order Number: 9222038

Photo Number: 1 of 1

Location/Photo Description:  Unblocked truck



UNITED STATES OF AMERICA
**FEDERAL MINE SAFETY AND HEALTH REVIEW COMMISSION**
**WASHINGTON, D.C.**

| | | |
|---|---|---|
| **SECRETARY OF LABOR** | ) | **CIVIL PENALTY PROCEEDINGS** |
| **MINE SAFETY AND** | ) | |
| **HEALTH ADMINISTRATION (MSHA),** | ) | **Docket No. WEVA 2019-0458** |
| | ) | |
| **Petitioner,** | ) | **A.C. No. 46-02444-487883** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **K C TRANSPORT, INC.** | ) | |
| | ) | **Mine: Elk Creek Plant** |
| **Respondent.** | ) | |
| | ) | |

**K C TRANSPORT, INC'S RESPONSE IN OPPOSITION TO**
**SECRETARY'S MOTION FOR PARTIAL SUMMARY DECISION**

K C Transport, Inc. ("K C Transport"), by counsel, responds to the Secretary's Motion for Partial Summary Decision ("Secretary's Motion") as follows:

**I.      Summary of Response**

In the Secretary's Motion, the Secretary relies on Subdivision (C) of Section 3(h)(1) of the Mine Act to declare the two cited trucks to be a "coal or other mine." *See, Secretary's Motion,* pp. 12-14, emphasizing the terms "equipment, machines," (p. 12), asserting the "[t]his definition…includes things like equipment, machines and tools that are used in the mining process" (p. 13) and concluding that the "trucks…are equipment that were used in the extraction and preparation of coal."(p.14). From this, it is clear the Secretary does not rely on either Subdivision (A) or (B) of Section 3(h)(1). The Secretary misinterprets Subdivision (C) of Section 3(h)(1). The problem is that Subdivision (C) necessarily refers to equipment and machines at the mine, not outside of the mine. Otherwise, there is no limit to the Secretary's jurisdiction.[1]

---

[1] The Secretary refers to "MSHA coverage" rather than "jurisdiction." (Secretary's Brief, p. 16). There is no concept in the statute referred to as "coverage."

1

Under the Secretary's construct, for which it seeks *Chevron* deference, any vehicle "used in the mining process" will forever be a rolling "mine" and MSHA can follow the truck anywhere, presumably even along public roads or to a maintenance shop away from the mine. This broad and unfettered jurisdiction was rejected by the Court in *Maxxim Rebuild, LLC. v. FMSHRC*, 848 F.3d 737 (6th Cir. 2017) and should be rejected here. If there is any limit to the Secretary's position, it is unquestionably not apparent from the interpretation the Secretary offers the Judge. This renders the Secretary's position arbitrary and inconsistent with the statute. There is no *Chevron* deference for a position inconsistent with the statute.

K C Transport's position is that the trucks may be inspected only while at the mine. This area correlates to the bonded area of the five mines and the preparation plant that Ramaco is using for mining. The parking lot of K C Transport's Emmett facility is not such a location. Consistent with the bright line limits of Section (h)(1) there is no need or statutory justification to follow the trucks when they leave the mine site and return to K C Transport's Emmett facility.

## II.    The cases relied upon by the Secretary are distinguishable from this case.

The Secretary principally relies upon five cases, *Jim Walter Resources,* 22 FMSHRC 21 (January 31, 2000), *Agapito Assocs., Inc.,* 34 FMSHRC 3465 (Dec. 2012) (ALJ Manning); *Rain for Rent*, 40 FMSHRC 1267 (Aug. 2018) (ALJ Simonton); *Maxxim Rebuild Co., LLC.*, 38 FMSHRC 605 (Apr. 2016); and *Power Fuels, LLC. v. FMSHRC*, 777 F.3d 214 (4th Cir. 2015) to support his position that the Mine Safety and Health Administration ("MSHA") had jurisdiction to issue Citation Nos. 9222039 and 9222040 to K C Transport at its Emmett facility. However, the Secretary's reliance upon these cases is misguided as all are easily distinguishable from this case, one has been rejected by a Federal Circuit Court of Appeals and another has been called into question by the same Court. Moreover, the Secretary's contention that the Respondent's position

2

would lead to a "absurd result" and "defeat the purpose of the Act and the cited standard" is without merit and should be rejected.

The Secretary cites to *Jim Walter Resources,* 22 FMSHRC 21 (January 31, 2000). However, the reasoning of Jim Walter was discredited in *Maxxim Rebuild, LLC v. FMSHRC,* 848 F.3d. 737 (2017), where the Third Circuit held:

> [T]he Secretary leans heavily on another decision of the Commission: *Secretary of Labor, Mine Safety & Health Administration v. Jim Walter Resources, Inc.*, 22 F.M.S.H.R.C. 21 (2000). *Jim Walter* held that an off-site supply shop, which stored hard hats, safety glasses, nails, conveyor belts, belt structures, oil filters, and other supplies exclusively for the use of the shop's parent company, was a "coal or other mine." We disagree. For the same reasons we reject the Commission's decision here, we reject *Jim Walters* as well. *Id*. at 744

The Court understandably reasoned:

> Once the agency tries to extend its jurisdiction to off-site shops and off-site equipment, the language of the statute provides no stopping point, leaving the scope of its jurisdiction to the whims of the Secretary. Far better, it seems to us, to stand by the text and context of § 802(h)(1), which limit the agency's jurisdiction to locations and equipment that are part of or adjacent to extraction, milling, and preparation sites. *Id*.

Here, the K C Transport facility was not adjacent to Ramaco Resources five extraction or preparation sites. It was "located more than a mile from the Elk Creek Plant, approximately 4-5 miles from three (3) deep mines operated by Ramaco Resources, LLC and six (6) miles from a strip mines and highwall mines operated by Ramaco Resources. It was also 1000 feet from the haul road. (Stipulation, paras. 22, 25).

Next, the Secretary relies on The ALJ's Decision in *Agapito*, 34 FMSHRC 3465, *supra*. However, *Agapito* is distinguishable from the case at bar. In *Agapito,* the issue was whether engineers could be cited for their engineering work which was related to an accident *at the mine*. *Id.* at 3455. Agapito literally designed the mining pillars which failed at the mine. *Id.* Here, the trucks were being maintained off the mine site. The citations were not for events at any of Ramaco's mines. The citations for failing to block were in the parking lot of K C Transport's

3

Emmett facility.   K C Transport is not challenging its contractor status.  It can be cited when its trucks are at a mine.  *Agapito* is inapposite.[2]

The next case the Secretary relies on is the ALJ's Decision in *Rain for Rent, supra,* is distinguishable from this case for the same reason *Agapito* is.  Namely, the cited truck in that case was located at a parking lot which is connected to the main mine office. See *Rain for Rent*, 40 FMSHRC at 1271. In *Rain for Rent*, MSHA issued a citation of a flatbed truck which was parked in the main parking lot of the mine office for the Natividad Plant. The issuing inspector observed the truck pull into the mine office parking lot and noticed that the truck rocked back and forth once the driver exited the truck and entered the mine office. *Id.* at 1269. Suspecting that the driver had failed to set the park brake, the inspector approached the truck and confirmed this suspicion. *Id.* Subsequently, the inspector issued a citation to the driver for a violation of 30 C.F.R. § 56.14207.

Rain for Rent challenged MSHA jurisdiction to issue the citation on two separate grounds. *Id.* at 1270. First, Rain for Rent argued that the parking lot was not a "coal or other mine" as contemplated by the Mine Act. *Id.* Second, Rain for Rent argued that it was not an "operator" at the time the citation was issued because the cited truck was not "performing services" at the mine. *Id.* The ALJ rejected both arguments and affirmed the issuance of the citation. *Id.* On the issue of whether the parking lot was a "coal or other mine," as defined in the Mine Act, the ALJ held that each were "facilities used in the work of mining in accordance with subsection (C)." *Id.* at 1271. The ALJ reasoned that the mine office and the parking lot attached to it were "geographically and

---

[2] The Secretary also cites briefly to *Secretary v. State of Alaska, Dep't of Transp.*, 36 FMSHRC 2642, 2647 (October 16, 2014) and *Justis Supply & Machine Shop*, 22 FMSHRC 1292, 2000 WL 1682492 (November 3, 2000). However, in *State of Alaska,* the Commission was looking at a mobile "gravel pit" screener.  *Id.* at 2642.  This is a completely different situation as the screener was located at and was an integral part of a mobile "mine."  As for *Justis Supply*, it involved the construction of a dragline and was based on the "used in" language of the Section 802(h)(1) discussed in *Jim Walter Resources*, supra.  *Id.* at *4.  As noted above, this aspect of *Jim Walter* has been called into question by the Sixth Circuit's *Maxxim* decision.  Even more importantly, the mine operator owned the dragline. *Id.* Ramaco does not own the trucks here. Also, the contractors constructing the dragline were directed to the location of the dragline by employees of the mine operator.  *Id.*

JA 062

functionally related to the mining process at Natividad Plant." *Id.* at 1272. Notably, the operator "directed mine operations" at the mine office and it was "located on mine property and adjacent to the plant's active extraction site." *Id.* As a result, "miners, contractors and vendors parked [in the parking lot] to receive authorization to enter the mine to perform work." *Id.*

Here, unlike in *Rain for Rent*, *supra*, the cited trucks **were not located in the parking lot of the main mine office**. Rather, the trucks were located over a mile from the nearest coal extraction/preparation site at a facility that is neither "functionally or geographically related to the mining process." K C Transport did not "direct mining operations" or perform any extraction or preparation activities from its Emmett facility. Indeed, many of the trucks at the Emmett facility do not perform any coal related function while in operation whatsoever and the facility is shared with a logging company. Additionally, "miners, vendors and/or contractors" do not park at the Emmett facility to obtain "authorization" to perform work at the mine. Thus, the easily distinguishable facts in *Rain for Rent* do not apply to this case of the citations here.

The next case the Secretary relies on is the Commission's interpretation of Section 3(h)(1) in *Maxxim Rebuild*, *supra*. However, as K C Transport noted in its Motion for Summary Decision, the Commission's holding that "the language of Section 3(h)(1)(C) clearly places the shop under MSHA jurisdiction" (relied on by the Secretary here) was flatly rejected by the Sixth Circuit Court of Appeals. See *Maxxim Rebuild, LLC. v. FMSHRC*, 848 F.3d 737 (6th Cir. 2017). K C Transport discussed the Sixth Circuit holding in great detail in its initial briefing and will not burden the Court with additional recitation here, except to say that Congress has not made a "dispositive" policy choice that the facility at issue there did not "fall within the plain meaning of Section 3(h)(1)(C)."

JA 063

The Secretary makes the assertion that "a bifurcated coverage scheme" with respect to the cited trucks would be "impractical" without bothering to explain how or why. In reality, the bifurcated jurisdiction scheme is quite simple. When K C Transport trucks are at the mine which includes the extraction and preparation areas, the trucks are under MSHA jurisdiction. Conversely, when the trucks are parked at the Emmett facility off the mines, the trucks are under OSHA jurisdiction. Yet, the Secretary contends that such a scheme would "lead to confusion on the part of miners and the operator itself." There was no confusion after the Sixth Circuit made its decision.

The Secretary also argues that the hazards cited are exactly of the type contemplated by the cited standard and points to K C Transport's willingness to make that concession. The only relevance of this fact, presumably, is that the Secretary invites the Court to make a logical leap and find that because the cited condition violates a standard promulgated under the Mine Act, MSHA jurisdiction must be proper. The Court should decline this invitation. OSHA precludes the failure to block equipment too. The cited standard is not unique to the mining industry.[3]

The Secretary's interpretation would render the limits imposed by Congress on the jurisdictional reach of the Mine Act rather meaningless (and limitless) if MSHA could cite trucks used to haul coal at any location simply because a condition contemplated by a standard it enforces is observed. For example, consider if the maintenance work on the cited trucks was performed at another maintenance facility, unaffiliated with K C Transport and located twenty miles away from the Elk Creek Plant with the same conditions observed. Could MSHA cite the truck in that instance? Under the Secretary's proposed interpretation, MSHA would have the authority to do

---

[3] 29 C.F.R. § 1910.178(m)(7), applicable to "Powered industrial trucks" and enforced by OSHA, provides in relevant part, "brakes shall be set and wheel blocks shall be in place to prevent movement of trucks, trailers, or railroad cars...[.]" *Id.* (emphasis added). OSHA regulation, 29 C.F.R. § 1910.217(d)(9)(iv), requires the use of "safety blocks" to prevent motion when performing maintenance on an industrial machine press. Additionally, other administrative agencies such as the Federal Railroad Administration ("FRA"), also enforce similar regulations. 49 C.F.R. § 173.31, enforced by the FRA, requires that tank cars be "protected against movement" prior to loading and unloading.

6

so. However, the Sixth Circuit has rejected such a sweeping interpretation and K C Transport urges the Court to follow suit.

### III.    The Secretary cannot make agency enforcement decisions which ignore the plain language of the Mine Act.

The Secretary relies upon the Fourth Circuit's Decision in *Power Fuels*, 777 F.3d at 217, for the proposition that because Congress tasked the Secretary with enforcement of both the Mine Act and the Occupational Safety and Health Act, it is he, who ultimately decides jurisdiction issues. However, this does not mean that the Secretary as the advocate of one agency or another can fluidly exercise his judgment and advocate for whichever client it happens to be representing at the time.  The check on this is the statute.

As noted by the Secretary, the Fourth Circuit advised that the Secretary cannot exercise that discretion when the text of the statute forecloses on the agency's enforcement authority. *Id.* Such is the case here. K C Transport refers the Court to its earlier briefing explaining why MSHA is precluded from exercising jurisdiction over the Emmett Facility by the plain language of Section 3(h)(1)(C) and urges the Court to follow the location based analysis used by the Sixth Circuit in *Maxxim Rebuild*, 848 F.3d 737 (6th Cir. 2017) to decide the jurisdictional issue here.

The key here is that the trucks are not a "mine" and were not at the "mine" when the citations were written. According to *Maxxim Rebuild,* location is the most important factor.  It guides the meaning of the other terms.  As the Court noted:

> The definition [Section 802(h)(1)(C)] is broad, sure enough. It's as if the author went to a mine and wrote down everything he saw in, around, under, above, and next to the mine. Even then, the definition still extends only to everything that one would see in or around a working mine. It does not cover mining "equipment" or for that matter mining "machines, tools, or other property" wherever they may be found or made.

The Secretary's position that these empty trucks-located off the mine property at K C Transport's facility-are subject to jurisdiction because they are "to be used" in mining is not

7

consistent with the statute and has no limits. The *Maxxim* Court noted that such an interpretation would have turned the Jeffrey Mining Manufacturing Company into a mine. *Id.* at 743. On the jurisdiction issue, location is everything. As in *Maxxim*, the trucks at issue here were not at "locations where coal is extracted or prepared" when they were cited. *Id.* at 744. For this reason, the citations should be vacated.

## IV.    CONCLUSION

For the reasons stated herein, Respondent K C Transport, Inc. moves the Court to grant Summary Decision in its favor and vacate Citation Nos. 9222038 and 9222040.

K C TRANSPORT, INC.,

By Counsel:

*/s/ James P. McHugh*
Christopher D. Pence, Esq.
James P. McHugh, Esq.
Hardy Pence PLLC
10 Hale Street, 4th Floor (25301)
Post Office Box 2548
Charleston, WV  25329
Phone:  (304) 345-7250
Fax:  (304) 553-7227

8

UNITED STATES OF AMERICA
FEDERAL MINE SAFETY AND HEALTH REVIEW COMMISSION
WASHINGTON, D.C.

| | | |
|---|---|---|
| SECRETARY OF LABOR | ) | CIVIL PENALTY PROCEEDINGS |
| MINE SAFETY AND | ) | |
| HEALTH ADMINISTRATION (MSHA), | ) | Docket No. WEVA 2019-0458 |
| | ) | |
| Petitioner, | ) | A.C. No.  46-02444-487883 |
| | ) | |
| v. | ) | |
| | ) | |
| K C TRANSPORT, INC. | ) | |
| | ) | Mine: Elk Creek Plant |
| Respondent. | ) | |
| | ) | |

## CERTIFICATE OF SERVICE

I hereby certify that a true and exact copy of the foregoing *"K C Transport, Inc.'s Response in Opposition to the Secretary's Motion for Partial Summary Decision"* was served via electronic mail on the 10th day of January 2020, to the following:

>        Robert S. Wilson, Esquire
>        U.S. Department of Labor, Office of the Solicitor
>        201 12th Street South
>        Arlington, VA 22202-5450
>        wilson.robert.s@dol.gov


>        */s/ James P. McHugh*
>        Christopher D. Pence, Esq.
>        Hardy Pence PLLC
>        10 Hale Street, 4th Floor
>        Post Office Box 2548
>        Charleston, WV  25329
>        Phone:  (304) 345-7250
>        Fax:  (304) 553-7227

9

UNITED STATES OF AMERICA
FEDERAL MINE SAFETY AND HEALTH REVIEW COMMISSION
WASHINGTON, D.C.

| | | |
|---|---|---|
| SECRETARY OF LABOR | : | CIVIL PENALTY PROCEEDINGS |
| MINE SAFETY AND | : | |
| HEALTH ADMINISTRATION (MSHA), | : | Docket No. WEVA 2019-0458 |
| Petitioner | : | A.C. No.  46-02444-487883 |
| | : | |
| v. | : | |
| | : | |
| K C TRANSPORT, INC, | : | Mine: Elk Creek Plant |
| Respondent | : | |
| | : | |

## SECRETARY OF LABOR'S RESPONSE TO RESPONDENT'S
## MOTION FOR SUMMARY DECISION

The Secretary of Labor, through the undersigned, hereby submits this response to the Respondent's Motion for Summary Decision.  The parties have filed simultaneous motions for summary decision along with detailed factual stipulations addressing the two remaining citations in dispute in this docket. The Secretary relies upon his Motion for Partial Summary Decision in support of affirmance of the citations at issue.  In response to the Respondent's motion, the Secretary briefly addresses the following matters.

Respondent argues that the Secretary had not previously or since the issuance of the subject citations inspected K C Transport's maintenance facility.  This argument is not relevant to the citations at issue.  First, as set forth in the stipulations, the subject facility was in the process of being constructed at the time of the inspection. (Stipulation 6)  Thus, the fact that the area had not been previously inspected is not surprising and not relevant.  Furthermore, whether the maintenance area is a mine subject to MSHA coverage need not be decided in this case to determine whether MSHA coverage applied to the subject trucks.  As set forth in the Secretary's motion for summary decision, the citations at issue involve the two cited trucks which were exclusively used to haul coal between various mine sites and a preparation plant.  As argued in the Secretary's motion, the term "mine" as it is used in the Mine Act does not have the same definition as that

term is used in general parlance and is subject to the specific definition provided by Congress. The trucks in question come within that definition. Thus, the fact that the subject area had not previously or since been inspected is not relevant to a determination of the citations at issue.

The Respondent argues that the Secretary's position that the subject trucks were subject to MSHA coverage would lead to unlimited wide-spread coverage by MSHA that was never intended by Congress.  First, that simply is not true.  The facts of this case are very specific and support the Secretary's assertion of coverage.  Secondly, this is a typical slippery-slope argument that should be given no consideration.  This case is limited to the facts of this case as set forth in the citations and in the stipulations.  Other cases that present different sets of facts should be judged on their own merit and based upon the unique facts presented in those case. For the reasons set forth in the Secretary's motion for summary, the facts in this case support the Secretary's assertion of Mine Act coverage over the subject trucks.

The Respondent cites to the Secretary's decision to vacate two citations in an earlier case.  There again, every case is unique and dependent upon the specific facts involved and the available evidence. Parties agree to settlement for all types of reasons and the Secretary's decision to vacate two citations in the earlier docket has no bearing on the facts and issues in this case and should not be considered as relevant to a determination of the subject citations in this current docket.

The Respondent cites to two Sixth Circuit decisions to support its argument against coverage. However, this case arises in the Fourth Circuit and *Maxxim Rebuild Co., LLC.*, 848 F. 3rd 737 (6th Cir. 2017), is not binding precedent for this case. In fact the lower unanimous decision by the Commission affirming MSHA coverage is the applicable precedent for this case. See 38 FMSHRC 605 (April 2016).  Furthermore, the facts in *Maxxim* are distinctly different from those in this case.  The citations in that case involved the conditions of the shop itself such as HazCom, dirty bathrooms and

2

equipment that was used in the shop.  The citations in this case specifically involve trucks that were exclusively used for the purpose of transporting coal from mine sites to a preparation plant for processing.   In *Maxxim*, the court specifically noted this distinction. "And the agency indeed did not cite Maxxim for equipment violations. It cited the repair shop for alleged problems with bathrooms, welders, loaders, heaters, and safety plans. Not one of those things is equipment sold to Alpha." 848 F. 3d at 742.  In this case the citations at issue do cite the conditions of the trucks themselves and not the maintenance facility.

Additionally, the shop cited in *Maxxim* was not connected to any active mine site. The maintenance facility at issue in this case can only be accessed by traveling along a private haul road that must be accessed through a manned gate controlled by the mining company. (Stipulation 26)  Also in *Maxxim*, OSHA exercised jurisdiction over other Maxxim shops and MSHA asserted coverage over only the shop in question.  There is no evidence or indication that OSHA has ever asserted jurisdiction over the trucks or site in question in this case.  As argued in the Secretary's motion for summary decision, the Respondent's argument, were it to be accepted, would result in bifurcated coverage over the subject trucks where MSHA would be responsible part of the time and OSHA would be responsible at other times. Such an absurd result was not at issue in *Maxxim Rebuild*. For these reasons, the Sixth Circuit's *Maxxim Rebuild* decision is not binding precedent in this case and, to the extent that it is in any way persuasive, it is not applicable to the unique and distinguishable facts in this case.

Likewise, other cases cited by Respondent involved factual situations inapplicable to the facts of this case. For example, *Herman v. Associated Electric Cooperative, Inc.,* 172 F.3d 1078 (8th Cir 1999), involved an electric plant that engaged in some processing of coal that it used at its plant.  The Court held that the "Act was designed primarily to protect miners, not employees of coal purchasers such as electric utilities and steel mills." (citations omitted)  KC Transport is not a purchaser of coal. They are intimately involved

3

in the coal mining process.  Transporting coal from the mine site to a preparation plant is part of that process.  *Bush & Burchett, Inc.,* 117 F.3d 932 (3rd Cir 1997) was actually a case where OSHA had asserted coverage of construction of a bridge being constructed as part of a roadway that connected a mine to a loadout facility.  The Court upheld the Secretary's determination that the worksite was covered by OSHA and not MSHA. *Lancashire Coal Company*, 968 F.2d 388 (3rd Cir 1992) involved an abandoned coal silo. None of the cases cited by Respondent support the contention that MSHA does not have coverage over the cited trucks and the unique factual circumstances presented in this case.

The Respondent argues that there is no justification for assertion of coverage over the subject trucks and cited conditions.  The justification is clearly set forth by Congress at the start of the Mine Act which states that "the first priority and concern of all in the coal or other mining industry must be the health and safety of its most precious resource-- the miner" and that "deaths and serious injuries from unsafe and unhealthful conditions and practices in the coal or other mines cause grief and suffering to the miners and to their families" and that "there is an urgent need to provide more effective means and measures for improving the working conditions and practices in the Nation's coal or other mines in order to prevent death and serious physical harm."  The Respondent admits to the substantive violations of the Mine Act regulation cited in the citations, both of which posed a reasonable likelihood of fatal injuries to miners. Vacating the citations at issue would give license to the company to commit similar violations in the future and subject miners to repeated exposure to such hazards.

For the foregoing reasons and for the reasons set forth in the Secretary's motion for summary decision, Citation Nos. 922038 and 9222040 should be affirmed.

4

Mailing Address:                                     Respectfully submitted,

Stephen S. Adkins                                    /s/*Stephen S Adkins*
Conference and Litigation Representative             Stephen S Adkins
U.S. Department of Labor/
MSHA
4499 Appalachian Highway
Pineville, WV 24874


Samantha Thomas                                      Kate S. O'Scannlain
Associate Regional Solicitor                         Solicitor of Labor
U.S. Department of Labor
201 12th Street South                                Oscar L. Hampton III
Suite 401                                            Regional Solicitor
Arlington, VA  22202-5450
(202) 693-9389                                       */s/Robert S. Wilson*
                                                     Robert S. Wilson
                                                     Regional Counsel

                                                     U.S. DEPARTMENT OF LABOR
                                                     Attorneys for Petitioner

CERTIFICATE OF SERVICE

    I hereby certify that on January 10, 2020 a copy of the Secretary of
Labor's Response to Respondent's Motion for Summary Decision was served by
Electronic Mail on the following:

Christopher Pence, Esq.
cpence@hardypence.com

Jim McHugh, Esq.
jmchugh@hardypence.com


                               */s/Robert S. Wilson*
                               Robert S. Wilson
                               Regional Counsel

5

## NOTICE

1.  Enclosed is a copy of a decision by an Administrative Law Judge of the Federal Mine Safety and Health Review Commission.  The issuance date of this decision appears on the first page of the Decision.

    *THIS DECISION MUST BE POSTED ON THE MINE BULLETIN BOARD BY THE OPERATOR.*

2.  You may petition for review of this decision by the Commission.  A PETITION FOR DISCRETIONARY REVIEW  must be <u>received</u> by the Commission within thirty (30) calendar days after the <u>issuance date</u> of the decision to be considered [29 C.F.R. § 2700.5(d) and .70(a)]. If this decision is an ORDER OF TEMPORARY REINSTATEMENT, the Petition for Review must be received within 5 days of the receipt of the order [29 C.F.R. § 2700.45(f)].  Petitions are accepted by facsimile. If you mail the petition, you should allow enough time for delivery by the thirtieth day.  Petitions (original plus six copies) should be filed at:

    <div align="center">

    DOCKET OFFICE
    FEDERAL MINE SAFETY AND HEALTH
    REVIEW COMMISSION
    1331 Pennsylvania Ave., N.W., Suite 520N
    WASHINGTON, D.C.  20004-1710
    telephone No. (202) 434-9950
    fax no. (202) 434-9954

    </div>

3.  The Federal Mine Safety and Health Review Commission's Rules of Procedure specify that a petition may be filed only on one or more of the following grounds:

    A.  A finding or conclusion of material fact is not supported by substantial evidence.
    B.  A necessary legal conclusion is erroneous.
    C.  The decision is contrary to law or to the duly promulgated rules or decision of the Commission.
    D.  A substantial question of law, policy or discretion is involved.
    E.  A prejudicial error of procedure was committed.

    Each issue shall be separately numbered and plainly and concisely stated, and shall be supported by detailed citations to the record when assignment of error are based on the record. Statutes, regulations or principal authorities shall be relied upon.  Except for good cause shown, no assignment of error by any party shall rely on any question of fact or law upon which the administrative law judge has not been afforded an opportunity to pass.  For further details on the filing of documents and the review process, see 30 U.S.C. § 823(d) and Commission rules 5 through 9 and .70 through .78 [29 C.F.R. §2700.5-.9 and .70-.78].

4.  A Petition for Review must be served on the opposing party.

5.  If a petition is filed, each party will be notified of the Commission's action on the petition.

**FEDERAL MINE SAFETY AND HEALTH REVIEW COMMISSION**

OFFICE OF ADMINISTRATIVE LAW JUDGES
7 PARKWAY CENTER, SUITE 290
875 GREENTREE ROAD
PITTSBURGH, PA 15220
TELEPHONE: 412-920-7240 / FAX: 412-928-8689

MAR – 3 2020

| | |
|---|---|
| SECRETARY OF LABOR<br>MINE SAFETY AND HEALTH<br>ADMINISTRATION (MSHA),<br>Petitioner, | CIVIL PENALTY PROCEEDING<br><br>Docket No. WEVA 2019-458<br>A.C. No. 46-02444-487883  A8938 |
| v. | |
| K C TRANSPORT, INC.,<br>Respondent. | Mine: Elk Creek Plant |

### ORDER DENYING RESPONDENT'S MOTION FOR SUMMARY DECISION
### ORDER GRANTING SECRETARY'S MOTION FOR SUMMARY DECISION
### ORDER TO MODIFY
### ORDER TO PAY

Before: Judge Lewis

On December 20, 2019, The Secretary of Labor ("Secretary") and K C Transport ("Respondent") filed with the undersigned cross-motions for partial summary decision in WEVA 2019-458.[1] The parties settled 18 of the 20 citations included in this docket prior to the motions for summary decision.[2] The two remaining citations at issue in the motions for summary decision are Citation Nos. 9222038 and 9222040, both for alleged violations of 30 C.F.R. § 77.404(c).[3]

---

[1] The parties were offered the opportunity to file Reply Briefs and they both did so on January 10, 2020.

[2] A Decision Approving Partial Settlement was issued on December 19, 2019.

[3] The full text of the Regulation is as follows:

**§ 77.404 Machinery and equipment; operation and maintenance.**

(a) Mobile and stationary machinery and equipment shall be maintained in safe operating condition and machinery or equipment in unsafe condition shall be removed from service immediately.

JA 074

Both citations were issued for conditions of trucks owned by Respondent that were in the parking area of K C Transport's truck maintenance facility in Emmett, West Virginia (the "Emmett facility" or "maintenance facility") at the time the citations were issued. The Respondent is challenging Mine Act jurisdiction over the Emmett facility and the trucks parked therein. The parties have stipulated that should this Court find that MSHA had jurisdiction over the trucks and location, the cited conditions would constitute violations of 30 C.F.R. § 77.404(c), that both violations were abated in good faith, that the gravity findings are accurate, and that the negligence for each citation should be modified from moderate to low. The parties further stipulated that the appropriate penalty amount for Citation No. 9222038 would be $3,908.00 and the appropriate penalty amount for Citation No. 9222040 would be $4,343.00. Accordingly, the only matter before this Court is a jurisdictional question.

For the following reasons, I grant the Secretary's Motion for Summary Decision and deny the Respondent's Motion for Summary Decision.

## **Undisputed Facts**

The parties in this case have worked diligently in creating a detailed list of joint stipulations.[4] They are as follows:

1. The Administrative Law Judge and the Federal Mine Safety and Health Review Commission have jurisdiction to hear and decide civil penalty proceedings pursuant to Section 105 of the Federal Mine Safety and Health Act of 1977.

2. On March 11, 2019, MSHA Coal Mine Inspector John M Smith was conducting inspection activities at the Elk Creek Prep Plant, Mine ID 46-02444.

3. The Elk Creek Prep Plant is owned and operated by Ramaco Resources, LLC. ("Ramaco Resources").

---

(b) Machinery and equipment shall be operated only by persons trained in the use of and authorized to operate such machinery or equipment.
(c) Repairs or maintenance shall not be performed on machinery until the power is off and the machinery is blocked against motion, except where machinery motion is necessary to make adjustments.
(d) Machinery shall not be lubricated while in motion where a hazard exists, unless equipped with extended fittings or cups.

30 C.F.R. § 77.404.

[4] Joint Stipulations will be designated by JS ¶ followed by the stipulation number.

JA 075

4. After completing his activities at the Elk Creek Prep Plant on March 11, 2019, CMI Smith traveled more than a mile up the hollow along the haul-road and then turned off the haul-road at Right Hand Fork Road and followed Right Hand Fork Road across a creek about 1000 feet to a location where K C Transport had constructed a parking area with two maintenance shipping containers. K C Transport purchased the gravel and stone for the parking lot and constructed the parking area. K C Transport also has commercial insurance to cover this facility.

5. Inspector Smith traveled up the haul-road and Right Hand Fork Road because he was looking for trucks to issue terminations for previously issued citations. When he reached K.C. Transport's maintenance lot, he observed the trucks cited in Citation Nos. 9222038 and 9222040.

6. At the time of the citations, K C Transport was in the process of constructing a new maintenance shop at that location. The construction materials for a planned approximately 60' x 70' metal building for the new maintenance shop had arrived at the site but were staged on pallets and the metal building had not yet been constructed. The parking area for the planned maintenance shop had been constructed and K C was using two shipping containers and two service trucks for its maintenance needs.

7. K C Transport is an independent trucking company which provides hauling services to various businesses, including coal hauling, earth hauling and gravel hauling.

8. K C Transport provides coal hauling services to various coal mine operators, including, but not limited to Ramaco Resources.

9. K C Transport operates truck maintenance and storage facilities at five (5) locations, including one at Bluefield West Virginia, one at Taz[e]well, Virginia, two at Princeton, West Virginia, one at Man, West Virginia and the one at issue in this proceeding in Emmett, West Virginia.

10. The new K C Transport maintenance area is located on Right Hand Fork Road, which is a road off the haulage road, which runs past the Elk Creek Plant operated by Ramaco Resources. It is located approximately 1000 feet from the haulage road.

11. The K C Transport maintenance facility is more than a mile up the hollow from the Elk Creek Plant. The Elk Creek Preparation Plant is the nearest coal extraction/preparation facility to K C Transport's maintenance facility.

12. There is a gate at the entrance to the K C Transport facility on Right Hand Fork Road and there is no other way into the hollow where it is located. At the time Citation Nos. 9222038 and 9222040 were issued, the gate was in need of repair and was not operational. KC Transport usually operates this

JA 076

maintenance facility on a 24-hour, 6 day a week basis. Right Hand Fork Road dead ends on the other side of the KC Transport facility. The road into the K C Transport facility is not a coal haulage road but does branch off from a haulage road.

13. K C Transport shares the parking area for its maintenance facility with a logging company. Ramaco Resources has no personnel or equipment at the facility.

14. K C Transport operates both on-road and off-road trucks out of this facility. The off-road trucks provide haulage for five (5) nearby Ramaco Resources' mines. The on-road trucks provide earth haulage services for AEP, gravel haulage services to other customers and coal haulage services for customers other than Ramaco Resources.

15. KC Transport asserts that about 60% of the services from this K C facility are to the five (5) nearby Ramaco Resource mines, including the 3 deep mines, a strip mine and a highwall mine. The other 40% of K C Transport's work from this location is to provide services for companies other than Ramaco Resources, including American Electric Power ("AEP") and other coal operators. For example, for the past 4-5 months, K C Transport has been working on a large earth moving project for AEP and the trucks working on this project are parked and maintained at the Emmett shop. Although the Secretary has no knowledge of these facts, the Secretary does not dispute the company's assertions.

16. This facility provides a convenient centralized maintenance facility in Logan County for KC Transport.

17. Representatives of Ramaco told K C Transport they could use the area where the trucks referenced in Citation Nos. 9222038 and 9222040 were located for a maintenance facility and assured K C Transport that this area was not on permitted, bonded mine property, so Ramaco would not be operating there. The Secretary has no evidence that K C Transports' facility is on permitted, bonded mine property. Ramaco Resources has no plans to operate a coal mine at the location where K C Transport maintains its maintenance area/shop. K C Transport uses the property for purposes of maintaining a portion of its truck fleet, including those trucks servicing the Ramaco Resources mines and customers other than Ramaco Resources.

18. The haul trucks cited in Citation Nos. 9222038 and 9222040 were owned by K C Transport and were located at KC Transport's Emmett, West Virginia maintenance facility when cited. The haul trucks referenced in Citation Nos. 9222038 and 9222040 were regularly used to haul coal from the five Ramaco mines to the Elk Creek prep plant at the time of the citations.

JA 077

19. At the time that CMI Smith inspected the haul trucks referenced in Citation Nos. 9222038 and 9222040, the trucks were not hauling coal, were not on a haul-road and were parked at K C Transport's maintenance area for maintenance work to be performed on the trucks.

20. On March 11, 2019, K C Transport's maintenance/shop area, where the trucks referenced in Citation Nos. 9222038 and 9222040 were located, was property that was not permitted or bonded by the state of West Virginia.    See Respondent's Exhibit A (map).

21. Until the Citation Nos. 9222038 and 9222040 were issued, MSHA never sought to enter or inspect K C Transport's Emmett maintenance shop or parking area at any time, from the time  K C Transport constructed the parking lot  to the time the citations were issued.  MSHA has not attempted to enter or inspect this area or the trucks while at this location, since the citations.

22. On one occasion, on April 3, 2018, MSHA did cite a work trailer and muddy parking area that K.C. Transport had adjacent to where the haulage road intersects with Right Hand Fork Road. (Citation Nos. 9174394 and 9174395). However, MSHA vacated the citations for the work trailer and muddy parking lot.   After this incident, K C Transport elected to construct the new facility approximately 1000 feet away from the haulage road up Right Hand Fork Road.

23. When Citation Nos. 9222038 and 9222040 were issued, MSHA did not attempt to inspect the shipping containers, service trucks or any other trucks at the location, nor did MSHA inspect the logging trucks which were located at K C Transport's maintenance area.

24. To get to KC transport's Emmett facility, it is necessary to pass along the Ramaco Resources, LLC's Elk Creek Plant haul-road until reaching the Right Hand Fork Road hollow where the facility is located. Then it is necessary to cross a creek and drive 1000' up Right Hand Fork Road to the facility.

25.  KC Transport's maintenance facility where these trucks were inspected is located more than a mile from the Elk Creek Plant, approximately 4-5 miles from three (3) deep mines operated by Ramaco Resources, LLC and six (6) miles from a strip mines and highwall  mines operated by Ramaco Resources. Thus, the closest location where coal is mined or prepared is more than a mile from this facility.

26. All of the Ramaco mines are accessed via the haul-road. That haul-road is a public road for some distance. However, before reaching the Elk Creek  Plant, there is a gate limiting public access to the haul-road beyond that location. The gate is manned and only authorized persons are permitted beyond that

point. The haul-road beyond the gate is maintained by Ramaco Resources and is no longer a public road. KC Transport's maintenance area is also accessed only by traveling through the gate and up the haul-road to the turn-off at Right Hand Fork Rd, although Right Hand Fork Road is not part of the haul-road.

27. At various times, the cited trucks have hauled coal from each of the Ramaco mines to the Elk Creek Plant. The cited trucks were not licensed to haul products over public roads at the time the citations were issued, but they have been in the past and they may be in the future.

28. On or about March 11, 2019, the trucks referenced in Citation Nos. 9222038 and 9222040 were only being operated on private land, including haul-roads operated by Ramaco Resources. There were other trucks parked at that same location which were used by K C Transport to haul coal and materials other than coal and for customers other than Ramaco.

29. The cited trucks are inspected regularly by MSHA when they are at the five (5) Ramaco Resources LLC mines and at the Elk Creek prep plant and along the haul-road. They had never previously been inspected at K C Transport's maintenance facility/parking area.

30. K C Transport operates about 35 trucks from the Emmett, West Virginia, Maintenance Facility.

31. The proposed penalty amounts that have been assessed for the violations at issue pursuant to 30 U.S.C. Section 820(a) will not affect the ability of K C Transport to remain in business.

32. MSHA Coal Mine Inspector John M Smith was acting in his official capacity and as an authorized representatives of the Secretary of Labor when Citation Nos. 9222038 and 9222040 involved in this proceeding were issued.

33. True copies of each of the citations that are at issue in this proceeding along with all continuation forms and modifications, were served on K C Transport or its agent as required by the Act.

34. Each of the violations involved in this matter were abated in good faith.

35. Government Exhibit 1 is an authentic copy of Citation No. 9222038, with all modifications and abatements, and may be admitted into evidence for the purpose of establishing its issuance and not for the purpose of establishing the accuracy of any statements asserted therein.

36. Government Exhibit 2 is an authentic copy of Citation No. 9222040,[5] with all modifications and abatements, and may be admitted into evidence for the

---

[5] The parties erroneously listed this citation as 9222038.

purpose of establishing its issuance and not for the purpose of establishing the accuracy of any statements asserted therein.

37. Respondent's Exhibit A is a map of the area. Neither party contests its authenticity and it may be admitted into evidence for the purpose of demonstrating the layout of the area and the permitted, bonded areas for the Court as well as the location of K C Transport's facility in relation to the Elk Creek Plant.

38. With respect to Citation Nos. 9222038 and 9222040, K C Transport contests that MSHA had jurisdiction over the trucks referenced in the citations, while located at KC Transport's Emmett, WV maintenance facility. K C Transport argues that both citations should be vacated for lack of jurisdiction at this location.

39. With respect to Citation Nos. 9222038 and 9222040, should the administrative law judge find that MSHA did have jurisdiction over the trucks, while at K C Transport's maintenance facility, K C Transport concedes that the conditions then present would violate 77.404(c) if the trucks had been subject to jurisdiction. With respect to Citation Nos. 9222038 and 9222040, should the administrative law judge affirm the finding that 77.404(c) was violated, the parties have agreed that the gravity findings set forth in the citations shall be affirmed.

40. With respect to Citation Nos. 9222038 and 9222040, should the administrative law judge find jurisdiction and affirm the finding that 77.404(c) was violated, the negligence for each citation shall be modified from moderate to low.

41. With respect to Citation No. 9222038, should the administrative law judge find jurisdiction and affirm the finding that 77.404(c) was violated, the parties agree that the appropriate penalty amount is $3,908.00.

42. With respect to Citation No. 9222040, should the administrative law judge find jurisdiction and affirm the finding that 77.404(c) was violated, the parties agree that the appropriate penalty amount is $4,343.00.

43. For purposes of Section 110(i) of the Act, the proposed penalty amounts are appropriate given the operator's history of violations and the size of the operator.

44. Government Exhibit 3 is a photograph depicting how the truck referenced in Citation No. 9222038 appeared at the time of inspection.

45. Government Exhibit 4 is a photograph depicting how the truck referenced in Citation No. 9222040 appeared at the time of inspection.

Secretary Motion for Partial Summary Decision, 3-12.[6] Respondent's Motion for Summary Decision, 1-3; Secretary's Motion for Summary Decision, 4-5. In addition to the stipulated facts, the parties each submitted exhibits.

## Summary Decision Standard

The Court may grant summary decision where the "entire record…shows: (1) That there is no genuine issue as to any material fact; and (2) That the moving party is entitled to summary decision as a matter of law." 29 C.F.R. § 2700.67(b); *see also UMWA, Local 2368 v. Jim Walter Res., Inc.*, 24 FMSHRC 797, 799 (July 2002); *Energy West Mining*, 17 FMSHRC 1313, 1316 (Aug. 1995) (*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986), which interpreted Fed.R.Civ.P. 56). The Commission has analogized its Rule 67 to Federal Rule of Civil Procedure 56, which authorizes summary judgments upon a proper showing of a lack of a genuine, triable issue of material fact. *Hanson Aggregates New York, Inc.*, 29 FMSHRC 4, 9 (Jan. 2007). A material fact is "a fact that is significant or essential to the issue or matter at hand." *Black's Law Dictionary* (9th ed. 2009, *fact*). "There is a genuine issue of material fact if the nonmoving party has produced evidence such that a reasonable factfinder could return a verdict in its favor." *Greenberg v. Bellsouth Telecommunications, Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (citation omitted). The court must evaluate the evidence "in the light most favorable to … the party opposing the motion." *Hanson Aggregates*, 29 FMSHRC at 9. Any inferences drawn "from the underlying facts contained in [the] materials [supporting the motion] must be viewed in the light most favorable to the party opposing the motion." *Id.* Though the moving party bears the initial burden of informing the court of the basis for its motion, it is not required to negate the nonmoving party's claims. *Celotex*, 477 U.S. at 323. "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Scott v. Harris*, 550 U.S. 372, 380 (2007) (citation omitted).

## Analysis

This case concerns the limits of MSHA jurisdiction, and like many jurisdictional cases, it raises difficult, often novel issues, driven by the precise facts of the case. As Judge Manning has eloquently stated, "Jurisdictional issues under the Mine Act are often factually complex. The Commission and various federal circuit courts have wrestled with these issues… Whether MSHA has jurisdiction under the specific facts at issue here will be one of the key issues in these cases." *Cox Transportation Corp.*, 22 FMSHRC 568, 569–70 (April 5, 2000) (ALJ). The case is

---

[6] References to the Secretary of Labor's exhibits are designated as "SX." References to Respondent's exhibits are designated "RX." References to the Secretary's Motion for Partial Summary Decision are designated "SB" followed by the page number. References to the Secretary's Reply Brief are designated "SRB" followed by the page number. References to the Respondent's Memorandum of Law in Support of Motion for Summary Decision are designated "RB" followed by the page number. References to Respondent's Reply Brief are designated "RRB" followed by the page number.

made even more difficult because even though both parties are arguing about jurisdiction, their arguments are often not directed at each other.

K C Transport is an independent trucking business that provides hauling services to various businesses, including coal and gravel mines. JS ¶¶ 7, 8. It owns and operates five maintenance and storage facilities in Virginia and West Virginia. JS ¶ 9. At issue here are trucks that were located in the Emmett, West Virginia maintenance facility (hereinafter referred to as the "maintenance facility"). JS ¶¶ 4-6. The maintenance facility provides off-road trucks for haulage for five nearby Ramaco Resources mines and on-road trucks for earth haulage services for American Electric Power ("AEP"), as well as trucks for gravel and coal haulage for other customers. JS ¶ 14. Approximately 60% of the services from the maintenance facility are for the five nearby Ramaco Resources mines, including three deep mines, a strip mine, and a highwall mine. JS ¶ 15. The other 40% of K C Transport's work from this facility provides services for AEP and other coal operators. JS ¶ 15. At the time of the citations, K C Transport was in the process of constructing a new maintenance shop at this location. JS ¶ 6.

In order to get to the maintenance facility, one travels along the Ramaco Resources Elk Creek Plant haul-road until reaching the Right Hand Fork Road, following that road for approximately 1,000 feet, until reaching the facility. JS ¶¶ 4, 10, 24. The haul-road "is a public road for some distance." JS ¶ 26. The maintenance facility is located more than a mile from the Elk Creek Plant, approximately four to five miles from three deep mines operated by Ramaco Resources, and six miles from strip mines and highwall mines operated by Ramaco. Therefore, the closest location where coal is mined or prepared is more than a mile from the maintenance facility. JS ¶ 25.

Here, an MSHA inspector at the Elk Creek Prep Plant traveled more than a mile up the hollow along the haul-road, then turned at the Right Hand Fork Road and traveled along it for approximately 1,000 feet, crossed a creek, and arrived at the maintenance facility. JS ¶ 4. Once he arrived, he cited two trucks that were undergoing maintenance at the off-site K C Transport maintenance facility for violations of 30 C.F.R. § 77.404(c).[7] JS ¶ 5; SX-1; SX-2. The mandatory

---

[7] Citation No. 9222038 states:

> The red Mack tandem coal truck Co# 120 is jacked up with the wheels and tires off both back axles and is not blocked to prevent motion. The rear of the truck is jacked up by using blocking under the back end of the bed and using the motion of the bed when raised to lift the back wheels off the ground. Work is being preformed [sic] on the brakes located on the back axles of the truck. Standard 77.404(c) was cited 1 time in two years at mine 4602444 (0 to the operator, 1 to a contractor).

GX-1. Citation No. 9222040 states:

> The bed on the Mack Co#5 coal truck is in the raised position and is not blocked against motion. A miner is observed standing on the frame of the truck under the

standard provides that "repairs or maintenance shall not be performed on machinery until the power is off and the machinery is blocked against motion, except where machinery motion is necessary to make adjustments." 30 C.F.R. § 77.404(c). At the time the trucks were cited, the trucks were not hauling coal or on a haul-road; rather, they were parked at the maintenance facility for maintenance work. JS ¶ 19. The cited trucks have hauled coal from each of the Ramaco mines to the Elk Creek Plant. JS ¶ 27. The parties agree as to the gravity, negligence, and penalty amounts if this Court finds jurisdiction over the trucks here. JS ¶ 39-43.

## **Contentions of the Parties**

A difficult aspect of this case is that the parties do not seem to be on the same page as to what issue is before the Court, with the Secretary arguing for jurisdiction over the trucks and the Respondent arguing against jurisdiction over the maintenance facility. The Secretary states in its opening brief, "The parties agree that the only issue in dispute concerning the citations is whether the trucks are subject to MSHA coverage."[8] SB at 1. Throughout its brief, the Secretary's arguments are almost entirely in support of the trucks, rather than the facility, being under MSHA's jurisdiction. The Secretary clarifies that "whether the maintenance area is a mine subject to MSHA coverage need not be decided in this case to determine whether MSHA coverage applied to the subject trucks." SRB at 1.

In contrast, the Respondent states that "all that remains for the Court to decide is the purely legal issue of whether MSHA had jurisdiction over K C Transport's Emmett facility." RB at 6. The Respondent argues that "because K C Transport's Emmett facility is not a 'coal or other mine,' as defined in the Federal Mine Safety and Health Act of 1977 ('Mine Act'), the Court should find that MSHA was without jurisdiction over the facility and that Citation Nos. 9222038 and 9222040 should be vacated." RB at 1. The Respondent's brief vacillates between arguing against this position that the Secretary does not take and arguing that MSHA cannot assert jurisdiction over the trucks without jurisdiction over the maintenance facility. RB at 8.

The Secretary argues that the definition of a "mine" was intended to be read broadly, and that the trucks referenced in the citations are equipment that were used in the extraction and preparation of coal and therefore subject to Mine Act coverage. SB at 14. The Secretary makes clear that its argument is that the trucks, not the maintenance facility or any structures on the site, are under MSHA jurisdiction. SRB at 1. The Secretary argues that though the Act is clear, if this Court finds ambiguity, the Secretary should be accorded *Chevron* deference. SB at 15-16. If this Court does not extend MSHA jurisdiction to the trucks, the Secretary asserts that it would create

---

raised unblocked bed. This citation was factor that contributed to the issuance of Imminent Danger Order No. 9222039 dated 3/11/2019. Therefore, no abatement time was set. Standard 77.404(c) was cited 2 times in two years at mine 4602444 (2 to contractor 77.404(c)).

SX-2.

[8] As will be discussed, *infra*, the parties did not in fact agree on this being the sole issue.

"a bifurcated coverage scheme [that] would be impractical, if not impracticable, and would lead to confusion on the part of miners and the operator itself as to what standards were applicable at any given time." *Id.* at 19. The Secretary refers to this bifurcated coverage between MSHA and OSHA as "an absurd result." SRB at 3.

The Respondent argues that off-site facilities, such as the maintenance facility here, are not under MSHA jurisdiction. RB at 6-7. It further argues that location is key to understanding whether MSHA has jurisdiction over equipment, and that MSHA cannot simply attach jurisdiction to a piece of mobile equipment and follow that equipment "wherever it goes." RB at 2. It argues that MSHA can cite the trucks at issue while they are at any of the Ramaco mines or Elk Creek preparation plant, but not when they are located in an area that is not under MSHA's jurisdiction.

Because the parties' briefs raise both the issue of whether the maintenance facility is a mine and whether the trucks are mines, this Court will consider both questions. Based on the following analysis, this Court rejects the Secretary's argument that each of these trucks constituted a "mine" under the Act no matter where they are located. However, this Court also rejects the Respondent's argument that the maintenance facility was not a "mine" under the Act. Rather, this Court finds that the maintenance facility was a "mine" under Section 3(h)(1)(C), and because the trucks were used in mining and parked at the facility, they constituted "equipment" under the same section. However, MSHA's jurisdiction over the trucks is not limitless; though it is clear that MSHA had jurisdiction in the instant case, it would likely lack such jurisdiction if the trucks were at a non-mining site performing non-mining activities.

## Case Disposition

The first inquiry here must be "whether Congress has directly spoken to the precise question at issue." *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842 (1984); *Thunder Basin Coal Co.*, 18 FMSHRC 582, 584 (Apr. 1996). "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 842-843. "In ascertaining the plain meaning of the statute, courts utilize traditional tools of construction, including an examination of the 'particular statutory language at issue, as well as the language and design of the statute as a whole,' to determine whether Congress had an intention on the specific question at issue. *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988); *Local Union 1261, UMWA v. FMSHRC*, 917 F.2d at 44; *Coal Employment Project v. Dole*, 889 F.2d 1127, 1131 (D.C. Cir. 1989)." *MSHA v. Jim Walter Resources, Inc.*, 22 FMSHRC 21 (Jan. 31, 2000). If it is found that Congress has not addressed the question at issue, "the court does not simply impose its own construction on the statute... Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Chevron*, 467 U.S. at 842-843.

Examining the Mine Act, as well as relevant legislative history, I find that Congress has directly spoken to the precise question at issue. Though the definition of a "mine" under the Mine Act is broad and was intended to be read expansively, it was not intended to be limitless.

JA 084

The Secretary's argument that MSHA has jurisdiction over a truck that was used to haul coal, no matter where that truck is located, expands MSHA's jurisdiction to every road, parking lot, garage, and facility in the country. Mobile equipment such as trucks would essentially become rolling mines under the Secretary's interpretation. Under the Secretary's interpretation, if the trucks at issue here were hundreds of miles from the mine and were undergoing maintenance at a private mechanic, MSHA would have jurisdiction over those trucks. If the trucks were parked at a diner while the drivers ate, MSHA would have jurisdiction. If the trucks were hauling lumber for a lumberyard, MSHA would have jurisdiction. Beyond the absurdity of MSHA having geographically and functionally limitless jurisdiction over the trucks, there would also be the problem that any person working on the truck or driving it at any time might be considered a miner under Section 3(g) ("'miner' means any individual working in a coal or other mine." 30 U.S.C. 802(g).)

"In enacting the statute, Congress was plainly aware that the mining industry is among the most hazardous in the country and that the poor health and safety record of this industry has significant deleterious effects on interstate commerce." *Donovan v. Dewey*, 452 U.S. 594, 602 (1981). As a result, Congress took care to put in place a strict regulatory scheme to protect the health and safety of miners at a mine. However, it carefully described what constituted a mine, creating three general categories that were geographically and functionally centered. Congress's definition does not include trucks in whatever location they may be and whatever they may be doing. However, the Mine Act clearly defines a mine in a manner that includes, under the facts of this case, both the maintenance facility and the equipment (or trucks) therein. While MSHA cannot simply attach jurisdiction to the trucks and follow them wherever they may drive, it can assert jurisdiction over the maintenance facility and all the equipment at the facility that is used for mining.[9]

Section 4 of the Mine Act makes clear that "Each coal or other mine, the products of which enter commerce, or the operations or products of which affect commerce, and each operator of such mine, and every miner in such mine shall be subject to the provisions of this chapter." 30 U.S.C. § 803. The Act further provides in Section 3(h)(1) three categories of definitions for what constitutes a "coal or other mine" as:

> (A) an area of land from which minerals are extracted in nonliquid form or, if in liquid form, are extracted with workers underground, (B) private ways and roads appurtenant to such area, and (C) lands, excavations, underground passageways, shafts, slopes, tunnels and workings, structures, facilities, equipment, machines,

---

[9] It should be noted that if MSHA asserts jurisdiction over the maintenance facility, trucks and other equipment contained on the site, it must conduct inspections "of the mine in its entirety at least two times a year." 30 U.S.C. § 813(a). In the instant case, the MSHA inspector only inspected the trucks, and "did not inspect the shipping containers, service trucks or any other truck at the location." JS ¶ 23. It is not entirely clear from the record whether all this equipment was mining-related, but if so, MSHA would be required to conduct such comprehensive inspections.

JA 085

tools, or other property including impoundments, retention dams, and tailings ponds, on the surface or underground, used in, or to be used in, or resulting from, the work of extracting such minerals from their natural deposits in nonliquid form, or if in liquid form, with workers underground, or used in, or to be used in, the milling of such minerals, or the work of preparing coal or other minerals, and includes custom coal preparation facilities.

30 U.S.C. § 802(h)(1). Because the controversy in this case concerns whether either the maintenance facility and/or the trucks could constitute a "mine," it is clear that subsection (A) concerning land, and subsection (B) concerning private ways and roads, are not at issue.[10] Specifically, it is the portion of subsection (C) that mentions "structures, facilities, equipment, machines, tools…used in, or to be used in, or resulting from, the work of extracting such minerals from their natural deposits….or used in, or to be used in, the milling of such minerals, or the work of preparing coal or other minerals," that the Secretary argues provides jurisdiction over the trucks. SB at 13.

When analyzing the definition of "mine" under the Act, one must not be "governed by ordinary English usage," but rather by the broad definition and intent that Congress set forth. *Donovan v. Carolina Stalite Co.,* 734 F.2d 1547, 1551 (D.C. Cir. 1984). The Commission has repeatedly emphasized that "The definition of a 'coal or other mine' in section 3(h) of the Mine Act is broad, sweeping and expansive." *MSHA v. KenAmerican Resources, Inc.*, 42 FMSHRC 1, 6 note 12 (Jan. 16, 2020); *Jim Walter Resources,* 22 FMSHRC at 24; *MSHA v. Justis Supply & Machine Shop*, 22 FMSHRC 1292, 1296 (Nov. 03, 2000). This description was based on the congressional intent of the Mine Act. The Senate Report accompanying the Mine Act states that "it is the Committee's intention that what is considered to be a mine and to be regulated under this Act be given the broadest possibl[e] interpretation*." Donovan v. Carolina Stalite Co.*, 734 F.2d 1547, 1554-55 (D.C. Cir. 1984) (quoting S. Rep. No. 461, 95th Cong., 1st Sess. 37 (1977), U.S. Code Cong. & Admin. News 1977, 3401, 3414). "Close jurisdictional questions are to 'be resolved in favor of inclusion of a facility within the coverage of the Act.' *Id.*

Following this directive to interpret the definition of a mine broadly, ALJs, the Commission, and Federal Courts of Appeal have found a broad variety of lands, roads, structures, facilities, and equipment to constitute a mine. Combined these provide a general framework for the breadth and limits of MSHA jurisdiction, as well as the appropriate analysis to determine jurisdiction.

In *Marshall v. Stoudt's Ferry Preparation Co.*, the Third Circuit held that a preparation plant that separated low-grade fuel from sand and gravel dredged from a riverbed was a mine. 602 F.2d 589 (3rd Cir. 1979). Analyzing the Act's use of the words, "structure" and "facility," the Court stated that "although it may seem incongruous to apply the label 'mine' to the kind of plant operated by Stoudt's Ferry, the statute makes clear that the concept that was to be conveyed

---

[10] In *National Cement Co. of Ca. Inc.*, the Secretary took the position that Section 3(h)(1)(B) covers roads, but not vehicles on those roads. 573 F.3d 788, 794-796 (D.C. Cir. 2009).

JA 086

by the word is much more encompassing than the usual meaning attributed to it[. T]he word means what the statute says it means." *Id.* at 592. Similarly, In *Harman Min. Corp. v. FMSHRC*, the Fourth Circuit held that a plant's "car dropping" facility, where railroad cars were loaded with coal, was a mine. 671 F.2d 794 (4th Cir. 1981). The Court held that the broad definition of "mine" included "all of the facilities used at a coal preparation plant." *Id.* at 796. In *Donovan v. Carolina Stalite Co.*, the D.C. Circuit held that a slate gravel processing facility that was immediately adjacent to a quarry, but was not engaged in direct slate extraction was a mine because it fit within Section (C)'s inclusion of "structures." 734 F.2d 1547 (D.C. Cir. 1984).

In *National Cement Co. of Ca. Inc.*, the D.C. Circuit held that the Secretary's interpretation of Section 3(h)(1) was reasonable when it argued that Mine Act jurisdiction extended to a private road leading to the plant. 573 F.3d 788 (D.C. Cir. 2009). In this case, the Secretary explained the interplay between the three subsections of Section 3(h)(1)(B), which the Court accepted as reasonable. The Secretary interpreted the word "area" in Subsection (A) as "all-encompassing because virtually everything in an extraction area ... is necessarily related to [mining] activity." *Id.* at 794. The Secretary interpreted Subsection (B) to cover mining roads, but not the vehicles traveling on those roads. *Id.* Lastly, the Secretary interpreted Subsection (C) to cover mining related vehicles traveling on mining roads. *Id.* at 795. "Subsections (B) and (C) can be read to work in tandem." *Id.*

In the seminal case, *MSHA v. Jim Walter Resources, Inc.*, the Commission held that a central supply shop used to repair and maintain electrical and mechanical equipment at nearby mines was a mine under the Act. 22 FMSHRC 21 (Jan. 2000).[11] The Commission reasoned that the language of the Mine Act was clear, stating:

> The stipulated record is equally clear in establishing that the Central Supply Shop is a dedicated off-site facility of a (multiple) mine operator where employees receive, stock, maintain, and deliver equipment, tools, and supplies used at JWR's coal extraction sites, preparation plants, and Central Supply Shop, including, inter alia, rock dust, line curtains, hard hats, machine parts, and conveyor belts. Consequently, there is Mine Act jurisdiction because a """"mine" includes "facilities" and "equipment ... used in or to be used in" JWR's mining operations or coal preparation facilities.

*Id.* At 25. In dicta, the Commission cited to the *W.J. Bokus Industries* for the proposition that "whether a mine operator's equipment is covered by the Mine Act is not determined by its

---

[11] Similarly, in *MSHA v. U.S. Steel Mining Co.*, the Commission held that an off-site central repair shop, which had a separate Mine ID, and "exists and functions to repair and maintain electrical and mechanical equipment used in or to be used in USSM's underground and surface coal mines and its coal cleaning plant" constituted a separate "surface coal mine" under the Act. 10 FMSHRC 146, 149 (Feb. 1988). Also, in *MSHA v. W.F. Saunders & Sons*, ALJ Melick held that a preparation plant's truck shop and storeroom, which was primarily used to store and repair trucks used in mining, was a mine under the Act.1 FMSHRC 2130 (Dec. 28, 1979) (ALJ).

JA 087

location but rather by its function -- that is, whether it is used in extracting or preparing coal." *Id.* at Note 11.

In *MSHA v. W.J. Bokus Industries, Inc.*, the Commission found that gas cylinders kept in a garage adjacent to an asphalt plant and beside an office used by the mine were under MSHA jurisdiction. 16 FMSHRC 704 (April 1994). The garage was regularly used by miners on mining-related tasks. *Id.* at 708. In *W.J. Bokus*, it was unclear whether the ALJ found the garage itself to be under MSHA jurisdiction, but the Secretary's position appeared to be that the equipment in the garage was under MSHA jurisdiction *because* the garage was under MSHA jurisdiction ("The Secretary assert[ed] that the judge 'accepted that MSHA had jurisdiction over the garage.' He infers that the judge would not have examined jurisdiction over items in the garage unless he assumed that MSHA had jurisdiction over the garage itself." 16 FMSHRC at 707, FN 9). However, in reversing the ALJ, the Commission made clear that "we need not reach the issue raised by the Secretary, that the garage was a 'structure' or 'facility' used in mining and, therefore, a 'mine' within the meaning of section 3(h)(1) of the Mine Act." Id. at 708.

In *MSHA v. Justis Supply & Machine Shop*, the Commission relied on *Jim Walter Resources* to conclude that an off-site dragline assembly site was a mine under the Act. 22 FMSHRC 1292 (Nov. 2000). The Commission found that the dragline was equipment "to be used in" mining coal, and the site and employees at the site were devoted to building the dragline that would be used at the mine. Therefore, the dragline assembly site was a mine under the Act.

In *MSHA v. State of Alaska, Dept. of Transp.*, the Commission held that a SAG Screener, a mobile piece of equipment that excavated material at pits along a gravel road and which had its own MSHA Mine ID, was a mine under the Act. 36 FMSHRC 2642 (Oct. 2014). The Commission examined Subsections (A) and (C) in conjunction and held that even though the dedicated right-of-way may not fall under the definition of "private ways and roads" in Subsection (B), it was a piece of equipment used in a mining area.

In *MSHA v. Austin Powder*, ALJ Andrews rejected the Respondent's arguments that because an off-site storage facility was "not employed in" mining at the quarry, it was not a "mine." 37 FMSHRC 1337, 1349 (June 8, 2015). He found that the storage facility was used to store explosives and related materials used in mining, and was therefore a "facility" under the Act. *Id.* at 1352. Similarly, In *MSHA v. Youngquist Brothers Rock, Inc.*, ALJ Gill found that MSHA had jurisdiction to cite a truck that may have been on a section of the mine property where a restaurant was located. 36 FMSHRC 2492 (Sept. 19, 2014) (ALJ). Judge Gill's analysis focused on the location of the truck when it was cited and he found jurisdiction specifically because it was on an area that fell under the definition of a "mine." Further relevant to the instant case, in *Youngquist* MSHA's position was that if the truck been outside the mine gates, MSHA would not have had jurisdiction over it.[12] *Id.* at 2496. In *MSHA v. Jeppesen Gravel*, ALJ Melick

---

[12] MSHA has stated this position in several cases. In *MSHA v. Drillex, Inc.*, the inspector "further confirmed that his enforcement jurisdiction over the respondent is limited to any trucks actually found on quarry or mine properties, and that in the instant case, he inspected the truck after it was driven onto the mine site in question." 9 FMSHRC 1972, 1975 (Nov. 24, 1987).

JA 088

held that a Caterpillar front end loader was under the Mine Act's jurisdiction when it was being used to load gravel in a private way or road appurtenant to the area where the gravel was extracted. 32 FMSHRC 1749 (Nov. 18, 2010) (ALJ). In *MSHA v. Northern Illinois Service Co.*, ALJ Gill held that MSHA had jurisdiction over a service truck and its contents when that truck was on mine premises, even if it was also used at non-mine locations. 36 FMSHRC 2811 (Nov. 10, 2014) (ALJ).

More recently, ALJ Simonton held that a parking lot and office that were located on mine property and adjacent to the plant's active extraction sites was a mine under the Act. *MSHA v. Rain for Rent*, 40 FMSHRC 1267, 1271 (Aug. 22, 2018). The Judge emphasized that the "parking lot is on Natividad Plant property, adjacent to active extraction sites, and used for mine-related purposes." *Id.* at 1272. In finding jurisdiction, Judge Simonton concluded that the "office and parking lot are thus geographically and functionally related to the mining process at Natividad Plant and are subject to MSHA jurisdiction under the Act." *Id.*

In *MSHA v. Maxxim Rebuild Co.*, the Commission held that an off-site maintenance shop that was used primarily to maintain, repair, and fabricate equipment used in the mining process was a mine under the Act. 38 FMSHRC 605 (April 2016). However, this decision was reversed by the Sixth Circuit, in a sweeping decision that rejected *Jim Walter Resources* and much of the Commission's reasoning on jurisdiction. *Maxxim Rebuild Co. v. FMSHRC*, 848 F.3d 737, 740 (6th Cir. 2017). In looking at the three subsections in the definition of a "mine," the Court emphasized, "Location, location, location: All three definitions are place connected and place driven." Id. at 742. The Sixth Circuit held that MSHA jurisdiction "extends only to such facilities and equipment if they are in or adjacent to—in essence part of—a working mine."[13] *Id.* at 740. Since the maintenance shop was not attached to or adjacent to a working mine, it did not fall under the Act's definition of a mine. *Id.* at 742. With regards to equipment, the Court held that such equipment's use in mining is not dispositive of MSHA jurisdiction. "It does not cover mining 'equipment' or for that matter mining 'machines, tools, or other property' wherever they may be found or made." *Id.* at 740.[14] In reaching its conclusion, the Court stated that for the same

---

[13] Similarly, in *MSHA v. Pickett Mining Group*, ALJ Rae found that MSHA lacked jurisdiction over a Ford tractor. 36 FMSHRC 2444 (Sept. 8, 2014) (ALJ). Judge Rae's analysis looked at the location of the tractor and its use. She found that there was no evidence that the tractor has been or will be used in mining activities, and that at the time of citation the tractor was not located at any location that could be deemed part of an extraction area.

[14] While the Respondent uses the Sixth Circuit position to advance its argument, the Secretary uses the Commission decision to advance its argument. RB at 10-12; SB at 14. The Secretary argues that not only is the Sixth Circuit's reversal of the Commission in *Maxxim Rebuild* not binding precedent in this case, which arises out of the Fourth Circuit, but that "the lower unanimous decision by the Commission affirming MSHA coverage is the applicable precedent for this case." SRB at 2. This Court questions the Secretary's argument that a Circuit Court reversal (without remand) only disturbs the Commission's decision in the applicable Circuit. Nonetheless, whether the Commission's decision still governs ultimately has little bearing on the instant decision. This is due to the fact that the Commission's *Maxxim Rebuild* decision does not

16

reason it was rejecting the Commission's decision in *Maxxim Rebuild*, it rejected the Commission's decision in *Jim Walter Resources*. *Id.* at 744. Throughout the decision, the Court expressed dismay that the Secretary's position provided no natural limits. It emphasized that "The Secretary's interpretation also has no stopping point," Id. at 743, and that the definition's "locational focus" provides such a limit. *Id.* at 742.

This is not the only instance of a judge expressing that MSHA's jurisdiction, while broad, must have limits. In *Bush & Burchett, Inc. v. Reich*, the Sixth Circuit rejected the argument that any road appurtenant to a mine was within MSHA's jurisdiction, stating:

> Not only does the statute not compel such a reading, but also such a reading is contrary to common sense. Without some limitation on the meaning of "roads appurtenant to," MSHA jurisdiction could conceivably extend to unfathomable lengths since any road appurtenant to a mine that connects to the outside world would necessarily run into yet other roads, thus becoming one contiguous road. Because of the potential reach of MSHA jurisdiction if the definition in § 802(h)(1)(B) is left unfettered, "private ways and roads" cannot simply mean "any road." Otherwise, there could conceivably be no limit to MSHA jurisdiction, a result Congress clearly did not intend.

117 F.3d 932, 937 (6th Cir. 1997). Similarly, *Dilip K. Paul v. P.B – K.B.B.*, Inc., the Commission held that an engineering office that was responsible for designing an exploratory shaft, as well as providing personnel, equipment, and materials, was not a mine under the Act. 7 FMSHRC 1784 (Nov. 21, 1985). The Commission stated that "while we have recognized that the definition of 'coal or other mine' provided in section 3(h) of the Mine Act is expansive and is to be interpreted broadly, the inclusive nature of the Act's coverage is not without bounds." *Id.* at 1787 (citations omitted).[15]

Analyzing this jurisdictional map that arises through a review of the outer bounds of the Mine Act's definition of a "mine," the facility and equipment at issue here falls squarely within the definition. The off-site maintenance facility and trucks at issue here are much like the central supply shop at issue in *Jim Walter Resources*, the gas cylinders at issue in *W.J. Bokus*, the off-site dragline assembly site at issue in *Justis Supply & Machine Shop*, the off-site Screener at issue in *State of Alaska Department of Transportation*, the off-site storage facility at issue in

---

stand alone for the proposition that off-site facilities and equipment are under MSHA jurisdiction. Rather, it is but one of many cases over decades of jurisprudence analyzing Mine Act jurisdiction.

[15] In *MSHA v. Ammon Enterprises*, ALJ Zielinski discussed in dicta the question of whether MSHA would have jurisdiction over trucks loading mined materials that were stockpiled and separated by a screen, calling it a "gray area." 2008 WL 4190445 at Note 9 (July 10, 2008) (ALJ). He further stated that if the mining operations had been closed, "that the loading of trucks from the stockpiles would not be considered within MSHA's jurisdiction." *Id.*

JA 090

*Austin Powder*, and other cases discussed *supra*. The Respondent is correct that the location of the trucks and the maintenance facility matter, and that the Secretary's idea of the trucks being rolling mines would lead to an absurdity.

However, in this instance, the maintenance and trucks were located four to five miles from Ramaco's three deep mines and more than a mile from the Elk Creek Plant. JS ¶ 25. In *Jim Walter Resources*, the central shop was not on the property of any one of the coal extraction sites, but rather one mile from the closest site, six miles from two of the sites, and 25 miles from the farthest site. 22 FMSHRC at 22. In *U.S. Steel Mining Co*., the shop at issue was located approximately eight and a half miles from one mine, five miles from another mine, and a half mile from the cleaning plant. 10 FMSHRC at 147. The location of K C Transport's maintenance facility is not remote from the extraction and processing sites. Indeed, its proximity leads to the second question concerning the maintenance facility and trucks' functions.

K C Transport asserted that approximately 60% of the services from the maintenance facility are to the five nearby Ramaco Resource mines, and the other 40% is split between other companies, including other coal operators. JS ¶ 15. These services include operating on-road and off-road trucks used in coal, gravel, and earth haulage. JS ¶ 14. The two cited trucks at issue here have been used at various times to haul coal from each of the Ramaco mines to the Elk Creek Plant. JS ¶ 27. The trucks used to haul the coal from the mine to the processing facility fit well within the Mine Act's definition of equipment used in the work of preparing coal. The transportation of coal from those mines to that preparation plant is an integral part of the mining and preparation process. Furthermore, the maintenance of the trucks at the facility is essential to the coal hauling and preparation process. This interpretation is in line with the Commission's reasoning in *W.J. Bokus*, where the Commission found compressed gas cylinders, a stove, and a grinder to be equipment used in mining. 16 FMSHRC at 707-709. The Commission reasoned that miners worked in the garage where the gas cylinders were kept on mining-related tasks, the grinder had been used to maintain mining equipment, and the stove warmed the garage where the miners worked. *Id.*

I find the possibility of the "bifurcated coverage scheme" that the Secretary warns of to be not quite as absurd as the Secretary states. In fact, it is already in existence many times over in most aspects of mining and other industries. There are various interagency agreements and memoranda of understanding between OSHA and MSHA precisely because jurisdiction often shifts between the agencies. *See eg State of Alaska, Dept. of Transportation*, 36 FMSHRC 2642; *W.J. Bokus Industries*, 16 FMSHRC 704. Despite the Secretary's dire warnings of a bifurcated coverage scheme covering the trucks when they are on mines and/or engaged in mining-related activities, and when they are not on mines engaged in activity unrelated to mining, this Court is confident that the Department of Labor can adequately determine which agency and statute provides coverage.[16]

---

[16] Judge Manning described the various statutory jurisdictions controlled by the Secretary of Labor thusly: "The Secretary takes what is often called a 'nooks and crannies' approach when interpreting OSHA jurisdiction. OSHA fills in the nooks and crannies that other safety statutes do not cover." *Cox Transportation Corp.*, 22 FMSHRC at 580.

18

JA 091

Therefore, this Court finds that MSHA had jurisdiction over the trucks at issue as well as the maintenance facility. Accordingly, under the prior agreement of the parties, Citation No. 9222038 is affirmed, but modified to "low" negligence with a penalty amount of $3,908.00. Citation No. 9222040 is affirmed, but modified to "low" negligence with a penalty amount of $4,343.00.

## ORDER

It is **ORDERED** that Citation Nos. 9222038 and 9222040 be modified to "low" negligence, and the Respondent, K C Transport, Inc., is **ORDERED** to pay the Secretary of Labor the sum of $8,251.00 within 30 days of this order. [17]

John Kent Lewis
Administrative Law Judge

Distribution:

Robert S. Wilson, Esq., U.S. Dept. of Labor, 201 12th St. South, Suite 401, Arlington, VA 22202-5450

Stephen S. Adkins, CLR, MSHA, 4499 Appalachian Highway, Pineville, WV 24874

James P. McHugh, Esq. & Christopher D. Pence, Esq., Hardy Pence PLLC, 10 Hale Street, 4th Floor, P.O. Box 2548, Charleston, WV 25329

---

[17] Payment should be sent to: MINE SAFETY AND HEALTH ADMINISTRATION, U.S. DEPARTMENT OF LABOR, PAYMENT OFFICE, P. O. BOX 790390, ST. LOUIS, MO 63179-0390

JA 092

**FEDERAL MINE SAFETY AND HEALTH REVIEW COMMISSION**

| | | |
|---|---|---|
| SECRETARY OF LABOR | ) | **BEFORE THE COMMISSION** |
| MINE SAFETY AND | ) | |
| HEALTH ADMINISTRATION (MSHA), | ) | **Docket No. WEVA 2019-0458** |
| | ) | |
| Petitioner, | ) | **A.C. No. 46-02444-487883** |
| | ) | |
| v. | ) | **Contractor No. A8938** |
| | ) | |
| K C TRANSPORT, INC. | ) | |
| | ) | **Mine: Elk Creek Plant** |
| Respondent. | ) | |
| | ) | |

**K C TRANSPORT, INC.'s**
**PETITION FOR DISCRETIONARY REVIEW**

K C Transport, Inc. ("K C Transport"), hereby petitions the Federal Mine Safety and Health Review Commission ("Commission"), pursuant to Section 113(d)(2)(A)(ii) of the Federal Mine Safety and Health Act of 1977, as amended ("Mine Act"), 30 U.S.C. § 823(d)(2)(A)(ii), and 29 C.F.R. §2700.70(c), for review of Administrative Law Judge John Kent Lewis' ("ALJ") March 3, 2020 Order Denying Respondent's Motion for Summary Decision and Granting Secretary's Motion for Summary Decision ("Decision") as to Citation Nos. 9222038 and 9222040, both for alleged violations of 30 C.F.R. § 77.404(c).

## I.   WHY THE COMMISSION SHOULD REVIEW THE ALJ'S DECISION.

The ALJ's Decision on Citation Nos. 9222038 and 9222040 (for violations of 30 C.F.R. § 77.404(c)) raises substantial issues of law related to jurisdiction and when an ALJ may deviate from the relief requested by the Secretary and issue a declaratory judgment. The ALJ committed legal error and the ALJ's errors of law are likely to be repeated in the absence of review by the Commission.

For background, this proceeding involves two citations, each alleging violations of 30 C.F.R. § 77.404(c), issued to K C Transport by MSHA Inspector John M. Smith ("Inspector Smith") on March 11, 2019 on two trucks parked in a parking lot area used by K.C. Transport. K C Transport's maintenance facility was located off bonded property near Ramaco Resource LLC's Elk Creek plant ("Ramaco"). (Decision, p. 2; Stip. No. 3.) In addition to the Elk Creek plant, Ramaco also owns and operates five (5) mining operations in the vicinity of K C Transport's Emmett facility that are routinely inspected by MSHA; including, three deep mines, one surface mine and one highwall miner. (Stip. No. 14). Each of these facilities provided ample opportunities for MSHA to inspect K C Transport's trucks without the need to leave the mine and follow the trucks to K C Transport's maintenance facility.

The K C Transport maintenance facility serves multiple mining and non-mining operations. At the time of the citations, the area was a parking lot with maintenance trailers. K C Transport shared the parking lot with a logging company. The area where the trucks were cited would later (after the citations were issued) become a parking lot for K C Transport's new 60' x 70' maintenance facility (Stip. No. 3.). The area was a mile from the Elk Creek coal preparation plant ("Elk Creek plant") in Emmett, West Virginia. (Decision, p. 3; Stip. Nos. 2, 3, 4, and Exhibit A to Stipulations)   Here, the ALJ declared that MSHA had jurisdiction not just over the two cited trucks, but even over K C Transport's entire new 60' x 70' maintenance facility which did not even exist at the time of the citations. Decision, p. 12.

An initial fundamental problem with the ALJ's decision is that it significantly expanded the jurisdictional request of the Secretary, without prior notice to Respondent. MSHA's Motion for Summary Judgment specifically sought only to obtain jurisdiction over the two cited trucks.

2

The Secretary made no request for jurisdiction over the Emmett maintenance facility, including the unbuilt (at the time) maintenance facility.  In this regard, the Secretary argued: "the only issue in dispute concerning the citations is whether the trucks are subject to MSHA coverage." Secretary's Motion, p. 1. The Secretary's motion concluded: "the Secretary respectfully requests that the Court find that the trucks referenced in Citation Nos. 9222038 and 9222040 were subject to Mine Act coverage." Secretary's Motion, p. 20.  Even the ALJ acknowledged that the Secretary only sought jurisdiction over the trucks.  Decision, p. 10.

In response to the Secretary's limited request, the ALJ first concluded "MSHA cannot simply attach jurisdiction to the trucks and follow them wherever they may drive."  Decision, p. 12.  Then, after agreeing with the Respondent on this dispositive point, the ALJ decided to depart from the relief requested by the Secretary and issue an advisory declaratory judgment (notwithstanding that the Secretary did not petition for this), holding that MSHA had the authority to regulate K C Transport's entire Emmett maintenance facility, a facility which maintains trucks, including those not used in mining activities.

Ironically, under the guise of purportedly *limiting* jurisdiction, the ALJ greatly *expanded* the jurisdiction sought by the Secretary.  The ALJ stated that the relief the Secretary sought was far too broad noting: "The Secretary's argument that MSHA has jurisdiction over a truck that was used to haul coal, no matter where that truck is located, expands MSHA's jurisdiction to every road, parking lot, garage, and facility in the country."  Then, while purporting to limit jurisdiction, the ALJ issued an un-petitioned for declaratory judgment, without prior notice to K C Transport, and gave the Secretary far more relief than it requested, holding "the Mine Act clearly defines a

3

mine in a manner that includes, under the facts of this case, both the maintenance facility and the equipment (or trucks) therein." Decision, p. 12.

This decision by the ALJ constitutes an unannounced declaratory judgment and affects K C Transport's 60' x 70' maintenance facility which did not even exist at the time of the citations, where there was no case or controversy before the Court.  The only citations before the court were those involving the two trucks.  When the citations were issued, the trucks were serviced from trailers at K C Transport's Emmett maintenance site.  Now, the trucks are serviced by a 60' x 70' full service garage that services trucks performing many types of work other than mining.[1]  Yet, the ALJ has basically found that MSHA had jurisdiction over this facility that did not even exist at the time of the citations.   The ALJ even ordered MSHA that it had an obligation to conduct semi-annual inspections of the facility. Decision, n. 9.  This is a clear case of judicial overreach which should be rejected and vacated by the Commission.

This case does not meet the requirements for a declaratory judgment decision. In this regard, the Commission has held that "for any grant of Commission declaratory relief, the complainant must show that there is an actual, not moot, controversy under the Mine Act between the parties, that the issue as to which relief is sought is ripe for adjudication, and that the threat of injury to the complainant is real, not speculative. See generally, *Mid-Continent Resources, Inc.*, 12 FMSHRC 949, 954 (May 1990); 5 *J. Stein, G. Mitchell & B. Mezines, Administrative Law* § 46.03 (1988).  In this case, the Secretary filed no Complaint seeking declaratory judgment.  The Secretary only asked for jurisdiction to inspect the trucks.  Further, there was no actual and ripe controversy as to whether MSHA could regulate the entire Emmett maintenance facility including

---

[1] Approximately 40% of the trucking was for businesses other than Ramaco's five mines. Decision, 4.

the then unbuilt 60' x 70' facility before the Court since MSHA's position was that it only wanted to regulate the trucks in the parking lot.

K C Transport had no notice that MSHA was even requesting a declaratory judgment to expand jurisdiction to the entire 60' x 70' maintenance facility.[2]  How could K C Transport predict that the Court would transform the Secretary's stated intention that all it wanted to regulate was the trucks into an Order that henceforth the entire Emmett maintenance facility should be inspected every six months?  This unexpected sleight of hand by the ALJ is fundamentally unfair to K C Transport should be rejected.

If the Commission affirms the ALJ's Decision, this is the first time that an ALJ has declared jurisdiction to exist over a facility that did not yet exist at the time of the Citations.   This abuse of discretion takes MSHA jurisdictional disputes to a new level of advisory jurisdiction. The Commission should reject this unwarranted overreach.

Aside from the unwarranted expansion of unrequested jurisdiction, the ALJ committed clear legal error in holding that the citations should be affirmed pursuant to Section 3(h)(1)(C) (30 U.S.C. § 802(h)(1)(C)) of the Mine Act.  In this regard, the ALJ specifically limited his decision to 3(h)(1)( C) of the Mine Act:  "this Court finds that the maintenance facility was a "mine" under Section 3(h)(1)(C), and because the trucks were used in mining and parked at the facility, they constituted "equipment" under the same section." Decision, p. 11.[3]

_____

[2] In fact, prior to these two citations, MSHA had specifically disclaimed jurisdictional interest over similar K C Transport maintenance trailers or the parking areas adjacent to them and had vacated citations related to a trailer and parking lot.  (Decision, p. 5; Stipulation No. 22).  At the same time MSHA vacated the two earlier citations, K C Transport paid citations for any trucks located on the haul road.  After those earlier citations, K C Transport moved its maintenance area 1000' away from the haul road and bonded property.  Until the two citations at issue, MSHA never cited K C Transports trucks unless they were on the haul road or at the mines.

[3] Similarly, the Secretary contended:

5

It is clear that the trucks are not "equipment, machines, tools…used in, or to be used in, or resulting from, the work of extracting such minerals from their natural deposits" at a mine. This definition must necessarily have some context.  Here, the context is provided by the land where minerals are extracted and processed under Subsection A.[4]  A broad interpretation of Subsection C was soundly rejected by the Sixth Circuit in *Maxxim Rebuild Co., LLC. v. FMSHRC*, 848 F.3d 737, 444 (6th Cir. 2017) ("Once [MSHA] tries to extend its jurisdiction to ***off-site shops*** and ***off-site equipment***, the language of the statute provides ***no stopping point***, leaving the scope of its jurisdiction to the ***whims*** of the Secretary.")(emphasis added).  K C Transport's maintenance facility and the area where the trucks were cited was the epitome of an off-site shop and the trucks are the epitome of off-site equipment.  For these reasons, the ALJ's Decision should be reversed.

## II.    STATEMENT OF PERTINENT FACTS

K C Transport is an independent trucking company that provides various types of hauling services to its customers; including, coal hauling, earth hauling and gravel hauling services. Decision, p. 4; Stip. Nos. 7, 14.  K C Transport provides its hauling services to a wide array of customers, including, but not limited to the Ramaco owned mines near the Emmett facility. *Id*., Stip. No. 8. To service and maintain its large truck fleet, K C Transport owns and operates maintenance and storage facilities at five (5) locations in two different states. K C Transport

---

> [I]t is clear that subsection (A) concerning land, and subsection (B) concerning private ways and roads, are not at issue. Specifically, it is the portion of subsection (C) that mentions "structures, facilities, equipment, machines, tools…used in, or to be used in, or resulting, the work of extracting such minerals from their natural deposits .... or used in, or to be used in, the milling of such minerals, or the work of preparing coal or other minerals," that the Secretary argues provides jurisdiction over the trucks. Decision, p. 13, citing Secretary's Brief.

[4] The Secretary agrees that Subsection (A) refers specifically to the "extraction" area.  *Secretary v. National Cement Co. of Cal, Inc*., 573 F.3d 788 (2009).  Logically, Subsection C refers to the facilities, equipment, machines and tools at the extraction/preparation point.

6

maintains one facility in Tazewell, Virginia; one facility in Bluefield, West Virginia; one facility in Man, West Virginia; two facilities in Princeton, West Virginia; and the facility at issue here, in Emmett, West Virginia. Decision, p. 3; Stip. No. 9.

K C Transport elected to construct the Emmett facility to serve as a convenient and centralized location for the maintenance, repair and staging of its truck fleet that provides hauling services to customers located in that area of Logan and Wyoming counties. Stip. Nos. 16. K C Transport solely purchased all the materials for the construction of the Emmett facility and insures the property. Decision, p. 3; Stip. No. 4. Overall, K C Transport operates approximately thirty-five (35) trucks from the Emmett facility consisting of both on and off-road trucks. Decision, p. 6; Stip. No. 30. The off-road trucks provide coal hauling services to the five (5) nearby Ramaco owned mines and to other nearby mines owned by different operators. Decision, p. 4; Stip. Nos. 14, 15. The on-road trucks provide earth and gravel hauling services to other, non-coal mining customers in the area, including AEP. Decision, p. 4; Stip. Nos. 14, 15.

The land where K C Transport's Emmett facility is located it is not permitted or bonded for mining. Decision, p. 5; Stip. No. 17. Ramaco has no personnel or equipment at this location. Decision, p. 4; Stip. No. 13. Nor is it used by Ramaco for mining operations. Stip. No. 18. Further, Ramaco has no plans to operate any mine at or near the location of the where K C Transport's Emmett facility is located. Decision, p. 4; Stip. No. 18. The Emmett facility is across a creek from the haulage road and well up a hollow along Right-Hand Fork Road, which branches off from the main haulage road running by the Elk Creek Plant.[5] Decision, p. 5; Stip. No. 25. It is located more

---

[5] See "Elk Creek Operations Area Map" attached to K C Transport's Motion for Summary Judgment Exhibit A attached to the Stipulations. Decision, p. 5. The parties agreed that this map accurately depicts the location of K C Transport's Emmett maintenance area and the nearest mine, which is the Elk Creek Preparation Plant.

7

than one (1) mile from the Elk Creek Plant (i.e. the nearest coal extraction/preparation facility), approximately four (4) to five (5) miles from the three Ramaco deep mines, approximately six (6) miles from the Ramaco strip mine/highwall miner and is on the other side of a creek, approximately 1000' away from the haulage road. The property is not bonded by the State of West Virginia. Decision, p. 5; Stip. No. 17.

On the day the citations were issued, the materials for K C Transport's planned 60' x 70' metal maintenance building, were on location but were temporarily stored on pallets awaiting construction. Decision, p. 3; Stip. No. 6.  However, the adjacent truck parking lot (where the trucks referenced in Citation Nos. 9222038 and 9222040 were located) had already been completed and the area was being actively used by K C Transport and an unaffiliated logging company to park their logging trucks. Decision, p. 3, 4; Stip. Nos. 6, 13.  At the time, K C Transport had two shipping containers there and two maintenance trucks which it used to maintain its trucks. Decision, p. 5; Stip. No. 23.  Prior to March 11, 2019, MSHA had never previously attempted to enter K C Transport's Emmett facility parking lot. Decision, p. 5; Stip. No. 21. Similarly, MSHA has not cited any trucks at this facility since Citation Nos. 9222038 and 9222040 were issued. *Id.* With the exception of these two citations, MSHA has shown no interest in inspecting this area.

Previously, on April 3, 2018, MSHA issued Citation Nos. 9174394 and 9174395 to K C Transport on a work trailer and a muddy parking area that was located on bonded, permitted property, directly adjacent to where the main haulage road intersects with Right-Hand Fork Road. Decision, p. 5, Stip. No. 22.  In April of 2018, K C Transport was utilizing this area for its truck fleet prior to the re-locating the facility off the bonded, permitted mine and up a hollow where there was no mining taking place. *Id.* The area cited in April was adjacent to the haulage road. *Id.*

8

Notably, MSHA ultimately vacated these citations. *Id.* Despite the vacatur, that incident was a factor which lead to K C Transport's decision to construct a new facility distinctly separated from the haulage road in an attempt to make it clear that the K C Transport maintenance facility was separate from the mine. *Id.*

With respect to the citations at issue, Inspector Smith was conducting inspection activities at the Elk Creek plant and then attempted to locate the trucks to terminate a previously issued citation. Stip. No. 5. To locate the trucks, he traveled more than one mile along the haulage road past the Elk Creek plant, turned off of the haulage road, crossed the creek and traveled up Right-Hand Fork Road through an opened gate to where the Emmett facility is located. Stip. Nos. 5, 24. Upon arrival, Inspector Smith discovered maintenance work being performed on two K C Transport's trucks in the Emmett facility parking lot and issued Citation Nos. 9222038 and 9222040. Decision p. 3; Stip. No. 5.

While the two cited trucks are routinely inspected by MSHA when performing hauling services to the nearby Ramaco mines and the Elk Creek plant, they were never inspected at this K C Transport maintenance facility location before or after the citations. Decision, p. 5; Stip. No. 21. K C Transport contends that the trucks are not within MSHA jurisdiction and not subject to inspection while parked at the Emmett facility because the facility is not a "coal or other mine" as defined in Subsection C the Mine Act.

## III. ASSIGNMENTS OF ERROR

K C Transport asserts the following substantial errors of law, policy, discretion and/or sufficiency of the evidence in this case:

9

A.  The ALJ erred as a matter of law in issuing a declaratory judgment that the entire K C Transport Emmett maintenance facility was subject to jurisdiction when the Secretary only requested a finding of jurisdiction over the two cited trucks.

B.  The ALJ erred as a matter of law in finding that the two cited trucks were subject to MSHA jurisdiction pursuant to Section 3(h)(1)(C) of the Mine Act.

## IV.  ARGUMENTS CONCERNING ASSIGNMENTS OF ERROR.

**A.    The ALJ erred as a matter of law in issuing a declaratory judgment that the entire K C Transport Emmett maintenance facility was subject to jurisdiction when the Secretary only requested a finding of jurisdiction related to the two cited trucks.**

In this case, the ALJ Denied Respondent's Motion for Summary Judgment and granted the Secretary's Motion for Summary Judgment.  Decision, p. 1.  The ALJ set the stage for legal error at the beginning of the Decision when he stated broadly that "Respondent is challenging Mine Act jurisdiction over the Emmett facility and the trucks parked therein." Decision, p.1.  Of course, Respondent did not contest any violation at its maintenance trailers of the unbuilt Emmett maintenance facility, because none was issued there.  Respondent only contested the citations issued on two trucks sitting in a parking lot being used by K C Transport.[6]

The Secretary should not receive more relief than what it sought through the citations and its Motion for Summary Judgment.  The ALJ impermissibly used a limited contest for the two citations at issue to broadly declare that MSHA had jurisdiction over the entire Emmett maintenance facility, including the portion which did not exist at the time of the citations.

By going beyond the Secretary's requested relief, the ALJ effectively issued an "advisory opinion/declaratory judgment" notwithstanding that such relief was not requested and

---

[6] The ALJ misinterpreted the import of Respondent's analysis related to the facility.  Respondent's analysis and argument related to its facility was offered for the sole purpose of contesting the truck-related citations before the Court and for no other reason.  Legal arguments to defend against specific violations are not an invitation to alter the case or controversy before the Court.

10

notwithstanding that K C Transport had no prior notice that the ALJ would broaden the scope of the dispute so broadly.  This was legal error.

In *Pocahontas Coal Company, LLC*, 38 FMSHRC 176, 180–81 (2016), the Commission declined to review POV notices and described the limited ways that a dispute gets before the Commission:

> Several provisions of the Mine Act grant subject matter jurisdiction to the Commission by establishing specific enforcement and contest proceedings and other forms of action over which the Commission presides: e.g., section 105(d), 30 U.S.C § 815(d), provides for the contest of *citations or orders*, or the *contest of civil penalties* proposed for such violations; section 105(b)(2), 30 U.S.C. § 815(b)(2), provides for *applications for temporary relief from orders* issued pursuant to section 104; section 107(e), 30 U.S.C. § 817(e), provides for *contests of imminent danger orders* of withdrawal; section 105(c), *181 30 U.S.C. § 815(c), provides for *complaints of discrimination*; and section 111, 30 U.S.C. § 821, provides for complaints for compensation. *Id.*

None of these methods allow the Court to freelance and broadly declare jurisdiction over K C Transport's entire Emmett Maintenance facility.  The citations at issue were on two trucks sitting in a parking lot.  There was no citation issued for the maintenance trailers or K C Transport's 60'x 70' facility.  As noted, MSHA did not even ask for this relief.  See Decision, p. 5; Stipulation No. 22.  Thus, the ALJ had no case or controversy from which he could order that MSHA had jurisdiction over the entire facility.  There was no justiciable dispute.

In *Mid-Continent Resources*, 12 FMSHRC 949, 955 (1990), the Commission held:

> federal courts, in applying the federal Declaratory Judgment Act, 28 U.S.C. § 2201 and Fed. R. Civ. P. 57, which implements that Act, may grant declaratory relief only in the context of actual "cases and controversies." This requirement is imposed by Article III, Section 2 of the federal Constitution and by the Declaratory Judgment Act itself. See generally 10A *Wright & Miller* § 2757; 6A *Moore's Pars*. 57-11--57-13. Among other things, the Article III "case or controversy" requirement weighs against use of the declaratory process to issue advisory opinions or to resolve abstract or hypothetical problems. *E.g., Maryland Casualty Co. v. Pacific Coal & Iron Co.,* 312 U.S. 270, 272-73, 85 L.Ed. 826, 828-29 (1941).

11

In *Mid-Continent*, MSHA cited the operator for a violation of the alleged "walk-around" rights of a miner. Prior to the administrative hearing, the Secretary determined the miner was not a designated miner's representative and moved to dismiss the proceeding. Mid-Continent opposed and asked for a declaratory judgment. The ALJ denied the request on the grounds there was no pending "case of controversy." *Id*. at 953, 955. There are very good reasons why Courts do not act until there is a controversy before them. Primarily it is based on Article III, Section 2 of the federal Constitution.[7]

The final problem with the ALJ's decision is that there was no "requesting party" seeking a declaratory judgment. The law is clear that before a declaratory judgment may issue in an appropriate case, a party must first request it. *e,g, Pocahontas Coal Company, supra* (Commissioner Althen, concurring), note 4.

Applying the declaratory judgment rules to this matter, it was wholly inappropriate for the ALJ to grant relief (declaration of jurisdiction over the entire Emmett facility) beyond the scope of the actual citations before the Court and well beyond what the Secretary requested. Such judicial overreach should be rejected.

**B.    The ALJ erred as a matter of law in finding that the two cited trucks were subject to MSHA jurisdiction pursuant to Section 3(h)(1)(C) of the Mine Act.**

The ALJ began his discussion of jurisdiction by asserting that jurisdictional issues are "difficult" and "complex," Decision, p. 8, but rapidly transitioned his conclusion that this case was not difficult or complex at all. Really, the only complex parts of the ALJ's Decision were his

---

[7] While the Court in *Mid-Continent* did note that "declaratory relief" is sometimes available if the requesting party establishes "a substantial likelihood of recurrence of the claimed enforcement harm or the imminence of repeated injury." *Id*. at 956; in this case, the likelihood of a reoccurrence is small since MSHA has indicated that it does not intend to inspect the facility, only the trucks in the parking lot and has vacated earlier similar citations.

12

efforts to explain away the Secretary's position, distinguish *Maxxim Rebuild Co., LLC. v. FMSHRC*, 848 F.3d 737, 444 (6th Cir. 2017) from this case and issue an unrequested declaratory judgment in order to find jurisdiction.[8]

The ALJ and the Secretary rely solely on Subsection (C) of Section 3(h)(1) of the Mine Act to reach the conclusion that the two trucks are subject to jurisdiction under the Mine Act. The Secretary argued that the two cited trucks, as mobile equipment, are a "coal or other mine." *See, Secretary's Motion,* pp. 12-14, emphasizing the terms "equipment, machines" in Subsection (C). Secretary's Brief, p. 12. The Secretary asserted that "[t]his definition…includes things like equipment, machines and tools that are used in the mining process." Secretary's Brief, p. 13. The Secretary concluded that the "trucks…are equipment that were used in the extraction and preparation of coal." Secretary's Brief, 14.

The Secretary and the ALJ clearly misinterpreted Subsection (C) of Section 3(h)(1) because Subsection (C) necessarily refers to equipment and machines at the mine, not outside of the mine. Otherwise, there is no limit to the Secretary's jurisdiction. Recognizing the Secretary's error, the ALJ took a different approach. He rejected the Secretary's contention that the trucks, as equipment, are a "mine," calling it absurd. Decision, p. 11. The ALJ then went even further than the Secretary and declared K C Transport's maintenance facility itself (presumably including the independent trucking company garage, the logging trucks, the gravel trucks, the earth moving trucks and the mechanics for these non-mining endeavors) a "mine" under Section 3(h)(1)(C)

---

[8] The Court stated: A difficult aspect of this case is that the parties do not seem to be on the same page as to what issue is before the Court, with the Secretary arguing *for jurisdiction over the trucks* and the Respondent *arguing against jurisdiction over the maintenance facility.* Decision, p. 8 (emphasis added). Missing from this is one of the parties arguing **for jurisdiction over the maintenance facility**, because neither party did. Lacking an advocate for such a position the ALJ became one.

13

reasoning that "the trucks were used in mining and parked at the facility, they constituted "equipment" under the same section." *Id*. Interestingly, the ALJ specifically rejected the Secretary's construct, for which it sought *Chevron* deference (that any vehicle "used in the mining process" is a "rolling mine.") *Id*. Then the ALJ created his own interpretation, not supported by *Chevron*, which is equally tenuous as it includes all manner of non-mining activities which just happen to occur somewhere near a mine. How is one approach "absurd" and the other not? The ALJ essentially determined that an independent trucking company's garage is a "mine."

The ALJ's rejection of the Secretary's approach necessarily means that the ALJ must apply the statute as it is written. In other words, the ALJ cannot reject the interpretation of the Secretary in *Chevron* and then create and resolve a new ambiguity. The ALJ has only two choices: Defer to the Secretary under *Chevron* or apply the Statute as written. The ALJ rejected the former option, leaving only the latter option. In applying the statute as written, the ALJ must be guided by what the statute says and not what the ALJ thinks it means. Here, the ALJ erred in his interpretation of Section 3(h)(1)(C) of the Mine Act.

Section 4 of the Mine Act states that its provisions, and the corresponding regulations promulgated by the Secretary, apply to each "**coal or other mine** …[.]" 30 U.S.C. § 803. (emphasis added). Conversely, the Mine Act does not apply to an area that is not a "coal or other mine." K C Transport's maintenance facility is not a mine. It is a facility owned and operated by an independent trucking company to provide maintenance for haulage services to both mining and non-mining activities. [9]

---

[9] If this maintenance garage is a mine, what is the Mine I.D. number assigned to it? Does it need a separate number? The ALJ's Decision certainly lacks this information.

14

The terms "coal or other mine" are defined in Section 3(h)(1) of the Mine Act, in relevant part (as limited by the ALJ) as:

> A) an area of *land from which minerals are extracted* in nonliquid form or, if in liquid form, are extracted with workers underground, (B) *private ways and roads appurtenant* to such area, and (C) lands, excavations, underground passageways, shafts, slopes, tunnels and workings, *structures, facilities, equipment, machines, tools, or other property including impoundments, retention dams, and tailings ponds, on the surface or underground, used in, or to be used in, or resulting from, the work of extracting such minerals* from their natural deposits in nonliquid form, or if in liquid form, with workers underground, or used in, or to be used in, the milling of such minerals, or the work of preparing coal or other minerals, and includes custom coal preparation facilities…[.]

30 U.S.C. § 802(h)(1) (emphasis added).

Thus, MSHA jurisdiction extends only to those areas that satisfy the statutory criteria. Although Congress intended the definition of what constitutes a "coal or other mine" for purposes of Mine Act jurisdiction to be broad, it is not limitless.  In fact, courts have commented on the ease of jurisdictional overreach under such a broadly worded statutory provision without appropriate judicial oversight. See *Maxxim Rebuild Co.,* 848 F.3d at 444 ("Once [MSHA] tries to extend its jurisdiction to **off-site shops** and **off-site equipment**, the language of the statute provides **no stopping point**, leaving the scope of its jurisdiction to the **whims** of the Secretary.")(emphasis added); see also *Bush & Burchett, Inc. v. Reich*, 117 F.3d 932, 937 (6th Cir. 1997) ("Without some limitation on the meaning of [Section 3(h)(1)] MSHA jurisdiction could conceivably extend to **unfathomable lengths** … a result Congress clearly did not intend.")(emphasis added).

In this case, the ALJ has applied this definition and deemed an independent trucking company a mine even though the trucking company purposefully set up its operation away from the bonded and permitted area so that it could conduct its trucking business without being deemed a mine.  Both courts and administrative adjudicative bodies have found several instances where

15

MSHA lacked jurisdiction over similar facilities and equipment, despite the Mine Act's broad coverage. *See e.g. Maxxim Rebuild, supra; Herman v. Associated Electric Cooperative, Inc.*, 172 F.3d 1078 (8th Cir. 1999); *Bush & Burchett, Inc.*, 117 F.3d at 937; *Lancashire Coal Co. v. MSHA*, 968 F.2d 388 (3rd Cir. 1992); *U.S. Dep't of Labor v. Ziegler Coal Co.*, 853 F.2d 529 (7th Cir. 1988); *Oliver M. Elam, Jr. Co.*, 4 FMSHRC 5 (Jan. 1982); *Powder River Coal, LLC*, 29 FMSHRC 650 (July 2007)(ALJ Manning); *Hobet Mining Co.*, 26 FMSHRC 890 (Nov. 2004)(ALJ Feldman).

In *Maxxim Rebuild*, the Court analyzed Subsection (C) of 30 U.S.C. § 802(h)(1) and recognized the problems with extending jurisdiction to mining equipment repair facilities. The Court required a determination of location of the proposed enforcement in relation to an active mine. The Court of Appeals in *Maxxim Rebuild* made it clear that Subsection (C) does not authorize MSHA to follow equipment used in mining anywhere it might be located and issue a citation. The caution of *Maxxim Rebuild* is even more appropriate when dealing with an independent trucking company which repairs trucks for both mining and non-mining activities and shares a parking lot with a logging company.

MSHA only has jurisdiction under the Mine Act over facilities and equipment that are in or actually at the location of a working mine. See *Id.,* 848 F.3d at 740. In *Maxxim Rebuild*, MSHA issued citations at a mining equipment repair shop ***owned by a subsidiary of a large coal company***, Maxxim Rebuild Company, LLC, and located adjacent to a sealed and abandoned mine also owned by the same parent company, Alpha Natural Resources ("Alpha").[10] *Id.* at 739. (emphasis added). Approximately ***75% of the work performed at the shop*** was on equipment to be used by Alpha at

---

[10] Maxxim Rebuild Company, LLC, the operator of the Sidney shop, was a wholly owned subsidiary of Alpha Natural Resources. *Id.,* 848 F.3d at 739.

its mining operations. *Id.* (emphasis added).[11] Additionally, Alpha owned the property where the repair shop was located and maintained an office on the top floor of the shop. *Id.*  Here, an independent trucking Company, unaffiliated with Ramaco, owned the trucks and shop.  The shop was located off the permitted property of any Ramaco mine.  The shop in *Maxxim Rebuild* was one of six similar independent repair shops operated by Maxxim and was the only shop that MSHA had asserted jurisdiction over. *Id.* at 744.  Here, K C Transport has several repair shops, but MSHA has never sought to exercise jurisdiction over any of them, including the Emmitt facility.

Maxxim challenged MSHA's authority to issue the citations for lack of jurisdiction over the repair shop. *Id.*  The Secretary argued that the Mine Act granted MSHA jurisdiction over "any facility that makes or repairs equipment that is **used in coal extraction or preparation activities**." *Id.* at 740 (emphasis added). An administrative law judge ("ALJ") agreed with the Secretary's interpretation and ruled that the shop was "a coal or other mine" within MSHA jurisdiction and the Commission affirmed the ALJ's ruling. *Id.* at 739.  Maxxim petitioned the Sixth Circuit Court of Appeals for review of the Commission's decision. *Id.*  The Sixth Circuit reversed the Commission and held that the shop was not a "coal or other mine," as defined by the Mine Act. The court reasoned that the term "coal or other mine" in the Mine Act is "locational" and relates to things "in or connected to a mine." *Id.* at 740.  While acknowledging the breadth of the Mine Act's definition of "coal or other mine," the court posited that the definition extends only to those things that are in or connected to a working mine and does not cover "*machines, tools, or other property wherever they may be found or made.*" *Id.* (emphasis added).

---

[11] Here, only 60% of the work performed by the shop supported Ramaco's five different nearby mines.

17

The Sixth Circuit in *Maxxim* made clear that the issue of whether equipment was or could be used in coal extraction and/or preparation activities is largely irrelevant to the analysis. The location of the Emmett facility clearly demonstrates that it is not a part of any particular mine and the ALJ did not identify any of the five mines where it was located. As clearly depicted in Respondent's Exhibit A to Stipulations, the Emmett facility is set off from permitted, bonded mine property in a hollow where no mining activity occurs. The facility is located more than one mile from the Elk Creek plant and between four and six miles from any other active underground or surface mine. There is a haulage road is on the other side of a creek, approximately 1000' feet away at its nearest point, from the facility. Ramaco does not use the area where the facility is located for any purpose and has no plans to conduct any mining activity near the facility in the future. K C Transport shares the parking area with a logging company, whose trucks MSHA never seeks to inspect.

Here, K C Transport's Emmett maintenance facility, like the shop at issue in *Maxxim Rebuild*, is not "in or connected to" a mine. It is near a mine, much like a local service station at the foot of the hollow. While the cited trucks were used at some time in the process of hauling coal from active mines to the Elk Creek plant, the trucks were not being used for that purpose at the time the citations were issued. Rather, they were being maintained at K C Transport's maintenance area which was located away from the permitted and bonded mine area. At that time, the trucks were co-mingled with other trucks which K C Transport uses to haul coal for other operators, as well as dirt and gravel for other customers away from Ramaco's several mines. To be clear, K C Transport does not contend that MSHA has no jurisdiction over its trucks when hauling coal on permitted and bonded mine property. Rather, K C Transport contends that MSHA

18

has no jurisdiction over its trucks while they are being maintained, repaired and parked at K C Transport's Emmett facility.

K C Transport's Emmett facility had never been inspected prior to March 11, 2019 and K C Transport immediately challenged MSHA's jurisdiction here. Notably, MSHA has not inspected this area since the citations were issued. K C Transport even challenged MSHA's jurisdiction over another area where it parked its trucks prior to the construction of the Emmett parking lot and MSHA ultimately vacated those citations. Therefore, under the circumstances of this case, Subsection (C) of 30 U.S.C. § 802(h)(1) does not confer jurisdiction on K C Transport's maintenance area.

As noted supra, Subsection (C) of 30 U.S.C. § 802(h)(1) is not freestanding. It derives its context from the location of these activities at a mine under Subsection (A), which relates to the "extraction" area. See, *Secretary v. National Cement Co. of Cal, Inc.,* 573 F.3d 788 (2009). Logically, Subsection (C) refers to the facilities, equipment, machines and tools at the extraction/preparation point. In *Maxxim Rebuild*, the Sixth Circuit similarly held:

> Far better, it seems to us, to stand by the text and context of § 802(h)(1), which limit the agency's jurisdiction to locations and equipment that are part of or adjacent to extraction, milling, and preparation sites. Id. (emphasis added). *Id.*, 848 F.3d at 744.

The *Maxxim Rebuild* Court also noted:

> The definition [Section 802(h)(1)(C)] is broad, sure enough. It's as if the author went to a mine and wrote down everything he saw in, around, under, above, and next to **the mine**. **Even then, the definition still extends only to everything that one would see in or around a working mine**. It does not cover mining "equipment" or for that matter mining "machines, tools, or other property" wherever they may be found or made. *Id.* (emphasis added).

19

Clearly, the context of the location of the equipment is crucial and the context of Subdivision (C) necessarily relates back to Subsection (A) as it must, to avoid being limitless.[12]

In support of his Decision, the ALJ cites to several cases including *Jim Walter Resources,* 22 FMSHRC 21 (January 31, 2000). Principally, the cases are used to support the ALJ's contention that the definition of "structures, facilities, [and] equipment" should be interpreted as broadly as possible. See, Decision, pp. 12, 13, 14 (examples of the points adopted by the ALJ from these cases include: 1) "When analyzing the definition of "mine" under the Act, one must not be "governed by ordinary English usage;" 2) "The definition of a 'coal or other mine' in section 3(h) of the Mine Act is broad, sweeping and expansive," 3) "it is the Committee's intention that what is considered to be a mine and to be regulated under this Act be given the broadest possibl[e] interpretation;" and 4) "Close jurisdictional questions are to 'be resolved in favor of inclusion of a facility within the coverage of the Act.") (citations omitted). Of course, repeating such talismanic admonitions does not help the reviewing Court determine if the facility is a "mine."

The ALJ also provides examples of structures and facilities which have been deemed to be mines. *E.g.* a preparation plant. *Marshall v. Stoudt 's Ferry Preparation Co*., 602 F.2d 589 (3rd Cir. 1979); a car-dropping facility at a preparation plant. *Harman Min. Corp. v. FMSHRC,* 671 F.2d 794 (4th Cir. 1981); a private road leading to a plant. *National Cement Co. of Ca. Inc*., 573 F.3d 788 (D.C. Cir. 2009); a central supply shop. *MSHA v. Jim Walter Resources, Inc*., 22

---

[12]30 U.S.C. § 802(h)(2) provides further evidence that Subsection (C) (structures, facilities, machinery, tools and equipment) is contextually related to Subsection (A) (land where minerals are extracted). In this regard, Section 802(h)(2) provides:

> For purposes of subchapters II, III, and IV, "coal mine" means an *area of land* **and** *all structures, facilities, machinery, tools, equipment*, shafts, slopes, tunnels, excavations, and other property, real or personal, placed upon, under, or above the surface of such land by any person, used in, or to be used in, or resulting from, the *work of extracting*. (emphasis added).

20

FMSHRC 21 (Jan. 2000); a garage used by miners adjacent to an asphalt plant. *MSHA v. W.J. Bokus Industries, Inc.,* 16 FMSHRC 704 (April 1994); a drag line assembly site. *MSHA v. Justis Supply & Machine Shop*, 22 FMSHRC 1292 (Nov. 2000); and, a mobile gravel pit. *MSHA v. State of Alaska, Dept. of Transp.*, 36 FMSHRC 2642 (Oct. 2014). Of course, these facilities were "in or connected to a mine" and were operated *by the mine* so they are different. Also, some of these cases rely on *Jim Walter Resources*, 22 FMSHRC 21 (January 31, 2000).

It is important that the reasoning of *Jim Walter Resources,* 22 FMSHRC 21 (January 31, 2000) has been called into question in *Maxxim,* where the Sixth Circuit held:

> [T]he Secretary leans heavily on another decision of the Commission: *Secretary of Labor, Mine Safety & Health Administration v. Jim Walter Resources, Inc.*, 22 F.M.S.H.R.C. 21 (2000). *Jim Walter* held that an ***off-site supply shop***, which stored hard hats, safety glasses, nails, conveyor belts, belt structures, oil filters, and other supplies exclusively for the use of the shop's parent company, was a "coal or other mine." We disagree. For the same reasons we reject the Commission's decision here, we reject *Jim Walters* as well. *Id*. 848 F.3d at 744. (emphasis added).

The Court understandably reasoned:

> Once the agency tries to extend its jurisdiction to ***off-site shops and off-site equipment***, the language of the statute provides no stopping point, leaving the scope of its jurisdiction to the whims of the Secretary. *Id.*

The ALJ also relies of a series of ALJ decisions with no precedential value and which involve different facts. *E.g.,* an explosive storage magazine, *MSHA v. Austin Powder*, 37 FMSHRC 1337, 1349 (June 8, 2015) (ALJ); a truck at a restaurant inside a mine gate. *MSHA v. Youngquist Brothers Rock, Inc*., 36 FMSHRC 2492 (Sept. 19, 2014) (ALJ); a loader operating on a public road at a mine. *MSHA v. Jeppesen Gravel*, (Nov. 18, 2010) (ALJ); a truck located at the mine. *MSHA v. Northern Illinois Service Co.,* 36 FMSHRC 2811 (Nov. 10, 2014); and, a truck at the mine

21

office.  *MSHA v. Rain for Rent*, 40 FMSHRC 1267, 1271 (Aug. 22, 2018).[13]

The cases upon which the ALJ relied share common denominators which are not present here.  First, these cases involve equipment actually "in or connected to the mine."  Second, in all those cases, MSHA was asking the court to find jurisdiction over a particular facility or piece of equipment.  The ALJ did so *sua sponte* as to K C Transport's facility here. Third, with the exception of *Rain for Rent*, many of these cases pre-dated *Maxxim*.[14]

Here, the K C Transport facility was not adjacent to Ramaco Resources five extraction or preparation sites.  It was "located more than a mile from the Elk Creek Plant, approximately 4-5 miles from three (3) deep mines operated by Ramaco Resources, LLC and six (6) miles from a strip mines and highwall mines operated by Ramaco Resources.  It was also 1000 feet from the haul road.

Like the Secretary, the ALJ inexplicably cites to the Commission's interpretation of Section 3(h)(1) in *MSHA v. Maxxim Rebuild Co*., 38 FMSHRC 605 (April 2016).  However, the Commission's holding in that case (relied on by the Secretary and the ALJ here) was flatly rejected by the Sixth Circuit Court of Appeals in *Maxxim*

MSHA is precluded from exercising jurisdiction over the Emmett Facility by the plain language of Section 3(h)(1)(C) because this area was not in or connected to an

---

[13] Interestingly, in a footnote, the ALJ cites to *MSHA v. Drillex, Inc*., where the ALJ found that "enforcement jurisdiction over the respondent is limited to any trucks actually found on quarry or mine properties, and that in the instant case, he inspected the truck after it was driven onto the mine site in question." 9 FMSHRC 1972, 1975 (Nov. 24, 1987).  The fact that the Inspector waited until the truck was at the mine would support K C Transport's position.  Perhaps that is why it is relegated to a footnote.

[14] In *Rain for Rent*, the cited truck in that case was located at a parking lot which is connected to the main mine office.  *Id.*, 40 FMSHRC at 1271.  At the office, the mine operator "directed mine operations" and it was "adjacent to the plant's active extraction site." *Id.*  Here, the cited trucks were not located in the parking lot of the main mine office.  Rather, the trucks were located over a mile from the nearest coal extraction/preparation site.

22

extraction/preparation point as defined in Subdivision (A). K C Transport urges the Commission to find that the trucks were not a "mine" and were not at a "mine" when the citations were written. For this reason, the citations should be vacated.

## V.    CONCLUSION

For the reasons set forth herein, K C Transport respectfully requests that the Commission grant this Petition and reverse the ALJ's Decision as to Citation Nos. 9222038 and 9222040, and find that MSHA did not have jurisdiction over the trucks where cited and that the ALJ went too far in approving jurisdiction over a facility which was not built at the time of the Citations.

K C TRANSPORT, INC.

By Counsel:

/s/ *James P. McHugh*
Christopher D. Pence, Esq.
James P. McHugh, Esq.
Hardy Pence PLLC
10 Hale Street, 4th Floor
Charleston, WV 25329
Phone:  (304) 345-7250
Fax:  (304) 553-7227

23

**FEDERAL MINE SAFETY AND HEALTH REVIEW COMMISSION**

| | | |
|---|---|---|
| SECRETARY OF LABOR | ) | **BEFORE THE COMMISSION** |
| MINE SAFETY AND | ) | |
| HEALTH ADMINISTRATION (MSHA), | ) | **Docket No. WEVA 2019-0458** |
| | ) | |
| Petitioner, | ) | **A.C. No.  46-02444-487883** |
| | ) | |
| v. | ) | **Contractor No.  A8938** |
| | ) | |
| K C TRANSPORT, INC. | ) | |
| | ) | **Mine: Elk Creek Plant** |
| Respondent. | ) | |
| | ) | |

<u>**CERTIFICATE OF SERVICE**</u>

I, James P. McHugh, hereby certify that a true and exact copy of the foregoing ***"K C Transport, Inc.'s Petition for Discretionary Review"*** was served by electronic mail on the 2nd day of April 2020, to the following:

> Robert S. Wilson, Esquire
> U.S. Department of Labor, Office of the Solicitor
> 201 12th Street South
> Arlington, VA 22202-5450
> wilson.robert.s@dol.gov
>
> Stephen S. Adkins
> Conference Litigation Representative
> U.S. Department of Labor
> Mine Safety and Health Administration
> 4499 Appalachian Highway
> Pineville, WV  24874
> adkins.stephen@dol.gov

> /s/ *James P. McHugh*
> James P. McHugh, Esq.

ON APPEAL TO THE COMMISSION

## FEDERAL MINE SAFETY AND HEALTH
## REVIEW COMMISSION

SECRETARY OF LABOR,
MINE SAFETY AND HEALTH
ADMINISTRATION ("MSHA"),

      Petitioner,

  v.                         Docket No. WEVA 2019-0458

K C TRANSPORT, INC.,

      Respondent.

## RESPONSE BRIEF FOR THE SECRETARY OF LABOR

KATE S. O'SCANNLAIN
Solicitor of Labor

APRIL E. NELSON
Associate Solicitor

EMILY TOLER SCOTT
Acting Counsel, Appellate Litigation

REBECCA W. MULLINS
Attorney
U.S. Department of Labor
Office of the Solicitor
201 12th St. South, Ste. 401
Arlington, VA 22202
202.693.9345 (telephone)
202.693.9392 (fax)
mullins.rebecca.w@dol.gov

## TABLE OF CONTENTS

Introduction…………………………………………………………………………..1

Standard of Review…………………………………………………………………..1

Statement of the Issues………………………………………………………………2

Statement of the Case………………………………………………………………...2

   I.    Factual and Procedural Background……..………………..…………………..…2

   II.    Judge's Decision…………………..…………………………………..4

Argument…………………………………………………………………………..5

   I.    The judge did not err in granting the Secretary's motion for summary
decision on a theory the Secretary did not urge because K C Transport,
having itself raised that theory, had notice and an opportunity to present
evidence related to the theory..……………………………………………..5

   II.    MSHA had jurisdiction over the trucks because they are equipment
used in the extraction and preparation of coal…………………………………...7

   III.    MSHA had jurisdiction over K C Transport's Emmett maintenance facility
because it is used in the extraction and preparation of coal…………………………12

Conclusion …………………………………………………………………………15

Certificate of Service………………………………………………………………16

## INTRODUCTION

This case involves two of K C Transport's off-road haul trucks used exclusively for hauling coal from an operator's extraction mines to its preparation plant along its private haul road. The haul trucks were undergoing maintenance at K C's truck maintenance facility, located on land the operator authorized K C to use and accessible only by traveling through an operator-manned gate onto a private haul road. K C raised the trucks but had not blocked them to prevent the trucks against rolling onto miners – a dangerous and potentially fatal condition.

MSHA cited K C Transport for these conditions; at issue is whether MSHA had jurisdiction to do so. The judge found that it did. Because both the cited trucks and the Emmett maintenance facility were used in coal extraction and preparation, the Mine Act's plain language compels the conclusion that MSHA had jurisdiction over both.

## STANDARD OF REVIEW

Commission Rule 67 authorizes a judge to grant summary decision if the entire record shows there is no genuine issue of material fact and the moving party is entitled to summary decision as a matter of law. 29 C.F.R. § 2700.67(b). The Commission has analogized this rule to Rule 56 of the Federal Rules of Civil Procedure, under which "the Supreme Court has indicated that summary judgment is authorized only 'upon proper showings of the lack of a genuine, triable issue of material fact.'" *W. Ala. Sand & Gravel*, 37 FMSHRC 1884, 1887 (Sept. 2015) (quoting *Energy W. Mining Co.*, 16 FMSHRC 1414, 1419 (July 1994)). The Commission reviews the judge's grant of summary decision de novo. *M-Class Mining, LLC*, 41 FMSHRC 579, 582 (Sept. 2019).

1

## STATEMENT OF THE ISSUES

1.  Whether the judge had the authority to grant the Secretary's motion for summary decision on a theory the Secretary did not urge when K C Transport raised the theory in its cross-motion for summary decision;

2.  Whether MSHA had jurisdiction over the trucks because they are equipment used in the work of extracting and preparing coal; and

3.  Whether MSHA had jurisdiction over K C Transport's Emmett maintenance facility because it is a facility used in the work of extracting and preparing coal.

## STATEMENT OF THE CASE

### I.      Factual and Procedural Background

K C Transport is an independent trucking company providing hauling services to coal operator Ramaco Resources, among others. Joint Stipulation ("J.S.") 7, 8. Near Emmett, West Virginia, Ramaco operates the Elk Creek prep plant, five extraction mines that feed the prep plant, and a private haul road that connects the mines to the prep plant. J.S. 3, 11, 14, 26. At a point before entering the Elk Creek prep plant area, a public road becomes Ramaco's private haul road; Ramaco maintains a manned gate there, and only authorized persons are allowed beyond that point. J.S. 26. The private haul road continues past the prep plant to the five Ramaco extraction mines. J.S. 26.

Ramaco gave K C Transport permission to use for truck maintenance an area of land, not on bonded, permitted property, about a mile past Ramaco's Elk Creek prep plant and between four to six miles from its five mines. J.S. 17, 25. The only way to access this Emmett maintenance facility is to travel on Ramaco's private haul road, turn onto Right Hand Fork Road, and travel about 1,000 feet until the road dead ends. J.S. 4, 17, 26. Part of K C Transport's business from

2

the Emmett maintenance facility serves other coal operators, as well as some non-mining customers, but about 60% of its business serves the five nearby Ramaco mines. J.S. 15. On March 11, 2019, the Emmett maintenance facility consisted of a parking area (that it shared with a logging company) and two maintenance shipping containers; K C Transport had materials onsite to construct a future maintenance shop. J.S. 4, 6, 13.

That day, after inspecting Ramaco's Elk Creek prep plant, MSHA Inspector John M. Smith entered the Emmett maintenance facility to terminate citations previously issued to K C Transport. J.S. 2, 5. He saw two raised trucks that were undergoing maintenance but not blocked to prevent motion. J.S. 39; GX-1; GX-2. Inspector Smith issued two 104(a) citations to K C Transport for violations of 30 C.F.R. § 77.404(c).[1] GX-1; GX-2.

K C Transport owns the trucks, which regularly hauled coal from the five Ramaco mines to the Elk Creek prep plant. J.S. 14, 18. Although K C Transport operates both on-road and off-road trucks out of the maintenance facility, the off-road trucks (including the cited trucks) serve only the Ramaco mines and prep plant. J.S. 14. At the time of the citations, the cited trucks were not licensed to haul products over public roads. J.S. 27. Although MSHA had not previously inspected the trucks while they were parked the Emmett maintenance facility, MSHA had regularly inspected them when they were at the Ramaco mines and the prep plant. J.S. 29.

The parties stipulated to all material facts, negligence, and gravity, and filed cross-motions for summary decision on the sole issue of whether MSHA had jurisdiction to issue the citations. The Secretary argued that MSHA had jurisdiction over the trucks because they were equipment that was used in the extraction and preparation of coal. Secretary's Mot. for Summ. Decision

---

[1]30 C.F.R. § 77.404(c) states: "Repairs or maintenance shall not be performed on machinery until the power is off and the machinery is blocked against motion, except where machinery motion is necessary to make adjustments."

3

("Sec'y MSD") 14, 20–21. K C Transport argued that MSHA lacked jurisdiction over the trucks while they were parked at the Emmett maintenance facility because the facility was not a "coal or other mine" under the Mine Act. K C Transport's Mem. of Law ("KCT Memo") 1.

## II.    Judge's Decision

The judge recognized that the parties presented different legal theories about MSHA's jurisdiction in this case. Dec. at 9. So he considered two questions: (1) whether the trucks are "mines" under Section 3(h)(1) of the Mine Act, 30 U.S.C. § 802(h)(1); and (2) whether the Emmett maintenance facility is a mine under the same section. Dec. at 11.

In evaluating whether the trucks are "mines," the judge agreed with the Secretary that the relevant portion of Section 3(h)(1) is subsection (C), which includes "equipment . . . used in, or to be used in . . . the work of extracting . . . or the work of preparing coal or other minerals." Dec. at 13. The judge concluded that the trucks fall well within the Mine Act's definition of equipment, noting that coal transportation and haul truck maintenance are essential to the mining process. *Id*. at 18. He noted that the Commission has repeatedly emphasized that the Mine Act's definition of "mine" is "broad, sweeping, and expansive," and that close jurisdictional questions should be resolved in favor of inclusion. *Id*. at 13. Despite this, the judge concluded that finding MSHA had jurisdiction over the trucks would expand its jurisdiction too far. *Id*. at 12.

Next, the judge considered whether MSHA could assert jurisdiction "over the maintenance facility and all equipment at the facility that is used for mining." Dec. at 12. He highlighted several prior Commission and Federal Courts of Appeals decisions that broadly interpreted the Mine Act's definition of "mine," including the Commission's seminal holding in *Jim Walter Resources, Inc.*, that an off-site facility where employees maintain equipment used at coal extraction sites constituted a mine. *Id*. at 14 (citing *Jim Walter Res., Inc.*, 22 FMSHRC 21 (Jan.

4

2000)). The judge also considered cases, including the Sixth Circuit's recent decision in *Maxxim Rebuild Co.*, in which courts expressed concern that MSHA's jurisdiction, while broad, must have limits. *Id*. at 16–17 (citing *Maxxim Rebuild Co. v. FMSHRC*, 848 F.3d 737 (6th Cir. 2017)).

Applying that precedent, the judge noted that the Emmett maintenance facility's proximity to Ramaco's extraction and processing sites "leads to the second question concerning the maintenance facility and the trucks' functions." Dec. at 18. He recognized that over 60% of Emmett maintenance facility's services are to the nearby Ramaco mines and that the cited trucks haul coal from the mines to the processing plant. *Id*. The judge concluded that the Emmett maintenance facility was a "mine" under Section 3(h)(1)(C) and "because the trucks were used in mining and parked at the facility, they constituted 'equipment' under the same section." *Id*. at 11.

The judge granted summary decision to the Secretary, affirmed the citations according to the parties' stipulations, and assessed the stipulated penalties. Dec. at 19.

## ARGUMENT

I.  **The judge did not err in granting the Secretary's motion for summary decision on a theory the Secretary did not urge because K C Transport, having itself raised that theory, had notice and an opportunity to present evidence related to the theory**

K C Transport argues that the judge made one jurisdictional error (issuing a declaratory judgment) and one procedural error (granting summary decision on a theory not before him). PDR 2–3, 5, 10–12. He did not.

First, K C Transport characterizes the judge's summary decision as an "advisory declaratory judgment" that was improper because there was no case or controversy about MSHA's jurisdiction over the maintenance facility. PDR 3, 10–12. That argument too narrowly construes "controversy." The controversy before the judge was *whether* MSHA had jurisdiction to issue the citations, not the precise rationale for *why* MSHA had jurisdiction. Because the judge

5

adjudicated that real controversy, not an abstract or theoretical question, his decision was not an improper declaratory judgment.

Next, K C Transport argues that it did not have adequate notice that the judge would "broaden" the scope of MSHA's jurisdiction to include the Emmett maintenance facility, because the Secretary asserted MSHA's jurisdiction over only the trucks, not the facility.[2] PDR 11; *see also* PDR 2, 3, 5. But appellate courts analyzing F.R.C.P. 56 have held that judges may grant summary judgment on grounds not raised by a party after "giving notice and a reasonable time to respond." *Oldham v. O.K. Farms, Inc.*, 871 F.3d 1147, 1150 (10th Cir. 2017); *see also Allstate Ins. Co. v. Fritz*, 452 F.3d 316, 323 (4th Cir. 2006) (affirming a judge's *sua sponte* grant of summary judgment where the party against whom judgment was entered had notice and an opportunity to demonstrate a genuine issue of material fact). Similarly, although the Commission cautions that it is only appropriate in "rare circumstances," a judge "may grant summary decision *sua sponte*" if parties have had a "reasonable opportunity to ascertain the material facts" and are given "adequate notice to bring forward their evidence." *W. Ala. Sand & Gravel*, 37 FMSHRC at 1887.

K C Transport's filings belie its notice argument. Not only did K C Transport call the trucks' location a "critical factor" in the judge's decision, KCT Memo 2, it identified as the *only* legal

---

[2] In addition to claiming lack of notice, K C Transport takes issue with the judge's conclusion that MSHA's jurisdiction included the 60' x 70' building that had not been constructed at the time of the citations. PDR 2, 5. What specific buildings comprised the "facility" at any point in time is irrelevant to the jurisdictional analysis in this case, because the facts that support finding MSHA's jurisdiction over the facility generally, *see* p. 12–15, *infra*, support finding jurisdiction over the whole facility. Further, the judge's broad use of the phrase "Emmett maintenance facility," Dec. at 9, is consistent with K C Transport's own use of the phrase "maintenance facility" to describe the area where the trucks were located at the time of the citations. KCT Memo 3 ("This proceeding stems from two citations . . . issued . . . at K C Transport's maintenance facility . . .).

6

issue for the judge to resolve "whether MSHA had jurisdiction over K C Transport's Emmett facility." *Id.* at 6. It even stipulated that a violation occurred if the judge determined that MSHA had jurisdiction over the trucks "*while at K C Transport's maintenance facility.*" J.S. 39 (emphasis added). In sum, K C Transport had notice that the judge would consider whether MSHA had jurisdiction over the Emmett maintenance facility because it inserted the issue into litigation.

Therefore, the judge did not err in granting summary decision to the Secretary based on a theory that the Secretary did not urge.

## II.     MSHA had jurisdiction over the trucks because they are equipment used in the extraction and preparation of coal

In his Motion for Summary Decision, the Secretary argued that MSHA had jurisdiction over the trucks because they are equipment used in the preparation of coal, satisfying the Section 3(h)(1)(C) definition of "mine." *See* Sec'y MSD 14–20. Therefore, he properly defends the judge's summary decision on the same theory, even though the judge rejected this theory and the Secretary did not file an appeal. *See KenAmerican Res.*, 42 FMSHRC 1, 7 n.13 (Jan. 2020) ("On appeal, a prevailing party may defend a decision based on anything in the record without filing a cross-appeal"). The Fourth Circuit has held that its review in the analogous summary judgment context is "not limited to the grounds the district court relied upon" and that it may affirm summary judgment "on any basis fairly supported by the record." *Lawson v. Union Cty. Clerk of Court*, 828 F.3d 239, 247 (4th Cir. 2016) (quoting *Eisenberg v. Wachovia Bank,* 301 F.3d 220, 222 (4th Cir. 2002)).

The Mine Act establishes the scope of MSHA's jurisdiction over mines. Section 4 provides that "each coal or other mine, the products of which enter commerce, or the operations or products of which affect commerce, and each operator of such mine, and every miner in such

7

mine shall be subject to the provisions of this Act." 30 US.C. § 803. In turn, Section 3(h)(1)

defines the term "coal or other mine" as:

> (A) an area of land from which minerals are extracted in nonliquid form or, if in
> liquid form, are extracted with workers underground, (B) private ways and roads
> appurtenant to such area, and (C) lands, excavations, underground passageways,
> shafts, slopes, tunnels and workings, structures, facilities, equipment, machines,
> tools or other property including impoundments, retention dams, and tailings
> ponds, on the surface or underground, used in, or to be used in, or resulting from,
> the work of extracting such minerals from their natural deposits in nonliquid
> form, or if in liquid form, with workers underground, or used in, or to be used in,
> the milling of such minerals, or the work of preparing coal or other minerals, and
> includes custom coal preparation facilities.

30 U.S.C. § 802(h)(1). In addition to the expansive statutory definition of "coal or other mine"

established in the Mine Act, the Senate Report states that "what is considered to be a mine and to

be regulated under this Act [shall] be given the broadest possibl[e] interpretation . . ." S. Rep.

No. 95-181, at 14 (1977), *as reprinted in* 1977 U.S.C.C.A.N. 3401, 3414; *see also Donovan v.*

*Carolina Stalite Co.*, 734 F.2d 1547, 1554 (D.C. Cir. 1984) (recognizing the "sweeping

definition" of a mine under Section 3(h)(1)).

   To determine whether MSHA had jurisdiction over the trucks themselves, the first inquiry is

"whether Congress has directly spoken to the precise question at issue." *Hopkins Cty. Coal*, 38

FMSHRC 1317, 1321 (June 2016) (quoting *Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,

467 U.S. 837, 842 (1984)). If the statute is clear and unambiguous, the Commission must give

effect to its language. *Id.* The plain meaning of Section 3(h)(1)(C) covers the cited trucks because

they are "equipment . . . used in, or to be used in . . . the work of extracting . . . or the work of

preparing coal."[3]

---

[3] To the extent that the language is ambiguous, the Commission should accord deference to the
Secretary's reasonable interpretation. *See Hopkins Cty. Coal*, 38 FMSHRC at 1321.

JA 126

Although the judge recognized that the cited trucks fit squarely within the Mine Act's definition of "mine," Dec. at 12, he concluded that MSHA can assert jurisdiction over the trucks only when they are located on a separate area of land that is also a "mine." Dec. at 11–12. But that is inconsistent with the plain meaning of Section 3(h)(1)(C), which defines equipment used in the work of extracting or preparing coal, standing alone, as a "mine." The Commission has previously affirmed MSHA's jurisdiction over equipment without determining whether the facility where the equipment was located constituted a "mine." *W.J. Bokus Indus., Inc.*, 16 FMSHRC 704, 708 (Apr. 1994) (finding MSHA had jurisdiction over gas cylinders, a grinder, and stove fan without determining whether the garage in which the equipment was located was a "mine" under section 3(h)(1)).

The Commission has also previously affirmed MSHA's jurisdiction over off-site "equipment . . . used in mining." *State of Alaska, Dep't of Transp.*, 36 FMSHRC 2642, 2647 (Oct. 2014) (affirming MSHA's jurisdiction over trucks and conveyors used in the screening process but located on a public road). It offered the following explanation:

> The definition of 'mine' was drafted in the conjunctive. It begins with subsection (A), the area of land from which minerals are extracted, and extends out beyond such areas to include subsection (B) appurtenant private roads, and in subsection (C) to such things as equipment used in mining or milling. The fact that the terms of subsection (B) foreclose extending jurisdiction over a public road under that subsection does not mean that operations or activities conducted on a public road right-of-way also fall outside the scope of subsections (A) or (C).

*Id.* at 2648. Consistent with this precedent and the Mine Act's plain language, subsection (C) should be evaluated independently from subsections (A) and (B). The plain meaning of subsection (C) covers equipment used in mining, notwithstanding whether the equipment is located on property that separately qualifies as a "mine."

9

The Sixth Circuit recently analyzed this issue in a case in which MSHA asserted jurisdiction over a machine repair shop on the grounds that it was a "facility" used in mining. *See Maxxim Rebuild Co.*, 848 F.3d at 740–44. The court read the subsections together to conclude that, for MSHA to have jurisdiction over the shop, the shop must be "in or adjacent to" a mine. *See id.* at 740–41. While the Emmett maintenance facility is located in the Fourth Circuit and *Maxxim* does not control this case, even under the *Maxxim* approach the Mine Act covered the trucks because, even though they were not on bonded property, they were "adjacent to" the prep plant and five related extraction mines. *See* p. 14, *infra*.

The trucks were also used in the work of extracting and preparing coal. K C Transport stipulated that the cited trucks regularly hauled coal from Ramaco's mines to the Elk Creek prep plant, J.S. 18, but argues that whether the trucks were "used in" mining depends on whether they were being used to haul at the exact moment the citations were issued. PDR 18. This ignores the plain meaning of Section 3(h)(1)(C), which includes equipment "to be used in" the work of extracting or preparing coal. This argument is also inconsistent with Commission precedent that requiring the Secretary to prove it was "more likely than not" that miners used equipment was "inconsistent with the protective purposes of the Mine Act." *W.J. Bokus Indus., Inc.*, 16 FMSHRC at 708 (Apr. 1994) (holding that Section 3(h)(1) only requires the Secretary to establish that equipment is "used or to be used in mining"). K C Transport's restrictive interpretation of "used in" would terminate MSHA's jurisdiction over the trucks any time K C Transport performs maintenance (or any time the trucks were not actively hauling coal). Essentially, K C Transport would never have to comply with mandatory safety standards such as 30 C.F.R. § 77.404(c), violations of which it agrees can reasonably result in fatal injury. J.S. 39.

10

Such an application is inconsistent with the plain meaning of Section 3(h)(1)(C) and the Mine Act's protective purposes.

The judge expressed concern that finding MSHA has jurisdiction over the trucks, regardless of location, "expands MSHA's jurisdiction to every road, parking lot, garage, and facility in this county." Dec. at. 12. He hypothesized that MSHA could retain jurisdiction over the trucks even if they were "hundreds of miles from the mine." *Id.* For this reason, he believed it was categorically necessary to tether jurisdiction over equipment with jurisdiction over the facility in which it sits. But not all equipment integral to mine operations sits in any facility at all and whether MSHA has jurisdiction over these trucks should not depend on whether the trucks sat on separate mine property. The judge's reading would mean, for example, that MSHA could not cite a large haul vehicle that a mine operator routinely parked out in the open in a vacant lot across the mine's property line next to an extraction site. But such a truck may be as integral a part of that mine as a similar truck parked 50 feet away inside the mine's property line.

And the Secretary does not claim that once a truck has been used in the work of preparing coal, MSHA retains permanent jurisdiction over the truck regardless of future location or future use. Rather, as the Secretary previously explained, MSHA evaluates jurisdiction on a case-by-case basis based upon a situation's unique facts. Secretary's Response to KCT's Motion for Summary Decision ("Sec'y Resp.") 2; *see also Nat'l Cement Co. of CA*, 27 FMSHRC 721, 735 (Nov. 2005) ("the definition of 'coal or other mine' must be applied to the unique factual circumstances in [a] case").

The "very specific" facts in this case support MSHA's jurisdiction over the trucks at the time of the citations. Sec'y Resp. 2. At the time of the citations, the cited trucks traveled only on Ramaco's private roads and on its extraction and coal preparation sites, were not licensed to

11

travel on public roads, provided haulage services exclusively to Ramaco, regularly hauled coal

from Ramaco's five mines to the Elk Creek prep plant, and were undergoing maintenance

necessary to continue providing coal haulage services in support of those coal operations. J.S. 14,

18, 19, 27, 28. One need not consider the possibility of the cited trucks being hundreds of miles

away from Ramaco's mines because, at the time of the citation, these trucks were not even

licensed to haul product on public roads. *Id.* at 27, 28. MSHA had jurisdiction over the trucks

because they were equipment used in extraction and preparation under the plain language of

Section 3(h)(1)(C).

### III.    MSHA had jurisdiction over K C Transport's Emmett maintenance facility because it is used in the extraction and preparation of coal

The judge concluded that K C Transport's Emmett maintenance facility was a "mine" under

Section 3(h)(1)(C) and that MSHA had jurisdiction over the trucks in this instance because they

were "equipment at the facility that is used for mining." Dec. at 12. Under the undisputed facts,

the facility was used in extraction and preparation, so it, too, was a "mine" under the Mine Act's

plain language. *See* J.S. 14, 17, 18, 19. Congressional intent, see p. 8, *supra*, and judicial

precedent also support the finding that the Emmett maintenance facility was a "mine."[4]

---

[4] In April 2018, MSHA cited K C Transport for a work trailer and muddy parking area adjacent to where Ramaco's haul road intersects with Right Hand Fork Road; MSHA subsequently vacated both citations. J.S. 22. Afterwards, K C Transport voluntarily moved the Emmett maintenance facility 1,000 feet further away from the haulage road. J.S. 22. K C Transport argues that, by vacating two citations, MSHA "specifically disclaimed jurisdictional interest over similar K C Transport maintenance trailers." PDR 5 n.2. K C Transport also points out that MSHA has not inspected the Emmett maintenance facility prior to or after March 11, 2019, PDR 19, implying that MSHA has ceded jurisdiction over the facility. The record does not state why MSHA vacated the citations or did not inspect the facility. In any event, the Secretary has discretion to vacate citations, *RBK Constr. Inc.*, 15 FMSHRC 2099, 2101 (Oct. 1993), and a lack of prior enforcement "does not prevent MSHA from proceeding under an application of the standard that it concludes is correct." *Maxxim Rebuild Co., LLC*, 38 FMSHRC 605, 610 (Apr. 2016) (quoting *Mach Mining, LLC*, 34 FMSHRC 1769, 1774 (Aug. 2012)).

12

The Commission has previously held that similar facilities fall within MSHA's jurisdiction because they are structures or facilities used in the work of extracting or preparing coal, under Section 3(h)(1)(C). These facilities, including repair shops, may be located off extraction or preparation mine property and still be subject to MSHA's jurisdiction. *See Justis Supply & Machine Shop*, 22 FMSHRC 1292 (Nov. 2000) (a dragline assembly site located a mile from the extraction area was found to be a "mine" under Section 3(h)(1)(C) because the dragline would be "used in" the work of extracting coal); *Jim Walter Res., Inc.*, 22 FMSHRC at 21 (a central repair shop that repaired mine equipment and a central supply shop that warehoused materials and supplies were a "mine" within the meaning of Section 3(h)(1) of the Mine Act because a mine includes facilities and equipment "used in or to be used in" extraction and preparation, regardless of the fact the shops were located 1 mile from the closest mine they serviced and 25 miles from the farthest mine they serviced); and *U.S. Steel Mining Co., Inc.*, 10 FMSHRC 146 (Feb. 1988) (a shop used for the repair and maintenance of electrical and mechanical mine equipment was a "mine" under Section 3(h)(1)(C) because the repair shop was "used in" the work of extracting or preparing coal, regardless of the fact that the shop was located one-half mile from a cleaning plant and 8.5 miles from the farthest mine it serviced).

Recently, in *Maxxim Rebuild Co.*, the Commission determined that MSHA has jurisdiction over an offsite maintenance shop that repaired, rebuilt, and fabricated mining equipment because the equipment was used in the mining process. 38 FMSHRC 605, 607 (Apr. 2016). On appeal, the Sixth Circuit broke with Commission precedent, rejecting *Jim Walters*, and concluded that Mine Act jurisdiction is limited to "locations and equipment that are part of or adjacent to extraction, milling, and preparation sites." *Maxxim Rebuild Co.,* 848 F.3d at 744. The court determined that the repair shop was not subject to Mine Act jurisdiction because it was not

13

"above, beneath, or appurtenant to active mines." *Id.* at 739. Instead, the repair shop was located on the property of an inactive, abandoned and sealed mine, off-site of any of the active mines it supported.

Although *Maxxim* is not binding, the facts in *Maxxim* also are not comparable to those in the present case. In this case, the only way to reach the Emmett maintenance facility is by traveling beyond a Ramaco-manned gate onto Ramaco's private haul road. J.S. 26. Further, Ramaco appears to control the land where the Emmett maintenance facility is located since it authorized K C Transport to use the land. J.S. 17. The Emmett maintenance facility is just over one mile away from Ramaco's Elk Creek preparation plant and is no more than six miles away from Ramaco's five mines. J.S. 11, 25.

Fourth Circuit case law supports MSHA's jurisdiction over the facility. For example, the Fourth Circuit found MSHA had jurisdiction over a facility that blended and delivered coal for a power plant located across the road, *Power Fuels, LLC* v. *Sec'y of Labor*, 777 F.3d 214 (4th Cir. 2015), and on railroad-owned tracks at an operator's "car dropping" facility at a preparation plant where railroad cars were loaded. *Harman Mining Corp. v. FMSHRC*, 671 F.2d 794 (4th Cir. 1981) (finding that the Mine Act's broad definition of "mine" includes "facilities and equipment 'used' in the work of preparing coal"). The Fourth Circuit recognized that MSHA is better equipped than the Occupational Safety and Health Administration to regulate coal preparation work because MSHA's regulations are "specifically tailored to the dangers that arise from handling coal" and the Mine Act provides "an array of enforcement mechanisms . . . that are particularized to the industry's hazards." *Power Fuels*, 777 F.3d at 217.

The Mine Act's plain language and applicable case law, including long-standing Commission precedent, supports the judge's conclusion that K C Transport's Emmett maintenance facility is a

14

"mine" under Section 3(h)(1)(C) and that MSHA has jurisdiction over the equipment at the facility, including the cited trucks.

## CONCLUSION

The Commission should hold that the plain meaning of Section 3(h)(1)(C) gives MSHA jurisdiction over the trucks and the Emmett facility and should affirm the judge's decision.

Respectfully submitted,

KATE S. O'SCANNLAIN
Solicitor of Labor

APRIL E. NELSON
Associate Solicitor

EMILY TOLER SCOTT
Acting Counsel, Appellate Litigation

REBECCA W. MULLINS
Attorney
U.S. Department of Labor
Office of the Solicitor
201 12th St. South, Ste. 401
Arlington, VA 22202
202.693.9345 (telephone)
202.693.9392 (fax)
mullins.rebecca.w@dol.gov

15

**CERTIFICATE OF SERVICE**

I certify that on June 4, 2020, I served a copy of the Secretary's Response Brief by email

on:

James P. McHugh
jmchugh@hardypence.com

Christopher Pence
cpence@hardypence.com

/s/ Rebecca W. Mullins
Attorney

16

<u>**ON APPEAL TO THE COMMISSION**</u>

**FEDERAL MINE SAFETY AND HEALTH REVIEW COMMISSION**

| | | |
|---|---|---|
| **SECRETARY OF LABOR** | ) | **BEFORE THE COMMISSION** |
| **MINE SAFETY AND HEALTH** | ) | |
| **ADMINISTRATION (MSHA),** | ) | **Docket No. WEVA 2019-0458** |
| | ) | |
| **Petitioner,** | ) | **A.C. No.  46-02444-487883** |
| | ) | |
| **v.** | ) | **Contractor No.  A8938** |
| | ) | |
| **K C TRANSPORT, INC.** | ) | |
| | ) | **Mine: Elk Creek Plant** |
| **Respondent.** | ) | |

<u>**K C TRANSPORT INC.'S REPLY BRIEF**</u>

# TABLE OF CONTENTS

I.    INTRODUCTION AND SUMMARY OF K C TRANSPORT'S
      REPLY ..................................................................................................1

II.   REPLY ARGUMENTS CONCERNING ASSIGNMENTS
      OF ERROR ............................................................................................4

      A.  The ALJ erred as a matter of law in issuing a declaratory
          judgment that the entire K C Transport Emmett maintenance
          facility was subject to jurisdiction when the Secretary only
          requested a finding of jurisdiction related to the two
          cited trucks. .....................................................................................4

      B.  The Secretary did not cross-appeal the ALJ's determination that
          the cited trucks were not "rolling mines" ........................................6

      C.  The ALJ erred as a matter of law in finding that the two cited
          trucks were subject to MSHA jurisdiction pursuant to Section
          3(h)(1)(C) of the Mine Act while at the Emmett Maintenance Facility .............9

III.  CONCLUSION ......................................................................................15

i

**FEDERAL MINE SAFETY AND HEALTH REVIEW COMMISSION**

| | | |
|---|---|---|
| SECRETARY OF LABOR | ) | BEFORE THE COMMISSION |
| MINE SAFETY AND HEALTH | ) | |
| ADMINISTRATION (MSHA), | ) | Docket No. WEVA 2019-0458 |
| | ) | |
| Petitioner, | ) | A.C. No.  46-02444-487883 |
| | ) | |
| v. | ) | Contractor No.  A8938 |
| | ) | |
| K C TRANSPORT, INC. | ) | |
| | ) | Mine: Elk Creek Plant |
| Respondent. | ) | |

<u>K C TRANSPORT, INC.'s REPLY BRIEF</u>

K C Transport, Inc. ("K C Transport"), submits its Reply Brief pursuant to Section 113(d)(2)(C) of the Federal Mine Safety and Health Act of 1977, 30 U.S.C. § 823(d)(2)(C)(ii) ("Mine Act") and 29 C.F.R. § 2700.75(a)(2), in support of its appeal from Administrative Law Judge John Kent Lewis' ("ALJ") March 3, 2020 Order Denying Respondent's Motion for Summary Decision and Granting Secretary's Motion for Summary Decision ("Decision") as to Citation Nos. 9222038 and 9222040, both for alleged violations of 30 C.F.R. § 77.404(c).

**I.    INTRODUCTION AND SUMMARY OF K C TRANSPORT'S REPLY.**

The Secretary's Motion for Summary Judgment below only sought to obtain jurisdiction over the two cited trucks, not the entire Emmett maintenance facility.  Secretary's Motion, pp. 1, 20.  Only after the ALJ unequivocally rejected the Secretary's request for jurisdiction over K C Transport's trucks and found that it was "absurd" to consider the trucks to be "rolling mines" does the Secretary now change its position, for the first time on appeal, without even filing its own Petition for Discretionary Review and seeks jurisdiction over KC Transport's entire Emmett maintenance facility.  Secretary's Response, Argument Section III, p. 12.  This would give MSHA

jurisdiction over an independent trucking company maintenance shop, where no miners work, and which MSHA has never inspected and which did not even exist when the citations were written.

The Secretary's Response Brief did not directly respond to KC Transport's assignments of error.[1]  Rather, the Secretary re-writes the issues and seeks to re-litigate an issue which was not appealed by the Secretary (the trucks are not "mines") and ignores the important legal issue of how Subsection (C) must be based on the location of the "equipment" and "facilities" described therein. *See* Secretary's "Statement of Issues," Secretary's Response, p. 2.

The Secretary and the ALJ both contend that Subsection (C) of Section 3(h)(1) of the Mine Act should be read independently of Subsection (A).[2]  The problem with such an approach is that it runs counter to the ALJ's own Decision and the clear weight of authority from several Circuits that all parts of Section 3(h)(1) must be read together.  In particular, Subsection (A) provides context for Subsection (C). *See* Section II.C, *supra*.

Because the ALJ treated the term "equipment" differently from the term "facilities," the decision is fundamentally inconsistent.  On the one hand, the ALJ essentially tethered MSHA jurisdiction over "equipment" to the location of the equipment at a "mine," similar to the Sixth Circuit's Decision in *Maxxim Rebuild Co., LLC. v. FMSHRC,* 848 F.3d 737 (6th Cir. 2017).  The ALJ determined that the "equipment" listed in Subsection (C) must necessarily be located at a "mine" before jurisdiction will attach.  Otherwise, jurisdiction would be without limits.  This

---

[1] In the assignments of error, K C Transport asserted that the ALJ erred by expanding MSHA's jurisdictional reach beyond the citations at issue and beyond that requested by the Secretary. Second, K C Transport asserted that the ALJ erred as a matter of law in interpreting subsection (C) of Section 3(h)(1) of the Mine Act (30 U.S. C. § 802(h)(1)(C)).

[2] The ALJ stated that "Because the controversy in this case concerns whether either the maintenance facility and/or the trucks could constitute a "mine," it is clear that subsection (A) concerning land, and subsection (B) concerning private ways and roads, are not at issue." Decision, p. 13.

2

holding by the ALJ means that Subsection (C) necessarily must be read *in pari materia* with Subsection (A) and not in isolation. The ALJ then found the Emmett maintenance facility to be subject to MSHA jurisdiction without applying the same analysis he used for the term "equipment." To be consistent, the analysis for the term "facilities" as used in Subsection (C), must be the same analysis used for "equipment." Like the term "equipment," such "facilities" are not intrinsically a mine and must be located at a mine before such "facilities" may be deemed a mine. The Secretary did not address this in his Response Brief.

Perhaps the best example of the proper analysis of the various terms in Subsection (C) is provided by the Sixth Circuit in *Maxxim Rebuild*, where the Circuit Court recognized the fundamental problem with an overly expansive reading of Section 3(h)(1) of the Mine Act. The Circuit Court explained that mining equipment manufacturers and repair shops are not mines:

> Alpha, it is true, needs facilities like Maxxim's to repair equipment and manufacture new parts. But that reality does not transform the Sidney shop into a mine any more than it could have transformed the Jeffrey Company plant into a mine in the past or a Caterpillar plant into a mine in the future.

*See Maxxim Rebuild,* 848 F.3d at 744. The same reasoning applies to independent trucking companies and their maintenance shops, like K C Transport's Emmett facility.

In the "Judge's Decision" section of his Response, the Secretary attempts to gloss over this obvious inconsistency and make the ALJ's Decision appear consistent. Secretary's Response, p. 4. The Secretary asserts that the ALJ found the trucks be "equipment under Subsection (C)." Secretary's Response, p. 4. The Secretary then asserted that the "[t]he judge concluded that the Emmett maintenance facility was a "mine" under Section 3(h)(1)(C )" and "because the trucks were used in mining and parked at the facility, they constituted "equipment" under the same section." Secretary's Response, p. 5. *citing* Decision, p. 11. Yet, the judge explicitly found that

3

the trucks were not "mines" under Subsection (C). If the trucks are not "rolling mines," how can they be used to convert the K C facility into a mine? In law school, this colloquially known as "bootstrapping." Since the trucks ("equipment") are not "mines" when not located at a mine, neither is the K C Emmett maintenance facility. Being near a mine is also not enough to confer jurisdiction. Courts also look at the operational functions at the location. Section II.C supra.[3]

Although it is difficult to see exactly how the ALJ reached his ultimate conclusion, and the Secretary does not illuminate how the ALJ reached his decision, stating simply that "applying that precedent, the judge noted that the Emmett maintenance facility's proximity to Ramaco's extraction and processing sites 'leads to the second question concerning the maintenance facility and the truck's functions.'" Secretary's Response, p. 5, citing ALJ Decision, p. 18. The Secretary then asserts the "[t]he judge concluded that the Emmett maintenance facility was a "mine" under Section 3(h)(1)(C). Secretary's Response, p. 5. C*iting,* Decision, p. 11. K C Transport's maintenance facility and the area where the trucks were cited was an "off-site shop" and the trucks were "off-site equipment" when cited. Accordingly, the ALJ's Decision should be reversed.

## II.    REPLY ARGUMENTS CONCERNING ASSIGNMENTS OF ERROR.

### A.    The ALJ erred as a matter of law in issuing a declaratory judgment that the entire K C Transport Emmett maintenance facility was subject to jurisdiction when the Secretary only requested a finding of jurisdiction related to the two cited trucks.

K C Transport asserted that the ALJ inappropriately broadened the scope of the citations before him when he stated broadly that "Respondent is challenging Mine Act jurisdiction over the Emmett facility and the trucks parked therein." Decision, p.1. However, K C Transport did not

---

[3] The *Maxxim Rebuild* Court stated that "the definition of "coal or other mine" relates to a place—land and things in or connected to a mine." *Id.* at 740. "[T]he power of the Mine Safety and Health Administration extends only to such facilities and equipment if they are in or adjacent to—in essence part of—a working mine." *Id.*

4

"challenge" Mine Act jurisdiction "over the Emmett facility." Rather, K C Transport challenged

jurisdiction over the two trucks at the parking lot for the Emmett maintenance facility. There was

no citation involving the maintenance shop or the other trucks in the parking lot and, the Secretary

did not seek jurisdiction over the Emmett maintenance facility, so there was no case or controversy

related to the Emmett maintenance facility before the Court. Normally, an administrative tribunal

is limited to the dispute before it. Advisory opinions are not permitted where an issue is not ripe

for adjudication and when the matter does not involve an "actual" existing controversy as opposed

to an abstract question. *See generally, Mid-Continent Resources, Inc*., 12 FMSHRC 949, 954

(May 1990); 5 *J. Stein, G. Mitchell & B. Mezines, Administrative Law* § 46.03 (1988).

The Secretary offers two responses to K C Transport's argument that the ALJ

inappropriately expanded the scope of the requested relief: First, the Secretary asserts that the

"controversy" before the ALJ purportedly included the Emmett facility and jurisdiction over the

entire facility was "not an abstract or theoretical question." Second, the Secretary asserted that

KC Transport had actual notice that the ALJ would "broaden" the scope of his decision beyond

the trucks to include the Emmett maintenance facility because K C Transport briefed the relevance

of the Emmett maintenance facility.[4] Secretary's Response, pp. 5-6. The Secretary cited two cases

in support of his argument: *Oldham v. O.K. Farms, Inc*., 871 F.3d 1147, 1150 (10th Cir. 2017)

and *Allstate Ins. Co. v. Fritz*, 452 F. 3d 316, 323 (4th Cir. 2006).

However, the two cases cited by the Secretary relate primarily to *sua sponte* "summary

decisions" in an existing case. They do not stand for the proposition that the Court may create a

dispute and decide it. The situation in this case is distinguishable. Here, there were only two

---

[4] The Secretary did not address K C Transport's Article III, Section 2 Constitutional argument that there was no citation involving the Emmett shop and therefore no case or controversy giving the ALJ jurisdiction.

5

citations and neither involved the Emmett facility maintenance shop or the myriad of other vehicles located at the parking lot. Accordingly, the two citations do not meet the "case or controversy" requirement of Article III, Section 2 of the Constitution as to the entire facility.

The Secretary asserts that K C Transport invited the ALJ to find jurisdiction over the Emmett maintenance facility. *See* Secretary's Response, p. 7. As noted in the PDR, the argument in K C Transport's Memorandum was offered solely to respond to the citations then before the court, not because K C Transport wanted to invite the court to declare MSHA jurisdiction over the entire facility. Rather, K C Transport used information related to the facility to demonstrate that there was no jurisdiction over the trucks because of their location. *See* K C Transport's PDR, n.6. The Joint Stipulation simply refers to jurisdiction over the trucks while at the facility and does not further the Secretary's argument.

The ALJ unexpectedly and inappropriately broadened the jurisdictional question before him and issued an advisory opinion and inappropriate declaratory judgment. If the Commission affirms the ALJ's Decision, this will be the first time that an ALJ has declared jurisdiction to exist over a facility that did not yet exist at the time of the citations. This was an abuse of discretion. The Commission should reject this unwarranted overreach.

**B.**    **The Secretary did not cross-appeal the ALJ's determination that the cited trucks were not "rolling mines."**

In responding to the PDR, the Secretary never responds directly to the "assignments of error" in K C Transport's PDR. Rather, the Secretary re-framed the "assignments of error" by offering a "Statement of Issues." Secretary's Response, p. 2. In the process, the Secretary attempts to appeal the adverse ruling of the ALJ that the trucks are not "rolling mines" without filing a

6

timely PDR.  Now, the Secretary again seeks to regulate the cited trucks off mine property, a proposal the ALJ rejected.  Secretary's Response, pp. 7-9.

In this case, the Secretary did not file an appeal pursuant to Section 113(d)(2)(A)(ii) of the Mine Act.  30 U.S.C. § 823(d)(2)(ii) and 29 C.F.R. §2700.70(c) to contest the ALJ's decision that the trucks were not "rolling mines" and not inherently subject to MSHA jurisdiction just because they had been used in mining at some point.  The Secretary seeks to justify his request based on case law which discusses relying on the record to defend an appeal. *e.g., KenAmerican Resources, Inc.*, 42 FMSHRC 1, n. 13 (Jan. 2020).  The Secretary is not simply defending the appeal on this issue.  Rather, the Secretary is attempting to attack the judgment.  Without question, the rights of the Secretary would be enlarged if the Commission were to declare, contrary to the ALJ, that MSHA has continuous jurisdiction over the trucks by virtue of the trucks being equipment used in mining, irrespective of their location when cited (i.e. that the trucks were "rolling mines").[5]

In *KenAmerican Resources*, this Commission relied on *Mass. Mut. Life Ins. Co. v. Ludwig*, 426 U.S. 479, 480-81 (1976).  Importantly, in *Mass Mutual*, the Supreme Court also held that "a party who does not appeal from a final decree of the trial court cannot be heard in opposition thereto when the case is brought here by the appeal of the adverse party.  In other words, t*he appellee may not attack the decree with a view either to **enlarging his own rights** thereunder.*"  *Mass Mutual*, 426 U.S. at 480 (emphasis added).

In addition, an administrative appeal is substantively different from a federal appeal.  In *Jim Walter Resources*, 12 FMSHRC 1521, 1539 (Aug. 1990), a concurring and dissenting Commissioner astutely observed: "the Commission's review authority differs substantially from

---

[5] The Secretary also relies on *Lawson v. Union Cty. Clerk of the Court*, 828 F.3d 239, 247(4th Cir. 2016), but that case involves the rules for reviewing summary judgment rather than an attempt to enlarge one's rights, so it is not on point.

7

that found in the typical appellate review model.  The unique statutory review scheme set forth in section 113(d) of the Mine Act more closely constrains the Commission's review authority.  *Parties are not free to raise and the Commission is not free to consider issues that have not been directed for review pursuant to section 113(d). 30 U.S.C. § 823(d)*" (citations omitted) (emphasis added).[6]

In support of his argument to re-visit the ALJ's "rolling mine" conclusion, the Secretary also cites to cases such as *W.J. Bokus Indus., Inc*., 16 FMSHRC 704, 708 (Apr. 1984) and *State of Alaska, Dept' of Transp.*, 36 FMSHRC 2642, 2647 (Oct. 2014).  The Secretary asserts that in *Bokus*, the Commission found that "equipment" was subject to jurisdiction "without determining whether the garage where the equipment was located was a mine."  Secretary's Response, p. 9.  Aside from the fact that the Secretary did not appeal this point, this argument conflicts with the language of Section 3(h)(1) which defines the limit of jurisdiction as the geographical area of a "mine."  The facts of *Bokus* are different.  There, the mine operator *owned* the "equipment" and the operator's *miners were working in the garage* with the cited equipment.  Similarly, in *Alaska,* the trucks, conveyors, cited loaders and a screener were all owned and used by the operator as a mobile "borrow pit."  Here the equipment (trucks) and facility were owned, operated and maintained by K T Transport and no miners from Ramaco worked at the facility.

The Secretary wants to extend jurisdiction without regard to whether the "equipment" or "facility" is located at a "mine" as long as the "equipment" or "facility was *ever used* in mining.  The Secretary seeks to apply Subsection (C) without regard to the location of "equipment."  The

---

[6] As an example of the differences between a federal appeal and an administrative appeal, in *Dynatec Mining Corporation*, 23 FMSHRC 4, n. 1 (Jan. 2001), two Commissioners in a split decision noted that Section 113 of the Mine Act is unique, stating "[n]either the Mine Act nor the Commission's Procedural Rules, however, make any provision for filing cross petitions similar to the provision for filing cross appeals contained in Rule 4(a)(3) of the Federal Rules of Appellate Procedure."

Secretary asserts that "subsection (C) should be evaluated independently of subsections (A) and (B)." Secretary's Response, p. 9. As noted, *infra,* pp. 11-12, this individualized approach to Section 3(h)(1) has been soundly rejected by every Circuit Court which has considered it. Of course, the Commission does not even need to get to this point in the analysis since the Secretary waived this argument by not appealing the ALJ's Decision that the trucks were not "rolling mines."

The Secretary below, simply requested jurisdiction over the two cited trucks asserting that they fell within the definition of "mine" because they had previously been used to haul coal from the Ramaco mines to the Ramaco preparation plant. The ALJ rejected this argument because it was too broad. Decision, p. 12. The Secretary did not appeal this aspect of the Decision. The law is clear that when a party fails to file their own PDR, they cannot raise their arguments in the guise of a Response. The Commission should not re-open this unpreserved point.

### C.    The ALJ erred as a matter of law in finding that the two cited trucks were subject to MSHA jurisdiction pursuant to Section 3(h)(1)(C) of the Mine Act while at the Emmett Maintenance Facility.

K C Transport argues that the ALJ committed clear legal error in holding that the citations should be affirmed pursuant to Section 3(h)(1)(C) (30 U.S.C. § 802(h)(1)(C)) of the Mine Act,[7] because he held that "the maintenance facility was a 'mine' under Section 3(h)(1)(C), and because the trucks were used in mining and parked at the facility, they constituted 'equipment' under the

---

[7] The terms "coal or other mine" are defined in Section 3(h)(1) of the Mine Act, in relevant part (as limited by the ALJ) as:

> A) an area of land from which minerals are extracted in nonliquid form or, if in liquid form, are extracted with workers underground, (B) private ways and roads appurtenant to such area, and (C) lands, excavations, underground passageways, shafts, slopes, tunnels and workings, structures, facilities, equipment, machines, tools, or other property including impoundments, retention dams, and tailings ponds, on the surface or underground, used in, or to be used in, or resulting from, the work of extracting such minerals from their natural deposits in nonliquid form, or if in liquid form, with workers underground, or used in, or to be used in, the milling of such minerals, or the work of preparing coal or other minerals, and includes custom coal preparation facilities…[.] 30 U.S.C. § 802(h)(1) (emphasis added).

9

same section." Decision, p. 11. When interpreting the term "facility," the judge did precisely what he asserted he could not do. Namely, to assert jurisdiction over specific "equipment" (trucks) at the mine, when it is quite clear that equipment (trucks) are not equipment located at the mine because the Emmett maintenance facility is not a place where minerals are extracted and prepared.

The Secretary responded to this assertion of error by arguing that MSHA has jurisdiction over both the trucks and the Emmett maintenance facility. Secretary's Response Brief, Argument Sections II and III. Further, the Secretary argued that the Emmitt maintenance facility is a "mine" because it is purportedly "adjacent to" or "appurtenant to" the preparation plant and five related extraction mines. Secretary's Response, p. 10 and p. 13, citing the Sixth Circuit Court's Decision in *Maxxim Rebuild*, 848 F. 3d at 744. The problem with this assertion by the Secretary is that K C Transport's maintenance facility is not "adjacent to" or "appurtenant to" the preparation plant and five related extraction mines. It is one mile from the preparation plant and five miles from the extraction mines. This is not "adjacent" or "appurtenant."

Logically, Subsection C only refers to the facilities, equipment, machines and tools at the extraction/preparation point. The dispute between the parties raises the issue of whether the three subsections of § 802(h)(1) must be read independently or together. The Secretary argues that Subsection (C) should be read independently of Subsection (A). Secretary's Response, p. 13.[8] K C Transport contends they must be read together. An overly broad interpretation of Subsection C, as described in *Jim Walter Resources, Inc*., 22 FMSHRC 21 (Jan 2000) was rejected by the Sixth Circuit in *Maxxim Rebuild,* 848 F.3d at 444 ("Once [MSHA] tries to extend its jurisdiction to off-

---

[8] Really, the Secretary prefers that jurisdiction remain a fluid concept. The Secretary asserts "MSHA evaluates jurisdiction on a case by case basis." Secretary's Response, p. 11. This provides no notice to an operator. Congress did not intend jurisdiction to change at the whim of the Secretary.

10

site shops and off-site equipment, the language of the statute provides no stopping point, leaving the scope of its jurisdiction to the whims of the Secretary.")(emphasis added).[9]

Contrary to the assertions of the Secretary, the *Maxxim Rebuild* Circuit Court case is not an outlier. Several Circuits have determined that the three subsections of Section 3(h)(1) must be read together. Merely performing work defined in Section 3(h)(1)(C) does not equate to jurisdiction. Courts necessarily look at the location of the work, the entity performing the work and the nature of the operations.

In *Herman v. Associated Electric Cooperative, Inc*., 172 F.3d 1078 (8th Cir. 1999) the Eighth Circuit considered whether a utility which clearly performed coal preparation activities within the definition of Section 3(h)(1)(C) was a "mine." The Court held: "not all businesses that perform tasks listed under "the work of preparing coal" in section 802(i) can be considered mines. The Act was designed primarily to protect miners, not employees of coal purchasers such as electric utilities and steel mills." *Id*. at 1082. The same reasoning applies to trucking companies.

In *Bush & Burchett, Inc. v. Reich*, 117 F.3d 932, 937 (6th Cir. 1997), the Sixth Circuit held that "[w]ithout some limitation on the meaning of [Section 3(h)(1)] MSHA jurisdiction could conceivably extend to unfathomable lengths…a result Congress clearly did not intend." *Id*. (emphasis added).

In *U.S. Dep't of Labor v. Ziegler Coal Co*., 853 F.2d 529, 533-34 (7th Cir. 1988), the Seventh Circuit held:

---

[9] The Secretary also cites *U.S. Steel Mining Co*., 10 FMSHRC 146, 149 (Feb. 1998),but that case is different from this case since the shop in *U.S. Steel* had a Mine I.D. number, which means the operator had declared it to be a mine. Moreover, it was owned, supervised and manned by coal operator miners. It was also regularly inspected. The Commission's decision in *Jim Walter Resources, Inc.* 22 FMSHRC 21 (Jan. 2000) is also different from the facts of this case as the coal operator owned, manned and supervised the shop there. *Id.* at 22-23. The citations at hand deal with an independent trucking company unaffiliated with the mine.

11

> [t]he statutory definition of a coal mine plainly contemplates that the facilities used in the work of extracting coal must be *located on or below the area of land where the coal is actually extracted* from its natural deposit. Section 802(h)[2] speaks in terms of "an area of land" and facilities "placed upon ... the surface of such land" used "in the work of extracting in such area [coal] ... from its natural deposits." The statutory definition therefore contains a geographical component; the facility must be on or below the area of land where coal is naturally found and is being extracted." *Id.* (emphasis added).

In *Oliver M. Elam, Jr. Co.,* 4 FMSHRC 5, 7 (Jan. 1982), this Commission, finding no jurisdiction, held:

> inherent in the determination of whether an operation properly is classified as "mining" is an inquiry not only into whether the operation performs one or more of the listed work activities, but also into the nature of the operation performing such activities.

Here, the citations involve an independent trucking company performing trucking maintenance operations at its own facility, away from the location of coal extraction or preparation, with no miners around. This situation falls squarely under the limitations of the case law cited above. Merely performing activities which fortuitously fall under the tasks listed in Section 3(h)(1)(C) does not mean that the location or equipment is a "mine."

Notwithstanding the weight of authority, the Secretary predicts that the Fourth Circuit will depart from the other Circuits and conclude that the individual Subsections of Section 3(h)(1) should be read independently. Of course, such a decision would extend MSHA jurisdiction well beyond the limits of a "mine" because all such "equipment" and "facilities" would become a "mine" before ever getting near an extraction site and once at an extraction site, such "equipment" and "facilities" would forever retain that status, no matter the location. Following the Secretary's logic to the end, such "equipment" and "facilities" could never lose their status as a "mine," even if all mining that provided the original status was abandoned and even if the "equipment" was on the other side of the country.

<div align="center">12</div>

The Secretary cites to *Power Fuels, LLC v. Sec'y of Labor*, 777 F.3d 214 (4th Cir. 2015) and *Harman Mining Corp., v. FMSHRC*, 671 F.2d 794 (4th Cir. 1981) to support his position. Secretary's Response, p. 14. Of course, these cases are distinguishable. In *Power Fuels*, the appellant operated an actual coal preparation plant. 777 F. 3d at 215. Maybe if Ramaco was repairing trucks it owned, at the actual Elk Creek Plant, this case might apply, but the facts are different here. In *Harman Mining*, the appellant was also operating a preparation plant. 671 F.3d at 795. This case is also inapplicable.[10]

The Secretary's arguments miss the point that Subsection (C) must always be read *in pari materia* with Subsections (A) and (B) and can never be read in isolation. Otherwise, as the ALJ noted, every truck will become a "rolling mine" and the "rolling mines" could be cited at the local diner. Decision, p. 12. Subsection (C) necessarily refers to equipment and machines at the mine, not outside of the mine. Otherwise, there is no limit to the Secretary's jurisdiction. The ALJ's broad and overly inclusive reading of the word "facility" to apply to an independent trucking company's garage is every bit as "absurd" as the Secretary's reading of "equipment."

As noted, the Mine Act does not apply to an area that is not a "coal or other mine." K C Transport's maintenance facility is not a mine. It is a facility owned and operated by an independent trucking company to provide maintenance for haulage services to both mining and non-mining activities. Although Congress intended the definition of what constitutes a "coal or other mine" for purposes of Mine Act jurisdiction to be broad, it is not limitless.

---

[10] The Secretary also cites to *Justis Supply & Machine Shop*, 22 FMSHRC 1292, 2000 WL 1682492 (Nov. 2000). Secretary's Response, p. 13. However, *Justis Supply* involved the construction of a dragline owned and operated by the coal operator and used for mining. The contractor constructing the dragline was directed to the location of the dragline by employees of the mine operator who were regularly at the work site. *Justis* is also based on a broad interpretation of the "used in" language of the Section 802(h)(1) discussed in *Jim Walter Resources*, 22 FMSHRC 22 (Jan. 2000). As noted herein, this aspect of *Jim Walter* has been called into question by the Sixth Circuit's *Maxxim Rebuild* decision and is inconsistent with the other Circuit Court decisions discussed at pp 11-12, *supra*.

13

Here, an independent trucking company set up and built a maintenance facility a mile from the preparation plant, five miles from the extraction mines and 1000 feet from the haul road. The trucks were co-located with other trucks providing services other than mining services. Stip. Nos. 7 and 14. The Elk Creek operator did not permit or bond the area where the trucks were and had no personnel or equipment there. Stip. No. 17. Unlike the facts of *Maxxim*, the Elk Creek operator did not own any materials at the Emmett maintenance facility and had no intention to conduct any mining operations there. Stip. No. 17. K C Transport shared the parking lot with a logging company. Stip. Nos. 6, 13. With the exception of these two trucks, MSHA has never sought to inspect the area and has not done so since. Stip, No. 21.

The Secretary argues that "K C Transport's interpretation "will terminate MSHA's jurisdiction over the trucks any time K C Transport performs maintenance" and " K C Transport would never have to comply with the mandatory safety standards such as 30 C.F.R. § 77.404(c)." This is not accurate. K C Transport's trucks would be bound by 30 C.F.R. § 77.404(c) when at one of the Ramaco mines. Otherwise, they would be bound by the OHSA regulations. Maintenance and blocking against motion are common non-mining requirements. The cited standard is not unique to the mining industry.[11]

K C Transport's Emmett maintenance facility, like the shop at issue in *Maxxim Rebuild*, is not "in or connected to" a mine. As noted *supra,* Subsection (C) of 30 U.S.C. § 802(h)(1) derives its context from the location of these activities at a mine under Subsection (A), which relates to

---

[11] For example, 29 C.F.R. § 1910.178(m)(7), applicable to "Powered industrial trucks" and enforced by OSHA, provides in relevant part, "brakes shall be set and wheel blocks shall be in place to prevent movement of trucks, trailers, or railroad cars...[.]" *Id.* (emphasis added). OSHA regulation, 29 C.F.R. § 1910.217(d)(9)(iv), requires the use of "safety blocks" to prevent motion when performing maintenance on an industrial machine press. Additionally, other administrative agencies such as the Federal Railroad Administration ("FRA"), also enforce similar regulations. 49 C.F.R. § 173.31, enforced by the FRA, requires that tank cars be "protected against movement" prior to loading and unloading.

14

the "extraction" area.  The *Maxxim Rebuild* Court noted:

> The definition [Section 802(h)(1)(C)] is broad, sure enough. It's as if the author went to a mine and wrote down everything he saw in, around, under, above, and next to **the mine**. **Even then, the definition still extends only to everything that one would see in or around a working mine**. It does not cover mining "equipment" or for that matter mining "machines, tools, or other property" wherever they may be found or made. *Id.* (emphasis added).

Clearly, the context of the location of the equipment is crucial.  30 U.S.C. § 802(h)(2) provides further evidence that Subsection (C) (structures, facilities, machinery, tools and equipment) is contextually related to Subsection (A) (land where minerals are extracted).  In this regard, Section 802(h)(2) provides:

> For purposes of subchapters II, III, and IV, "coal mine" means an area of land and all structures, facilities, machinery, tools, equipment, shafts, slopes, tunnels, excavations, and other property, real or personal, placed upon, under, or above the surface of such land by any person, used in, or to be used in, or resulting from, the work of extracting.  (emphasis added).

MSHA is precluded from exercising jurisdiction over the Emmett maintenance facility by the plain language of Section 3(h)(1)(C) because this area was not in or connected to an extraction/preparation point discussed in Subsections (A) and (C).

## III.   CONCLUSION

K C Transport respectfully requests that the Commission reverse the ALJ's Decision as to Citation Nos. 9222038 and 9222040, and find that MSHA did not have jurisdiction over the trucks where cited and that the ALJ went too far in approving jurisdiction over a facility, part of which was not built at the time of the Citations.

15

K C TRANSPORT, INC.

By Counsel:


/s/ *James P. McHugh*

Christopher D. Pence, Esq.
James P. McHugh, Esq.
Hardy Pence PLLC
10 Hale Street, 4th Floor
Charleston, WV 25329
Phone:  (304) 345-7250
Fax:  (304) 553-7227

16

**FEDERAL MINE SAFETY AND HEALTH REVIEW COMMISSION**

| | | |
|---|---|---|
| SECRETARY OF LABOR | ) | BEFORE THE COMMISSION |
| MINE SAFETY AND | ) | |
| HEALTH ADMINISTRATION (MSHA), | ) | Docket No. WEVA 2019-0458 |
| | ) | |
| Petitioner, | ) | A.C. No.  46-02444-487883 |
| | ) | |
| v. | ) | Contractor No.  A8938 |
| | ) | |
| K C TRANSPORT, INC. | ) | |
| | ) | Mine: Elk Creek Plant |
| Respondent. | ) | |
| | ) | |

<u>**CERTIFICATE OF SERVICE**</u>

I, James P. McHugh, hereby certify that a true and exact copy of the foregoing *"K C Transport, Inc.'s Reply Brief"* was served by electronic mail on the 24th day of June 2020, to the following:

> Rebecca W. Mullins, Esquire
> Appellate Litigation Counsel
> U.S. Department of Labor, Office of the Solicitor
> 201 12th Street South
> Arlington, VA 22202-5450
> Mullins.rebecca.w@dol.gov
>
> Robert S. Wilson, Esquire
> U.S. Department of Labor, Office of the Solicitor
> 201 12th Street South
> Arlington, VA 22202-5450
> wilson.robert.s@dol.gov

> /s/ *James P. McHugh*
> James P. McHugh, Esq.

**FEDERAL MINE SAFETY AND HEALTH REVIEW COMMISSION**

**1331 PENNSYLVANIA AVENUE, NW, SUITE 520N**
**WASHINGTON, DC 20004-1710**

**April 5, 2022**

| | | |
|---|---|---|
| SECRETARY OF LABOR, | : | |
| MINE SAFETY AND HEALTH | : | |
| ADMINISTRATION (MSHA) | : | Docket No. WEVA 2019-0458 |
| | : | |
| v. | : | |
| | : | |
| KC TRANSPORT, INC. | : | |

BEFORE:  Traynor, Chair; Althen and Rajkovich, Commissioners

<u>**DECISION**</u>

BY:  Althen and Rajkovich, Commissioners

This proceeding arises under the Federal Mine Safety and Health Act of 1977, 30 U.S.C. § 801 et seq. (2012) ("Act" or "Mine Act").  It involves two citations issued to the trucking company, KC Transport, Inc., regarding haul trucks parked for maintenance at the company's facility in Emmett, West Virginia.[1]  The only issue before the Commission is whether the Mine Safety and Health Administration ("MSHA") had jurisdiction to issue the citations.

The parties filed cross-motions for summary decision on the jurisdictional issue.  The Secretary asserted stand-alone jurisdiction over the trucks.  The Judge rejected that argument; however, the Judge found MSHA had jurisdiction over the facility and, therefore, over the trucks while they were at the facility.  42 FMSHRC 221 (Mar. 2020) (ALJ).  KC Transport appeals.

For the reasons below, we reverse the Judge's decision, grant KC Transport's motion for summary decision, and vacate the two citations.  In doing so, we affirm the finding that MSHA did not have jurisdiction over the cited trucks and reverse the Judge's finding of jurisdiction over the KC Transport facility.

---

[1]  A settlement regarding 18 of the 20 citations in this docket was approved by the Judge below on December 19, 2019.  The two remaining citations, Nos. 9222038 and 9222040, both allege violations of 30 C.F.R. § 77.404(c) ("Repairs or maintenance shall not be performed on machinery until the power is off and the machinery is blocked against motion.").  If MSHA is found to have jurisdiction, the parties stipulated the facts of the violations and reached an agreement concerning gravity, negligence, and appropriate penalty amounts.  Jt. Stips. 39-42.

# I.

## Factual and Procedural Background

### A.  Summary of Uncontested Facts

KC Transport is an independent trucking company that provides coal, earth, and gravel hauling services to various businesses, including (but not limited to) coal operators such as Ramaco Resources ("Ramaco").  Jt. Stips. 7, 8.  KC Transport operates maintenance and storage facilities at five locations, including at Emmett, West Virginia (the "Emmett facility").[2]  The Emmett facility is located on Right Hand Fork Road, approximately 1,000 feet from a haulage road that serves Ramaco's Elk Creek Prep Plant and other Ramaco mines.  The haulage road is partly public; there is a gate limiting access near the Elk Creek Plant, beyond which Ramaco maintains the road.  To reach the Emmett facility, one must pass through the gate, travel up the haulage road, then turn onto the public Right Hand Fork Road.  The facility is over a mile from the prep plant, with three mines approximately four to five miles distant and additional mines about six miles remote.  Jt. Stips. 9-12, 24-26.

KC Transport operates approximately 35 trucks from the Emmett facility.  These trucks include off-road trucks that provide haulage for nearby mines and on-road trucks that provide haulage services completely unrelated to mining.  Approximately 60% of services from the facility are for Ramaco.  The facility is not on mine property, and Ramaco does not employ personnel or maintain equipment at KC Transport's facility.  KC Transport shares the facility's parking area with a logging company.  Jt. Stips. 13-15, 17, 20, 30.  When the relevant citations were issued, KC Transport had not yet built a maintenance shop at the facility, so KC Transport used shipping containers and service trucks for maintenance needs.  Jt. Stip. 6.  The area was, essentially, a parking lot with an open storage area.

The relevant events occurred on March 11, 2019.  An MSHA Inspector was searching for trucks that he had cited while they were at Ramaco's Elk Creek Prep Plant during a recent inspection.  He intended to terminate those citations.  When he arrived at the KC Transport facility's parking area, he discovered ongoing maintenance work on two trucks and issued the two new subject citations.  Jt. Stips. 2-5.  The citations allege that the trucks were not blocked against motion while raised for repair in violation of 30 C.F.R. § 77.404(c).[3]  The trucks were parked for maintenance at the KC Transport parking lot when cited.  Jt. Stips. 18, 19.

The cited trucks are regularly inspected by MSHA when on-site at a Ramaco property or along Ramaco's haulage road, but MSHA had never inspected the Emmett facility.  Jt. Stip. 29.

---

[2]  The parties' stipulations did not provide any facts regarding the other locations.

[3]  Section 77.404(c) provides, "[r]epairs or maintenance shall not be performed on machinery until the power is off and the machinery is blocked against motion, except where machinery motion is necessary to make adjustments."

2

MSHA never sought to inspect the facility before March 11, 2019, and the inspector did not attempt to inspect any other vehicles at or other parts of the facility that day.[4]

### B. Procedural Background

The parties filed cross-motions for summary decision before the Judge on the issue of jurisdiction.  Both parties relied upon the definition of "coal or other mine" in Section 3(h)(1) of the Mine Act, 30 U.S.C. § 802(h)(1).[5]  The Secretary argued that each truck independently constituted a "mine" under subsection 3(h)(1)(C) and was, therefore, subject to MSHA jurisdiction irrespective of its location.  KC Transport countered that the Mine Act only provides jurisdiction over equipment in or appurtenant to a mine as defined in section 3(h)(1)(A) or (B).  Therefore, KC Transport claimed the facility was not a mine, and MSHA did not have jurisdiction over the trucks while at the facility.

As a preliminary matter, the Judge noted that the parties disagreed as to the jurisdictional question at issue: the Secretary argued that each *truck* independently constituted a mine, while the operator argued that the *facility* was not a mine and, therefore, MSHA could not issue citations for the trucks parked at it.  42 FMSHRC at 229-30.  The Judge rejected both arguments, finding that the Secretary's approach would create "rolling mines" and lead to "absurd results," but that the facility fell "within the definition" of a mine.  *Id.* at 231, 237.  The Judge ultimately found MSHA jurisdiction over the facility and both trucks, concluding that the trucks were at the KC Transport maintenance facility, which he found to be a "mine."  By implication, therefore, he found the trucks were "mines" within subsection 3(h)(1)(C) only when located on a mine or haulage road.  He held that maintaining trucks to haul coal was integral to the mining process.

---

[4]  The parties stipulated that eleven months earlier, on April 3, 2018, MSHA issued two citations to KC Transport at a muddy parking area that KC Transport then had adjacent to where the haulage road intersects Right Hand Fork Road.  MSHA later vacated those citations.  Sometime between April 2018 and March 2019, KC Transport constructed its new facility 1,000 feet away from the Right Hand Fork Road's haulage road.  Jt. Stips. 21-23.  MSHA knew of the new location as demonstrated by the inspector going to the facility.  However, MSHA did not attempt to inspect the facility or trucks located at it until April 2019.  Having traveled to the facility for a different purpose than inspecting, the inspector issued the citations in dispute.

[5]  Section 3(h)(1) of the Act defines a "mine" as:

> (A) an area of land from which minerals are extracted . . . (B) private ways and roads appurtenant to such area, and (C) lands, excavations, underground passageways, shafts, slopes, tunnels and workings, structures, facilities, equipment, machines, tools, or other property . . .  used in, or to be used in, or resulting from, the work of extracting such minerals . . . or used in, or to be used in, the milling of such minerals, or the work of preparing coal or other minerals, and includes custom coal preparation facilities.

30 U.S.C. § 802(h)(1).

JA 156

Therefore, both the facility and the trucks at the facility were "used in" mining under section 3(h)(1)(C) of the Mine Act. *Id.* at 230-32, 237-38.

On appeal, the parties reiterate their arguments. KC Transport claims the Judge erred in finding jurisdiction over the trucks at the facility because only equipment and facilities that are in or appurtenant to working mines (as defined in section 3(h)(1)(A)) are subject to MSHA jurisdiction, and the facility does not engage in coal extraction or preparation within the scope of Subsection (A). The Secretary counters that the Commission must evaluate subsection (C) independently and that the plain language of the definition covers the trucks and facility because they are "used in" mining.[6]

## II.

### Disposition

This case comes before us in an unusual posture. Before the Judge's decision, MSHA did not assert or attempt to exercise jurisdiction over the KC Transport facility. Nor did it do so after citing the trucks while they were at the facility. On cross-motions for summary judgment on the truck citations, the Judge awarded MSHA unasked-for jurisdiction over the facility. Before us, the Secretary vigorously seeks to retain MSHA's unrequested prize.

Vital to this analysis is that KC Transport is an independent contractor and that no mining activities or structures within the scope of subsection (A) occur at its facility. Further, MSHA does not assert the KC Transport facility is on a road or private way appurtenant to Ramaco's operation. The Secretary asserts MSHA jurisdiction over trucks and a facility owned by this independent contractor situated on land where no mining is occurring. The Secretary's effort must fail.

### A. The Secretary's Arguments

The Secretary principally argues that the definition of a "mine" is plain and that we must apply a *Chevron* analysis.[7] Under step one of the analysis (*Chevron* I), if Congress has spoken in subsection 3(h) to the precise issue in dispute, the matter is ended, and we must accept Congress' directive. According to the Secretary, subsection 3(h)(1)(C) plainly applies to all tools, equipment, machines, etc. actually used in or to be used in mining regardless of whether they are on a mine site, a site appurtenant to the mine site, or elsewhere. The Secretary would permit no

---

[6] KC Transport contends that the Judge erred in even addressing MSHA's jurisdiction over the facility. Noting that the Secretary had not sought such jurisdiction, the company claims the Judge should not have reached an issue for which there was no live case or controversy. As we are reversing the Judge's finding of jurisdiction over the facility, we need not address this argument in depth. However, we note that it was necessary to discuss the facility's jurisdictional status under KC Transport's rationale. The company asserted that the trucks were not subject to MSHA jurisdiction because the facility was not a mine. Mot. for Sum. Dec. at 1, 6.

[7] *Chevron USA Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984).

4

further inquiry. Secondarily, by footnote, the Secretary argues that if we do not apply *Chevron* I, we must conduct an analysis under step two of *Chevron* (*Chevron* II) and defer to the Secretary's construction. S. Resp. Br. at 8 n.3.

## 1. Plain Meaning

We find no support for the Secretary's proposition that the definition of a "mine" in the Mine Act plainly applies to offsite, non-mining storage and repair facilities or all tools, equipment, and machines located off a mine site that have a use in mining. The Secretary would find tools and equipment to be mines regardless of their location. Thus, as the Judge pointed out, a truck sitting in a diner parking lot would be a "mine." 42 FMSHRC at 231. If a miner used his own hammer at work, it would be a "mine" even when located in his home workshop. The Judge was correct that such a construction of the term "mine" would be absurd. If jurisdiction follows equipment as it travels away from the mine, there is no point at which jurisdiction ceases.

The Secretary invokes this "plain meaning" basis for jurisdiction over the trucks because they were "used in" mining previously and most likely would be used in the future. S. Resp. at 7-11; 42 FMSHRC at 230-32, 237-38. The Secretary argues for jurisdiction over the independent KC Transport facility because it provides offsite parking and repair for trucks used in mining. S. Resp. at 12-15. It is a fixed location away from any mine site, and no mining occurs at the site. The difficulty with the Secretary's argument is that it seizes on the words "used in" within the lengthy definition rather than undertaking any analysis of the definition as a whole or its role in securing miners' safety. Such focus results in an absurd interpretation that certainly is not "plain."

In rejecting the Secretary's assertion under almost similar facts, the U.S. Court of Appeals for the Sixth Circuit recently made the specific finding that MSHA's theory would create "no stopping point." *Maxxim Rebuild Co. LLC v. Federal Mine Safety and Health Review Commission*, 848 F.3d 737, 743 (6th Cir. 2017). In fact, *Maxxim* did not involve merely trucks or other tools; it involved a facility far more closely related to mining than the KC Transport facility. The circuit court did not accept the Secretary's limitless definition of a mine.

In reaching this conclusion, the circuit court essentially followed the same logic as the Judge applied to the trucks (standing alone) in this case. The Secretary's grossly overbroad interpretation creates an absurdity, and avoidance of absurd results in reviewing statutes is a "golden rule of statutory interpretation." 2A Sutherland Construction § 45.12 (7th ed.). The Commission recognizes this principle. *Sims Crane*, 40 FMSHRC 301, 303 (Apr. 2018) ("[S]tatutes and regulations should not be construed to produce an absurd result.")

Beyond the absurdity of such unlimited inspection reach, we cannot square the proposed interpretation that every tool, machine, etc., is a separate and distinct "mine" regardless of location or current usage with a resultant imposition of the Mine Act's mandatory inspection

requirements.  Section 103(a) of the Act requires the Secretary to "make inspections of each underground coal or other mine in its entirety at least four times a year."[8]  30 U.S.C. § 813(a).  The duty to make such inspections is not optional; the Mine Act mandates such inspections.  Yet, we have not been made aware of any MSHA policy, program, or procedures for inspecting warehouses, repair shops, storage areas, and other facilities that are not on or at a mine site.

Separate from the absurdity of MSHA's construction, there is no merit to the Secretary's proposition that the lengthy, multi-tiered definition of a mine "plainly" applies to the offsite parking and repair facility of an independent entity and trucks neither on a mine site nor engaged in mining activity.  It is not "plain" that Congress meant the phrase "used in" to be taken in such a literal sense that tools on shelves of independent supply stores would be deemed to be "mines."[9]

Certainly, a tool present in a mine remains within MSHA's jurisdiction even though it is not actively being used at a particular moment.  It is there and readily available for use in mining.  However, when it is not at the mine, it cannot be engaged in mining and it is not a "mine."

Further, as discussed below, the definition of a "mine" focuses on land areas where mining is occurring, on private ways appurtenant to such lands, and on equipment used to extract and prepare mined material.  It is certainly not "plain" that Mine Act jurisdiction applies to tools, equipment, machines, etc., *not* on a mine site that at one time *were used* on the mine site, or that could be brought to the mine site again.

Turning again to the Sixth Circuit's *Maxxim* decision, the circuit court addresses this precise point in construing the definition of "mine" in the Mine Act.  The circuit court states:

> But context and perspective are everything.  In pulling back the lens, we see several indications that the power of the Mine Safety and Health Administration extends only to such facilities and equipment if they are in or adjacent to—in essence part of—a working mine.

*Maxxim*, 848 F.3d at 740.  Thus, the Secretary's interpretation of subsection 3(h) would make the definition absurd.  Further, the complexity of the definition and the many factors we take into account below demonstrate that the definition of a "mine" is not "plain."  The Secretary's interpretation does not warrant *Chevron* I regard.

---

[8]  We explain below that section 103(a) requires "frequent inspections and investigations *in* coal or other mines each year."  The use of the word "in" further emphasizes the locational aspect to mines for jurisdictional purposes.

[9]  As Judge Learned Hand wisely opined, "there is no surer way to misread any document than to read it literally."  *Guiseppi v. Walling*, 144 F.2d 608, 623, 624 (2d Cir. 1944) (J. Hand, concurring).

JA 159

### 2. *Chevron* II/*Skidmore* deference

Because MSHA's definition of a "mine" is absurd, we do not owe it deference. We could proceed immediately to our interpretation. Nonetheless, we examine deference under *Chevron* II[10] and *Skidmore*[11] standards.

Under *Chevron* II, the Commission reviews whether the Secretary's interpretation of the Act is reasonable. If so, the Commission must accept it, even if it differs from how the Commission would have interpreted the statute in the absence of the Secretary's interpretation. *Marfork Coal Company, Inc.*, 29 FMSHRC 626, 630 (Aug. 2007). Separately, if the Commission decides an MSHA interpretation does not warrant *Chevron* II deference, the Commission may afford the interpretation a lesser degree of deference under the *Skidmore* standard. *The American Coal Company*, 38 FMSHRC 1972, 1979 n.9 (Aug. 2016). That standard is whether the Secretary's interpretation is persuasive.

In this case, the Secretary's position is a litigation position, rather than a formal position taken after a demonstrated internal review or policy consideration, let alone public notice and comment. Indeed, regarding jurisdiction over the KC Transport facility, it is a position taken on appeal and not expressed before the Judge. Only after the Judge decreed unrequested jurisdiction did the Secretary assert jurisdiction over the facility at the second stage of litigation.

Thus, the Secretary did not develop this position by an objective standard found in MSHA's rules or policy statements. Instead, this is a matter of retaining an unasked-for litigation award. As a late-blooming litigation tactic, the interpretation would receive only weak *Skidmore* deference—namely, deference only to the extent it has the power to persuade. *Knox Creek Coal Corp. v. Secretary of Labor*, 811 F.3d 148, 159-60 (4th Cir. 2016).[12]

---

[10] *Chevron*, 467 U.S. at 842-43.

[11] *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944).

[12] We recognize, of course, that in other cases the Secretary has also asserted jurisdiction over off-site facilities. We find no record of a thoughtful policy-driven basis for such claims. Indeed, in the *Maxxim* case, the respondent, Maxxim, was a wholly-owned subsidiary of a mining company. Maxxim operated seven shops. Five were inspected by the Occupational Safety and Health Administration and two, including the subject shop, were inspected by MSHA. The Secretary did not explain any logic or legal reason for such differences. Further, as here, the Secretary did not provide evidence that MSHA had developed any consistent policy for the exercise of jurisdiction over off-site facilities. In this case, MSHA certainly knew of the existence and location of the facility but did not seek to exercise any jurisdiction or perform any statutorily required inspections until after an inspector went to the site and impulsively issued citations for two trucks. Even then, MSHA did not assert jurisdiction over the facility. The actions of MSHA regarding such facilities and off-site equipment demonstrate only a pattern of random, sporadic action rather than implementation of a thoughtful policy.

7

In any event, given the guides identified and discussed below, the Secretary's proffered interpretation is neither reasonable nor persuasive. We turn to the proper construction of section 3(h). In doing so, we employ the "traditional tools of statutory construction," including an examination of the statute's text, legislative history, and structure, as well as its purpose. *See Chevron*, 467 U.S. at 842-43.

### B. MSHA does not have Jurisdiction Over KC Transport's Parking and Repair Facility or Trucks Parked at the Facility.

The purpose of the Mine Act is to protect individuals performing work "*in the Nation's coal or other mines*." *See generally* 30 U.S.C. § 801 (emphasis added). The repeated references to conditions "in" coal or other mines demonstrate that Congress was concerned with the health and safety of miners *as they engage in mining tasks*. Necessarily, therefore, the Mine Act addresses the full range of activities and instrumentalities used *in* those mines. That focus differs substantially from defining a mine to include all tools and equipment, regardless of use and wherever they are located.

KC Transport operates a trucking and repair facility that is neither in a mine nor appurtenant to a mine. KC Transport is an independent entity unrelated to any mining enterprise and supplies trucking services to mining and non-mining customers. Jt. Stip. 39. Applying the proper construction tools, we find no support for finding that KC Transport's facility or trucks are "mines." No support exists in the language of the Mine Act's predecessor statute (the Coal Act), the legislative history of the Mine Act, the text of the Mine Act, important precedential decisions of the United States Circuit Courts of Appeal for the Sixth and Seventh Circuits, or common sense.

### 1. The Federal Coal Mine Health and Safety Act of 1969 ("Coal Act")

The Coal Act defined a "mine" by reference to activities conducted upon, under, or above a land area that constituted a mining operation. The statute defined a coal mine as:

> an area of land *and* all structures, facilities, machinery, tools, equipment, shafts, slopes, tunnels, excavations, and other property, real or personal, placed upon, under, or above the surface of such land by any person, used in, or to be used in, or resulting from, the work of extracting in such area bituminous coal . . . and the work of preparing the coal so extracted.

30 U.S.C. § 802(h) (1976) (emphasis added).

This definition contains the conjunctive "and" linking two distinct aspects of a coal mine. The first aspect covered "land" as it related to the extraction of coal. This aspect covered "lands" where extractive mining, milling, or preparation occurs. The conjunctive "and" then brought under the Coal Act real or personal property used in mining on such lands. Most importantly, the Coal Act applied to property "placed upon, under, or above the surface of *such* land." *Id*. (emphasis added). Thus, the coverage reached and applied only to personal or real property

JA 161

related to extracting coal *in that land.*  This definition plainly does not reach beyond the land and property used in or resulting from extracting or preparing coal.

### 2.  Legislative History of the Mine Act

In passing the Mine Act some eight years later, Congress did not express any intent to expand the jurisdiction of MSHA (the newly formed enforcement agency) beyond the scope exercised by its predecessor the Mine Enforcement Safety Administration ("MESA")[13] under the Coal Act.  Thus, the Mine Act's legislative history does not demonstrate an intention to expand the geographical scope of MSHA jurisdiction to lands or areas removed from the mine, such as independent contractor maintenance facilities, or to facilities where mining equipment is stored, repaired, or sold.

While Congress modified the Coal Act's definition of "mine" in the Mine Act, Congress explicitly stated that it intended to *clarify* the scope of the definition:

> [T]he definition of 'mine' is *clarified* to include the areas, both underground and on the surface, from which minerals are extracted. . . . Also included in the definition of 'mine' are lands, excavations, shafts, slopes, and other property, including impoundments, retention dams, and tailings ponds.  These latter were not specifically enumerated in the definition of mine under the Coal Act.  It has always been the Committee's express intention that these facilities be included in the definition of mine and subject to regulation under the Act, and the Committee here expressly enumerates these facilities within the definition of mine in order to *clarify* its intent.

S. Rep. No. 95-181, at 14 (1977), *reprinted in* Senate Subcomm. on Labor, Comm. on Human Res., *Legislative History of the Federal Mine Safety and Health Act of 1977*, at 602 (1978) ("*Legis. Hist.*") (emphasis added).

The updated definition simply "enumerated" types of facilities that were already presumed to be subject to MSHA jurisdiction under the Coal Act.  The definition did not expand MSHA's jurisdiction in any broad sense.  Congress' clarification to include these large structures of impoundments, retention dams, and tailings ponds on a mining site does not support expanding jurisdiction to mining equipment wherever it is located.[14]

---

[13]  MESA was an agency within the Department of the Interior.  The Mine Act created MSHA and moved mine safety enforcement to the new agency within the Department of Labor.

[14]  While the legislative history concludes with the statement that "doubts" regarding jurisdiction should "be resolved in favor of inclusion of a facility within the coverage of the Act," MSHA cannot create jurisdiction by wrongly asserting jurisdiction and then arguing that there exists a "doubt" about it.  In this case, MSHA either did not think it had jurisdiction over the Emmett facility or at least did not act on such a thought or seek jurisdiction over the facility until after the Judge's decision.

9

### 3. The Mine Act Definition of a "Mine" and Related Terms

Section 3(h)(1) of the Mine Act defines a "coal or other mine" in relevant part as:

> (A) an area of land from which minerals are extracted in nonliquid form or, if in liquid form, are extracted with workers underground, (B) private ways and roads appurtenant to such area, and (C) lands, excavations, underground passageways, shafts, slopes, tunnels and workings, structures, facilities, equipment, machines, tools, or other property including impoundments, retention dams, and tailings ponds, on the surface or underground, used in, or to be used in, or resulting from, the work of extracting such minerals from their natural deposits . . . or used in, or to be used in, the milling of such minerals, or the work of preparing coal or other minerals, and includes custom coal preparation facilities.

30 U.S.C. § 802(h)(1).

As seen in the plain language, all three subsections include a locational connection to working mines. Subsection (A) covers relevant "area[s] of land from which minerals are extracted," while (B) includes ways and roads "appurtenant to such area." Subsection (C) then catalogs various mining-related places (e.g., lands, underground passageways, retention dams, tailing ponds) and objects that serve a mining-related purpose in such areas (i.e., structures, facilities, equipment, machines, and tools used in mining). *See Maxxim*, 848 F.3d at 740-42.

Each of these definitions relates to work in or at a mine. The definition of "mine" in subsection (C) specifically refers to things "*on the surface or underground*." 30 U.S.C. § 802(h)(1)(C). "[S]urface" and "underground" are terms of art in mining and mining regulation. They are used to differentiate distinct areas of what is generally understood to be a mine site in the normal sense. "Surface" and "underground" do not suggest areas off the mine site. The use of "surface" does not mean the drafters used it to corral in off-site areas.

Other definitions in the Mine Act are similarly locational. An "operator" is defined as "any owner, lessee, or other person who operates, controls, or supervises *a coal or other mine* or any independent contractor performing services or construction *at such mine*." 30 U.S.C. § 802(d) (emphasis added). An agent means "any person charged with responsibility for the operation of all or a part of *a coal or other mine* or the supervision of the miners *in a coal or other mine*." 30 U.S.C. § 802(e). A miner is an "individual working *in a coal or other mine*." 30 U.S.C. § 802(g). Section 103(a) (related to inspections) provides, "[a]uthorized representatives of the Secretary or the Secretary of Health and Human Services shall make frequent inspections and investigations *in coal or other mines*." 30 U.S.C. § 813(a) (emphasis added). MSHA must thoroughly inspect operations conducting mining, milling, and preparation activities and all instruments and instrumentalities used in such operations. It is not required to leave the mine site and track down tools, equipment, machines, trucks, and other instruments when they are on a site unrelated to mining. Certainly, the record in *Maxxim, supra*,

10

demonstrates that MSHA does not fulfill its inspection obligations by inspecting only two of seven identical facilities owned and operated by subsidiaries of the same mining company.

In statutes, words are known by the company they keep. *Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561, 575 (1995) ("[A] word is known by the company it keeps (the doctrine of *noscitur a sociis*)"). Just as in the federal courts, the Commission applies this rule to avoid ascribing to one word or phrase a meaning so broad that it is inconsistent with its accompanying words, thus giving "unintended breadth to the Acts of Congress." *Jarecki v. G.D. Searle & Co.*, 367 U.S. 303, 307 (1961).

In context, the definition of a "mine" states—consistent with the surrounding language, intent of the drafters, and purpose of the Mine Act—that MSHA jurisdiction extends to lands used in mining and appurtenant roads, and equipment and structures thereupon. The statute's goal is to protect miners from hazards found in mines or on appurtenant private ways. The Mine Act does not follow equipment after its removal to facilities where mining does not occur, nor does it apply to equipment before it has entered or after it has left a mine site because operators could use the equipment for mining in the future.

Subsection (B)'s coverage of appurtenant ways is clearly connected to lands covered by Subsection (A). The small extension of jurisdiction specifically to cover "appurtenant" roads is consistent with the larger protective purpose of the Act. Those areas may expose individuals to mining-related hazards. For the reasons above, it is clear that neither the purpose nor the language of the Act indicate a further geographical extension of jurisdiction under subsection (C). Coverage over appurtenant ways and roads under subsection (B) does not somehow imply coverage over lands distant from a mine site, owned by an independent company, and used for parking and repairing its vehicles.[15]

### 4. As an "Independent Contractor," KC Transport is an "Operator" Only When "Performing Services at a Mine."

"Operators" fall into two categories, as noted above. An entity that *does not* own, lease, operate, control, or supervise a coal or other mine is an "operator" only when that entity, acting as an independent contractor, *physically* performs services *at a mine*. 30 U.S.C. § 802(d).

---

[15] The Secretary cites *State of AK Dep't of Transp.*, 36 FMSHRC 2642, 2647-48 (Oct. 2014). There, the Commission considered an argument that equipment used along a public road to extract sand and gravel could not be a "mine" because it was not a "private way or road appurtenant" to an area of extraction. The Commission quickly dismissed that argument, finding the activity on that road constituted both extraction (mining) and milling. Therefore, the activity fell squarely under subsection (A) as land upon which mining and milling occurred. In turn, the activities fell under subsection (C) because the equipment's use was on land where mining was occurring. The case provides no support for the proposition that MSHA has jurisdiction over lands that are not appurtenant to a mine site and where no mining activities occur.

11

When KC Transport's trucks are at its parking area off the mine site, the trucks are not performing services at a mine, and KC Transport is not an "operator" for the Act's purposes. There is no reason to believe Congress envisioned MSHA following independent contractors back to their home locations, or anywhere else, away from the actual mine after their services.

Congress expressly addressed independent contractors to ensure that all employees working in a mine "are miners within the definition of the [Act]." S. Rep. No. 95-181 at 14; *Legis. Hist.* at 602. In other words, persons exposed to the same hazards as miners deserve the same protections granted to miners, regardless of their employer. *United Energy Syncs. Inc. v. MSHA*, 35 F.3d 971, 974-76 (4th Cir. 1994). Conversely, persons not working in a mine but who provide non-mining services off a mine site do *not* face mining hazards. Such workers do not require the Mine Act's extra protection and may otherwise be appropriately protected by the Occupational Safety and Health Act of 1970, 29 U.S.C. § 651 *et seq.*; *Old Dominion Power Co. v. Donovan*, 772 F2d 92, 95 (4th Cir. 1985). These jurisdictional concepts regarding independent contractors providing services at mines find expression in the Congressional intent and statutory purpose.

The Secretary concedes that KC Transport is an independent contractor that provides coal haulage services at Ramaco mines and the Elk Creek Plant as part of its business activities. Jt. Stips. 7, 10, 11. It offers services to other non-mining entities, as well. Jt. Stips. 7, 15. As an independent contractor, KC Transport is an operator subject to MSHA jurisdiction while performing work at a mine site.

Here, the inspector cited trucks that were not performing services at a mine. They had *left* the mine site where the trucks were "used in mining" and returned to the separately and independently-owned Emmett facility for parking and repair. Jt. Stips. 15-17. When the citations were issued, KC Transport was not performing services in a mine. Jt. Stip. 19. Thus, it was not an operator under section 3(d), further confirming that the Secretary did not have jurisdiction to issue the relevant citations.[16]

KC Transport used its Emmett facility for its independent contract trucking business that served both coal and non-coal customers. There is no evidence that Ramaco or any other coal operator used the facility for any mining functions or activities that might cause it to be considered a mining facility. *See Harman Mining Corp. v FMSHRC*, 671 F.2d 794 (4th Cir. 1981).

---

[16] We note that MSHA stated on the citations that the violations occurred at the Elk Creek Plant, despite the fact that the citations were issued in an area that was *not* on Ramaco property. *See* Citation Nos. 9222038 and 9222040. We view this as indicating MSHA's belief—which is borne out both in its standard inspection regimen and its citation form—that its exercise of jurisdiction over a contractor is necessarily contingent upon the contractor's activities occurring at a site within Mine Act jurisdiction.

12

**5.   Important Federal Circuit Court decisions in *Ziegler Coal* and *Maxxim Rebuild Co.* Demonstrate that KC Transport's Facility is not a "Mine."**

Federal circuit courts have accepted these underlying jurisdictional precepts for more than 30 years.  In *Dep't of Labor v. Ziegler Coal Co.*, 853 F.2d 529, 533-34 (7th Cir. 1988), the Seventh Circuit noted the "geographical component" of the situs of a facility:

> The statutory definition of a coal mine plainly contemplates that the facilities used in the work of extracting coal must be located *on or below the area of land where the coal is extracted*, milled, or prepared.  Section 802(h) speaks in terms of "an area of land" and facilities "placed upon . . . the surface of such land" used "in the work of extracting in such area [coal] . . . from its natural deposits."

*Id.* (emphasis added).

*Ziegler* involved a repair shop located approximately one and one-half miles away from the nearest Ziegler mine.  *Id.* at 531.  The court recognized that the Mine Act's legislative history contains a generous construction of the term "coal mine" but specifically noted that "this does not justify *disregarding* the statutory language which speaks in terms of the area in which coal is being extracted."  *Id.* at 534 (emphasis added).  The shop dealt only with equipment used in mining, but the court recognized that it was "one-step removed from those facilities used to perform work directly on the extracted coal."  *Id.* at 536.  The court went on to recognize "that a repair shop might be essential to an efficient mining operation, but this alone is insufficient to satisfy [section] 802(i)."  *Id.*

Even more importantly, the U.S. Court of Appeals for the Sixth Circuit directly addressed circumstances nearly identical to this case in the previously cited *Maxxim* case.  The Commission had applied a prior Commission case, *Jim Walter Res., Inc.*, 22 FMSHRC 21 (Jan. 2000), to affirm a finding that MSHA had jurisdiction over a maintenance shop that repaired, rebuilt, and fabricated mining equipment and parts for mining equipment.  *Maxxim Rebuild Co. v. FMSHRC*, 38 FMSHRC 605 (Apr. 2016).

The facts in *Maxxim* were considerably more robust than the facts presented in this case. The shop operator (Maxxim) was a wholly-owned subsidiary of a mining company (Alpha Natural Resources) rather than a wholly independent business. The shop's location was on property owned by Sidney Coal Company, a sister company to Maxxim and a mining subsidiary of Alpha Natural Resources.  *Id.* at 607.  Maxxim's employees regularly went to the mining operation to complete boreholes to accommodate blasting equipment furnished by Maxxim.  *Id*. The Commission found the work by Maxxim made the shop a "mine" though not located on an actual mining site.

13

The Sixth Circuit unanimously reversed the Commission.[17]  In doing so, the circuit court emphasized the need for context and perspective.  Looking at the case from the standpoint of protecting miners from mining hazards, the circuit court found jurisdiction extended to facilities and equipment *if* they are in or adjacent to—in essence, part of—a working mine.  Again, this finding applied to a wholly-owned subsidiary of a mining company with a related company for which Maxxim supplied services engaged in active mining.

Quoting the Mine Act definitions cited above, as well as the definitions in Title IV of the Mine Act, the circuit court found these provisions teach:

> [A] lesson taught many times before. "A provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme [ ] because the same terminology is used elsewhere in a context that makes its meaning clear or because only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law."

*Id.* at 742 (citation omitted).

Going further, the circuit court considered the irrational practical implications of finding jurisdiction, including the common sense points raised below.  Thus, the Sixth Circuit squarely held that MSHA did not have jurisdiction over the Maxxim facility, a repair shop more closely related to actual mining activities than the Emmett facility of KC Transport.

Finally, the circuit court noted that the Commission relied upon its finding of jurisdiction in *Jim Walter Resources, supra.*  The court found that *Jim Walter* was decided incorrectly, stating:

> Far better, it seems to us, to stand by the text and context of § 802(h)(1), which limit the agency's jurisdiction to locations and equipment that are part of or adjacent to extraction, milling, and preparation sites.

*Id.* at 744.

---

[17]  We do not hold that we are required to find the Seventh Circuit's decision in *Ziegler* or the Sixth Circuit's decision in *Maxxim* binding upon us for a case arising in the Fourth Circuit. Nevertheless, we recognize both as superior authorities.  *See Westmoreland Coal Co*., 11 FMSHRC 960, 964 (June 1989); *Ray, emp. by Leo Journagan Constr. Co. Inc*., 20 FMSHRC 1014, 1025 (Sept 1998)*.*  As discussed herein, we find that both circuit courts' reasoning is consistent with the plain text, larger statutory context, and purpose of the Mine Act.  We are in full accord with these decisions.  For that reason, we write in agreement with, and rely upon, both decisions.

14

We are in accord with and fully accept the circuit court's analysis. Not only as a matter of authority, but because it aligns with the positions identified above following from the Coal Act, the Mine Act's legislative history, definitions in the Mine Act, and KC Transport's independent contractor status, as well as common sense as discussed below. We recognize that our decision today departs from the *Jim Walter* approach and certain prior Commission cases.[18] Our holding is that an independent repair, maintenance, or parking facility not located on or appurtenant to a mine site and not engaged in any extraction, milling, preparation, or other activities within the scope of subsection 3(h)(1)(A) is not a mine within the meaning of section 3(h) of the Mine Act. We further hold that tools, equipment, and the like not on a mine site or any appurtenance thereto and not engaged in any extraction, milling, preparation or other activities within the scope of subsection 3(h)(A) are not mines within the scope of subsection 3(h) of the Mine Act. Today's decision is consistent with the history, language, statutory framework, legislative intent, and two well-considered federal circuit court of appeals decisions.

### 6. Common Sense

Finally, we are well-advised to follow the Sixth Circuit's path and take an overall view of the business in which KC Transport is engaged and the illogical consequences of accepting the Secretary's construction of the Mine Act. KC Transport is an independent commercial trucking firm. It provides trucking services to different types of customers and stays in business by carrying different materials. In short, it is engaged in commercial trucking like thousands of other commercial trucking firms. When its trucks are in a mine providing services, they must conform to MSHA standards. Therefore, any assertion that denying jurisdiction over trucks at the KC Transport facility means that they could enter a mine and engage in extraction related work, without complying with MSHA's requirements, is without merit.[19]

The jurisdictional standard we describe is consistent with a common sense understanding of the Mine Act's purpose, namely protecting miners from *hazards associated with mining*. *See* 30 U.S.C. § 801. Common sense dictates that jurisdiction should not attach in situations, such as here, where no such risks particular to a mine exist at an independent parking area and garage removed from a mine site. No stipulation suggests that repair work at the Emmett facility is

---

[18] *W.J. Bokus Indus. Inc.*, 16 FMSHRC 704, 708 (Apr. 1994); *US Steel Mining Co. Inc.*, 10 FMSHRC 146 (Feb. 1988).

[19] Our dissenting colleague asserts the majority approach would compromise safety by impeding the inspector's ability to issue citations. MSHA knew of the facility but never asserted a right to inspect the facility. Even then, MSHA only sought jurisdiction over the trucks. Indeed, MSHA went there to vacate citations issued on the trucks while *on the mine site*. If an inspector finds a pre-shift violation while examining a contractor's truck on the mine site, he may and will cite it, and similarly, an inspector can and should cite any equipment defect he sees on the mine site. *See, e.g., Ames Construction Inc.*, 33 FMSHRC 1607, 1611 (July 2011), *aff'd* 676 F.3d 1109 (D.C. Cir. 2012) (where independent contractor was performing services at a mine and was therefore an operator under the Act, contractor can be found strictly liable for a violation of a mandatory standard occurring at the mine). At no point is a truck allowed on the mine with a mine safety violation. Thus, the same vigorous safety enforcement applies.

15

different, in any respect, from the same type of work performed on tens of thousands of trucks throughout the nation at other facilities or, indeed, on any other KC Transport truck that hauls material other than coal. The record shows no difference in activities at the Emmett facility between contractor trucks hauling coal and contractor trucks moving non-coal materials.

As explained in *Maxxim*, *supra*, Congress tailored the Mine Act to protect against dangers that arise from handling coal and other minerals, not generic risks associated with making or repairing equipment. 848 F.3d at 743; *see also United Energy Svcs. Inc. v. MSHA*, 35 F3d 971, 975 (4th Cir. 1994) (emphasizing that employees deserve the same protections as miners if they are subject to the same risks). Jurisdiction over an independent and *offsite* truck repair facility, not exposing employees to any hazards associated with the mining process, does not serve the Mine Act's purpose.[20]

A manufacturing plant is not a mine because it manufactures equipment for use in mining and an electrical utility plant is not a mine only because it uses coal. *Id.* at 743; *Herman v. Assoc. Elec. Coop.*, 172 F.3d 1078, 1082-83 (8th Cir. 1999); *see also Bush & Burchett Inc v. Reich*, 117 F.3d 932 (6th Cir. 1997). If jurisdiction follows each piece of equipment, regardless of its travel away from the mine, then, as the Sixth Circuit said, there would be no stopping point. *Id.* at 744. Such an unbounded jurisdictional approach clearly leads to absurd results. A supervisor's pickup truck used at the mine for mining purposes would be subject to MSHA regulations—but not in the supervisor's garage at home.

The jurisdictional principles announced here apply equally to the attempt to exercise jurisdiction over the KC Transport facility and the trucks parked there.[21] The KC Transport facility is only one of the hundreds of facilities that manufacture, store, or repair the vast amount of equipment used in mines. Thus, we share the opinion and observations of the Sixth Circuit in *Maxxim* regarding attaching MSHA jurisdiction to *any* facility or *any* piece of equipment with *some* connection to mining, regardless of whether that connection exposes employees to relevant mining hazards.

---

[20] By no means is safety ignored in this situation. Where Mine Act jurisdiction does not apply, other jurisdictional oversight does, such as the Occupational Safety and Health Act of 1970, 29 U.S.C. § 651 *et seq.*, or additional state safety or transportation enforcement agencies. Nothing in the record casts doubt upon their enforcement capabilities.

[21] In reversing the Judge's finding of jurisdiction over the facility, we note the Judge's correct rejection of the Secretary's "rolling mines" theory of jurisdiction over the trucks as stand-alone pieces of equipment at a parking/repair facility. 42 FMSHRC at 231.

JA 169

**IV.**

**<u>Conclusion</u>**

For the preceding reasons, we find that the Secretary did not have jurisdiction to issue Citation Nos. 9222038 and 9222040 involving trucks parked at KC Transport's Emmett Facility. Accordingly, we reverse the Judge's decision, grant KC Transport's Motion for Summary Decision, and vacate the citations.

_____
William I. Althen, Commissioner


_____
Marco M. Rajkovich, Jr., Commissioner

17

**Chair Traynor, dissenting:**

The question on review is whether an inspector from the Secretary of Labor's Mine Safety and Health Administration ("MSHA") had jurisdiction to issue citations to KC Transport, Inc., when he observed its employees violate a mandatory safety standard while repairing coal haul trucks at KC Transport's parking lot. As I will demonstrate, Congress has directly spoken to the issue; the Mine Act plainly states that "equipment . . . used in, or to be used in" mining processes are subject to the provisions of the Mine Act. 30 U.S.C. § 802(h)(1)(C).

**A. Factual Summary**

On March 11, 2019, MSHA Inspector John M. Smith traveled down a public road in Logan County, West Virginia and arrived at a manned-gate controlled by Ramaco Resources. The gate marked the point where the public road became Ramaco's private mine haul road. Only authorized personnel are permitted access to the mine road, which connects five coal mines (three deep mines, one strip mine and a highwall mine) with the Elk Creek Preparation Plant. The road, mines, and preparation plant are all owned and operated by Ramaco and subject to the provisions of the Mine Act.

Inspector Smith first traveled to the Elk Creek Plant. From the plant, Inspector Smith traveled about a mile down the haul road to KC Transport's parking lot. KC Transport is an independent contractor that provides haulage services at these Ramaco mine properties.[1] KC Transport's off-road trucks regularly haul coal from the five mines, over the haul road and to the Elk Creek Plant. The off-road trucks were not licensed to travel on-road at the time of the inspection and, therefore, were operated exclusively at Ramaco's mine complex. On this day, Inspector Smith was following-up on citations that had been previously issued to KC Transport's trucks during a MSHA inspection of a Ramaco mine.

KC Transport parks and maintains its trucks at a sand and gravel parking lot built on land controlled by Ramaco. The lot is separated from the haul road by an approximately 1000-foot side road. At the time of the inspection, KC Transport was in the process of constructing a maintenance facility next to the parking lot and was using two shipping containers and two service trucks to conduct repairs.[2] KC Transport shares the lot with a logging company.

In addition to the off-road trucks, KC Transport also operates on-road trucks out of this facility providing services for other customers. This was the first time that MSHA issued a

---

[1] KC Transport operates truck maintenance and storage facilities at five different locations. The Emmett, West Virginia facility at issue contained approximately 35 trucks, including both off-road trucks and on-road trucks.

[2] On the day Inspector Smith issued these citations he did not attempt to inspect the shipping containers, service trucks or any other trucks located at KC Transport's facility.

citation for conduct that occurred at this newly-constructed parking lot.[3]  However, MSHA regularly inspects the same exact trucks when operated at Ramaco's mines and on its roads.

On March 11, 2019, during his visit to the parking lot, Inspector Smith observed two Mack haul trucks undergoing repairs.  The trucks were not blocked against motion as required by the mandatory safety standard at 30 C.F.R. § 77.404(c).  Accordingly, Inspector Smith issued two citations to KC Transport.  Inspector Smith also issued an imminent danger order pursuant to section 107(a) of the Mine Act because a person was standing underneath the raised unblocked bed of one truck, a serious hazard that could result in a fatal injury.  The issuance of the imminent danger order authorized the inspector to withdraw the individual from danger.  The order is not at issue in this case.

The parties filed cross motions for summary decision with the Judge.  KC Transport agreed to accept the two citations as issued if the Judge found that MSHA had properly asserted jurisdiction.  Commission Procedural Rule 67, 29 C.F.R. § 2700.67, authorizes a Judge to grant summary decision if the entire record shows there is no genuine issue of material fact and the moving party is entitled to summary decision as a matter of law.  KC Transport argued that MSHA lacked jurisdiction to issue the citations because the repairs were being performed at a facility that was not a "mine."  The Secretary argued that MSHA has jurisdiction to enforce safety standards governing equipment "used in" mining.

The Judge granted the Secretary's motion for summary judgement, finding MSHA jurisdiction over the trucks as well as the parking lot facility.

**B. Analysis**

On review, KC Transport argues that section 3(h)(1)(C) of the Mine Act only covers equipment connected to "mines" as specified in sections 3(h)(1)(A) and (B).  The Secretary maintains that section 3(h)(1)(C) covers equipment that is "used in" mining irrespective of its location.  The Commission reviews a Judge's decision to grant summary decision *de novo*. *M-Class Mining, LLC*, 41 FMSHRC 579, 582 (Sept. 2019) (citations omitted).

The Mine Act provides that "[e]ach coal or other mine, the products of which enter commerce, or the operations or products of which affect commerce, and each operator of such mine, and every miner in such mine shall be subject to the provisions of this Act."  30 U.S.C. § 803.  Section 3(h)(1) of the Mine Act defines a "coal or other mine" in relevant part as:

> (A) An area of land from which minerals are extracted in nonliquid form or, if in liquid form, are extracted with workers underground, (B) private ways and roads appurtenant to such area, and (C) lands, excavations, underground passageways, shafts, slopes, tunnels and

---

[3]  In April 2018, MSHA visited a different KC Transport parking lot.  MSHA issued citations that were later vacated.  After those citations were issued, KC Transport constructed the subject sand and gravel parking lot, in an area that was further from the mine haul road than its previous lot.

> workings, structures, facilities, equipment, machines, tools, or other property including impoundments, retention dams, and tailings ponds, on the surface or underground, used in, or to be used in, or resulting from, the work of extracting such minerals from their natural deposits . . . or used in, or to be used in, the milling of such minerals, or the work of preparing coal or other minerals, and includes custom coal preparation facilities.

30 U.S.C. § 802(h)(1).

Under the plain language of the Mine Act, the Mack coal haul trucks are "equipment . . . used in, or to be used in" "extracting" and "preparing coal" and thus I would find that the citations were properly issued. *Chevron U.S.A. Inc. v. National Resources Defense Council, Inc.*, 467 U.S. 837, 842-43 (1984) (Under step one of *Chevron*, we ask "whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.").

In the legislative history of the Act, Congress made it clear "that what is considered to be a mine and to be regulated under this Act be given the *broadest possibl[e] interpretation*." S. Rep. No. 95-181, at 14 (1977), *reprinted in* Senate Subcomm. on Labor, Comm. on Human Res., Legislative History of the Federal Mine Safety and Health Act of 1977, at 602 (1978) ("Legis. Hist") (emphasis added).[4] Congress further stated that "doubts [shall] be resolved in favor of inclusion of a facility within the coverage of the Act." *Id*. Accordingly, the Commission has consistently construed section 3(h)(1) broadly in favor of Mine Act coverage and recognized that "jurisdictional doubts [shall] be resolved in favor of coverage by the Mine Act." *Calmat Company of Arizona,* 27 FMSHRC 617, 624 (Sept. 2005) (holding that the cited haul trucks "were clearly related to mining operations and within MSHA's jurisdiction.").

In fact, the Commission has repeatedly held that pursuant to section 3(h)(1)(C), "equipment" that is "used in, or to be used in" mining is subject to the provisions of the Mine Act, *even* when located at a place that is not a "mine" pursuant to sections 3(h)(1)(A) and (B).[5] *See W.J. Bokus Industries, Inc.*, 16 FMSHRC 704, 708 (Apr. 1994); *see also State of AK Dep't of Transp.*, 36 FMSHRC 2642, 2647-48 (Oct. 2014) (holding that equipment used to extract material is subject to the provisions of the Mine Act and noting that lack of jurisdiction over a public road under subsection (B) does not foreclose jurisdiction over operations on that road

---

[4] Indeed, in *Marshall v. Stoudt's Ferry Preparation Co*., 602 F.2d 589, 591-92 (3d Cir. 1979), *cert. denied*, 444 US 1015 (1980), the court stated that "the statute makes clear that the concept that was to be conveyed by the word ["mine"] is much more encompassing than the usual meaning attributed to it—the word means what the statute says it means."

[5] The Commission generally considers whether the equipment "used in" coal preparation or extraction is "essential to" or "integral to" the process. *See Maxxim Rebuild Co., LLC*, 38 FMSHRC 605, 607 (Apr. 2016).

20

under (A) or (C)).  That is because under section 3(h)(1)(C) whether a particular piece of equipment is subject to the provisions of the Mine Act is primarily resolved by examining the equipment's function (not its location or ownership).[6]

In *W.J. Bokus*, the Commission held that "[u]nder section 3(h)(1), the Secretary *need only establish* that the items in issue *were used or to be used in mining*."  16 FMSHRC at 708 (emphasis added).  Bokus Industries operated a sand and gravel mine on a portion of its property. An asphalt plant was also located on the property.  Bokus had an arrangement by which it leased the asphalt plant to another company.  Bokus also leased a garage, located adjacent to the asphalt plant, to the asphalt company.  Under the terms of the lease, both Bokus Industries and the asphalt company could jointly use the garage.  On review, the Commission held that it was not necessary to determine whether the garage was a "mine," because the evidence established that the cited pieces of equipment in the garage "were used or to be used in mining."  *Id*. at 708.  In so holding, the Commission relied upon the function of the cited equipment.[7]

In *Jim Walter Res, Inc*., 22 FMSHRC 21 (Jan. 2000), the Commission reaffirmed that "whether a mine operator's equipment is covered by the Mine Act *is not determined by its location but rather by its function*—that is, whether it is used in extracting or preparing coal." *Id*. at 27 n.11 (emphasis added).  The Commission held that the supply shop at issue and its contents were subject to the provisions of the Mine Act because the "facilit[y]" was a "mine" and because it held "equipment . . . used in or to be used in" mining.  *Id*. at 25.

My colleagues rely on the anomalous Sixth Circuit opinion in *Maxxim Rebuild*, 848 F.3d 737 (6th Cir. 2017), for their finding that these haul trucks were not subject to MSHA jurisdiction at the time the citations were issued.[8]  My colleagues are wrong.  Even under the narrow interpretation of section 3(h)(1) articulated in *Maxxim*, the citations and the Judge's decision should be affirmed.[9]

---

[6] And not by reference to the folk notion of two Commissioners in the majority who declare that the technical definition of a "mine" in the Act cannot possibly encompass trucks parked immediately adjacent to mine property.

[7] *See also Justis Supply & Machine Shop*, 22 FMSHRC 1292, 1296 (Nov. 2000) (finding MSHA jurisdiction over a dragline assembly site where the record demonstrates that the dragline was intended for use at a nearby mine).

[8] My colleagues rely upon *U.S. Dept of Labor v. Ziegler Coal Co.*, 853 F.2d 529 (7th Cir. 1988), in which the court reviews a decision of the Benefits Review Board.  Slip op. at 13. Because *Ziegler* neither concerns a decision of the Federal Mine Safety and Health Review Commission, nor MSHA jurisdiction, it is not relevant to our inquiry.

[9] The Sixth Circuit's decision in *Maxxim* is not binding on a case arising in the Fourth Circuit.  As *Maxxim* is inconsistent with the plain language of section 3(h)(1) of the Mine Act, as well as its legislative history and Commission precedent, I believe it was wrongly decided.

21

*Maxxim* concerned a repair shop that mostly serviced mining equipment for Alpha Natural Resources—a large coal producer and Maxxim's parent company. *Id*. at 739. The shop also included a warehouse which stored at least one piece of equipment for Alpha. The Commission affirmed that MSHA properly asserted jurisdiction over the shop.[10] The Sixth Circuit reversed, holding that section 3(h)(1) of the Mine Act limited the agency's jurisdiction "to locations and equipment that are part of or adjacent to extraction, milling, and preparation sites." *Id*. at 744. The Sixth Circuit stated that the Mine Act does not govern "'machines, tools, or other property' wherever they may be found or made. *Id*. at 740. Instead, "equipment" covered by subsection (C) "*must be connected* to a working mine." *Id*. at 741 (emphasis added). The Sixth Circuit stated that section 3(h)(1) (A), (B), and (C) "are place connected, and place driven." The court ultimately held that the shop at issue "was not attached to or adjacent to a working mine," instead it was "one-step removed from" a "mine" and that "it makes no difference that Alpha's mines may one day use the shop's fabricated or repaired equipment" to extract coal. *Id*. at 742-43.

The facts of the case currently before the Commission are readily distinguishable from the facts in *Maxxim*. First, let's consider the location. The parking lot is not "one-step removed" from a mine site. Instead, it sits on a large tract of land that contains five working mines and a coal prep plant. Furthermore, it is *adjacent to an active mine haul road* (about 1000 feet away) which connects five mines and a preparation plant. Each of these entities, including the mine haul road, are a "mine." 30 U.S.C. § 803(h)(1)(B) ("private ways and roads appurtenant to such area"). Moreover, one cannot access the parking lot without first traveling through a manned gate controlled by the mine operator.

Second, and more importantly, let's consider direct evidence of the trucks' function. The two trucks are each "connected to a working mine" because the parties stipulated that each was "regularly used to haul coal from the five Ramaco mines to the Elk Creek prep plant" and are regularly inspected by MSHA. Jt. Stips. 18, 29. These stipulations are dispositive evidence of the trucks' function. In addition, the trucks were parked and undergoing maintenance work previously mandated by MSHA at the time these citations were issued. The repairs were necessary so that the trucks could continue hauling coal for Ramaco. These particular trucks were not licensed to travel over public roads at the time the citations were issued and thus could only be operated on Ramaco's property. Jt. Stip. 27. Accordingly, both trucks were obviously connected to a working mine. Even under *Maxxim*, the Secretary rightfully asserted Mine Act jurisdiction.

---

However, as demonstrated *infra*, even under the Sixth Circuit's narrow interpretation of section 3(h)(1), the Judge's decision in this case should be affirmed.

[10] The Commission concluded that under the plain language of section 3(h)(1)(C) the shop was subject to MSHA jurisdiction because it was a "facility" that was "used in" the process of "extracting" and preparing coal; the Maxxim facility worked on equipment that was integral to the mining process. 38 FMSHRC 605, 607 (Apr. 2016). Substantial evidence supported the Judge's conclusion that a significant part of the work performed at the shop was mining related. *Id*. at 608.

22

In summary, substantial evidence supports the Judge's finding that the coal haul trucks are "equipment" "used in" mining as defined at 30 U.S.C. § 802(h)(1).  Furthermore, the Secretary demonstrated that the trucks are essential and integral to mining operations.  The location of the parking lot, adjacent to the mine haul road, provides additional evidence of the trucks' function.[11]  The Judge's finding of jurisdiction should be affirmed.  Insofar as the Judge believed he had to address the jurisdiction over the facility to affirm jurisdiction over the trucks, he was in error.[12]

### C.  The Result of the Majority's Ruling

The majority's decision will result in decreased enforcement of safety standards governing the maintenance and operation of mining equipment at off-site facilities or on-site separate facilities.  As a result, those workplaces will become more dangerous.

Powered haulage accounts for a large percentage of the fatal injuries in mining.  In 2017, 50% of fatal injuries at mines involved powered haulage.[13]  Haul trucks in particular present a variety of safety hazards.  Two of the fatal injuries in 2017 occurred when a 340-ton haul truck collided with a passenger van at a mine site.[14]

---

[11] Considering the location of the equipment as circumstantial evidence of function, while also requiring direct evidence of the equipment's function, helps to address KC Transport's concerns regarding overbroad MSHA jurisdiction.  For example, certain implications can logically be drawn if a truck is parked at its manufacturer's warehouse versus being parked at a mine operator's on-site repair shop.

[12] The Judge primarily conducted a functional analysis, finding that the trucks perform "an integral part of the mining and preparation process" by transporting coal from the mines to the prep plant, and "the maintenance of the trucks at the facility is [also] essential to the coal hauling and preparation process."  42 FMSHRC at 237-38.  However, the Judge also states that "the location of the trucks and the maintenance facility matter."  *Id*. at 237.  Essentially, in so doing, he was stating that location can serve as evidence that the equipment is "used in" the extraction or preparation of coal.

[13] Jennica Bellanca, Mining Project: Characterization of Haul Truck Health and Safety Issues, The National Institute for Occupational Safety and Health (NIOSH), www.cdc.gov/niosh/mining/researchprogram/projects/index.html.

[14] MSHA, Fatality Alert #11 & #12 - October 31, 2017, Mine Safety and Health Administration, www.msha.gov/data-reports/fatality-reports/2017/fatality-11-12-october-31-2017/fatality-alert.

23

More recently, from October 1 to December 13, 2021, five of the ten total fatal injuries at mines involved powered haulage.[15]  In an attempt to better address those hazards, MSHA recently issued a notice of proposed rule-making to require mine operators to develop and implement powered haulage safety programs.  *Safety Program for Surface Mobile Equipment*, 86 Fed. Reg. 50496 (Sept. 9, 2021).  Apparently, as a result of the majority's decision, KC Transport will not be required to comply with this particular MSHA rule while maintaining trucks at its parking lot.

Of course, injuries can also occur during the maintenance of haul trucks.  Recently, a mechanic was fatally injured when a haul truck bed collapsed on him while he was working on the truck.[16]  The citation and imminent danger order issued to KC Transport on March 11, 2019, cite eerily similar facts.  Inspector Smith observed a miner standing underneath the truck bed while it was in a raised position, without having been blocked to prevent motion.  According to my colleagues' ruling, MSHA inspectors are not permitted to issue an order to stop work if they observe a similar dangerous occurrence in the future.

However, the complete implications of their ruling remain unclear.  In fact, it gives rise to a number of questions.  For instance, suppose an MSHA inspector stops a truck at a Ramaco mine.  The inspector discovers that the KC Transport driver conducted an inadequate pre-shift examination earlier in the day.[17]  If the pre-shift examination occurred at the parking lot, can MSHA issue a citation?  Suppose the truck is later involved in a fatal accident at a mine.  Are MSHA's accident investigators permitted to consider whether improper maintenance at the parking lot was a contributing factor?  Or perhaps an MSHA inspector observes a haul truck driving on the mine road with an obvious equipment defect.  The inspector follows the truck to the parking lot.  Does the truck's presence at the lot prevent the MSHA inspector from issuing a citation for a defect that he observed at the mine road?

These questions and confusion demonstrate the absurdity of my colleagues' interpretation.  Impeding MSHA's ability to prevent and investigate accidents that involve coal haul trucks frustrates Congress's goals in passing the Mine Act.  30 U.S.C. § 801(c) ("[H]ere is an urgent need to provide more effective means and measures for improving the working conditions and practices in the Nation's coal or other mines in order to prevent death and serious physical harm").  Haul truck accidents lead to fatal injuries.

---

[15]  <u>MSHA: 'Work with us' as powered haulage, other concerns persist</u>, Safety and Health Magazine, www.safetyandhealthmagazine.com/articles/22065-msha-work-with-us-as-powered-haulage-other-concerns-persist.

[16]  MSHA, <u>October 19, 2021 Fatality - Fatality Alert</u>, Mine Safety and Health Administration, www.msha.gov/data-reports/fatality-reports/2021/october-19-2021-fatality/fatality-alert.

[17]  The mandatory safety standard at 30 C.F.R. § 77.1606(a) states that "[m]obile loading and haulage equipment shall be inspected by a competent person before such equipment is placed in operation," and that safety defects shall be "recorded and reported."

24

Instead of permitting MSHA to ensure that mining equipment complies with minimum mandatory safety standards, my colleagues issue a decision that designates an area an "MSHA free zone."  I am concerned that their decision will become a how-to-guide, used by the most cynical mine operators to avoid regulations.

My colleagues contend that the trucks at the parking lot are subject to the provisions of the Occupational Safety and Health Act, 29 U.S.C. § 651, and thus safety will not be compromised.  They fail to acknowledge that the Occupational Safety and Health Administration ("OSHA") does not have the budget or the man-power to inspect even a fraction of the workplaces currently in its jurisdiction.

OSHA ended fiscal year 2021 with only 750 inspectors, the lowest number of inspectors in the 51-year history of the agency.[18]  With similar staffing levels it would take 165 years for OSHA inspectors to visit every workplace in its jurisdiction once.[19]  In contrast, the Mine Act requires MSHA to inspect each surface mine at least two times a year and each underground mine at least four times a year.  30 U.S.C. § 813(a).  MSHA inspectors will continue to regularly visit Ramaco's mining complex, however, OSHA inspectors will rarely, if ever, be on the premises.[20]

Accordingly, miner safety would be best promoted if equipment "used in" mining was inspected by MSHA inspectors, as Congress intended. Thus, I dissent.

_____
Arthur R. Traynor, III, Chair

_____

[18]  Bruce Rolfson, Federal Workplace Safety Inspector Numbers Fall Under Biden, Bloomberg Law, https://news.bloomberglaw.com/safety/federal-workplace-safety-inspector-numbers-tumble-under-biden.

[19]  David Michaels and Jordan Braab, The Occupational Safety and Health Administration at 50: Protecting Workers in a Changing Economy, National Library of Medicine, www.ncbi.nlm.nih.gov/pmc/articles/PMC7144438/.

[20]  The Mine Act also provides miners with other enhanced protections that are absent from the Occupational Safety and Health Act, including the right to temporary reinstatement to their position if fired for engaging in protected safety related activity.  30 U.S.C. § 815(c)(2).

Furthermore, MSHA inspectors have been granted greater access to inspect properties as compared to their OSHA counterparts.  Cf. Marshall v. Barlow's, Inc., 436 U.S. 307 (1978) (warrantless inspection under the OSH Act violates the 4th amendment); Donovan v. Dewey, 452 U.S. 594, 606 (1981) (warrantless Mine Act inspections are "constitutionally permissible").

JA 178

Distribution:

Christopher D. Pence, Esq.
Hardy Pence PLLC
10 Hale Street, 4th Floor (25301)
P.O. Box 2548
Charleston, WV 25329
cpence@hardypence.com

James P. McHugh, Esq.
Hardy Pence PLLC
10 Hale Street, 4th Floor (25301)
P.O. Box 2548
Charleston, WV 25329
jmchugh@hardypence.com

Robert S. Wilson, Esquire
U.S. Department of Labor, Office of the Solicitor
201 12th Street South
Arlington, VA 22202-5450
wilson.robert.s@dol.gov

Stephen S. Adkins
Conference Litigation Representative
U.S. Department of Labor
Mine Safety and Health Administration
4499 Appalachian Highway
Pineville, WV 24874
adkins.stephen@dol.gov

John M. McCracken, Esq.
Office of the Solicitor
U.S. Department of Labor
Mine Safety and Health Division
201 12th Street South,  Suite 401
Arlington, VA 22202-5452
McCracken.John.M@dol.gov

Emily Toler Scott
Senior Trial Attorney
Office of the Solicitor
U.S. Department of Labor
Mine Safety and Health Division
201 12th Street South, Suite 401
Arlington, VA 22202-5452
scott.emily.t@dol.gov

April Nelson, Esq.
Office of the Solicitor
U.S. Department of Labor
Mine Safety and Health Division
201 12th Street South, Suite 401
Arlington, VA 22202-5452
Nelson.April@dol.gov

Melanie Garris
U.S. Department of Labor
Office of Civil Penalty Compliance
Mine Safety and Health Administration
201 12th Street South, Suite 401
Arlington, VA 22202-5452
Garris.Melanie@dol.gov

Chief Administrative Law Judge Glynn F. Voisin
Federal Mine Safety & Health Review Commission
1331 Pennsylvania Avenue, NW, Suite 520N
Washington, DC 20004-1710
GVoisin@fmshrc.gov

Administrative Law Judge John Lewis
Federal Mine Safety Health Review Commission
875 Green Tree Road,
7 Parkway Center, Suite 290
Pittsburgh, PA 15220
jlewis@fmshrc.gov

27

ORAL ARGUMENT NOT YET SCHEDULED

# No. 22-1071

## UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Secretary of Labor,
Mine Safety and Health Administration,
Petitioner

*v.*

KC Transport, Inc. and
Federal Mine Safety and Health Review Commission,
Respondents

On Petition for Review of a Decision of the
Federal Mine Safety and Health Review Commission

Brief for the Secretary of Labor

SEEMA NANDA
  Solicitor of Labor
APRIL E. NELSON
  Associate Solicitor
EMILY TOLER SCOTT
  Counsel for Appellate
  Litigation

SUSANNAH M. MALTZ
Attorney
U.S. Department of Labor
Office of the Solicitor
Division of Mine Safety & Health
201 12th Street South, Ste. 401
Arlington, VA 22202
(202) 693-5393

## Certificate as to Parties, Rulings, and Related Cases

Under the D.C. Circuit Court Rule 28(a)(1)(A), the Secretary of Labor certifies as follows:

### 1. Parties

The following parties participated in the underlying proceeding before the Federal Mine Safety and Health Review Commission, *KC Transport, Inc.*, WEVA 2019-0458:

- KC Transport, Inc.

- Federal Mine Safety and Health Review Commission

- Secretary of Labor, Mine Safety and Health Administration

Petitioner in this case is the Secretary of Labor. Respondents are KC Transport, Inc. and the Federal Mine Safety and Health Review Commission. There are no amici curiae.

### 2. Rulings Under Review

The ruling under review is the April 5, 2022 final order of the Federal Mine Safety and Health Review Commission in *KC Transport*, WEVA 2019-0458, vacating two citations the Secretary of Labor issued under 30 U.S.C. 814(a). The decision is reported at *KC Transport, Inc.*, 44 FMSHRC 211 (Apr. 2022).

ii

### 3.  Related Cases

This case has not previously been before this Court. The Secretary of Labor is not
aware of any related cases currently pending in this Court or any other.

JA 183

# Table of Contents

Table of Authorities ................................................................ vi

Glossary .................................................................................. xi

Jurisdictional Statement .......................................................... 1

Introduction and Statement of the Issues ............................... 1

Statement of the Case ............................................................. 5

   1.  Statutory Framework ....................................................... 5

   2.  Factual Background .......................................................... 5

   3.  Procedural Background ..................................................... 9

     3.1  The ALJ's Decision ...................................................... 9

     3.2  The Commission's Decision .........................................13

Summary of Argument.......................................................... 16

Standing ................................................................................ 19

Argument .............................................................................. 19

   1.  Standard of review ......................................................... 19

   2.  The plain meaning of "mine" includes equipment and facilities used in or to be used in mining. ....................................................... 21

     2.1  Statutory text.............................................................. 21

     2.2  Previous interpretations. ............................................. 25

     2.3  Legislative history...................................................... 30

     2.4  Protective purpose. ..................................................... 32

     2.5  Reasonable results. ..................................................... 33

   3.  If section 3(h)(1) is ambiguous, the Secretary's interpretation is reasonable and owed deference. ....................................................... 38

   4.  MSHA had jurisdiction over the Emmett facility and trucks. ..................... 42

   5.  The Commission did not have jurisdiction to reach the issue of whether independent contractors must be physically "at the mine" to be considered operators. ....................................................... 44

Conclusion ........................................................................... 47

iv

Certificate of Compliance with Type-Volume Limit,  Typeface Requirements, and Type-Style Requirements ......................................................... a

Certificate of Service ................................................................... b

Addendum – Pertinent Statutes and Regulations ................................................... c

v

# Table of Authorities

*Am. Coal Co.* v. *FMSHRC*,
  796 F.3d 18 (D.C. Cir. 2015) ………………………………...…… 20, 32, 42, 43

*Barbour* v. *Browner*,
  181 F.3d 1342 (D.C. Cir. 1999) …………………………………...…………... 21

*Bruesewitz* v. *Wyeth, LLC*,
  562 U.S. 223 (2011) ………………………………………………………..…… 22

*Bush & Burchett, Inc.* v. *Reich*,
  117 F.3d 932 (6th Cir. 1997) …………………………....…………. 11, 29, 30

*CalPortland Co., Inc.* v. *FMSHRC*,
  839 F.3d 1153 (D.C. Cir. 2016) ……………………………………… 21, 22, 25

*Chaney Creek Coal Corp.* v. *FMSHRC*,
  866 F.2d 1424, (D.C. Cir. 1989) …………………………………....…..…… 44

*Chevron, U.S.A., Inc.* v. *Nat'l Res. Defense Council, Inc.*,
  467 U.S. 837 (1984) …………………………………...…………………….... 37

*Donovan* v. *Carolina Stalite Co.*,
  734 F.2d 1547 (D.C. Cir. 1984) ………………………… 2, 16, 20, 27, 28, 29, 31

*Emerald Mines Co.* v. *FMSHRC*,
  863 F.2d 51 (D.C. Cir. 1988) …………………………………….…..… 24, 37

*Environmental Defense Fund, Inc.* v. *EPA*,
  82 F.3d 451 (D.C. Cir. 1996) ……………………………………………… 35

*Good Samaritan Hosp.* v. *Shalala*,
  508 U.S. 402 (1993) ……………………………………….…………… 18, 40

*Authorities on which this brief chiefly relies are marked with an asterisk.

JA 186

*Harman Mining Corp.* v. *FMSHRC*,
    671 F.2d 794 (4th Cir. 1981) …………………………………………... 10, 27, 28

*Herman* v. *Assoc. Elec. Co-op., Inc.*,
    172 F.3d 1078 (8th Cir. 1999) …………………………….………... 33

*Hosp. of Barstow, Inc.* v. *NLRB*,
    820 F.3d 440 (D.C. Cir. 2016) ……………………………………… 46

*Judge Rotenberg Educ. Ctr., Inc.* v. *U. S. Food & Drug Admin.*,
    3 F.4th 390 (D.C. Cir. 2021) ……………………………………..… 44

*Marshall* v. *Stoudt's Ferry Preparation Co.*,
    602 F.2d 589 (3d Cir. 1979) …………………………….…..……... 10, 28

*Martin* v. *OSHRC*,
    499 U.S. 144 (1991) ………………………………………….. 18, 38, 41

*Maxxim Rebuild Co., LLC* v. *FMSHRC*,
    848 F.3d 737 (6th Cir. 2017) …………………………..…………… 3, 11, 13, 28

*Otis Elevator Co.* v. *Sec'y of Labor*,
    921 F.2d 1285 (D.C. Cir. 1990) ……………………………..………… 38

*Petit* v. *U.S. Dep't of Educ.*,
    675 F.3d 769 (D.C. Cir. 2012) ………………………….…..……….. 21, 32

*RAG Cumberland Res., LP* v. *FMSHRC*,
    272 F.3d 590 (D.C. Cir. 2001) ……………………………………….. 20

*Sec'y of Labor* v. *Excel Mining, LLC*,
    334 F.3d 1 (D.C. Cir. 2003) ……………………………..…………… 20, 41

JA 187

*Sec'y of Labor* v. *Nat'l Cement Co. of Cal.*,
    573 F.3d 788 (D.C. Cir. 2009) ………………………… 2, 3, 17, 18, 19, 24, 25, 26,
                                29, 32, 35, 36, 38, 39, 40, 41, 42

*Sec'y of Labor* v. *Twentymile Coal Co.*,
    456 F.3d 151 (D.C. Cir. 2006) ………………………………… 19, 20, 25, 38, 46

*Thunder Basin Coal Co.* v. *Reich*,
    510 U.S. 200 (1994) …………………………………………….…... 21, 30, 33

*United Mine Workers of Am.* v. *Dep't of Interior*,
    562 F.2d 1260 (D.C. Cir. 1977) …………………………..………. 40

*U.S.* v. *Mead Corp.*,
    533 U.S. 218 (2001) ……………………………………..………. 38

*Village of Barrington, Illinois* v. *Surface Transp. Bd.*,
    636 F.3d 650 (D.C. Cir. 2011) ……………………………………….. 23, 25

**Statutes**

30 U.S.C. 801 ……………………………………………………….... 5, 32, 42

30 U.S.C. 802(d) …………………………………………………….. 3, 18, 46

30 U.S.C. 802(h) (1976) ………………………………………………… 31

* 30 U.S.C. 802(h) …………………………………2, 4, 9, 13, 14, 15, 16, 18, 22, 23,
                       24, 25, 28, 30, 31, 32, 33, 39, 42, 47

30 U.S.C. 814(a) ……………………………………………………........... 5

30 U.S.C. 815 ……………………………………………………...…… 1, 5

30 U.S.C. 816 ……………………………………………………….... 1, 5, 19

30 U.S.C. 817(a) ………………………………………………….......…… 8

30 U.S.C. 820(a) ………………………………………………….......…… 5

30 U.S.C. 823(d) …………………………………………………… 1, 5, 13, 18, 44, 45

viii

## Mandatory Health and Safety Standards

30 C.F.R. 77.404(c) …………………...……………………………...…… 8

## Rules

D.C. Cir. R. 28 ………………………………………………………….. 19

## Federal Mine Safety and Health Review Commission Decisions

*Austin Powder*,
    37 FMSHRC 1337 (June 2015) …………………………………......... 11

*Jim Walter Res., Inc.*,
    22 FMSHRC 21 (Jan. 2000) ……………………………… 2, 10, 16, 22, 28, 40

*Justis Supply & Machine Shop*,
    22 FMSHRC 1292 (Nov. 2000) ………………………………………... 10, 12

*Kentucky Fuel Corp.*,
    40 FMSHRC 28 (Feb. 2018) …………………………………….……. 43

*Musser Eng'g, Inc.*,
    32 FMSHRC 1257 (Oct. 2010) …...……………………………….... 3, 46

*Ray, employed by Leo Journagan Constr. Co., Inc.*,
    20 FMSHRC 1014, 1025 (Sept. 1998) ……………………………… 29

*State of Alaska, Dep't of Transp.*,
    36 FMSHRC 2642 (Oct. 2014) ……………………………. 11, 12, 24, 37, 39

*U.S. Steel Mining Co., Inc.*,
    10 FMSHRC 146 (Feb. 1988) …………………………………....... 28, 43

*W.J. Bokus Indus., Inc.*,
    16 FMSHRC 704 (Apr. 1994) ……………………………………. 11, 12, 27, 40

## Other Authorities

S. Rep. No. 95-181 (1977) ……………………………………. 17, 30, 31, 32, 39, 42

JA 189

Bryan A. Garner,
   *The Chicago Guide to Grammar, Usage, and Punctuation* (2016) …………..… 22

x

**Glossary**

| | |
|---|---|
| ALJD | Citations to the Underlying Administrative Law Judge Decision |
| Coal Act | Federal Coal Mine Health and Safety Act of 1969 |
| Comm. | Citations to the Underlying Federal Mine Safety and Health Review Commission Decision |
| Mine Act | Federal Mine Safety and Health Act of 1977 |
| MSHA | Mine Safety and Health Administration |
| OSHA | Occupational Safety and Health Administration |
| JA | Citations to the Joint Appendix[1] |

---

[1] Per the Court's briefing schedule, the deferred joint appendix will be filed by October 26, 2022 and the final briefs with updated citations to the joint appendix will be filed by November 9, 2022. Citations to the joint appendix in this brief appear in this form: [JA ___] and will be updated with page numbers in the final briefs.

## Jurisdictional Statement

The Federal Mine Safety and Health Review Commission had jurisdiction over this case because KC Transport, Inc. timely contested the citations it received from the Mine Safety and Health Administration. 30 U.S.C. 815(d), 823(d).

The Commission issued its final decision on April 5, 2022. The Secretary filed a petition for review with this court on May 4, 2022, within 30 days of the Commission's decision, as required by the Federal Mine Safety and Health Act of 1977. 30 U.S.C. 816(b). This Court has jurisdiction under section 106(b) of the Mine Act. *Ibid.*

## Introduction and Statement of the Issues

This case is about MSHA's jurisdiction over "mines." It is a simple question of statutory interpretation that has significant consequences for the safety and health of miners nationwide. It is also a case in which the Commission distorted the meaning of the Mine Act, ignored limitations on its own jurisdiction, and reversed decades of its own precedent—apparently in an effort reach the Commission's desired policy result, despite its lack of any policymaking authority.

1

Under the Mine Act, MSHA has jurisdiction to inspect "each coal or other

mine[]," 30 U.S.C. 813(a), and the Mine Act defines that term in section 3(h)(1) as:

> (A) An area of land from which minerals are extracted in nonliquid form or, if in liquid form, are extracted with workers underground,
>
> (B) private ways and roads appurtenant to such area, and
>
> (C) lands, excavations, underground passageways, shafts, slopes, tunnels and workings, structures, facilities, equipment, machines, tools, or other property . . . used in, or to be used in . . . the work of extracting . . . or the work of preparing coal or other minerals . . . .

30 U.S.C. 802(h)(1).

For decades, the meaning of subsection (C) has been settled: it includes

facilities and equipment used in mining.[2] Whether equipment or a facility is a

"mine" depends on function, not location. *Donovan* v. *Carolina Stalite Co.*, 734

F.2d 1547, 1554 (D.C. Cir. 1984); *Jim Walter Res., Inc.*, 22 FMSHRC 21, 25 (Jan.

2000). In *National Cement*, this Court held that it was reasonable and "entirely

consistent with a broad statutory definition of 'mine'" to interpret each subsection

of section 3(h)(1) as an independent basis for jurisdiction, and to interpret

---

[2] The statute covers three broad types of work: extracting, milling, and preparing coal or other minerals. 30 U.S.C. 802(h)(1)(C). This Court has shorthanded that work as "mining," *Sec'y of Labor* v. *Nat'l Cement Co. of Cal., Inc.*, 573 F.3d 788, 792 (D.C. Cir. 2009), and for brevity and convenience, this brief does the same.

2

subsection (C) as "reach[ing] vehicles used in mining but not located within an extraction area." *Sec'y of Labor* v. *Nat'l Cement Co. of Cal., Inc.*, 573 F.3d 788, 795 (D.C. Cir. 2009).

In 2017, the Sixth Circuit—alone among the Commission and every court of appeals to consider the issue—departed from that precedent and held that facilities referred to in subsection (C) are "mines" only if they are "part of or adjacent to" extraction sites as defined in (A). *Maxxim Rebuild Co., LLC* v. *FMSHRC*, 848 F.3d 737, 744 (6th Cir. 2017).

The Mine Act also gives MSHA jurisdiction to issue citations to "operators," a term that includes "any independent contractor performing services or construction at [a] mine." 30 U.S.C. 802(d). The Commission has held that contractors may be cited even if they are performing work not on an extraction site. *Musser Eng'g, Inc.,* 32 FMSHRC 1257, 1266-1269 (Oct. 2010).

During unrelated routine inspection activities, MSHA issued two citations to independent contractor KC Transport for unsafely performing maintenance on trucks that, at the time, were used almost exclusively to haul coal between extraction sites and a coal preparation plant. KC Transport contested the citations, argued that *Maxxim* was right, and invited the Commission to radically redefine MSHA's jurisdiction under subsection (C).

3

The Commission obliged. Reversing decades of precedent, it held that MSHA's jurisdiction over items described in subsection (C) depends not only on their functions, but also on their locations: they must be *both* engaged in extracting, milling, or preparing minerals (as subsection (C) requires) *and* "located on or appurtenant to a mine site" (as defined in subsection (A)). *KC Transport*, 44 FMSHRC 211, 216 (Apr. 2022) (Comm. 15), [JA ___]. The Commission also held that independent contractors can be cited as operators only when performing services physically at the mine, even though that issue was not raised by the parties or directed by the Commission for review. Comm. 11-12, [JA ___]. The Secretary subsequently petitioned this Court for review to consider the following questions:

1. Did the Commission err in determining that MSHA's jurisdiction under section 3(h)(1)(C) of the Mine Act is limited to equipment, facilities, and other enumerated items that are "in or adjacent to—in essence part of—a working mine"?

2. Did the Commission err in determining that MSHA lacked jurisdiction over the Emmett facility and trucks?

3. Did the Commission lack jurisdiction to reach the question of whether "operator" includes independent contractors who perform services when not physically at a mine given that 1) neither party raised it before the ALJ or in a petition for discretionary review; and 2) the Commission did not follow the statutory procedures for considering questions not raised in a petition for discretionary review?

4

## Statement of the Case

### 1. Statutory Framework

The Mine Act was enacted to improve and promote safety and health in the

Nation's mines. 30 U.S.C. 801. In enacting the Mine Act, Congress stated that

"there is an urgent need to provide more effective means and measures for

improving the working conditions and practices in the Nation's . . . mines in order

to prevent death and serious physical harm, and in order to prevent occupational

diseases originating in such mines." 30 U.S.C. 801(c).

The Mine Act authorizes the Secretary, acting through MSHA, to promulgate

mandatory safety and health standards, inspect mines, issue citations and orders for

violations of the Act or mandatory standards, and propose penalties for those

violations. 30 U.S.C. 811(a), 813(a), 814(a), 815(a), 820(a). The Mine Act also

established the Commission, an independent agency, to adjudicate many Mine Act

disputes. Commission administrative law judges adjudicate citations, orders, and

penalties that mine operators contest, subject to discretionary review by the

Commission and judicial review by a United States Court of Appeals. 30 U.S.C.

823(d), 816.

### 2. Factual Background

KC Transport is an independent trucking company that provides hauling services

to Ramaco Resources, a coal mine operator. Jt. Stip. 7, 8, [JA ___]. In a hollow in

5

JA 196

southern West Virginia, Ramaco operates five coal extraction sites, the Elk Creek prep plant where coal is processed, and a private haul road connecting the extraction sites to the plant. Jt. Stip. 3, 11, 14, 26 [JA ___].

The road begins outside of the area as a public road, but as it runs closer to the extraction sites and prep plant, it becomes Ramaco's private road. Jt. Stip. 26, [JA ___]. Ramaco maintains a manned security gate at the point where the road becomes private, and only authorized people may drive past that point. *Ibid*. From the security gate, the road runs past the prep plant and then a few miles more to the extraction sites. *Ibid.* Trucks hauling coal travel along the road from the extraction sites to the prep plant and back. Jt. Stip. 14, 18, [JA ___].

Ramaco gave KC Transport permission to use for truck maintenance the Emmett facility, an area of land just off the haul road and behind the security gate. Jt. Stip. 17, [JA ___]. It is about one mile away from the prep plant, and about four miles to the nearest extraction site. Jt. Stip. 25, [JA ___]. The only way to access the Emmett facility is to travel on Ramaco's private road past the security gate, turn onto Right Hand Fork Road (a small side road branching from the private haulage road), and travel 1000 feet to a dead end. Jt. Stip. 10, 12, 24, [JA ___]. There is no other way into the hollow where the facility is located. Jt. Stip. 12, [JA ___].

6

KC Transport uses the trucks stored and maintained at the Emmett facility for different purposes. Some trucks are on-road trucks that travel on public roads and serve different companies. Jt. Stip. 14, [JA ___]. Other trucks are off-road trucks that operate only on the private road and serve only Ramaco's mines and prep plant. Jt. Stip. 14, [JA ___]. All told, the trucks serve a few different companies, but about 60% of the services out of this facility are to Ramaco. Jt. Stip. 14, 15, [JA ___]. At the time of the citations, the Emmett facility consisted of a parking area with two shipping containers on site. Jt. Stip. 4, 13, [JA ___]. KC Transport also had materials in the area with which the company planned to construct a maintenance shop at some point in the future. Jt. Stip. 6, [JA ___].

On March 11, 2019, MSHA Inspector John Smith inspected Ramaco's Elk Creek prep plant as part of a routine inspection. Jt. Stip. 2, [JA ___]. After finishing that inspection, he went to the Emmett facility to ensure KC Transport had abated the violations listed in unrelated, previously issued citations. Jt. Stip. 4, 5 [JA ___]. When he arrived, he saw two raised trucks that were undergoing maintenance work but had not been blocked to prevent motion. Jt. Stip. 44, 45, [JA ___], Sec'y Exh. 1, 2, [JA ___]. A miner was standing underneath one of the raised, unblocked truck

beds.[3] Sec'y Exh. 2, [JA ___]. Inspector Smith issued two citations—one for each truck—for violations of 30 C.F.R. 77.404(c), which provides that "[r]epairs or maintenance shall not be performed on machinery until the power is off and the machinery is blocked against motion." Sec'y Exh. 1, 2, [JA ___].

KC Transport owns the trucks and, when the citations were issued, used them to haul coal from the Ramaco extraction sites to the prep plant. Jt. Stip. 18, [JA ___]. Though MSHA had not previously inspected those trucks while they were parked in the Emmett facility, it MSHA had previously inspected those trucks when they were at the extraction sites and prep plant. Jt. Stip. 29, [JA ___]. The trucks were off-road trucks that were not licensed to drive on public roads, drove only on Ramaco's private road, and served only the Ramaco extraction sites and prep plant. Jt. Stip. 14, [JA ___]. Their only function was to haul coal from the extraction sites to the prep plant, along the private road. Jt. Stip. 14, 27 [JA ___]. In short, the trucks were used in mining.

_____

[3] This was the basis of a section 107(a) imminent danger order not at issue in this appeal. ALJD 9-10 n.7, [JA ___]; see 30 U.S.C. 817(a) (authorizing the Secretary to order withdrawal of miners subject to an imminent danger).

8

### 3. Procedural Background

#### 3.1 The ALJ's Decision

KC Transport contested the citations before the Commission. The only dispute was whether MSHA had jurisdiction to issue the citations, Jt. Stip. 38, [JA ___], so the parties stipulated to the facts and cross-filed motions for summary judgment on that question. KC Transport Mot. for Summ. Dec., WEVA 2019-0458 (Dec. 23, 2019) [JA ___], Sec'y Mot. for Partial Summ. Dec., WEVA 2019-0458 (Dec. 23, 2019) [JA ___].

The Secretary argued that the trucks met the statutory definition of a "mine" because they are equipment "used in . . . or to be used in . . . the work of extracting . . . or the work of preparing coal . . . ." 30 U.S.C. 802(h)(1)(C). KC Transport argued, based largely on the Sixth Circuit's decision in *Maxxim Rebuild*, that the facility (and therefore the trucks at it) was not a "mine" because it was not located at an extraction or milling site. The ALJ framed the jurisdiction issue as comprising two questions: first, whether the trucks themselves were "mines," and second, whether the Emmett facility was a "mine." ALJD 11, [JA ___]. KC Transport did not raise, and the ALJ did not address, the question of whether MSHA had jurisdiction to issue citations to an independent contractor that was not physically performing services at a mine.

9

The ALJ rejected the argument that subsection (C) gives MSHA jurisdiction over equipment and facilities used in mining based on the equipment's and facilities' functions, rather than their locations. ALJD 17-18, [JA ___]. The ALJ reasoned that location matters. *Id.* at 18, [JA ___]. The ALJ then turned to MSHA's jurisdiction over the Emmett facility and trucks, and determined that MSHA had jurisdiction over both. ALJD 11, [JA ___]. The ALJ reviewed a number of cases concluding that various kinds of off-site facilities constituted "mines," including:

- a plant where fuel was separated from gravel and sand. *Marshall* v. *Stoudt's Ferry Preparation Co.*, 602 F.2d 589, 591-592 (3d Cir. 1979), *cert. denied*, 444 U.S. 1015 (1980).

- a "car-dropping" facility where railroad cars were loaded with coal. *Harman Mining Corp.* v. *FMSHRC*, 671 F.2d 794, 795-796 (4th Cir. 1981).

- an off-site maintenance facility for equipment used at coal extraction sites. *Jim Walter Res.*, 22 FMSHRC at 25.

- an off-site dragline assembly site. *Justis Supply & Machine Shop*, 22 FMSHRC 1292, 1296 (Nov. 2000).

10

- an off-site storage facility. *Austin Powder*, 37 FMSHRC 1337, 1349 ( June 2015).

ALJD 13-16, [JA ___]. He also reviewed a number of cases finding that various kinds of "equipment" constituted "mines," including:

- gas cylinders located in a garage adjacent to an asphalt plant. *W.J. Bokus Indus., Inc.*, 16 FMSHRC 704, 708 (Apr. 1994).

- mobile "screener" equipment used for sorting large rocks from gravel. *State of Alaska, Dep't of Transp.*, 36 FMSHRC 2642, 2645 (Oct. 2014).

ALJD 14-15, [JA ___].

The ALJ also considered the Sixth Circuit cases of *Bush & Burchett, Inc.* v. *Reich*, 117 F.3d 932, 937 (6th Cir. 1997), and *Maxxim Rebuild*, 848 F.3d 737. *Bush & Burchett* held that MSHA did not have jurisdiction over a public road appurtenant to a mine; the court opined that MSHA does not have jurisdiction over all roads that indirectly connect to a road appurtenant to a mine because that could encompass virtually any road that is accessible by land—even one that is hundreds of miles away. 117 F.3d at 934, 937. And *Maxxim* held that MSHA did not have jurisdiction over a shop used primarily to maintain, repair and fabricate mining equipment but that was not part of or connected to "a working mine"—i.e. an extraction site. 848 F.3d at 741.

11

In contrast to those cases, the ALJ found that because the Emmett facility was close to "working mines"—it was just more than a mile to the preparation plant and only four to five miles from the extraction sites—it was similar to the *Jim Walter* site, which was one mile from the closest extraction site, six miles from two of the sites, and 25 miles from the furthest. ALJD 18, [JA ___]. He also found that the trucks were similar to the gas cylinders of *W.J. Bokus*, because the trucks were similarly "used in the work of preparing coal," ALJD 19, [JA ___]; the dragline assembly site of *Justis Supply & Machine Shop*, because the trucks, like the dragline, were "to be used in mining coal" and the Emmett facility, like the assembly site, was "devoted to [work on equipment] that would be used in the mine," ALJD 15, [JA ___]; the mobile equipment in *State of Alaska*, because the trucks were also mobile equipment, ALJD 15, [JA ___]; and the storage facility in *Austin Powder*, because the Emmett facility, like the storage facility, "store[d]... materials used in mining." ALJD 15, [JA ___]; The ALJ determined that the Emmett facility and trucks were "not remote from the extraction and processing sites," and were an "integral part of the mining process." ALJD 19, [JA ___]. Thus, the ALJ concluded that MSHA had jurisdiction over both the trucks and facility.

The ALJ granted the Secretary's motion for summary decision and affirmed the citations. ALJD 19, [JA ___].

<center>12</center>

### 3.2    The Commission's Decision

KC Transport appealed to the Commission. In its petition for discretionary review, it raised issues only about MSHA's jurisdiction over the facility and trucks; it did not raise any issues about MSHA's authority to issue citations to independent contractors based on their location. And although the Commission has statutory authority to direct issues for review on its own, 30 U.S.C. 823(d)(2)(B), it did not do so in this case.

The Secretary argued that the plain meaning of section 3(h)(1)(C) includes the facility and trucks because they are "facilities [and] equipment . . . used in, or to be used in . . . the work of extracting . . . or the work of preparing coal." Comm. 4-5, [JA ___]. The Secretary argued that because the statutory meaning is plain, the Commission must apply it. *Id.* at 5, [JA ___]. And, alternately, if the Commission determined the meaning was ambiguous, it must defer, under *Chevron*, to the Secretary's reasonable interpretation. *Ibid.* KC Transport relied on *Maxxim* to argue that MSHA has jurisdiction only over equipment or facilities "that are part of or adjacent to extraction, milling, and preparation sites." *Maxxim Rebuild*, 848 F.3d at 744.

The Commission majority rejected the Secretary's arguments. Comm. 5-8, [JA ___]. The Commission majority determined that whether something is a "mine"

13

depends on its location. It held that jurisdiction depends on whether a facility or equipment is "in or adjacent to—in essence part of—a working mine." Comm. 6, 14-15, [JA ___]. Considering the language of section 3(h)(1)(C), the majority held that the plain meaning of the statute does not include all "equipment . . . used in" mining, but only equipment that is both "used in" mining and "on or at a mine site." Likewise, a facility not itself covered by (A) must be "located on or appurtenant to a mine site" to be a "mine." *Id.* at 6, 10, 14-15, [JA ___].

The majority determined that the meaning was not plain because, if it were, jurisdiction over equipment "used in" mining would be overbroad and that it need not defer to the Secretary's interpretation because it was "absurd." *Id.* at 5-6, 7, [JA ___]. The majority also suggested that the Secretary's interpretation was advanced in a litigation position, rather than in a formal policy medium, and thus should be afforded only the lesser *Skidmore* deference rather than *Chevron* deference. *Id.* at 7, [JA ___]. It then determined that the Secretary's interpretation was neither reasonable nor persuasive and therefore not entitled to *Skidmore* deference. *Id.* at 8, [JA ___].

The majority, like the ALJ, considered the Sixth Circuit's decision in *Maxxim*. Comm. 6, [JA ___]. But unlike the ALJ, the Commission majority determined that *Maxxim* was not distinguishable, and instead required the Commission to overrule

14

decades of its own precedent. *Id.* at 14-15, [JA ___]. As a result, the majority held that facilities "not located on or appurtenant to a mine site and not engaged in any extraction, milling, preparation or other activities within the scope of subsection 3(h)(1)(A) [are] not a mine within section 3(h) of the Mine Act," and that equipment listed in (C) "not on a mine site or any appurtenance thereto and not engaged in any extraction, milling, preparation or other activities within the scope of subsection 3(h)(A) are not mines within the scope of subsection 3(h) of the Mine Act." Comm. 15, [JA ___]. The majority did not discuss, or even acknowledge, this Court's decision in *National Cement.*

The majority also held that independent contractors can be considered operators (and thus subject to the Mine Act) only when performing services while physically on location at the mine. Comm. 11-12, [JA ___]. Neither party argued that KC Transport could not be considered an "operator," and the Commission did not direct that issue for review on its own; the majority advanced that interpretation spontaneously.

The majority reasoned that Congress included independent contractors in the definition of "operator" to expand the protection of the Mine Act to all workers at extraction sites, regardless of their employer. Comm. 12, [JA ___]. The majority concluded that independent contractors and their employees performing services

15

not at an extraction or milling site "do not face mining hazards . . . . [and] do not require the Mine Act's extra protection . . . ." Comm. 12, [JA ___].

The majority reversed the ALJ's decision, granted summary decision to KC Transport, and vacated the citations. Comm. 1, [JA ___].

## Summary of Argument

MSHA has jurisdiction to inspect mines. 30 U.S.C. 813(a). Section 3(h)(1)(C) of the Mine Act contains a plain and unambiguous definition of a "mine," which includes equipment and facilities "used in, or to be used in . . . the work of extracting . . . or the work of preparing coal . . . ." 30 U.S.C. 802(h)(1)(C). MSHA's jurisdiction over a piece of equipment or a facility is thus determined by function (whether it is "used in" mining), not location. *Jim Walter Res.*, 22 FMSHRC at 25.

This statutory text is clear. As this Court has noted, "the statute makes clear that the concept that was to be conveyed by the word ['mine'] is much more encompassing than the usual meaning attributed to it—the word means what the statute says it means." *Carolina Stalite*, 734 F.2d at 1554 (citing *Stoudt's Ferry*, 602 F.2d at 592). Subsection (C), defining items used in mining, is one of a set in section 3(h)(1). Each subsection specifies a separate category that meets the definition of a mine and provides an independent basis for MSHA's jurisdiction:

16

(A) lands, (B) roads, and (C) items used in mining. Nothing in the statute supports the Commission's suggestion that subsection (C) is subordinate to or dependent upon subsection (A). Indeed, this Court has already agreed that subjection (C) covers equipment used in mining even if it that equipment is not located on an extraction site. *Nat'l Cement*, 573 F.3d at 795.

The text is all that is necessary to divine the meaning of what constitutes a mine, but applying other tools of statutory interpretation yields the same result. The legislative history instructs that "what is considered to be a mine and to be regulated under this Act [is to] be given the *broadest possible interpretation*." S. Rep. No. 95-181, at 14 (emphasis added). And an interpretation granting MSHA broad jurisdiction supports the Mine Act's protective purpose to ensure the health and safety of miners and protect them from mining hazards. See *Nat'l Cement*, 573 F.3d at 796 (a broad definition of "mine" "is perfectly aligned with a key objective of the Mine Act… to ensure the 'health and safety of [the mining industry's] most precious resource—the miner'") (quoting 30 U.S.C. 801(a)) (alterations in *Nat'l Cement*).

Under the correct statutory definition of a "mine," KC Transport's off-road coal haulage trucks and the Emmett facility are mines, because they were,

17

respectively, "equipment and [a] facilit[y] . . . used in" mining. 30 U.S.C.

802(h)(1)(C).

Even if the statutory definition were ambiguous, the Secretary's interpretation

would be entitled to *Chevron* deference. It was embodied in an enforcement

citation, a form which carries the force of law. *Martin* v. *OSHRC*, 499 U.S. 144, 157

(1991) ("when embodied in a citation, the Secretary's interpretation assumes a

form expressly provided for by Congress"). It has been consistent over time. *Good*

*Samaritan Hosp.* v. *Shalala*, 508 U.S. 402, 417 (1993) (courts accord deference

where interpretations are consistent). It is derived directly from the text of the

statute. And this Court has acknowledged that it is reasonable. See *Nat'l Cement*,

573 F.3d 788.

In addition to addressing the interpretation of section 3(h)(1)(C), the

Commission took it upon itself to address section 3(d)'s definition of "operator" as

well. But the Commission did not have jurisdiction to do so. It may consider only

those issues raised before the ALJ and in the parties' petitions for discretionary

review, or issues the Commission directs for review on its own discretion. 30

U.S.C. 823(d)(2)(A)(iii). The parties did not raise the issue and the Commission

did not direct review; instead, the Commission seemingly sought to enact its own

policy preferences by announcing them in its decision. The Commission has no

18

policymaking role, particularly on issues that are not duly before it. *Sec'y of Labor* v. *Twentymile Coal Co.*, 456 F.3d 151, 160-161 (D.C. Cir. 2006).

## Standing

The Secretary has standing to seek review under section 106(b) of the Mine Act. 30 U.S.C. 816(b); see D.C. Cir. R. 28(a)(7). It authorizes the Secretary to seek review of any final Commission order in this Court. 30 U.S.C. 816(b); *Nat'l Cement*, 573 F.3d at 792. The Secretary is aggrieved by the Commission's order because it incorrectly limits the scope of the Mine Act, curtailing MSHA jurisdiction and negatively impacting the Secretary's ability to enforce the Mine Act and protect miners.

## Argument

### 1. Standard of review

This case presents three questions. The first is whether the Commission correctly interpreted the Mine Act's definition of "mine." The second is whether the Commission correctly applied that definition. The third is whether the Commission lacked statutory authority to review an issue not raised either in a petition for discretionary review by any party or by the Commission in accordance with statutory requirements.

This Court reviews questions of law de novo. The interpretive question is a question of law. In matters of statutory interpretation, the Court first determines

whether the statute has a plain meaning, using the traditional tools of statutory

interpretation: the text, the legislative history, and the miner-protective purpose.

*Am. Coal Co.* v. *FMSHRC*, 796 F.3d 18, 23-24 (D.C. Cir. 2015); *Carolina Stalite*,

734 F.2d at 1553-1554. If the statute's meaning is plain, the Court applies it. If, after

applying all the tools of statutory interpretation, the Court concludes that the

statute is ambiguous, the Court gives *Chevron* deference to the Secretary's

reasonable interpretation. *Sec'y of Labor* v. *Excel Mining, LLC*, 334 F.3d 1, 5-6

(D.C. Cir. 2003). When the Secretary and Commission differ, this Court defers to

the Secretary's interpretation. *RAG Cumberland Res., LP* v. *FMSHRC*, 272 F.3d

590, 596 (D.C. Cir. 2001). Given the Mine Act's "remedial health-and-safety"

purpose, this Court "must 'liberally construe' the Act's terms, meaning that [it is]

all the more 'obliged to defer to the Secretary's miner-protective construction of

the Mine Act so long as it is reasonable.'" *Am. Coal Co.*, 796 F.3d at 24 (quoting

*Sec'y of Labor* v. *Cannelton Indus., Inc.*, 867 F.2d 1432, 1437 (D.C. Cir. 1989)). And

when the issue in dispute is really a disagreement over policy rather than a

disagreement over interpretation, the Secretary's policy choice prevails, because

the Secretary—not the Commission—sets Mine Act policy. *Twentymile Coal Co.*,

456 F.3d at 160-161.

20

The other two questions in this case are mixed questions of law and fact, because they "require the application of a broad legal standard to particular facts . . . ." *Barbour* v. *Browner*, 181 F.3d 1342, 1345 (D.C. Cir. 1999) (citing *Pullman–Standard* v. *Swint,* 456 U.S. 273, 289 n.19 (1982)). Regarding the Commission's applying the definition of "mine," the record establishes that the trucks and facility were used in mining, so whether they are "mines" depends entirely on the interpretive question. And, with respect to the Commission-jurisdiction question, the law is clear that the Commission lacks jurisdiction to review issues not properly raised; this Court need only apply that principle to an issue that neither the parties nor the Commission raised.

## 2.  The plain meaning of "mine" includes equipment and facilities used in or to be used in mining.

This Court uses the traditional tools of statutory construction to determine whether a statute's meaning is plain. That includes the statute's text and structure, *CalPortland Co., Inc.* v. *FMSHRC*, 839 F.3d 1153, 1163 (D.C. Cir. 2016); its legislative history, *Thunder Basin Coal Co.* v. *Reich*, 510 U.S. 200, 209-212 (1994); and its purpose, *Petit* v. *U.S. Dep't of Educ.*, 675 F.3d 769, 781 (D.C. Cir. 2012).

### 2.1 Statutory text.

"To determine whether the meaning of a statutory provision is plain, the court's analysis begins with the most traditional tool of statutory construction, reading the

21

text itself." *CalPortland*, 839 F.3d at 1163 (quoting *Wolf Run Mining Co.* v.

*FMSHRC*, 659 F.3d 1197, 1200 (D.C. Cir. 2011)). The text of section 3(h)(1)(C)

is clear: equipment and facilities "used in, or to be used in . . . the work of

extracting . . . or the work of preparing coal" are "mines." 30 U.S.C. 802(h)(1)(C).

The definition requires little interpretation because the meaning is plain. What

constitutes a mine is defined by function (equipment and facilities "used in"

mining). 30 U.S.C. 802(h)(1)(C); *Jim Walter Res.*, 22 FMSHRC at 25.

Each subsection of section 3(h)(1) specifies a different category that meets the

definition of a "mine": (A) lands, (B) roads, and (C) (as relevant here) items used

in mining. These subsections are joined by "and." 30 U.S.C. 802(h)(1). The

coordinating conjunction "and" is used "to join clauses of equal grammatical

rank." Bryan A. Garner, *The Chicago Guide to Grammar, Usage, and Punctuation*

146 (2016). "[L]inking independent ideas is the job of a coordinating junction like

'and . . . .'" *Bruesewitz* v. *Wyeth, LLC*, 562 U.S. 223, 236 (2011). The use of that

conjunction here indicates that everything in the list is a mine. By insisting that

equipment and facilities used in mining can meet the statutory definition under

subsection (C) only if they are "on a mine site," the Commission's interpretation

collapses subsection (C) into subsection (A). In other words, it requires that *both*

subsections apply. But (C) is not subordinate to (A); nothing in the text suggests

<div align="center">22</div>

that (C) applies only within the physical constraints of the land set forth in (A). The text and context demonstrate that (C) describes an independent basis for MSHA's jurisdiction.

Statutory context provides additional evidence that subsection (C) provides an independent basis for jurisdiction. Subsection (A) refers to an "area of land" and (B) refers to roads "appurtenant to *such area* . . . ." 30 U.S.C. 802(h)(1) (emphasis added). Congress knew how to include a locational element in the definition of "mine." If Congress meant (C) to include a locational element, it would have said so. "[W]here Congress includes particular language in one subsection of a provision but omits it in another subsection, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Village of Barrington, Illinois* v. *Surface Transp. Bd.*, 636 F.3d 650, 661 (D.C. Cir. 2011) (citing *Russello* v. *U.S.*, 464 U.S. 16, 23 (1983)) (internal quotation marks omitted).

Furthermore, the Commission's interpretation is nonsensical given the structure of the statute. Both subsections (A) and (C) refer to "land." Subsection (A) refers to "an area of land from which minerals are extracted" and (C) to "lands . . . facilities . . . equipment . . . or other property . . . used in, or to be used in . . ." mining. If the items in (C) were meant to be located *on* the lands described in (A) for jurisdiction to attach, then (C) would refer in part to "lands" located on "an

23

area of land." This makes no sense, and this Court rejects nonsensical interpretations. See, *e.g.*, *Emerald Mines Co.* v. *FMSHRC*, 863 F.2d 51, 57 (D.C. Cir. 1988) (rejecting a mine operator's interpretation that was "susceptible of the characterization 'nonsensical'"). Indeed, both the Commission and this Court have explicitly rejected this reading in the past. *State of Alaska*, 36 FMSHRC at 2648; *Nat'l Cement*, 573 F.3d at 795.

The Commission noted that subsection (C) refers to items "on the surface or underground." Comm. 10, [JA ___]. The Commission suggested that the use of "surface" and "underground" "do[es] not suggest areas off the mine site." *Ibid.* But the use of those terms does not suggest the items in subsection (C) must be on the extraction site, either. It suggests simply that MSHA has jurisdiction over items regardless of whether they are on the surface or underground; lots of equipment and facilities used in mining can be either for surface use or underground use (or both). And the definition of "coal mine" in section 3(h)(2) (which applies to different titles of the Mine Act and does not apply to MSHA's enforcement authority) explicitly covers facilities and equipment "placed upon, under, or above the surface" of land used in mining. 30 U.S.C. 802(h)(2). If Congress meant to tie the surface or underground location of equipment or facilities covered by subsection (C) to an extraction site, it knew how to do so. The

24

fact that Congress did not is presumably deliberate. *Village of Barrington*, 636 F.3d at 661.

The Commission evidently does not like the statute's meaning. But the Commission's interpretation is not derived from the actual text of the statute, and "an agency has no power to 'tailor' legislation to bureaucratic policy goals by rewriting unambiguous statutory terms." *CalPortland*, 839 F.3d at 1162 (quoting *Util. Air Regulatory Grp.* v. *EPA*, 573 U.S. 302, 325 (2014)) (alteration omitted). That is especially true of the Commission, which has no policymaking authority. *Twentymile Coal Co.*, 456 F.3d at 160-161.

### 2.2    Previous interpretations.

The plain meaning of subsection (C) is borne out by the uniform interpretation the Commission and courts have given it (until *Maxxim* and this case). Both the Commission, prior to its decision in this case, and the courts have determined that subsection (C) provides an independent basis for jurisdiction, and that MSHA has jurisdiction over items described in subsection (C) whether or not they are located on or beyond a separate extraction site.

In *National Cement*, this Court considered the Secretary's interpretation of section 3(h)(1). The question was whether a mostly private road that provided the only paved access between a cement plant and a state highway was a "mine," and

25

whether the mining-related vehicles that used it were covered by subsection (B) or (C). 573 F.3d 788. The Secretary interpreted the statute to mean that the road was a "mine" as defined in (B), and that vehicles traveling on the road were also "mines"—not because they were on the roads, but because they were independently defined as "mines" in (C). *Id.* at 791-792. This Court held that this interpretation was reasonable. *Id.* at 794-797.

On the interplay of subsections (A), (B), and (C), this Court said that each subsection independently defines a "mine":

> Subsection (A) confers jurisdiction over extraction areas and all activities within their boundaries. Subsection (B) extends jurisdiction to private roads appurtenant to extraction areas, and subsection (C) *reaches vehicles used in mining but not located within an extraction area.* The Secretary's construction of subsections (B) and (C) is entirely consistent with a broad statutory definition of "mine," which extends the protections of the Mine Act beyond the actual site where mining takes place.

573 F.3d at 795 (emphasis added). This Court also said that it was reasonable to interpret (B) as covering roads and (C) as covering vehicles traveling on them: "[b]ecause subsection (C), which covers mining-related equipment, clearly encompasses mining vehicles, it is reasonable to read (B) in a way that does not." *Nat'l Cement*, 573 F.3d at 795. (Though *National Cement* focused on jurisdiction over roads and equipment (vehicles), its construction of subsection (C) applies with equal force to facilities.)

26

This Court, other courts of appeals, and (until now) the Commission have also read subsection (C) as providing an independent (and broad) basis for MSHA jurisdiction. In *Carolina Stalite*, this Court held that a gravel processing facility adjacent to but not on a quarry was covered by subsection (C). 734 F.2d at 1554. And in *Harman Mining*, the Fourth Circuit said, "it is clear that a 'mine' includes facilities and equipment 'used' in the work of preparing coal"—i.e., subsection (C). *Harman Mining Corp*, 671 F.2d at 796.

In *W.J. Bokus Industries, Inc.*, the Commission concluded that MSHA had jurisdiction over gas cylinders, a grinder, and a stove fan, without determining whether the garage where they were located was itself a "mine." 16 FMSHRC at 708. The Commission held that, to establish jurisdiction, the Secretary need prove only that equipment is "used or to be used in mining." *Ibid.* And the Commission has also found MSHA jurisdiction over equipment used in mining even when it is located somewhere that is definitively *not* an extraction site. In *State of Alaska,* the Commission found that MSHA had jurisdiction over trucks and conveyors used in mining that were located on a public road. 36 FMSHRC at 2647.

Likewise, the Commission previously interpreted the statute to extend jurisdiction to facilities used in mining, even if they were far from the extraction site. In *Jim Walter Resources*, a supply shop and a repair shop were "mines"

27

regardless of being offsite (1 mile from the nearest mine they serviced and 25 miles from the furthest mine). 22 FMSHRC at 21. And in *U.S. Steel Mining Co., Inc.*, a repair and maintenance shop for mine equipment was a "mine" because the repair shop was "used in" the work of extracting or preparing coal, despite being 8.5 miles from the mine. 10 FMSHRC at 146, 148–149.

More generally, this Court has long recognized the broad definition of a "mine" in the Mine Act. *Carolina Stalite*, 734 F.2d at 1554 (holding that a slate gravel processing facility was a "mine" and recognizing the "sweeping definition" of a mine under section 3(h)(1)). Other circuit courts have as well. *Harman Mining Corp.*, 671 F.2d at 795-796 (rejecting an argument that because a company handled coal only after it was extracted and prepared, it was not a mine, as "contrary to the broad definition of a 'mine' as set forth in the Act"); *Stoudt's Ferry*, 602 F.2d at 591-592 ("the statute makes clear that the concept that was to be conveyed by the word ["mine"] is much more encompassing than the usual meaning attributed to it[—]the word means what the statute says it means."). The Secretary's interpretation—that "the word means what the statute says it means"—is consistent with courts' interpretations.

It is true that *Maxxim Rebuild Company* departed from this precedent and imported a locational requirement into the statute. 848 F.3d at 741-744. For the

28

same reasons the Commission's reasoning in this case is wrong, *Maxxim* was wrongly decided. See *Ray, employed by Leo Journagan Constr. Co., Inc.*, 20 FMSHRC 1014, 1025 (Sept. 1998) (the Secretary can disagree with a circuit decision outside of that circuit, and can "attempt[] to persuade other Courts of Appeals" that a case was wrongly decided). Additionally, *Maxxim* is not precedential authority here; it is a Sixth Circuit case that conflicts with this Court's decisions in *Carolina Stalite* and *National Cement*. And in those cases, this Court accepted the Secretary's interpretation that "the word ['mine'] means what the statute says it means," *Carolina Stalite*, 734 F.2d at 1554 (quoting *Stoudt's Ferry*, 602 F.2d at 592), and that subsection (C)'s definition "extends the protections of the Mine Act beyond the actual site where mining takes place." *Nat'l Cement*, 573 F.3d at 795.

The ALJ and Commission cited two other cases to support the conclusion that subsection (C) does not cover equipment and facilities used in mining, location notwithstanding. The ALJ relied on *Bush & Burchett*, 117 F.3d 932, to opine that there must be *some* limit to MSHA's jurisdiction. The Secretary agrees with that general proposition; the limit is what the statute says it is. And *Bush & Burchett* illustrates that point. The Sixth Circuit held that a road was not subject to MSHA jurisdiction just because it was appurtenant to a subsection (A) "mine"; the road

29

also was not private, and a road must be both private and appurtenant to a

subsection (A) "mine" for MSHA to have jurisdiction. 117 F.3d at 937-38; 30

U.S.C. 802(h)(1)(B). Notably, MSHA did not assert jurisdiction over the road; the

company raised MSHA jurisdiction as a defense to two citations OSHA issued to

it after two of its workers were killed. *Bush & Burchett*, 117 F.3d at 934, 935.

The Commission relied on *Director, OWCP* v. *Ziegler Coal Company*, 853 F.2d

529 (7th Cir. 1988), but that case is of little use. It was about the definition of "coal

mine" under section 3(h)(2) for purposes of federal black lung benefits; that

definition applies to different titles of the Mine Act and does not apply to

MSHA's enforcement authority. And as explained *supra*, p. 24, section 3(h)(2)

*does* require facilities to be located on, above, or under an area of land used in

extraction and preparation of coal.

### 2.3    Legislative history.

Congress did not intend to limit MSHA's jurisdiction to extraction sites alone,

and this Court should take that legislative history into account. See *Thunder Basin*,

510 U.S. at 209-212. Congress said that "what is considered to be a mine and to be

regulated under this Act [is to] be given the *broadest possible interpretation*." S. Rep.

No. 95-181, at 14 (emphasis added). And where doubts exist as to jurisdiction, the

matter should be "resolved in favor of inclusion . . . within the coverage of the

Act." *Ibid.*; *Carolina Stalite*, 734 F.2d at 1554. Given this context, there is little reason to believe that Congress intended to limit MSHA jurisdiction to extraction sites while excluding any other facilities and the equipment used for mining purposes.

The Commission's decision in this case incorrectly stated that the Mine Act's definition simply "clarified" or "enumerated" what was already presumed to be a "mine" under the Mine Act's predecessor statute, the Coal Act. Comm. 9-10, [JA ___]. The Coal Act's definition of "mine" included "an area of land" for extracting coal and "property, real or personal, placed upon, under, or above the surface of *such land*"—that is, non-land items were "mines" only if they were located on (or above or below) the "area of land" described in subsection (A). 30 U.S.C. 802(h) (1976) (emphasis added). The Mine Act's subsection (C), however, conspicuously does not connect any of the items listed in (C) to "such land" (even though subsection (B) does). That change shows Congress's intent to define as "mines" the items listed in (C), regardless of their location relative to any "such land." Far from merely enumerating what the Coal Act already included, the Mine Act's amended definitions "reflect the broader jurisdiction of the Act." *Carolina Stalite*, 734 F.2d at 1554 (quoting S. Rep. No. 95-181, at 14) (alterations omitted).

31

And more generally, the Commission's suggestion that the legislative history of the Mine Act and its predecessor statute limit MSHA jurisdiction to geographically bound mining sites where extraction is performed is hardly "the broadest possible interpretation." S. Rep. No. 95-181, at 14. The Commission merely disagrees with Congress; nothing in the legislative history indicates that MSHA jurisdiction is limited to extraction sites.

### 2.4    Protective purpose.

Broad jurisdictional coverage furthers the Mine Act's protective purpose to regulate the mining industry and protect workers subject to the industry's particular hazards. *Petit*, 675 F.3d at 781 (considering a statute's purpose in determining its plain meaning). The Mine Act's "primary purpose . . . [is] to protect mining's most valuable resource—the miner." *Am. Coal Co.*, 796 F.3d at 24 (citing *Int'l Union, United Mine Workers* v. *MSHA*, 823 F.2d 608, 617 (D.C. Cir. 1987)); 30 U.S.C. 801.

The Secretary's interpretation, which ensures that MSHA can enforce the Mine Act at *all* mines, advances that purpose. In *National Cement*, this Court accepted a broad interpretation of section 3(h)(1) in part because "it is perfectly aligned with a key objective of the mine Act," i.e., "to ensure the 'health and safety of [the mining industry's] most precious resource—the miner.'") 573 F.3d at 796

32

(quoting 30 U.S.C. 801(a)) (alterations in *Nat'l Cement*). And the Supreme Court has acknowledged the "[f]requent and tragic mining disasters [that] testified to the ineffectiveness of [pre-Mine Act] enforcement measures," *Thunder Basin*, 510 U.S. at 209-210—measures that would not have reached equipment or facilities not located on an extraction site.

### 2.5 Reasonable results.

The Secretary's interpretation of section 3(h)(1) is reasonable. It does not lead to the absurd results the Commission so feared; in fact, it is the Commission's approach that would lead to absurd and safety-and-health-defeating results.

The Commission posited that the Secretary's interpretation of the Mine Act was absurdly overbroad and expanded MSHA's jurisdiction too far. Comm. 7, [JA ___]. The Secretary's interpretation is broad because Congress wrote and intended the statute to be broad. Jurisdiction simply extends as far as the statute says it does: to equipment and facilities used in mining. 30 U.S.C. 802(h)(1)(C).

The Commission suggested that the Secretary's interpretation would confer unlimited jurisdiction and therefore result in ludicrous outcomes, like MSHA exercising jurisdiction over a personal hammer in a miner's private toolshed that was once used at the miner's worksite. Comm. 5, [JA ___]. But the Secretary does not argue that MSHA has unlimited jurisdiction. There are limits to jurisdiction

33

where equipment and facilities are not "used in" mining. See, *e.g.*, *Herman* v.
*Assoc. Elec. Co-op., Inc.*, 172 F.3d 1078, 1083 (8th Cir. 1999) (once an operator
delivers processed coal to a consumer, including a utility company, MSHA does
not have jurisdiction). Just because an item was once used in mining does not mean
that MSHA retains permanent jurisdiction over that item; whether an item is
"used in" (or "to be used in") mining is a fact-bound inquiry that must be
addressed—and that MSHA does address—on a case-by-case basis. And the
Secretary's interpretation is not that location is irrelevant to that fact-bound
inquiry; the Secretary's interpretation is that location on an extraction site, for
purposes of subsection (C), is not necessary. All MSHA-jurisdiction questions are
fact-specific, and the location of any particular piece of equipment or facility is a
fact that is likely relevant to whether it is used in mining.

The Commission's suggestion that the Secretary's interpretation leads to
absurd results also is contradicted by MSHA's enforcement experience. The
Secretary's interpretation has been in force for years. Until its decision in this case,
the Commission agreed with it. Comm. 15, [JA ___] ("We recognize that our
decision today departs from . . . prior Commission cases."). And there has been no
scourge of MSHA inspectors descending on private toolsheds, independent
hardware stores, or diner parking lots in the decade-plus since this Court accepted

34

the Secretary's interpretation. There is no reason to expect anything different if this Court accepts it again.

This is in part because MSHA is necessarily constrained by practical realities. MSHA is required by statute to inspect each "mine" in its entirety multiple times each year, 30 U.S.C. 813(a); MSHA does not have the unlimited resources that would be required to scour the nation's homes for any tool that might be connected to a mine. Rather, MSHA commits its resources where they are most needed and effective. MSHA's practical approach is also consistent with the de minimis doctrine, under which an agency need not rigidly apply a statute where there would be no meaningful regulatory benefit. *Environmental Defense Fund, Inc.* v. *EPA*, 82 F.3d 451, 466 (D.C. Cir. 1996) (if Congress was "extraordinarily rigid" in drafting a statute, de minimis exemptions are appropriate if regulation would have "trivial or no value").

More basically, concerns about at-the-edges enforcement have little to do with whether the Secretary's interpretation is reasonable. This Court does not reject interpretations "simply because there is a remote chance it may lead to problematic results with regard to a small subset of the Mine Act's enforcement provisions," and "[t]he theoretical possibility that an agency might someday abuse its authority is of limited relevance in determining whether the agency's interpretation... is

35

reasonable." *Nat'l Cement*, 573 F.3d at 796. In *National Cement*, this Court was

satisfied by the Secretary's assertions that MSHA would not stray beyond

reasonable enforcement. *Ibid*. MSHA did not abuse its authority then, and it will

not now. And if "MSHA use[s] its jurisdiction . . . to unduly burden" an operator,

"the courts remain open to consider a challenge to that action." *Nat'l Cement*, 573

F.3d at 796 (quotation omitted).

    In fact, it is the Commission's approach that would lead to absurd and

dangerous results. Safety and health hazards on equipment or a facility used in

mining do not exist only when that equipment or facility is on an extraction site, but

the Commission's approach would allow MSHA to address those hazards only in

the latter case. Allowing hazardous equipment that is indisputably used in mining

to go uninspected just because it is parked in one place rather than another

obviously creates risks to miners. And it is simply nonsensical to suggest that

MSHA has jurisdiction over that equipment when it is on a mine site, but loses

that jurisdiction if the equipment crosses an arbitrary "extraction site" line.

MSHA's responsibility is to protect miners' safety and health; requiring

inspectors to spend their time poring over plat maps instead of inspecting

equipment hardly serves that purpose. See Comm. 24, [JA___] (Comm'r Traynor,

dissenting) ("[P]erhaps an MSHA inspector observes a haul truck driving on the

36

mine road with an obvious equipment defect. The inspector follows the truck to the [Emmett facility]. Does the truck's presence at the [facility] prevent the MSHA inspector from issuing a citation . . . ?"). As this case illustrates, there is nothing strange or extreme about MSHA's enforcement; the trucks at issue here were coal trucks and used *only* for hauling coal between the extraction sites and prep plant, and the facility was on a site that KC Transport sought permission from Ramaco to use. Jt. Stip. 14, 17 [JA ___].

The Commission's interpretation also would create safety-and-health-defeating incentives. For example, if MSHA has jurisdiction to inspect trucks used in mining only when those trucks are on a separate extraction or mill site, then operators will be incentivized to move or store those trucks off of those sites to avoid MSHA inspections. This Court has rejected interpretations that would require MSHA to be in exactly the right place at exactly the right time. See *Emerald Mines*, 863 F.2d 51 (rejecting the argument that MSHA may issue certain orders only when an inspector actually sees a violation, rather than after investigating the site after the violation has already occurred).

The Commission opined that, in the absence of MSHA jurisdiction, OSHA or state-level agencies could exercise jurisdiction over the trucks and facility. Comm. 16 n.20, [JA ___]. But this decision is not the Commission's to make; it is

37

Congress's. Congress made that choice in subsection (C). And even if Congress had not, interpreting the definition of mine "clearly involves a policy choice at the core of [the Secretary's] regulatory mission under the Mine Act." *Nat'l Cement*, 573 F.3d at 793. This Court gives significant weight to the Secretary's interpretation when it involves those kind of policy choices. See *ibid.*; *Otis Elevator Co.* v. *Sec'y of Labor,* 921 F.2d 1285, 1291 (D.C. Cir. 1990) (deciding contractors are operators subject to MSHA jurisdiction is "the kind of expert policy judgment" courts are "ill-equipped to make"). The Commission, by contrast, has no policymaking role. *Twentymile Coal Co.*, 456 F.3d at 160-161.

### 3.  If section 3(h)(1) is ambiguous, the Secretary's interpretation is reasonable and owed deference.

*Chevron* deference applies to an agency's interpretation of a statute when the interpretation takes a form carrying "the force of law." *U.S.* v. *Mead Corp.*, 533 U.S. 218, 229 (2001). When reviewing an agency's statutory interpretation that is advanced in a form that merits deference, *Chevron* requires a two-step approach. First courts consider whether the statute is clear and unambiguous. If yes, courts give effect to the plain meaning. *Chevron, U.S.A., Inc.* v. *Natural Res. Defense Council, Inc.*, 467 U.S. 837, 843 (1984). If there is ambiguity, courts "do[] not simply impose [their] own construction on the statute." *Ibid.* Instead, courts defer to the agency's interpretation if it is permissible or reasonable. *Ibid.*

38

The Secretary's interpretation here takes a form that carries the force of law because it was advanced in an enforcement citation. *Martin*, 499 U.S. at 157 ("when embodied in a citation, the Secretary's interpretation assumes a form expressly provided for by Congress.") The meaning of section 3(h)(1)(C) is plain. Section 2, pp. 21-38. But, if any ambiguity exists as to what constitutes a mine, the Secretary's interpretation is reasonable and entitled to *Chevron* deference.

The Secretary's interpretation is that "mine" includes "facilities [and] equipment . . . used in, or to be used in . . . the work of extracting . . . or the work of preparing coal," 30 U.S.C. 802(h)(1)(C), even when those facilities and equipment are not an extraction site. This interpretation does not limit the application of subsection (C) to equipment or facilities based solely on their location.

The Secretary's interpretation is reasonable, not least because it is derived directly from the language of the statute, without embellishment. The statute's construction supports this interpretation, because it indicates that subsection (C) is an independent basis for MSHA jurisdiction, distinct from "lands" and "roads" in subsections (A) and (B). Section 2, pp. 22-23, 25-26, *supra*; *State of Alaska*, 36 FMSHRC at 2648; *Nat'l Cement*, 573 F.3d at 795. The Secretary's interpretation is also reasonable for several other reasons.

39

First, it is in keeping with the legislative history. Congress indicated the definition should be given the "the broadest possible interpretation," S. Rep. No. 95-181, at 14, and the Secretary's interpretation acknowledges that nothing in the statute binds or limits jurisdiction to an extraction site.

Second, it advances the Mine Act's protective purpose. See, *e.g.*, *Nat'l Cement*, 573 F.3d at 796 (accepting the Secretary's interpretation that was "consistent with the statute's language [and] perfectly aligned with a key objective of the Mine Act"); *United Mine Workers of Am.* v. *Dep't of Interior*, 562 F.2d 1260, 1265 (D.C. Cir. 1977) ("[A] statutory interpretation that would promote safety . . . should be preferred."). The Secretary's interpretation applies the statute's protections to those workers who use equipment and operate facilities that have to do with mining. The Mine Act was enacted to address hazards in the industry, and those hazards are not confined to coal pits.

Third, the Secretary has been consistently advancing this interpretation for decades, arguing (successfully) that MSHA has jurisdiction over equipment (*W.J. Bokus Indus., Inc.*, 16 FMSHRC at 708) and facilities (*Jim Walter Res.*, 22 FMSHRC at 21) used in mining. Courts accord more deference to agency interpretations when the agency's position has been consistent over time. *Shalala*, 508 U.S. at 417.

40

The Commission held that the Secretary's interpretation was not entitled to *Chevron* deference because it is a "litigation position, rather than a formal position taken after demonstrated internal review or policy consideration, let alone public notice and comment." Comm. 7, [JA ___]. This is wrong for two reasons. First, that the trucks were under MSHA's jurisdiction was not a litigation position. MSHA issued a citation based on that position, and the litigation flowed from that citation. *Martin*, 499 U.S. 157 ("when embodied in a citation, the Secretary's interpretation assumes a form expressly provided for by Congress").[4]

Second, even if it were a litigation position, "the Secretary's litigating position before [the Commission] is as much an exercise of delegated lawmaking powers as is the Secretary's promulgation of a… health and safety standard." *Excel Mining*, 334 F.3d at 5-6. Litigation positions receive *Chevron* deference. *Ibid.*

And even if *Skidmore* deference were appropriate, the Secretary's interpretation should still prevail. It is persuasive because, as discussed above, it is based on

_____

[4] On the subject of jurisdiction over the Emmett facility, the Commission determined that it was a position taken on appeal and thus an "unasked for litigation award" due only *Skidmore* deference. Comm. 7, [JA ___]. It is true that the inspector did not cite the facility, only the trucks, and that the Secretary did not raise jurisdiction over the facility before the ALJ. But the Secretary's interpretation applies to the entirety of section 3(h)(1)(C).

41

compelling textual considerations and drawn directly from the statute. See *Nat'l Cement*, 573 F.3d at 795. It is consistent with the legislative history's emphasis on broadness. S. Rep. No. 95-181, at 14. And it serves protective Mine Act policy, by entrusting jurisdiction of equipment and facilities used in mining to the agency that regulates the mining industry and protects mine workers. See *Am. Coal Co.*, 796 F.3d at 24; 30 U.S.C. 801. The interpretation is a convincing, consistent reflection of what the statute requires, in other words, it is persuasive. Thus, it is due at least *Skidmore* deference.

### 4.  MSHA had jurisdiction over the Emmett facility and trucks.

As discussed, a "mine" includes equipment and facilities "used in, or to be used in . . . the work of extracting . . . or the work of preparing coal." 30 U.S.C. 802(h)(1)(C). The definition "extends the protections of the Mine Act beyond the actual site where mining takes place." *Nat'l Cement*, 573 F.3d at 795.

The trucks fit squarely in this definition: they are equipment used in the work of extracting and preparing coal. The trucks hauled coal from the extraction site to the prep plant. Jt. Stip. 14, 18, 27 [JA ___]. The trucks were not even equipped to do anything else. They were "off-road" trucks that were not licensed to travel on public roads; KC Transport used them only to haul coal. Jt. Stip. 14, [JA ___]. And the Emmett facility meets the definition: it is a facility where mining equipment

42

(coal haulage trucks) are repaired. Jt. Stip. 5, [JA ___]. The Emmett facility is

instrumental, in the literal sense of the word, to the extraction and preparation of

minerals and so is "used in" mining. In *U.S. Steel Mining Co., Inc.*, a repair and

maintenance shop for mine equipment was a "mine" because the repair shop was

"used in" the work of extracting or preparing coal. 10 FMSHRC 146, 148–149

(Feb. 1988). The Emmett facility is likewise "used in" mining.

The Mine Act's purpose to is to protect workers subject to the industry's

particular hazards. *Am. Coal Co.*, 796 F.3d at 24. And those hazards were present

here: KC Transport employees were working on unblocked coal trucks. A worker

standing on the truck frame beneath a raised, unblocked bed (as one worker was

when the MSHA inspector arrived) could have been killed had the truck moved.

Sec'y Exh. 2, 3, 4 [JA ___]. Being crushed by a coal truck while performing repairs

is a mining hazard. See, *e.g.*, *Kentucky Fuel Corp.*, 40 FMSHRC 28, 30 (Feb. 2018)

(an unblocked truck rolled backwards over a mechanic while he was working

beneath it). Jurisdictional coverage over workers like those fixing KC Transport's

trucks furthers the Act's aim to ensure safe practices in mining.

Additionally, workers at supposedly "offsite" facilities are impacted by the

conditions of the mining industry. See *U.S. Steel*, 10 FMSHRC at 147 (workers at

mine equipment maintenance facility were "subject to hazards inherent in moving

43

heavy equipment, performing electrical work, and engaging in various grinding, cutting, sharpening, and welding tasks . . . . [and exposure to] flammable and caustic liquids"). The miners at the Emmett facility are subject to hazards associated with mining, including those hazards posed by unblocked coal trucks. Sec'y Exh. 2, [JA ___].

The trucks and facility fall squarely into (C), and thus, squarely under MSHA jurisdiction.

**5. The Commission did not have jurisdiction to reach the issue of whether independent contractors must be physically "at the mine" to be considered operators.**

The Commission lacked jurisdiction to conclude that independent contractors could be considered operators (and thus, subject to MSHA's jurisdiction) only when physically performing services at a mine. Comm. 11-12, [JA ___].

The Commission is a "creature[] of statute" and has "only those powers that Congress confers upon" it. *Judge Rotenberg Educ. Ctr., Inc.* v. *U. S. Food & Drug Admin.*, 3 F.4th 390, 399 (D.C. Cir. 2021). The Mine Act lays out specific limitations on the Commission's appellate jurisdiction. 30 U.S.C. 823(d)(2). The Commission may review issues only if they were raised before the ALJ below and in the petition for discretionary review, or if the Commission directs review on its own. *Ibid.* So if an issue was not raised in a petition for discretionary review or

44

directed by the Commission for review, the Commission lacks statutory authority to consider it. *Chaney Creek Coal Corp.* v. *FMSHRC*, 866 F.2d 1424, 1429 (D.C. Cir. 1989) (concluding that the Commission "lacked legal justification" for reaching an issue that was not raised in a petition for discretionary review, especially when other distinct reasons for review were raised).

Before the ALJ, neither party raised the issue of whether KC Transport was an "operator" under the Mine Act, or whether, under the statutory definition, independent contractors could be considered operators when not physically present at a mine site. In fact, KC Transport indicated it was "not challenging its contractor status," admitting that it was an operator for the purposes of the Mine Act if jurisdiction should attach. KC Transport Resp. to Sec'y Mot. for Partial Summ. Dec., WEVA 2019-0458, p. 4 (Jan. 10, 2020), [JA ___]. So, unsurprisingly, KC Transport did not raise this issue in its petition for discretionary review. KC Transport Pet. for Rev., WEVA 2019-0458 (Apr. 2, 2020), [JA ___].

Nor did the Commission direct the issue for review in accordance with the Mine Act's requirements. The Mine Act allows the Commission to direct issues for review, by a vote within 30 days of the ALJ's decision, but only where the decision "may be contrary to law or Commission policy, or [presents] a novel question of policy." 30 U.S.C. 823(d)(2)(B). The Mine Act requires the Commission to state

45

the issue and the basis for review in an order. *Ibid.* And if the Commission has

granted a party's petition for discretionary review, "the Commission *shall not raise*

*or consider additional issues* in [its] review proceedings except in compliance with"

those requirements. *Ibid.* (emphasis added).

The Commission did not hold a vote or issue an order identifying an issue for

review. Instead, the Commission raised this issue and announced its own

interpretation of section 3(d) for the first time in its decision. In its zeal to limit

MSHA's authority, it ignored its own jurisdictional limitations. The Commission

had no statutory authority to do so. To advance this new interpretation, the

Commission quietly overruled precedent. See, *e.g.*, *Musser Eng'g, Inc.,* 32

FMSHRC 1257, 1266-1269 (Oct. 2010) (a contractor was an "operator" subject

to MSHA jurisdiction when it prepared a mine map off-site). As this Court has

previously reminded the Commission, it has no policymaking role, and

"substitut[ing] its views of enforcement policy for those of the Secretary [is] a

power that . . . the Commission does not possess." *Twentymile Coal Co.*, 456 F.3d

at 158.

If this Court concludes that the Commission had jurisdiction, it should remand

the issue to the Commission to give the Secretary (and KC Transport) an

opportunity to brief and argue the issue. Cf. *Hosp. of Barstow, Inc.* v. *NLRB*, 820

F.3d 440, 444-445 (D.C. Cir. 2016) (remanding for NLRB to interpret NLRA

after NLRB erroneously concluded interpretive issue was waived).

## Conclusion

The definition of a "mine" under section 3(h)(1)(C) of the Mine Act as

encompassing equipment and facilities used in mining is clear. The definition

includes equipment and facilities used in mining, regardless of whether they are

located on a separate extraction or mill site. Under this definition, MSHA had

jurisdiction over KC Transport's coal trucks and the Emmett facility. The

Commission upended decades of law to hold that it is location, rather than

function, that makes a subsection (C) mine. This is out of step with the statute's

text, context, legislative history, and protective purpose. The Commission also

attempted to revise what constitutes an "operator" under the Mine Act, an issue

that it had no jurisdiction to reach.

The Court should grant the Secretary's petition for review, reverse the

Commission's decision, and affirm the citations.

Respectfully submitted,

SEEMA NANDA
Solicitor of Labor

APRIL E. NELSON
Associate Solicitor

47

EMILY TOLER SCOTT
  Counsel for Appellate Litigation

s/ SUSANNAH M. MALTZ
  Attorney
  U.S. Department of Labor
  Division of Mine Safety & Health
  201 12th Street South, Suite 401
  Arlington, VA 22202
  (202) 693-5393

Attorneys for the Secretary of Labor

JA 239

## Certificate of Compliance with Type-Volume Limit,
## Typeface Requirements, and Type-Style Requirements

This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B)

because, excluding the parts of the document exempted under Fed. R. App. P.

32(f), it contains 10,578 words.

   This document complies with the typeface requirements of Fed. R. App. P.

32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has

been prepared in Microsoft Word in 14-point Equity.

                              s/ SUSANNAH M. MALTZ
                                Attorney
                                U.S. Department of Labor
                                Division of Mine Safety & Health
                                201 12th Street South, Suite 401
                                Arlington, VA 22202
                                (202) 693-5393

a

**Certificate of Service**

I certify that I electronically filed the foregoing with the Clerk of the Court for the

United States Court of Appeals for the District of Columbia Circuit by using the

appellate CM/ECF system on August 29, 2022 and the following registered users

will be served via the CM/ECF system:

T. Jason Riley
Office of General Counsel
Federal Mine Safety and Health Review Commission
1331 Pennsylvania Ave., NW Suite 520N
Washington, D.C. 20004
jriley@fmshrc.gov

James P. McHugh
Hardy Pence PLLC
10 Hale Street, 4th Floor
P.O. Box 2548
Charleston, WV 25329
jmchugh@hardypence.com

s/ SUSANNAH M. MALTZ
Attorney
U.S. Department of Labor
Division of Mine Safety & Health
201 12th Street South, Suite 401
Arlington, VA 22202
(202) 693-5393

b

# Addendum – Pertinent Statutes and Regulations

## 30 U.S.C. 802(h)(1)
For the purposes of this Act, the term—
"coal or other mine" means
(A) An area of land from which minerals are extracted in nonliquid form or, if in liquid form, are extracted with workers underground,
(B) private ways and roads appurtenant to such area, and
(C) lands, excavations, underground passageways, shafts, slopes, tunnels and workings, structures, facilities, equipment, machines, tools, or other property including impoundments, retention dams, and tailings ponds, on the surface or underground, used in, or to be used in, or resulting from, the work of extracting such minerals from their natural deposits . . . or used in, or to be used in, the milling of such minerals, or the work of preparing coal or other minerals, and includes custom coal preparation facilities.

## 30 U.S.C. 802(d)
For the purposes of this Act, the term—
"operator" means

any owner, lessee, or other person who operates, controls, or supervises a coal or other mine or any independent contractor performing services or construction at such mine….

## 30 U.S.C. 823(d)(2)(A), (B)

The Commission shall prescribe rules of procedure for its review of the decisions of administrative law judges in cases under this Act which shall meet the following standards for review:

(A)(i) Any person adversely affected or aggrieved by a decision of an administrative law judge, may file and serve a petition for discretionary review by the Commission of such decision within 30 days after the issuance of such decision. Review by the Commission shall not be a matter of right but of the sound discretion of the Commission.

(ii) Petitions for discretionary review shall be filed only upon one or more of the following grounds:

(I) A finding or conclusion of material fact is not supported by substantial evidence.

c

(II) A necessary legal conclusion is erroneous.

(III) The decision is contrary to law or to the duly promulgated rules or decisions of the Commission.

(IV) A substantial question of law, policy or discretion is involved.

(V) A prejudicial error of procedure was committed.

(iii) Each issue shall be separately numbered and plainly and concisely stated, and shall be supported by detailed citations to the record when assignments of error are based on the record, and by statutes, regulations, or principal authorities relied upon. Except for good cause shown, no assignment of error by any party shall rely on any question of fact or law upon which the administrative law judge had not been afforded an opportunity to pass. Review by the Commission shall be granted only by affirmative vote of two of the Commissioners present and voting. If granted, review shall be limited to the questions raised by the petition.

(B) At any time within 30 days after the issuance of a decision of an administrative law judge, the Commission may in its discretion (by affirmative vote of two of the Commissioners present and voting) order the case before it for review but only upon the ground that the decision may be contrary to law or Commission policy, or that a novel question of policy has been presented. The Commission shall state in such order the specific issue of law, Commission policy, or novel question of policy involved. If a party's petition for discretionary review has been granted, the Commission shall not raise or consider additional issues in such review proceedings except in compliance with the requirements of this paragraph.

## 30 C.F.R. 77.404(c)

Repairs or maintenance shall not be performed on machinery until the power is off and the machinery is blocked against motion, except where machinery motion is necessary to make adjustments.

d

ORAL ARGUMENT HAS NOT YET BEEN SCHEDULED

In The

# United States Court of Appeals

### For The District of Columbia Circuit

# SECRETARY OF LABOR,
# MINE SAFETY AND HEALTH ADMINISTRATION,

*Petitioner*,

**v.**

# KC TRANSPORT, INC.;
# FEDERAL MINE SAFETY AND HEALTH REVIEW COMMISSION,

*Respondents.*

## ON PETITION FOR REVIEW OF A DECISION OF
## THE FEDERAL MINE SAFETY AND HEALTH REVIEW COMMISSION

———————————

## PAGE-PROOF BRIEF OF RESPONDENT KC TRANSPORT, INC.

———————————

**James P. McHugh (D.C. Bar No. 56277)**
**Christopher D. Pence (D.C. Bar No. 53362)**
**HARDY PENCE, PLLC**
**10 Hale Street, 4th Floor**
**Charleston, West Virginia  25301**
**(304) 345-7250**
**jmchugh@hardypence.com**
**cpence@hardypence.com**

*Counsel for Respondent KC Transport, Inc.*

**THE LEX GROUP**DC ♦ 1050 Connecticut Avenue, N.W. ♦ Suite 500, #5190 ♦ Washington, D.C.  20036
(202) 955-0001 ♦ (800) 856-4419 ♦ www.thelexgroup.com

JA 244

## <u>CERTIFICATE OF PARTIES, RULINGS AND RELATED CASES</u>

Pursuant to Rule 28(a)(1), I hereby certify the following:

## I.    **Parties**

The parties appearing in the administrative proceedings before the Federal

Mine Safety and Health Review Commission and this Court are:

1.    Secretary of Labor, Mine Safety and Health Administration, the

Petitioner ("Secretary");

2.    KC Transport, Inc., a Respondent ("KC Transport"); and,

3.    Federal Mine Safety and Health Review Commission ("Commission"),

a Respondent.

No intervenors or amici appeared.

## II.    **Ruling Under Review**

This matter is before the Court on the Secretary's petition for review of a final

Decision of Commission, issued on April 5, 2022, in the matter captioned *Sec'y of*

*Labor (MSHA) v. KC Transport, Inc*., Docket No. WEVA 2019-458, 44 FMSHRC

211 (Rev. Comm. Apr. 2022) [JA___]. The Commission Decision reversed the

March 3, 2020 Decision issued by Administrative Law Judge John K. Lewis ("Judge

Lewis") or ("ALJ"), in the matter captioned *Sec'y of Labor (MSHA) v. KC*

*Transport, Inc*., Docket No. WEVA 2019-458, 42 FMSHRC 221 (Mar. 2020) (ALJ)

[JA___]. The Commission Decision held that the Mine Safety and Health

i

Administration ("MSHA") did not have jurisdiction to issue Citation Nos. 9222038 and 9222040 to KC Transport, involving trucks parked at KC Transport's Emmett, West Virginia maintenance facility.

## III.    Related Cases

This case has not previously been before this Court or any other court, and no related cases are currently pending in this Court or any other court.

## **RULE 26.1 CORPORATE DISCLOSURE STATEMENT**

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, KC Transport, Inc. is a privately owned non-governmental corporation, with no parent corporation. No publicly held entity holds a 10% or greater interest in KC Transport, Inc.

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF PARTIES, RULINGS AND RELATED CASES.....................i

RULE 26.1 CORPORATE DISCLOSURE STATEMENT................................. iii

TABLE OF CONTENTS.........................................................................iv

TABLE OF AUTHORITIES ................................................................vi

GLOSSARY OF ABBREVIATIONS AND ACRONYMS ..................................xi

STATEMENT OF THE ISSUES.................................................................1

PERTINENT STATUTES AND REGULATIONS..........................................1

STATEMENT IN SUPPORT OF ORAL ARGUMENT ........................................1

INTRODUCTION ..................................................................................2

STATEMENT OF THE CASE.....................................................................6

    I.     Factual Background...............................................................6

    II.    Procedural History.............................................................10

        A.    ALJ Proceedings .........................................................10

        B.    Commission Decision ...............................................12

STANDARD OF REVIEW .......................................................................14

SUMMARY OF THE ARGUMENT ...................................................18

ARGUMENT ......................................................................................22

JA 248

I.    Equipment and facilities "used in, or to be used in mining" must have both a functional and locational connection to the extraction, milling and preparing of coal to be a "mine." ...................22

    A.    MSHA Does Not Have Jurisdiction Over the Off-Site Emmett Facility or the Trucks while at the Emmett Facility.......................................................................22

    B.    The Secretary's Interpretation of Section 3(h)(1)(C) in Isolation Improperly Seeks to Expand MSHA's Jurisdictional Reach Beyond the Limits of Section 3(h)(1)(C) ..................................................................29

    C.    The Legislative History Supports the Commission's Textual Analysis of Section 3(h)(1).........................33

    D.    Previous Interpretations of the Definition of a "coal mine" under Section 3(h) are consistent with the Commission Decision ..................................................................37

    E.    The Commission's Interpretation of the Mine Act Facilitates the Protective Purpose of the Mine Act .................43

II.    The Secretary's Interpretation of Sections 3 and 4 of the Mine Act are Unreasonable and not Entitled to Deference .........................44

III.    When finding that Independent Contractors are only operators when performing services at the Mine, the Commission was merely quoting the Mine Act for Context ...........................................48

CONCLUSION ...................................................................51

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

ADDENDUM

JA 249

## TABLE OF AUTHORITIES

**Pag(s)**

**CASES**

*AFGE v. FLRA*,
    25 F.4th 1 (D.C. Cir. 2022)...........................................................................16

*Akzo Nobel Salt, Inc. v. Fed. Mine Safety & Health Review Comm'n*,
    212 F.3d 1301 (D.C. Cir. 2000)....................................................................15

*Alaska, Dept. of Transp.*,
    38 FMSHRC 122 (ALJ Feldman Jan. 2016).........................................41, 42

*American Mining Congress v. EPA*,
    824 F.2d 1177 (D.C. Cir. 1987)....................................................................16

*Brown v. Gardner*,
    513 U.S. 115, 115 S. Ct. 552, 130 L. Ed. 2d 462 (1994) .............................25

*Bush & Burchett, Inc. v. Reich*,
    117 F.3d 932 (6th Cir. 1997) ........................................................................38

*CalPortland Co. v. Fed. Mine Safety & Health Review Comm'n*,
    839 F.3d 1153 (D.C. Cir. 2016)...........................................18, 25, 26, 27, 47

*Chevron U.S.A. v. Natural Resources Defense Council, Inc.*,
    467 U.S. 837 (1984).................................................................17, 21, 28, 45

*Christopher v. SmithKline Beechum Corp.*,
    132 S. Ct. 2156 (2012).................................................................................17

*City of Arlington v. FCC*,
    133 S. Ct. 1863 (2013)...........................................................................17, 28

*Dir., Office of Workers' Comp. Programs,*
*United States Dep't of Labor v. Ziegler Coal Co.*,
    853 F.2d 529 (7th Cir. 1988) .............................4, 12, 13, 14, 19, 38

vi

*Donovan v. Carolina Stalite*,
    734 F.2d 1547 (D.C. Cir. 1984)...............................................................35, 40

*Financial Planning Ass'n v. S.E.C.*,
    482 F.3d 481 (D.C. Cir. 2007)...............................................................22, 30

*Gutierrez-Brizuela v. Lynch*,
    834 F.3d 1142 (10th Cir. 2016).......................................................................28

*Harman Mining Corp. v. FMSHRC*,
    671 F.2d 794 (4th Cir. 1981)...................................................................40, 41

*Herman v. Associated Electric Cooperative, Inc.*,
    172 F.3d 1078 (8th Cir. 1999)...............................................................37, 38

*INS v. Cardoza-Fonseca*,
    480 U.S. 421 (1987)...............................................................................16, 33

*Jim Walter Resources, Inc.*,
    22 FMSHRC 21 (Rev. Comm. Jan. 2000)...................... 10, 11, 13, 31, 32, 46

*Kinder Morgan, LP*,
    23 FMSHRC 1288 (Rev. Comm. Dec. 2001) ...............................................39

*Martin v. Occupational Safety & Health Review Comm'n*,
    499 U.S. 144 (1991)...............................................................................15, 46

*Maxxim Rebuild Co., LLC. v. FMSHRC*,
    848 F.3d 737 (6th Cir. 2017) ...............................................3, 4, 5, 12, 13, 19,
                                         25, 26, 27, 28, 29, 30,
                                             32, 37, 45, 47

*Michigan v. EPA*,
    135 S. Ct. 2699 (2015)...................................................................................28

*Musser Eng'g, Inc.*,
    32 FMSHRC 1257 (Oct. 2010)..............................................................49, 50

*North Fork Coal Corp. v. FMSHRC*,
    691 F.3d 725 (6th Cir. 2012) .......................................................................17

vii

*Oliver M. Elam, Jr. Co.*,
   4 FMSHRC 5 (Rev. Comm. 1982) ...............................................23, 30, 37, 39

*Pennsylvania Electric Co. v. FMSHRC*,
   969 F.2d 1501 (3d Cir. 1992) ...........................................................23, 24, 30

*Pereira v. Sessions*,
   138 S. Ct. 2105 (2018)......................................................................................28

*Sec'y of Labor v. Cranesville Aggregate Cos.*,
   878 F.3d 25 (2d Cir. 2017) ..............................................................................39

*Sec'y of Labor v. Keystone Coal Mining Corp.*,
   151 F.3d 1096 (D.C. Cir. 1998).......................................................................14

*Sec'y of Labor v. Nat'l Cement*,
   30 FMSHRC 668 (Rev. Comm. Aug. 2008), *overruled on other grounds in
   Sec'y of Labor v. Nat'l Cement Co. of Cal., Inc.*,
   573 F.3d 788 (D.C. Cir. 2009)....................................................20, 24, 39, 40

*Sec'y of Labor v. Nat'l Cement Co. of Cal., Inc.*,
   494 F.3d 1066 (D.C. Cir. 2007).............................................5, 15, 19, 20, 24,
                                                                                  25, 28, 39, 44, 46

*Sec'y of Labor v. Nat'l Cement Co. of Cal., Inc.*,
   573 F.3d 788 (D.C. Cir. 2009)................................ 19, 24, 25, 28, 29, 39, 40

*Sec'y of Labor v. Twentymile Coal Co.*,
   456 F.3d 151 (D.C. Cir. 2006)..........................................................................14

*Skidmore v. Swift & Co.*,
   323 U.S. 134 (1944)..........................................................................................17

*State of Alaska, Dept. of Transp.*,
   36 FMSHRC 2642 (Rev. Comm., Oct. 2014) ...............................................41

*US Steel Mining, Co. Inc.*,
   10 FMSHRC 146 (Rev. Comm. Feb. 1988)...........................................13, 42

viii

*Westar Energy, Inc. v. Fed. Energy Regulatory Comm'n*,
    473 F.3d 1239 (D.C. Cir. 2007)......................................................................33

*Westwood Energy Products*,
    11 FMSHRC 2408 (Rev. Comm. Dec. 1989) .........................................16, 43

*Williams v. Taylor*,
    529 U.S. 362 (2000)................................................................................22, 30

*W.J. Bokus Indus. Inc.*,
    16 FMSHRC 704 (Rev. Comm. Apr. 1994).....................................13, 41, 46

## STATUTES

29 U.S.C. § 653(b)(1)............................................................................................44

30 U.S.C. §§ 802-803.............................................................................................5

30 U.S.C. § 802....................................................................................27, 44, 45, 47

30 U.S.C. § 802(d) ...........................................................................................48, 49

30 U.S.C. § 802(h) .............................................................................................1, 27

30 U.S.C. § 802(h)(1)............................................................ 2, 3, 5, 9, 18, 21, 22, 23,
    24, 25, 37, 38, 39, 44, 48

30 U.S.C. § 802(h)(1)(A) ..............................................................1, 11, 22, 24, 27,
    29, 32, 39, 47

30 U.S.C. § 802(h)(1)(B) ...................................................................11, 22, 24, 25,
    27, 29, 32, 39

30 U.S.C. § 802(h)(1)(C) ........................... 11, 12, 14, 15, 16, 18, 19, 20, 21, 22, 23
    24, 25, 26, 27, 28, 29, 30, 31, 32, 33,
    34, 35, 36, 37, 39, 40, 41, 44, 45, 51

30 U.S.C. § 802(i) ........................................................................................23, 37, 41

30 U.S.C. § 803 ........................................................................2, 3, 18, 44, 45, 47

ix

30 U.S.C. § 823(d)(2)................................................................49

30 U.S.C. § 823(h)(1)................................................................49

## **REGULATION**

30 C.F.R. § 75.1200 ..................................................................50

## **OTHER AUTHORITY**

S. Rep. No. 95-181 (1977), reprinted in Senate Subcomm. on Labor,
Comm. on Human Res., Legislative History of the Federal Mine Safety and
Health Act of 1977 (1978) .......................................................35

x

## <u>GLOSSARY OF ABBREVIATIONS AND ACRONYMS</u>

| | |
|---|---|
| A | Appendix |
| ALJ | Administrative Law Judge |
| Commission | Federal Mine Safety and Health Review Commission |
| Jt. Stip. | Joint Stipulation |
| KC Transport | KC Transport, Inc. |
| Mine Act | Federal Mine Safety and Health Act of 1977, as amended |
| MSHA | Mine Safety and Health Administration ("MSHA"), United States Department of Labor |
| P. Br. | Brief for the Petitioner, Secretary |
| JA | Joint Appendix |
| Secretary | Secretary of Labor, United States Department of Labor |

## STATEMENT OF THE ISSUES

The issues presented in this case are:

1)      Whether the Commission correctly held that:

an independent repair, maintenance, or parking facility not located on or appurtenant to a mine site and not engaged in any extraction, milling, preparation, or other activities within the scope of subsection 3(h)(1)(A) is not a mine within the meaning of section 3(h) of the Mine Act.

*KC Transport, Inc.*, 44 FMSHRC 211, 225 (Rev. Comm. Apr. 2022) [JA____].

2)      Whether the Commission correctly held that:

tools, equipment, and the like [including trucks] not on a mine site or any appurtenance thereto and not engaged in any extraction, milling, preparation or other activities within the scope of subsection 3(h)[1](A) are not mines within the scope of subsection 3(h) of the Mine Act.

*Id.*

## PERTINENT STATUTES AND REGULATIONS

The texts of pertinent statutes and regulations are set forth in the addendum at the end of this brief.

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

KC Transport, Inc. ("KC Transport") respectfully requests oral argument. This case presents significant legal issues that will affect KC Transport and other independent trucking companies and contractors. KC Transport believes that oral argument would be of value to the Court given the fundamental importance of jurisdiction.

1

# **INTRODUCTION**

This case calls upon the Court to determine whether MSHA, by its authorized representative, had jurisdiction pursuant to Section 4 and 3(h)(1) (30 U.S.C. § 803 and 30 U.S.C. § 802(h)(1)), of the Federal Mine Safety and Health Act of 1977 (the "Mine Act"), as amended, to issue two citations to Respondent KC Transport, an independent contractor trucking company, for conditions related to trucks parked at KC Transport's Emmett, West Virginia maintenance facility ("Emmett facility").

KC Transport's Emmett maintenance facility was located over a mile from Ramaco Resources LLC's ("Ramaco") Elk Creek coal preparation plant and 1000' from a coal haulage road. Jt. Stip. 4 [JA __]. Trucks from KC Transport's facility either worked at the various Ramaco mines or crossed the haul roads to work elsewhere for various other mining and non-mining companies. Jt. Stip. 15 [JA __].

When the Citations were issued, the Secretary did not seek to assert MSHA jurisdiction over KC Transport's Emmett facility. Rather, the Secretary only sought jurisdiction over the trucks. Secretary of Labor's Motion for Partial Summary Decision, pp. 14, 20 [JA___]. KC Transport asserted that MSHA lacked jurisdiction to issue citations on the conditions of the trucks, while those trucks were parked at KC Transport's off-site maintenance facility. KC Transport's Motion for Summary Decision, p. 11-12 [JA ___].

For MSHA to have jurisdiction to issue the citations, the trucks and/or KC Transport's maintenance facility would have to be deemed a "coal mine" pursuant to Section 4 and Section 3(h)(1) of the Mine Act.

Section 3(h)(1) of Mine Act (30 U.S.C. § 802(h)(1)) states that "coal or other mine" means:

> (A) an area of land from which minerals are extracted in nonliquid form or, if in liquid form, are extracted with workers underground, (B) private ways and roads appurtenant to such area, and (C) lands, excavations, underground passageways, shafts, slopes, tunnels and workings, structures, facilities, equipment, machines, tools, or other property including impoundments, retention, dams, and tailings ponds, on the surface or underground, used in, or to be used in, or resulting from, the work of extracting such minerals from their natural deposits in nonliquid form, or if in liquid form, with workers underground, or used in, or to be used in the milling of such minerals, or the work of preparing coal or other minerals, and includes custom coal preparation facilities. In making a determination of what constitutes mineral milling for purposes of this chapter, the Secretary shall give due consideration to the convenience of administration….

By drawing upon the unambiguous language of the Mine Act, its purpose, and logically examining the facts, the Commission aptly determined that neither KC Transport's facility, nor the two trucks while parked at the facility, were a "coal mine," as that term is defined in the Mine Act. *KC Transport, Inc*., 44 FMSHRC at 225. [JA___].

The Commission's determination that the trucks and the facility were not a "mine" at the time they were cited was consistent with the Sixth Circuit's decision in *Maxxim Rebuild Co., LLC. v. FMSHRC*, 848 F.3d 737, 744 (6th Cir. 2017)

("*Maxxim*") ("Once [MSHA] tries to extend its jurisdiction to **off-site shops** and **off-site equipment**, the language of the statute provides **no stopping point**, leaving the scope of its jurisdiction to the **whims** of the Secretary.") (emphasis added) and the Seventh Circuit's decision in *Dir., Office of Workers' Comp. Programs, United States Dep't of Labor v. Ziegler Coal Co.*, 853 F.2d 529, 533-34 (7th Cir. 1988) (The statutory definition of a coal mine…. contains a geographical component") ("*Ziegler*").

The Secretary now advances a fluid and limitless concept of jurisdiction that is entirely unpredictable and arbitrary. This small portion of the Secretary's Appeal Brief demonstrates that the Secretary does not want to be bound by any predictable geographic limitations of the Mine Act:

> Just because an item was once used in mining does not mean that MSHA retains permanent jurisdiction over that item; whether an item is "used in" (or "to be used in") mining is a fact-bound inquiry that must be addressed—and that MSHA does address—on a case-by-case basis. And the Secretary's interpretation is not that location is irrelevant to that fact-bound inquiry; the Secretary's interpretation is that location on an extraction site, for purposes of subsection (C), is not necessary. ….
>
> MSHA is necessarily constrained by practical realities. MSHA is required by statute to inspect each "mine" in its entirety multiple times each year, 30 U.S.C. § 813(a); MSHA does not have the unlimited resources that would be required to scour the nation's homes for any tool that might be connected to a mine. Rather, MSHA commits its resources where they are most needed and effective.

P. Br., pp 45-46 [JA __].

4

Such an *ad hoc* approach to jurisdiction cannot be reconciled with the 30 U.S.C. §§ 802-803. In *Sec'y of Labor v. Nat'l Cement Co. of Cal., Inc.*, 494 F.3d 1066, 1076 (2007) ("*National Cement* I"), this Court previously rejected such an approach to jurisdiction and required the Secretary to be precise as to the limits of jurisdiction, holding:

> This vague, open-ended (and unenforceable) representation offers scant comfort to the various road users who would be subject to liability under the Secretary's expansive construction of Mine Act jurisdiction. In any event, the Mine Act itself does not authorize such prosecutorial discretion…

*Id.*

The Secretary's refusal to set a clear locational limitation on its jurisdiction; first in *National Cement* I, then in *Maxxim* and now here, demonstrates why the Sixth Circuit's holistic view of Section 3(h)(1) (in *Maxxim*) is appropriate.

Without judicial oversight, the Secretary may continue to try to keep jurisdiction vague and unpredictable. This case presents the Court with an opportunity to affirm the Commission's sound decision analyzing Mine Act jurisdiction in relation to both function and location. Here, neither KC Transport's maintenance facility nor the trucks parked there are a "mine" under the Mine Act.

5

## STATEMENT OF THE CASE

### I.    Factual Background

KC Transport is an independent contractor trucking company that provides various types of hauling services to its customers including: coal hauling, earth hauling and gravel hauling services. Jt. Stip. 7, 14 [JA ___].  To service and maintain its large truck fleet, KC Transport owns and operates maintenance and storage facilities at five (5) locations in two different states. KC Transport maintains one facility in Tazewell, Virginia; one facility in Bluefield, West Virginia; one facility in Man, West Virginia; two facilities in Princeton, West Virginia; and the facility at issue here, in Emmett, West Virginia. Jt. Stip. 9. [JA ___].

KC Transport elected to construct the Emmett facility to serve as a convenient and centralized location for the maintenance, repair and staging of its truck fleet that provides hauling services to customers located in the area around Logan County, West Virginia. Jt. Stip. 16. [JA ___].  KC Transport solely purchased all the materials for the construction of the Emmett facility and insures the property. Jt. Stip. 4. [JA ___].  Overall, KC Transport operates approximately thirty-five (35) trucks from the Emmett facility consisting of both on and off-road trucks. Jt. Stip. 30. [JA ___].

Certain trucks maintained at the facility, including the two trucks which were cited, provide coal hauling services to the five (5) nearby Ramaco owned mines and to other nearby mines owned by different operators. Jt. Stip. 14, 15 [JA ___]. The on-

6

road trucks maintained at the facility provide coal, earth and gravel hauling services to other, coal and non-coal mining customers in the area, including American Electric Power ("AEP"). Jt. Stip. 7, 8, 14, 15. [JA ___].

MSHA regularly inspects Ramaco's Elk Creek plant as well as the five (5) mining operations owned by Ramaco in the vicinity of KC Transport's Emmett facility, including, three deep mines, one surface mine and one highwall miner and the haul roads. Jt. Stip. 14. [JA ___]. Each of these seven facilities provides ample opportunities for MSHA to inspect KC Transport's trucks, without the need to also leave the mines and follow the trucks to KC Transport's maintenance facility.

The land where KC Transport's Emmett facility is located it is not permitted or bonded for mining. Jt. Stip. 17. [JA ___]. Ramaco has no personnel or equipment at this location, nor is it used by Ramaco for mining operations. Jt. Stip. 13, 18. [JA ___]. Further, Ramaco has no plans to operate any mine at or near the location of the where KC Transport's Emmett facility is located. Jt. Stip. 18. [JA ___].

The Emmett facility is across a creek from a haulage road and well up a hollow along Right-Hand Fork Road, which branches off from the main haulage road running by the Elk Creek Plant.  Jt. Stip. 25 [JA___]. It is located more than one (1) mile from Ramaco's Elk Creek Plant (i.e. the nearest coal extraction/preparation facility), approximately four (4) to five (5) miles from the three Ramaco deep mines,

7

approximately six (6) miles from the Ramaco strip mine/highwall miner and is on the other side of a creek, approximately 1000' away from a coal haulage road.

On the day the citations were issued, the materials for KC Transport's planned 60' x 70' metal maintenance building, were on location but were temporarily stored on pallets awaiting construction. Jt. Stip. 6. [JA __].  However, the adjacent truck parking lot (where the trucks referenced in Citation Nos. 9222038 and 9222040 were located) had already been completed and the area was being actively used by KC Transport and an unaffiliated logging company to park their logging trucks. Jt. Stip. 6, 13. [JA __].  At the time, KC Transport had two shipping containers there and two maintenance trucks which it used to maintain its trucks. Jt. Stip. 23. [JA __].

Prior to March 11, 2019, MSHA had never previously attempted to enter KC Transport's Emmett facility parking lot. Jt. Stip. 21. [JA __]. Similarly, MSHA has not cited any trucks at this facility since Citation Nos. 9222038 and 9222040 were issued. *Id.* [JA __]. With the exception of these two citations, MSHA has shown no interest in inspecting the area where the maintenance facility was located.

Previously, on April 3, 2018, MSHA had issued Citation Nos. 9174394 and 9174395 to KC Transport on a work trailer and a muddy parking area that was located on bonded, permitted property, directly adjacent to where the main haulage road intersects with Right-Hand Fork Road. Jt. Stip. 22.  [JA __]. In April of 2018, KC Transport was utilizing this area for its truck fleet prior to re-locating the facility

8

off the bonded, permitted mine and up a hollow where there was no mining taking place. *Id*. [JA ___]. MSHA ultimately vacated these citations. *Id.* [JA ___].

With respect to the citations at issue, Inspector Smith was conducting inspection activities at the Elk Creek plant and then attempted to locate certain trucks to terminate a previously issued citations. Jt. Stip. 5. [JA ___]. To locate those trucks, he traveled more than one mile along the haulage road, turned off of the haulage road, crossed the creek and traveled up Right-Hand Fork Road through an opened gate to where the Emmett facility is located. Jt. Stip. 5, 24. [JA ___]. Upon arrival, Inspector Smith discovered maintenance work being performed on two other KC Transport's trucks in the Emmett facility parking lot and issued Citation Nos. 9222038 and 9222040. Jt. Stip. 5. [JA ___].

While the two cited trucks are routinely inspected by MSHA when performing hauling services at the nearby Ramaco mines and the Elk Creek plant, they were never inspected at this KC Transport maintenance facility location before or after the citations. Jt. Stip. 21. [JA ___]. KC Transport contends that the trucks are not subject to inspection while parked at the Emmett facility and neither the trucks nor the facility were a "coal or other mine" as defined in Section 3(h)(1) of the Mine Act.

9

## II.    Procedural History

### A.    ALJ Proceedings

In response to the issuance of Citations Nos. 9222038 and 9222040, the Secretary and KC Transport prepared a joint set of factual stipulations and moved for summary decision. The Secretary asserted that the definition of "coal or other mine" included the *trucks*, making them subject to MSHA jurisdiction. The Secretary did not seek jurisdiction over the KC Transport *facility*. Secretary of Labor's Motion for Partial Summary Decision, pp. 14, 20 [JA___]. The Secretary emphasized the "function" of the trucks. *Id.* at 15-16 [JA ___]. The Secretary declined to set any geographic limit on when the trucks are "mines." *Id*. at 17. [JA ___]. KC Transport asserted that the trucks were located at the facility of an independent trucking company serving both mining and non-mining businesses and it was not subject to MSHA jurisdiction. KC Transport's Motion for Summary Decision, p. 11-12, [JA___]. KC Transport emphasized the "location" of the trucks at the time of the citations. *Id.* [JA___].

On March 3, 2020, ALJ John Kent Lewis issued his Order Denying Respondent's Motion for Summary Decision and Granting Secretary's Motion for Summary Decision. *KC Transport, Inc*., 42 FMSHRC 221, 231 and 237 (Mar 2020) (ALJ). The ALJ followed the purely functional analysis of the Commission described in *Jim Walter Resources, Inc*., 22 FMSHRC 21 (Rev. Comm. Jan. 2000)

10

("*Jim Walter*"), which does not identify a geographic limit for facilities "used in, or to be used in" mining. *KC Transport*, 42 FMSHRC at 234 [JA___].

Interestingly, the ALJ found that the Secretary's assertion of jurisdiction over the trucks based on function alone was unreasonable, noting "the Secretary's idea of the trucks being rolling mines would lead to an absurdity." *Id.* at 237. [JA___]. The ALJ specifically held that there was no jurisdiction under Section 3(h)(1)(A) (extraction areas) and 3(h)(1)(B) (appurtenant ways and roads). *Id.* at 232. [JA___]. Rather, the ALJ found jurisdiction over the facility, pursuant to Section 3(h)(1)(C) and the trucks while at the facility, notwithstanding that the Secretary did not request jurisdiction over the facility. *Id*. at 229. [JA___]. The ALJ also held, "Respondent is correct that the *location* of the trucks and the maintenance facility matter…" *Id.* at 237. [JA___]. The ALJ noted various cases where Courts found geographic limits to MSHA jurisdiction. *Id.* [JA___].

Without explaining or reconciling how the facility and the trucks that are not located at a mine met the statutory definition of a "mine," the ALJ still found jurisdiction over the facility and the trucks based merely on their "proximity" to the mine, coupled with their purpose. (i.e., they were closer to the mine than the distance found acceptable in *Jim Walter*.) *Id.* at 238 [JA___]. It appears the ALJ simply felt constrained by the limitless approach of *Jim Walter*. Without some explanation of

11

how this "proximity" rule was consistent with the Mine Act, the ALJ's decision was as arbitrary and unpredictable as the Secretary's own description.

The ALJ acknowledged a geographic limitation to jurisdiction over the trucks when he called the concept of "rolling mines" absurd. *Id.* at 237. [JA___]. Inexplicably, the ALJ did not find any similar geographic limitation for MSHA jurisdiction over a "facility."

## B.    Commission Decision

Upon discretionary review, the Commission reversed the Decision of the Administrative Law Judge. The Commission majority relied extensively on the Sixth Circuit's decision in *Maxxim* and the Seventh Circuit's decision in *Ziegler*. *KC Transport, Inc*., 44 FMSHRC at 233. [JA___].

The Commission majority held that Subsection 3(h)(1)(C) is dependent on location, holding:

> an independent repair, maintenance, or parking facility not located on or appurtenant to a mine site and not engaged in any extraction, milling, preparation, or other activities within the scope of subsection 3(h)(1)(A) is not a mine within the meaning of section 3(h) of the Mine Act. We further hold that tools, equipment, and the like not on a mine site or any appurtenance thereto and not engaged in any extraction, milling, preparation or other activities within the scope of subsection 3(h)(A) are not mines within the scope of subsection 3(h) of the Mine Act.

*Id*. at 225 [JA ___].

12

The Commission agreed with the ALJ that the concept of the trucks as "rolling mines" "was absurd." *Id.* at 213 (*quoting KC Transport*, 42 FMSHRC at 231, 237). The majority noted that it was departing from prior Review Commission precedent, including *Jim Walter* (dealing with central machine and supply shops *owned and operated by the coal mine operator* and dedicated "*only to JWR's mines* and related facilities." 22 FMSHRC at 22), *W.J. Bokus Indus. Inc*., 16 FMSHRC 704 (Rev. Comm. Apr. 1994) (dealing with equipment in a storage facility *owned and operated* by the mine operator, where employees of the mine operator worked. *Id*. at 705), and *US Steel Mining, Co*., *Inc*., 10 FMSHRC 146 (Rev. Comm. Feb. 1988) (dealing with a central supply shop having a Mine I.D. Number and *owned, operated and managed* by the coal mine operator. *Id*. at 147.) *See, KC Transport*, 44 FMSHRC at 225, n. 8 [JA___].

The Commission relied on a functional and locational analysis. *Id.* at 225. [JA ___]. Departing from the concept of jurisdiction without locational limit, the Commission noted that "the circuit courts had recognized the jurisdictional precepts" that the majority was following. *Id.* at 223. [JA__]. In that regard, the majority found that extending jurisdiction off the site of a mine to an independent facility where equipment was stored or serviced, would create "no stopping point." *Id*. at 226, citing, *Maxxim*, 848 F.3d at 743 [JA___]. The majority also pointed to *Ziegler* and

13

its emphasis on "the geographical component of the situs of a facility." *Id*. at 223, *citing, Ziegler*, 853 F.2d at 533-34.

The majority also offered several examples of why Section 3(h)(1)(C) includes a locational limit, such as manufacturing facilities, trucks leaving the site, equipment and tools being taken off site, etc., referring to this as "common sense." *KC Transport*, 44 FMSHRC at 225-226. [JA ___]. The Commission majority concluded that neither the trucks nor the facility are a "mine" if not located at the mine site and engaged in extraction, milling and preparation. *Id*. at ___. [JA ___].

## STANDARD OF REVIEW

This Court reviews the Commission's legal conclusions related to jurisdiction, *de novo*. *Sec'y of Labor v. Twentymile Coal Co*., 456 F.3d 151, 156 (D.C. Cir. 2006); *Sec'y of Labor v. Keystone Coal Mining Corp*., 151 F.3d 1096 (D.C. Cir. 1998). Here, the parties stipulated to the material facts. Jt. Stip. [JA___].

The Secretary implies that review is limited because this case purportedly involves a "disagreement over policy" between the Secretary and the Commission, rather than a *de novo* legal dispute. P. Br., p. 20, [JA___] (citing *Twentymile Coal Co*., 456 F.3d 151, 160-161 (D.C. Cir. 2016)). However, unlike *Twentymile Coal Co*., this case does not involve the interpretation of a regulation or policy promulgated by the Secretary. Rather, here, the Commission was determining whether the statute was clear and reviewing the reasonableness of the Secretary's

14

exercise of *jurisdiction* under the Mine Act. Previously, this Court has reviewed the reasonableness of the Secretary's interpretation of jurisdiction under the Mine Act. *See, National Cement* I, 494 F.3d at 1076.

Congress defined the limits of jurisdiction in the statute, not the Secretary, in a regulation or policy. It would be ridiculous to assert that the Secretary can somehow enforce its way into jurisdiction, where the jurisdictional statute does not allow. Even if the Secretary somehow had discretion to alter its interpretation of its own jurisdiction at a whim, it is also clear that in those cases where the Secretary has discretion, such as in interpreting its own regulations, or drafting policy, this Court does not tolerate "flip-flops" and "*post hoc* rationalizations" in connection with such interpretations. Such unpredictability impugns the "reasonableness" of the Secretary's position. Neither the Commission nor the Courts are obligated to defer in these circumstances. *Akzo Nobel Salt, Inc. v. Fed. Mine Safety & Health Review Comm'n*, 212 F.3d 1301, 1304-05 (D.C. Cir. 2000) (*citing Martin v. Occupational Safety & Health Review Comm'n*, 499 U.S. 144, 157 (1991)).

Prior to this case, the Secretary did not assert jurisdiction over the KC Transport facility or the trucks while off the mine site. Jt. Stip. 21 [JA___].  Now in this case, the Secretary adopted one position before the ALJ-that the Secretary had jurisdiction over the trucks pursuant to Section 3(h)(1)(C). Secretary of Labor's Motion for Partial Summary Decision, pp. 14, 20 [JA___]; *KC Transport*, 44

FMSHRC at 211 [JA, ___]. Then, before the Commission, the Secretary asserted

jurisdiction over both the trucks and the KC Transport facility pursuant to Section

3(h)(1)(C). Secretary of Labor's Response Brief before the Commission, p. 12-15.

[JA, ___]. Now the Secretary wants to assert jurisdiction over facilities and

equipment, without regard to location (if "used in, or to be used in" mining) at its

discretion, and as its resources allow. P. Br., pp 45-46 [JA ___].

      Without judicial review, it is impossible to analyze whether the statute is clear

or ambiguous and, if ambiguous, the reasonableness of the Secretary's cascading

interpretations (from initially not exercising jurisdiction to now seeking jurisdiction

over facilities and trucks wherever they may be, subject to available resources).

Here, MSHA's evolving and inconsistent interpretations of jurisdiction lack "a

reasoned analysis indicating that prior policies and standards are being deliberately

changed." *AFGE v. FLRA*, 25 F.4th 1, 5 (D.C. Cir. 2022).[1] The Commission has

held that the Agency's position is unworthy of deference where it deviates from its

prior positions. *See, e.g., Westwood Energy Products*, 11 FMSHRC 2408, 2424

(Rev. Comm. Dec. 1989) (Comm. Doyle dissenting), *See, also, e.g. INS v. Cardoza-

Fonseca*, 480 U.S. 421 (1987); *American Mining Congress v. EPA*, 824 F.2d 1177,

1182 (D.C. Cir. 1987). Here, the Secretary's changing position constitutes *post hoc*

---

[1] When there is a change in policy, "[T]he agency must also show that "the new
policy is permissible under the statute, that there are good reasons for it, and that the
agency believes it to be better" than the previous policy. *FLRA*, 25 F.4th at 5.

rationalizations advanced through litigation. Deference to that is improper. *Christopher v. SmithKline Beechum Corp*., 132 S. Ct. 2156, 2166-67 (2012).

As the Commission noted, such changing positions are, at best entitled to analysis under *Skidmore v. Swift & Co*., 323 U.S. 134, 140 (1944). Under *Skidmore*, the Secretary's position does not have the "power to persuade" because it lacked "thoroughness evident in its consideration…validity of its reasoning [and] … consistency with earlier and later pronouncements." *North Fork Coal Corp. v. FMSHRC*, 691 F.3d 725, 743 (6th Cir. 2012).

Without full judicial review, considering all the tools of statutory construction as the Commission did here, it is impossible to determine if "the agency has stayed within the bounds of its statutory authority." *City of Arlington v. FCC*, 133 S. Ct. 1863, 1866 (2013). In *City of Arlington*, the Supreme Court held that "[w]here Congress has established a clear line, the agency cannot go beyond it; and where Congress has established an ambiguous line, the agency can go no further than the ambiguity will fairly allow." *Id.* at 1874.

Of course, before reverting to ambiguity, it is always the best course to see if the statute's meaning is apparent since the statute's plain meaning is conclusive. *Chevron U.S.A. v. NRDC, Inc.*, 467 U.S. 837, 842-43 (1984).

## SUMMARY OF THE ARGUMENT

In this case, KC Transport is an independent contract trucking company that does not extract, mill or prepare coal and is not a "coal mine." The Commission properly determined that KC Transport's facility and trucks were not a mine under Section 3(h)(1) of the Mine Act. The activities of the KC Transport facility are not mining, but rather the maintenance and repair of trucks. The Commission also properly concluded that MSHA's attempted exercise of jurisdiction over the trucks while at KC Transport's facility improperly expanded the jurisdiction of MSHA beyond Section 3(h)(1)(C), with "no stopping point." *KC Transport*, 44 FMSHRC at 226. [JA___].

Section 3(h)(1)(C) must be read in the context of the remainder of Section 3(h)(1) and Section 4 of the Mine Act using the tools of statutory construction. It is a fundamental rule of statutory construction that a Court must consider the text itself and the "language and design of the statute as a whole" and in reliance on the "devices of judicial construction." *CalPortland Co. v. Fed. Mine Safety & Health Review Comm'n*, 839 F.3d 1153, 1163 (D.C. Cir. 2016).

As the Commission noted: "all three subsections [of Section 3(h)(1)(C) include a locational connection to working mines." *KC Transport*, 44 FMSHRC at 219 [JA ___]. Congress never intended that every piece of equipment or every facility having once been "used in, or to be used in…the work of extracting…or the

18

work of preparing coal…," without any reference to location, would be deemed a mine as asserted by the Secretary. P. Br., p. 16. For equipment and facilities to be a mine, they must have both a functional and locational connection to the extraction, milling and preparation areas to be a mine. Using the tools of statutory construction, the Commission, in this case, eliminated possible ambiguities so that the clear test of the statute could be applies as intended by Congress.

In addition to examining the language and structure of the Mine Act, the Commission also used another important device of statutory construction, Legislative history. The Commission examined that history and determined that Section 3(h)(1)(C) was added by Congress in the Mine Act to clarify the definition of "coal mine" from the prior Coal Act to include a list of facilities and equipment that are used for extraction, milling and the work of preparing coal. *KC Transport*, 44 FMSHRC at 219.

The Sixth Circuit Court decision in *Maxxim*, 848 F.3d at 744 and the Seventh Circuit's decision in *Ziegler Coal Co.*, 853 F.2d at 533-34 considered and rejected the idea and problems of a statutory scheme that defines the term "coal or other mine" without geographic limits. *Maxxim* and *Ziegler* are well-founded and apply both a functional and a geographic limit to the definition of "coal or other mine."

Both *Maxxim* and *Ziegler* are consistent with the approach previously taken by the Secretary in *National Cement* I and *National Cement* II. In *National Cement*

19

I, this Court rejected a limitless definition of the term "coal or other mine" (subject to the Secretary's nebulous charging discretion) and required the Secretary to fashion a workable and limited definition of "mine" in lieu of an ad hoc, unworkable and limitless definition. *National Cement* I, 494 F.3d at 1076. On remand from *National Cement* I, the Secretary offered a new interpretation of the term "mine," under Section 3(h)(1)(C) limiting its assertion of jurisdiction to vehicles to those on a mine access road *and* engaged in mining activities. *Sec'y of Labor v. National Cement*, 30 FMSHRC 668, 672 (Rev. Comm. Aug. 2008), *overruled on other grounds in Sec'y of Labor v. Nat'l Cement Co. of Cal., Inc*., 573 F.3d 788, 795 (2009). In other words, the vehicles (equipment) must both be on the mine access road *and* engaged in mining activities. This prior position by the Secretary demonstrates that the Secretary has applied both a functional and geographic limit on MSHA jurisdiction, notwithstanding that the Secretary now wants to assert jurisdiction over equipment and facilities that are removed from the "coal mine" wherever they may be.

As this Court has noted, Mine Act jurisdiction has important consequences because the Mine Act "mandates that a citation issue when its provisions or the regulations promulgated thereunder are violated by a party within Mine Act jurisdiction." *Sec'y of Labor v. Nat'l Cement Co. of Cal*., 494 F.3d 1066, 1076 (2007). The Mine Act also mandates quarterly inspections. *KC Transport*, 44

FMSHRC at 215-16 [JA____]. The sobering consequences of overly expansive jurisdiction are what likely led the Secretary to self-limiting jurisdiction in *National Cement*.

Prior interpretations of the definition of "coal mine" by the Commission and courts (as well as the Secretary) make it clear that the definition of "coal mine" has both a functional and locational component and it makes no sense to read Section 3(h)(1)(C) in isolation. The Secretary now wants to repeat prior errors and keep jurisdiction broad and uncertain, subject to its individual discretion, on a "case-by-case basis, as resources allow. P. Br., pp 45-46 [JA __]. This exceeds the limits of Section 3(h)(1)(C) and is unreasonable. It also exposes a myriad of independent businesses, far from the mining site to unexpected and unreasonable inspections and citations. *KC Transport*, 44 FMSHRC at 226 [JA ____].

Finally, in this case, the Secretary has failed to identify any ambiguities with Section 3(h)(1) which might even give rise to a *Chevron* Step 2 reasonableness analysis. Of course, if the Secretary did identify ambiguities, its interpretation of the statute is not consistent, precise or reasonable.

KC Transport, as an independent contract repair and maintenance facility, not located on or appurtenant to a mine site and not engaged in any extraction, milling, or preparation work, is not a mine under Section 3(h)(1)(C) of the Mine Act.

21

## ARGUMENT

I.  **Equipment and facilities "used in, or to be used in mining" must have both a functional and locational connection to the extraction, milling and preparing of coal to be a "mine."**

Both this Court and the Commission follow the "cardinal principle" of statutory interpretation that courts "must give effect, if possible, to every clause and word of a statute." *Williams v. Taylor*, 529 U.S. 362, 404 (2000); *Financial Planning Ass'n v. S.E.C.*, 482 F.3d 481, 492 (D.C. Cir. 2007) (recognizing a court's duty to give each word in a statute meaning).

The Commission correctly held that to be considered a mine under Section 3(h)(1)(C), a facility or equipment must be engaged in mining activities and be located appurtenant to a mine site.  *KC Transport*, 44 FMSHRC at 216 [JA ___].

A.  **MSHA Does Not Have Jurisdiction Over the Off-Site Emmett Facility or the Trucks while at the Emmett Facility.**

Here, KC Transport's facility is not a mine under Section 3(h)(1)(C). The facility is not used in the process of extracting, milling or preparing coal. Rather, the facility is an independent trucking company. Jt. Stip 7. [JA ___].  Moreover, the trucks and other equipment are not on a mine site or any appurtenance thereto. Jt. Stip 10-11, 17. [JA ___].

The definition of "mine" in Section 3(h)(1) has been interpreted in various contexts. Over time, it has become apparent that Subsections A-C must be read *in Pari Materia*, and not in isolation, as the Secretary suggests. An early Commission

22

case interpreting Section 3(h)(1)(C) was *Oliver M. Elam, Jr. Co*., 4 FMSHRC 5 (Rev. Comm. Jan. 1982). That case dealt with the issue of whether a commercial dock loading coal and other cargo was a mine. *Id.* at 5. The coal was delivered to the facility by truck, crushed to uniform size, and loaded onto barges. *Id.* When examining Section 3(h)(1)(C), the Commission interpreted the terms "work of preparing coal" as described in Section 3(i) (30 U.S.C. § 802(i)). In determining that the facility was not a mine, the Commission adopted a two-part inquiry: "(1) does the operation perform one or more of the activities listed in Sect. 3(i) and (2) what is the nature of the operation performing such activities." *Id.* at 8. The Commission concluded that Elam's coal-related activities were undertaken for its own purpose of being able to load the coal for shipment and consequently that "Elam does not prepare coal to market specifications or for particular uses." *Id.*

Later, the Third Circuit introduced a similar "functional analysis" test for determining jurisdiction under Section 3(h)(1). *Pennsylvania Electric Co. v. FMSHRC*, 969 F.2d 1501 (3d Cir. 1992). In *Pennsylvania Electric*, the Court considered the applicability of the Mine Act to guarding on conveyors delivering coal directly from the minehead scales to a power plant processing station. The Court found that the work on the conveyor was "usually done by the operator of a coal mine" rendering it a mine. *Id.* at 1503. In that instance, the conveyor was an

23

integrated portion of the mine's operation and necessary to deliver raw coal to a processing facility. *Id*. at 1504.

Then in *National Cement* I and *National Cement* II, this Court rejected a limitless definition of the term "coal or other mine" and required the Secretary to fashion a workable and limited definition of "mine" instead of an ad hoc, unworkable definition.

On remand from *National Cement* I, the Secretary offered the following interpretation of the term "mine," under Section 3(h)(1)(C) that was not as broad and uncertain as what was initially offered.

> [t]he Secretary interprets the definition of "mine" in Section 3(h)(1)(B) of the Mine Act to encompass the [A]ccess [R]oad in this case. The Secretary, however, interprets Section 3(h)(1)(C) of the Act to exclude from the definition of "mine" vehicles on the road that are not related to National Cement's mining operations.

*Sec'y v. National Cement*, 30 FMSHRC 668, 672.

This marked a clear point at which even the Secretary agreed that Subsection (C) must be read together with another Subsection of Section 3(h)(1). At the time of *National Cement* II, it seemed clear that the Secretary had no intention of seeking to exercise jurisdiction over those vehicles "used in, or to be used in…the work of extracting…or the work of preparing coal…," once those vehicles left the "coal mine" as delineated as the Section 3(h)(1)(A) extraction/preparation area, or the haul roads, as defined in Section 3(h)(1)(B). In essence, the Secretary applied both a

24

functional and geographic limit on MSHA jurisdiction, notwithstanding that the Secretary now wants to interpret Section 3(h)(1)(C) in isolation.

KC Transport acknowledges that in *National Cement* I and *National Cement* II, this Court found Section 3(h)(1)(B) to be ambiguous. However, perhaps this Court will find the more recent "lens" analysis of the Sixth Circuit in *Maxxim Rebuild*, 848 F.3d 737 (6th Cir. 2017), as described *infra*, to be compelling and persuasive in relation to Section 3(h)(1)(C). If there is no ambiguity, there is no deference, and the statute is simply applied. The Supreme Court has noted, "Ambiguity is a creature not of definitional possibilities but of statutory context," *Brown v. Gardner*, 513 U.S. 115, 118, 115 S. Ct. 552, 130 L. Ed. 2d 462 (1994). The *Maxxim* Court's opinion aptly describes how Section 3(h)(1)(C) works within the statute as a whole.

All of these efforts to apply Section 3(h)(1) of the Mine Act were based on the language and structure of the Mine Act. This Court has noted the importance of the plain language of the statutory text and its relation to the overall statutory design. *CalPortland Co.*, 839 F.3d at 1163. This Court has cautioned against rushing to find ambiguity without a full analysis of the statute using the traditional tools of statutory construction to determine Congressional intent:

> To determine whether the meaning of a statutory provision is plain, the court's analysis begins with the most traditional tool of statutory construction, reading the text itself."…. In making this determination, we consider "the particular statutory language at issue, as well as the

25

language and design of the statute as a whole."…."Ambiguity is a creature not of definitional possibilities but of statutory context," …and "the presence of a difficult question of statutory construction does not necessarily render that provision ambiguous,"….In short, we defer to an agency's interpretation of a statute "only when the devices of judicial construction have been tried and found to yield no clear sense of congressional intent."….

*Id*. (citations omitted).

More recently, in *Maxxim*, 848 F.3d 737 (6th Cir. 2017), the Sixth Circuit Court of Appeals faced a situation similar to the one at hand. In that case, MSHA asserted jurisdiction over an independent maintenance shop that repaired, rebuilt and fabricated mining equipment and parts that did not extract or prepare coal. *Id.* at 738. The *Maxxim* Court applied the traditional rules of statutory construction and rejected the Secretary's assertion that MSHA had jurisdiction over any facility that makes and repairs equipment that is used in coal extraction and coal preparation activities, even when that facility is not adjacent to or part of a working mine. *Id.* at 744. The Court held that an off-site shop was not a "coal or other mine" within the meaning of the Mine Act. *Id*. at 744. In reaching this conclusion, the Court noted that Section 3(h)(1)(C) is "locational" because it involves "land and things in or connected to a mine. *Id.* at 740. The *Maxxim Rebuild* Court noted:

The definition [Section 802(h)(1)(C)] is broad, sure enough. It's as if the author went to a mine and wrote down everything he saw in, around, under, above, and next to the mine. Even then, the definition still extends only to everything that one would see in or around a working mine. It does not cover mining "equipment" or for that matter mining

26

"machines, tools, or other property" wherever they may be found or made.

*Id*. (emphasis added).

To explain its conclusion, the *Maxxim* Court used a creative approach of "pulling back the lens" to demonstrate that MSHA jurisdiction extends only to facilities and equipment that are "in or adjacent to-in essence part of-a working mine." *Id* at 740. The *Maxxim* Court first examined the facilities and equipment in the context of Section 3(h)(1)(C) to show that all of the items listed are located at a working mine. *Id.* at 740-41. (Words "are known by their companions"). The *Maxxim* Court then looked at Subsection (C) in relation to Subsections (A) and (B) to demonstrate that all subsections relate to "a place." *Id.* at 741. Then, the *Maxxim* Court pulled the lens out farther to compare Section 3(h) with the other definitions in Section 3 to show that all are connected with a working mine. *Id*. at 742. The *Maxxim* Court concluded that even if the definition may appear ambiguous when viewed in isolation and close up, it does not from afar, considering the statute at these different levels. *Id.* The obvious point being that if the definition is not ambiguous, it is applied, without deference, similar to how this Court ruled in *CalPortland Co*., 839 F.3d at 1164-65.

The Secretary asserts that *Maxxim* conflicts with this Court's holding in *National Cement*, P. Br., p. 29 [JA\_\_\_], but this is not the case. In both *Maxim* and *National Cement*, the Courts were simply performing their role of determining if

"the agency has stayed within the bounds of its statutory authority." *See, City of Arlington v. FCC*, 569 U.S. 290, 297 (2013) (applying the framework of *Chevron, U.S.A., Inc. v. NRDC, Inc*., 467 U.S. 837 (1984)).

Where, as here, the agency seeks to exceed such bounds, Courts of Appeal are authorized to and even required to intervene. In *National Cement* I, this oversight resulted in a truncated and precise jurisdictional statement by the Secretary, which was approved in *National Cement* II, 573 F.3d at 797. In *Maxxim*, the Court of Appeals complied with *Chevron* and found that Section 3(h)(1)(C) of the Mine Act was clear and found the Secretary's interpretation of jurisdiction over an off-site repair and fabrication shop to be unreasonable because "it had no stopping point," and applied the Mine Act as written. *Maxxim*, 848 F.3d at 743. In the process, the *Maxxim* Court noted: "[a] provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme." *Id.* at 742 (6th Cir. 2017).

Several Justices have even found that, regardless of potential ambiguities, courts still have the primary role in interpreting a statute and not the executive branch agency. *e.g., Michigan v. EPA*, 135 S. Ct. 2699 (2015) (Thomas, J., concurring); *City of Arlington*, 569 U.S. 290, 327 (Roberts, C. J., dissenting); *Pereira v. Sessions*, 138 S. Ct. 2105, 2121 (2018) (Kennedy, concurring); *Gutierrez-Brizuela v. Lynch*, 834 F.3d 1142, 1149 (10th Cir. 2016) (Gorsuch, J., concurring). This view is particularly compelling where the issue is jurisdiction, something not within

MSHA's agency expertise. At a minimum, this is a good reason to fully consider the tools of statutory construction to eliminate unnecessary ambiguities.

Regardless, the end result of both *National Cement* and *Maxxim* was the same. The Secretary's jurisdiction was not as extensive as initially asserted and was properly limited and fully analyzed, through the Court review process. In this important respect, *Maxxim* and *National Cement* are entirely consistent.

In this case, the Commission complied with the appropriate methods of statutory construction in determining that MSHA did not have jurisdiction over KC Transport's offsite trucking maintenance facility and trucks.

**B.    The Secretary's Interpretation of Section 3(h)(1)(C) in Isolation Improperly Seeks to Expand MSHA's Jurisdictional Reach Beyond the Limits of Section 3(h)(1)(C).**

The Secretary now argues that the use of the conjunction "and" supports its theory that Subsections (A), (B) and (C) are equal and independent. P. Br. 22 [JA___]. Of course, this argument runs headlong into the Secretary's own prior reasoning in *National Cement* II, where the Secretary linked Subsections (B) and (C). While Subsection (C) may not be subordinate to the other Subsections, all Subsections must still be read together and in the context of the overall statutory scheme, instead of in isolation.

The Secretary also takes issue with the Commission's finding that the words "on the surface or underground" in Subsection (C) indicate that the items listed in

29

Subsection (C) necessarily relate to the location of a mine. P. Br., p. 24, [JA___]. Of course, the Commission was just noting the obvious point that those words indicate a connection to the land where mining activity was occurring. The Secretary's proposed interpretation that the items listed in Subsection (C) can be cited anywhere they may be found gives no meaning to the words "on the surface and underground" and makes them mere surplusage. This violates the tenets of statutory construction to give every word meaning. *Williams*, 529 U.S. at 404 (2000) and *Financial Planning Ass'n*, 482 F.3d at 492 (D.C. Cir. 2007).

The Commission, in this case, rightly applied the persuasive reasoning of *Maxxim* to the facts of this case and rejected MSHA's efforts to interpret Section 3(h)(1)(C) in isolation. Here, unlike earlier cases interpreting Section 3(h)(1)(C), the Secretary does not even attempt to argue that KC Transport itself was engaged in the "work of extracting coal" or the "work of preparing coal." Rather, MSHA relies on the "used in, or to be used in…the work of extracting…or the work of preparing coal" to contend that MSHA jurisdiction is based simply on the fact that the trucks and KC Transport's Emmett facility previously facilitated the mining operation, regardless of whether KC Transport's work of repairing those vehicles at its off-site shop is customarily performed by a coal mine or not. P. Br., p. 22. [JA___].

Unlike in *Elam* or *Pennsylvania Electric*, the Secretary apparently no longer deems itself constrained to conduct an actual "functional analysis" of the KC

Transport facility, which is an independent trucking company. Rather, the Secretary now wants the Court to interpret Section 3(h)(1)(C) in isolation and so broadly that it covers all facilities and equipment that are or will be "used in, or to be used in…the work of extracting…. or the work of preparing coal," no matter how distant the facility or the equipment is from the actual mining activities. The Commission was wholly correct that such a broad reach has "no stopping point," and is inconsistent with the text of the statute as a whole.

In seeking to interpret Section 3(h)(1)(C) in isolation and without a locational limit, the Secretary continues to rely on the Commission's earlier decision in *Jim Walter*, 22 FMSHRC 21 (Jan. 2000), which dealt with the assertion of jurisdiction over an off-site Central Supply Shop owned by the mine operator and serving only the mine operator and *not* serving any members of the public. *Id.* at 22. However, the Commission in *Jim Walter* expressly never expressly decided "whether an off-site supply warehouse operated by a vendor, equipment manufacturer or distributor would be covered under the Act, or even whether an off-site facility operated by a mining company or a subsidiary that is open for "commercial' business would be covered." *Id.* at 25, n. 7. Here, 40% of KC Transport's business from this facility was for commercial customers other than Ramaco, including non-mining customers, like AEP. Jt. Stip. 15 [JA___]. The Commission found that *Jim Walter* was no longer precedential in this context. *KC Transport*, 44 FMSHRC at 225, n. 8. The Sixth

31

Circuit in *Maxxim* also stated the reasons why they found *Jim Walter* unpersuasive. *Maxxim*, 848 F.3d at 744.

The Commission in this case and the Sixth Circuit in *Maxxim* were correct that Subsection (C) must always be read with Subsections (A) and (B) and can never be read in isolation. Otherwise, as the ALJ noted here, every truck will become a "rolling mine" and the "rolling mines" could be cited at the local diner. *KC Transport*, 42 FMSHRC at 231. [JA__]. Moreover, commercial facilities having no role in the "work of extracting coal" or the "work of preparing coal" would be unexpectedly exposed to MSHA jurisdiction. *KC Transport*, 44 FMSHRC at 225-226. The text of Section 3(h)(1)(C) necessarily refers to equipment and facilities at the mine, but not those located away from the mine.

The Secretary's broad and overly inclusive reading of the word "facility" to apply to an independent trucking company's facility is every bit as "absurd" as the Secretary's attempt to make the trucks "rolling mines," an attempt rejected by both the ALJ and the Commission. Under the Secretary's overly broad theory, all "equipment" and "facilities," once used in support of the extraction and preparation, would forever retain that status, no matter the location and even if all mining that provided the original status was abandoned.

Since the citations involve an independent trucking company performing trucking maintenance operations at its own facility, not appurtenant to the location

<div align="center">32</div>

of coal extraction or preparation, with no miners around, the situation falls squarely outside the limitations of the jurisdictional statute. Merely performing activities which fortuitously fall under the tasks listed in Section 3(h)(1)(C) does not mean that the facility or equipment is a "mine."

It is important to recall that MSHA never contended that the Emmett facility was a mine until the ALJ unexpectedly said that it was. *KC Transport*, 44 FMSHRC at 214 (referring to MSHA's "unrequested prize") [JA___]. The Secretary's approach, before the issuance of these citations of electing not to exercise jurisdiction over this facility, any of KC Transport's other four facilities and any trucks that are not on the mine site and engaged in mining activities, was the correct approach, and consistent with the Mine Act. That *status quo ante* should be preserved.[2]

## C.    The Legislative History Supports the Commission's Textual Analysis of Section 3(h)(1).

Legislative history, like textual analysis and statutory design, is just one tool of statutory construction which can be consulted during the *Chevron* analysis. Of course, it is always presumed that whatever Congress' intent, the final statute reflects that intent. *INS v. Cardoza-Fonseca*, 480 U.S. 421, 431, (1987) ("we have

---

[2] Consistency of an agency's application of a statute may be relevant to a question of jurisdiction. *Westar Energy, Inc. v. Fed. Energy Regulatory Comm'n*, 473 F.3d 1239, 1243 (D.C. Cir. 2007) ("a fundamental norm of administrative procedure requires an agency to treat like cases alike.")

JA 288

considered ourselves bound to 'assume that the legislative purpose is expressed by the ordinary meaning of the words used.'").

The Secretary now asserts that the Commission's view of the legislative history was erroneous and that the Legislative history demonstrates that "Congress did not intend to limit MSHA's jurisdiction to *extraction* sites alone." (emphasis added) P. Br., p. 30 [JA___]. Of course, the Commission did not limit the definition of mine to *extraction sites* alone. Instead, the Commission held that jurisdiction was limited to facilities and equipment "on or appurtenant to a mine site" and "*engaged in any extraction, milling, [or] preparation.*" *KC Transport, Inc*., 44 FMSHRC at 225 (emphasis added).

In support of its analysis of the text of the Mine Act, the Commission noted that the Legislative history indicated Congress' intent to "clarify" that the items in Subsection (C) were always intended by Congress to be included in the definition of mine. The Commission added that nothing in the Legislative history indicates an intention to expand the geographical scope of jurisdiction to independent trucking companies or other lands or areas removed from the mine. *KC Transport*, 44 FMSHRC at 219.

The Secretary then asserts that Congress intended "to define as 'mines' the items listed in Subsection (C), *regardless of their location* relative to any 'such land.'" P. Br. 31 [JA___]. In support of this limitless proposition, the Secretary cites

34

to *Donovan v. Carolina Stalite*, 734 F.2d 1547, 1554 (D.C. Cir. 1984). However, in

*Carolina Stalite*, the materials were delivered from the Quarry to the facility directly

by conveyor. *Id.* at 1548. The mineral processing facility had integrated and unified

operations with the quarry supplying the minerals for processing. *Id.* at 1551 and

1553. The interpretation of this Court in *Carolina Stalite* which necessarily relies on

location and function, does not support the Secretary's view that Section 3(h)(1)(C)

can be applied without reference to location of the activity or equipment.

As the Commission noted here, the Legislative history shows that Congress

always intended for *processing facilities* to be deemed mines and that the purpose of

Subsection (C) was to make this prior intent clear. *KC Transport, Inc.*, 44 FMSHRC

at 225. The Commission quoted this portion of the Legislative history:

> [T]he definition of 'mine' is clarified to include the areas, both underground and on the surface, from which minerals are extracted. . . Also included in the definition of 'mine' are lands, excavations, shafts, slopes, and other property, including impoundments, retention dams, and tailings ponds. These latter were not specifically enumerated in the definition of mine under the Coal Act. It has always been the Committee's express intention that these facilities be included in the definition of mine and subject to regulation under the Act, and the Committee here expressly enumerates these facilities within the definition of mine in order to clarify its intent.

*KC Transport*, 44 FMSHRC at 219, *citing* S. Rep. No. 95-181, at 14 (1977),

reprinted in Senate Subcomm. on Labor, Comm. on Human Res., Legislative History

of the Federal Mine Safety and Health Act of 1977, at 602 (1978) (emphasis added)

[JA___].

The Secretary complains that the mere fact that the Coal Act was different from the Mine Act evidences intent to broaden jurisdiction and asserts that subsection (C) contains no reference to "such land." P. Br., p. 31 [JA ____]. However, the Secretary does not offer any portion of the Legislative history to support this claim, nor does the Secretary offer any Legislative history to demonstrate that Congress intended to expand jurisdiction to off-site independent trucking companies. Moreover, Subsection (C) uses the words "on the surface or underground," so there is a direct connection to the lands where the mining occurs, in the statute.

In *KC Transport*, the Commission noted:

> While the legislative history concludes with the statement that "doubts" regarding jurisdiction should "be resolved in favor of inclusion of a facility within the coverage of the Act," MSHA cannot create jurisdiction by wrongly asserting jurisdiction and then arguing that there exists a "doubt" about it. In this case, MSHA either did not think it had jurisdiction over the Emmett facility or at least did not act on such a thought or seek jurisdiction over the facility until after the Judge's decision.

*KC Transport*, 44 FMSHRC at 219, n. 14 [JA____].

In this case, the Commission's holding is entirely supported by the Legislative history.

36

**D.     Previous Interpretations of the Definition of a "coal mine" under Section 3(h) are consistent with the Commission Decision.**

Contrary to the assertions of the Secretary, the Decision of the Commission in this case is not an outlier. P. Br., p. 14 [JA___]. Aside from the Sixth Circuit's Decision in *Maxxim Rebuild*, other Circuits have also determined that the three subsections of Section 3(h)(1) must be read together and not in isolation. Merely performing some tasks or being a facility/equipment, as listed in Section 3(h)(1)(C) in relation to mining does not equate to jurisdiction. Courts necessarily look at the location of the work, the entity and employees performing the work, the nature of the work and the nature of the operations.

For example, in *Herman v. Associated Electric Cooperative, Inc*., 172 F.3d 1078 (8th Cir. 1999) the Eighth Circuit considered whether a utility fell within the definition of Section 3(h)(1)(C) as a "mine" if it performed some coal processing tasks. The Court noted, "not all businesses that perform tasks listed under 'the work of preparing coal' in section 802(i) can be considered mines. The Act was designed primarily to protect miners, not employees of coal purchasers such as electric utilities and steel mills." *Id.* at 1082. The *Herman* Court also noted: "Inherent in the determination of whether an operation properly is classified as 'mining' is an inquiry not only into whether the operation performs one or more of the listed work activities, but also into the nature of the operation performing such activities." *Id.* (*citing Elam*, 4 FMSHRC 5, 7 (Rev. Comm. 1982)). The important point from

37

*Herman* is that there is more to being a mine than simply performing some tasks listed in the Mine Act. This analysis would certainly apply to an independent trucking company.

In *Bush & Burchett, Inc. v. Reich*, 117 F.3d 932, 937 (6th Cir. 1997), OSHA issued citations involving deaths of construction workers on a bridge intended to be used to access a mine. The Sixth Circuit considered whether MSHA jurisdiction preempted OSHA on the road and bridge. *Id.* at 936. The Court noted that the MSHA statute was intentionally broad, but the Court determined that such a reading would lead to "bizarre results" where "highway maintenance workers would be subject to MSHA regulations…" *Id*. The Court concluded that "[w]ithout some limitation on the meaning of [Section 3(h)(1)] MSHA jurisdiction could conceivably extend to unfathomable lengths…a result Congress clearly did not intend." *Id.*

In *Ziegler Coal Co.*, 853 F.2d at 533-34 (7th Cir. 1988), the Seventh Circuit held:

> [t]he statutory definition of a coal mine plainly contemplates that the facilities used in the work of extracting coal must be located on or below the area of land where the coal is actually extracted from its natural deposit. Section 802(h)[2] speaks in terms of "an area of land" and facilities "placed upon ... the surface of such land" used "in the work of extracting in such area [coal] ... from its natural deposits." The statutory definition therefore contains a geographical component; the facility must be on or below the area of land where coal is naturally found and is being extracted."

38

*Id.* (emphasis added).  *See also, Sec'y of Labor v. Cranesville Aggregate Cos*., 878 F.3d 25, 28 (2d Cir. 2017) ("Under the Mine Act, MSHA has jurisdiction to regulate the working conditions at mines, that is, *sites used for extracting, milling and preparing minerals*.")(emphasis added).

There are also Commission cases which are consistent with the Commission's Decision here. For example, in *Elam*, 4 FMSHRC 5 (Rev. Comm. Jan. 1982), the Commission refrained from exercising jurisdiction over a commercial dock on the Ohio river, holding that while Elam handles coal, Elam did not engage in the "work of preparing coal" under Section 3(h)(1) and declined jurisdiction. The test developed in *Elam* has been applied in later cases. *e.g. Kinder Morgan, LP*, 23 FMSHRC 1288, 1293 & 1296 (Rev. Comm. Dec. 2001).

The Secretary leans strongly on this Court's Decision in *National Cement* II to support its position that Subsections (A), (B) and (C) of Section 3(h)(1) must be read independently. P. Br., p. 26 [JA___]. However, there is more to the *National Cement* cases.  In *National Cement* I, this Court actually rejected the Secretary's initial interpretation of the Mine Act as limitless. See, *National Cement* I, 494 F.3d at 1075, 1076. This Court required the Secretary to fashion a workable and limited definition of "mine." *Id.* at 1077.

On remand, from *National Cement* I, the Secretary altered its approach to Section 3(h)(1)(B) and (C). See, *National Cement*, 30 FMSHRC at 672 (Rev. Comm.

Aug. 2008), *reversed on other grounds* in *National Cement* II, 573 F.3d 788 (2009).[3] Practically, in *National Cement*, the Secretary applied both a functional and geographic limit on MSHA jurisdiction, notwithstanding that the Secretary now wants to assert jurisdiction over equipment and facilities that are removed from the "coal mine" wherever they may be. The Court should reject this *ad hoc* approach to jurisdiction, which this Court has previously disallowed.

The Secretary also cites to *Carolina Stalite Co*., 734 F.2d 1547 (D.C. Cir. 1984) in support of the proposition that a gravel processing facility adjacent to an extraction facility is a mine. P.Br., 27. [JA___]. However, in *Carolina Stalite*, this was a gravel *processing facility* immediately adjacent to the quarry and was engaged in mineral *processing* under Section 3(h)(1)(C). *Carolina Stalite*, 734 F.2d at 1548. The Court also held that *Carolina Stalite* was engaged in "a unified mineral processing operation with Young Stone." [the quarry]. *Id*. at 1551. This case is different from the facts here. Unlike *Carolina Stalite*, KC Transport was not engaged in mineral extraction, milling or processing. It was an independent contract trucking company, separate from the mine.

Similarly, in *Harman Mining Corp. v. FMSHRC*, 671 F.2d 794 (4th Cir. 1981), the Court considered a car dropping facility at Harman Mining Corp.'s

---

[3] In *National Cement* II, this Court was simply determining if the Secretary's proffered interpretation was consistent with the statute. *National Cement* II, 573 F.3d at 797.

JA 295

preparation plant. *Id*. at 794. The Court determined that the car dropping facility located at Harman's preparation plant was "part of Harman's mine" pursuant to Section 3(h)(1)(C) and 3(i) because "Harman's car dropping activities are carried on incident to the loading and storage of its coal and therefore are part of the work done by Harman in preparing its coal for market." *Id.* at 796. This is hardly comparable to an independent trucking company not affiliated with the extraction or preparation facilities of Ramaco.

The Secretary also cites a series of Commission cases that are entirely distinguishable from this case. In *W.J. Bokus Indus., Inc*., 16 FMSHRC 704, 708 (Rev. Comm., Apr. 1984), the facts were different. There, the mine operator *owned* the "equipment" and the operator's *miners were working in the garage* with the cited equipment.

The Secretary also cites to *State of Alaska, Dept. of Transp.*, 36 FMSHRC 2642 (Rev. Comm., Oct. 2014). P. Br. 27 [JA ____], where the Commission found that certain trucks, conveyors, cited loaders and a screener which were all *owned and used by the operator* as a mobile "borrow pit" were a sand and gravel mine. *Id* at 2645. However, when courts cite the *Alaska, Dept. of Transp.* case, they often fail to note the rest of the story. On remand, in *Alaska, Dept. of Transp.*, 38 FMSHRC 122 (ALJ Feldman Jan. 2016), the Secretary vacated a total of five citations, noting:

41

The disposition of this remand matter was delayed to give the Secretary and Alaska the opportunity to resolve conflicts of jurisdiction between MSHA and the Alaska Occupational Safety and Health Administration. On November 18, 2015, the Secretary moved to vacate the five citations at issue…

*Id.* at 123.

The ALJ further noted, "I trust that the parties have resolved this issue through mutual agreement." *Id*. at n. 2.

The Secretary also cites *U.S. Steel Mining Co*., 10 FMSHRC 146, 149 (Feb. 1998), but that case is different from this case since the shop in *U.S. Steel* had a Mine I.D. number, which means the operator had declared it to be a mine. Moreover, it was *owned, supervised and manned by miners employed by the coal operator*. It was also regularly inspected by MSHA and USSM conceded the shop was subject to the Mine Act. *Id*. at 149. Here, the equipment (trucks) and facility were owned, operated and maintained by KC Transport and no miners from Ramaco worked at the facility. Hence, the U.S. Steel case was not at all analogous, and this explains why the Commissions departed from it. *See, KC Transport*, 44 FMSHRC at 324, n. 11.

Giving meaning to each word in the Mine Act, the overall structure of the Mine Act, the Legislative history and the precedent, the Commission appropriately rejected the Secretary's contention that the KC Transport facility and trucks are a mine.

42

E.    **The Commission's Interpretation of the Mine Act Facilitates the Protective Purpose of the Mine Act.**

Having a bright line limit of Mine Act jurisdiction is the best way to ensure that the protective purposes of the Mine Act are fulfilled. Here, the Secretary seeks to assert jurisdiction over an off-site trucking company on a "case-by-case basis," as its resources allow. P. Br., pp. 45-46 [JA ___].  Such a fluid approach is inconsistent with the protective purpose of the Mine Act because the regulated community does not know which regulations to follow.

The Commission noted the importance of exercising Mine Act jurisdiction in cases involving mining hazards. Here, KC Transport is an independent trucking company. The Commission aptly held:

> Congress tailored the Mine Act to protect against dangers that arise from handling coal and other minerals, not generic risks associated with making or repairing equipment…. (emphasizing that employees deserve the same protections as miners if they are subject to the same risks). Jurisdiction over an independent and offsite truck repair facility, not exposing employees to any hazards associated with the mining process, does not serve the Mine Act's purpose.

*Id.* at 226 (citations omitted).

The Occupational Safety and Health Act ("OSH Act") is the most broadly applicable statute regarding the safety and health aspects of working conditions of American workers. *See, e.g., Westwood Energy Properties*, 11 FMSHRC 2408, 2412 (Rev. Comm. Dec. 1989). It gives OSHA jurisdiction over virtually all workplaces,

43

except those where it is preempted by another federal agency that has statutory authority over matters of occupational safety and health. 29 U.S.C. § 653(b)(1).

Section 3(h)(1) of the Mine Act (30 U.S.C. § 802(h)(1)) defines "coal or other mine." Despite the Mine Act's Broad definition of "mine," MSHA's jurisdiction is limited, however, by the language of the Mine Act to those locations and activities discussed in the Mine Act. Outside of those limitations, OSHA has jurisdiction. Here, MSHA never previously exercised jurisdiction over KC Transport, an independent trucking company. Nor is there any evidence that MSHA sought jurisdiction over the adjacent logging company sharing the parking lot with KC Transport. The protective purpose of the Mine Act is best facilitated when the regulated community clearly knows which set of regulations apply.

## II.     The Secretary's Interpretation of Sections 3 and 4 of the Mine Act are Unreasonable and not Entitled to Deference.

Section 3(h)(1)(C) of the Mine Act is not ambiguous as to the issues before this Court. Nor does the Secretary identify any particular ambiguities in Section 3(h)(1), merely asserting "[i]f Section 3(h)(1) is ambiguous…" P. Br. 38. Asserting the possibility of ambiguity is not the same thing as identifying it. Moreover, K C Transport cannot respond to an alleged ambiguity that is not identified. This Court has noted that "Chevron step 2 deference is reserved for those instances when an agency recognizes that the Congress's intent is not plain from the statute's face." *National Cement* I, 494 F.3d at 1075 (citations omitted). Thus, absent the

44

identification of actual ambiguities, this Court should not even consider the reasonableness of an agency's position.

Even if Section 3(h)(1)(C) is ambiguous, for the reasons apparent throughout this Response, the Secretary's interpretation of Section 3(h)(1)(C) is unreasonable and not entitled to deference. In the most recent iteration of the Secretary's version of MSHA's jurisdiction in this case, the Secretary contends that all facilities and equipment "used in, or to be used in mining" remain subject to MSHA jurisdiction without regard to location. P. Br., p. 31 [JA___]. Since this interpretation is limitless, unreasonable and unworkable and since it conflicts with the expressed intent of Congress found in the text of Sections 3 and 4 of the Mine Act, it is unreasonable and not entitled to deference. See *Chevron, U.S.A., Inc. v. NRDC, Inc.*, 467 U.S. 837, 842–43 (1984) ("If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."). The Commission (and the Sixth Circuit in *Maxxim*) correctly found that such a broad and limitless approach leads to absurd results concerning both facilities and equipment.  *KC Transport*, 44 FMSHRC as 225-226. [JA ___].[4]

The Secretary attempts to ameliorate the potential for boundless jurisdiction by assuring this Court that, consistent with past practice, it will exercise discretion

---

[4] The ALJ also found that this interpretation was absurd, but only as to the trucks. *KC Transport, Inc.*, 42 FMSHRC at 237. [JA___].

45

and MSHA inspectors will not be "descending on private toolsheds, independent hardware stores, or diner parking lots…" P. Br. 34 [JA____]. The Court may note that conspicuously absent from the list of places Inspectors will not visit are off-site manufacturing facilities, off-site independent trucking companies and off-site trucks. As noted *supra*, this Court previously rejected such an *ad hoc* and imprecise approach. *See, National Cement* I, 494 F.3d at 1076. The Secretary's fluid interpretation of the Mine Act is *prima facie* unreasonable.

In its Brief, the Secretary asserts that its view of jurisdiction is "distinct from 'lands' and 'roads,'" that it advances the protective purpose of the Mine Act, that it is consistent with the Commission's holdings in *W.J. Bokus*, 16 FMSHRC at 708 and *Jim Walter*, 22 FMSHRC at 21 and, that the MSHA can express its views through its citations. P. Br., pp. 39-41. [JA____]. All but the last of these points has already been addressed above.

As to the last point, if the Secretary's limitless approach is correct, MSHA could simply decide at a whim to cite itself into the "private toolsheds, independent hardware stores, or diner parking lots" it now disclaims. Also, in *Martin*, the Supreme Court only addressed the issuance of a citation interpreting a regulation promulgated by the Secretary and not the jurisdictional statute promulgated by Congress. *Martin*, 499 U.S. at 150. Rather, where the Secretary seeks to interpret the Mine Act, this Court analyzes the effort using the "two step Chevron standard."

*CalPortland Co.*, 839 F.3d at 1162. If the statute is unambiguous, using the traditional tools of statutory construction, it is applied by the reviewing court. *Id.* at 1162-65. If the statute is ambiguous, then courts consider if the Secretary's interpretation is reasonable. *Id.* This Court has noted that "[a]n agency has no power to 'tailor' legislation to bureaucratic policy goals by rewriting unambiguous statutory terms." *Id.* (citations omitted). Here, where the Secretary's proffered interpretation is contrary to the statute and unreasonable, it cannot receive deference, nor can the Secretary express an unreasonable view through enforcement.

The Commission and the Sixth Circuit in *Maxxim* appropriately analyzed the unambiguous text and structure of Sections 3 and 4 of the Mine Act and determined that the Mine Act includes both a functional and locational aspect when requiring the equipment and facilities to be: "located on or appurtenant to a mine site and … engaged in any extraction, milling, preparation, or other activities within the scope of subsection 3(h)(1)(A)" *KC Transport, Inc.*, 44 FMSHRC at 225.

The Commission did not improperly substitute its own competing view for that of the Secretary. Rather, the Commission simply declined the effort to expand the statutory definition of "mine" outside the bounds of the Mine Act. It is neither the law nor the intent of the law that any equipment or facility "used, or to be used in mining" is a "mine," regardless of its location.

47

Therefore, the Commission correctly rejected the ALJ's unreasonable definition of the term "mine."

## III.    When finding that Independent Contractors are only operators when performing services at the Mine, the Commission was merely quoting the Mine Act for Context.

The Secretary now complains that the Commission "lacked jurisdiction to conclude that independent contractors could be considered operators only when physically performing services at a mine." P. Br., p. 44 [JA___].  In this regard, the Commission noted:

> Operators" fall into two categories, as noted above. An entity that does not own, lease, operate, control, or supervise a coal or other mine is an "operator" only when that entity, acting as an independent contractor, physically performs services at a mine. 30 U.S.C. § 802(d).

> When KC Transport's trucks are at its parking area off the mine site, the trucks are not performing services at a mine, and KC Transport is not an "operator" for the Act's purposes.

*KC Transport*, 44 FMSHRC at 221-222.

It is clear that the Commission was simply quoting from and applying 30 U.S.C. § 802(d), which provides:

> (d) "operator" means any owner, lessee, or other person who operates, controls, or supervises a coal or other mine *or* any independent contractor performing services or construction at such mine;

The Commission did nothing wrong by quoting a related statute to help explain the meaning of a nearby subsection 30 U.S.C. § 802(h)(1). The Commission cannot conduct statutory analysis without examining the surrounding regulations.

48

The Commission's point was simply that for § 802(d) to have meaning, there must be a difference between an operator of a coal mine--Ramaco here and an independent contractor--KC Transport here.

If the off-site facilities and equipment of independent contractors automatically become a "mine" once their equipment or services are "used in, or to be used in mining," then the second clause of 30 U.S.C. § 802(d) ("when performing services or construction at the mine") becomes meaningless because every independent contractor would become an operator, even when not performing services at the mine.

The Commission makes the valid point that this distinction explains why an independent contractor, like KC Transport is not an operator when not performing services at a mine and why jurisdiction is locational. In no way did this observation run afoul of 30 U.S.C. § 823(d)(2). No doubt the meaning of 30 U.S.C. § 823(h)(1) and its relationship to nearby statutes was before the Commission. Also, unlike a contractor performing services at the mine site, where the operator has control, it would not be appropriate for Ramaco to be held liable for an independent off-site trucking company's maintenance and repair facility, over which it has no control or expertise.

It appears that the Secretary is primarily sensitive to the Commission's comments on § 802(d) because of *Musser Eng'g, Inc*., 32 FMSHRC 1257, 1266-69.

JA 304

P. Br., p. 46 [JA___]. Nothing in the Commission decision overruled *Musser*. In *Musser*, the Court found Musser to be an independent contractor performing services "at the mine." In that case, Musser

> prepared the original permit application including the maps that were an integral part of securing a mining permit from state and federal authorities. … Once Musser engineer Secor certified the state permit application map that indicated the boundaries of the Harrison No. 2 Mine, all future mine maps, including mine maps submitted to MSHA, were prepared using that map as the "base map."

*Id*. at 1267.

Thus, Musser was acting as the mine engineer and performing duties normally performed by the operator. *See, e.g.*, 30 C.F.R. § 75.1200 ("The operator of a coal mine shall have in a fireproof repository located in an area on the surface of the mine… an accurate and up-to-date map of such mine drawn on scale. Such map shall show: (a) The active workings…")

Importantly, the *Musser* Court held:

> there is substantial evidence to support the finding that Musser's work was performed, in part, *at the mine site*. This conclusion is supported by Musser's time records contained in Musser Exhibit 4. These time records indicate *repeated visits to the mine site for work related to the permitting process, including surveying, field investigations, and water sampling*.

*Id*. at 1269 (emphasis added).

The Commission's comments on the distinction between operators and independent contractors was simply to provide additional support for the

50

Commission's interpretation of the Mine Act and Section 3(h)(1)(C). There is no basis for the Court to disregard the Commission's limited comments on the distinction between an operator and an independent contractor.

## **CONCLUSION**

For all of the reasons stated above, KC Transport respectfully requests that this Court affirm the Decision of the Commission that Section 3(h)(1)(C) of the Mine Act requires both a functional and locational nexus to the extraction, milling or preparation of coal in order to be a mine. Under the facts of this case, neither the Emmett facility nor the trucks at this off-site independent trucking facility were a "mine." Therefore, this Court should affirm the Commission's well-reasoned decision.

Respectfully submitted,

KC TRANSPORT, INC.
By Counsel:

/s/ James P. McHugh
James P. McHugh (D.C. Bar No. 56277)
Christopher D. Pence (D.C. Bar No. 53362)
HARDY PENCE, PLLC
10 Hale Street, 4th Floor
Charleston, WV 25301
304-345-7250 (office)
304-553-7227 (fax)
jmchugh@hardypence.com
cpence@hardypence.com

51

JA 306

## <u>CERTIFICATE OF COMPLIANCE</u>

1.   This brief complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. R. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

  [ X ] this brief contains [*12,366*] words.

  [   ] this brief uses a monospaced type and contains [*state the number of*] lines of text.

2.   This brief document complies with the typeface and type style requirements because:

  [ X ] this brief has been prepared in a proportionally spaced typeface using [*Microsoft Word 365*] in [*14pt Times New Roman*]; *or*

  [   ] this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].

Dated: <u>September 28, 2022</u>          <u>/s/ James P. McHugh</u>
                                                       *Counsel for Respondent*
                                                         *KC Transport, Inc.*

JA 307

<u>**CERTIFICATE OF FILING AND SERVICE**</u>

I hereby certify that on this 28th day of September, 2022, I caused this Page-Proof Brief of Respondent KC Transport, Inc. to be filed electronically with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users:

Susannah H. Maltz
Emily T. Scott
U.S. DEPARTMENT OF LABOR
MINE SAFETY & HEALTH ADMINISTRATION
201 12th Street South, Suite 401
Arlington, VA  22202

*Counsel for Petitioner Secretary of Labor,*
 *Mine Safety and Health Administration*

Thaddeus Jason Riley
OFFICE OF GENERAL COUNSEL
 FEDERAL MINE SAFETY AND HEALTH REVIEW COMMISSION
1331 Pennsylvania Ave., NW, Suite 520N
Washington, D.C.  20004

*Counsel for Respondent Federal Mine Safety and*
 *Health Review Commission*

/s/ James P. McHugh
*Counsel for Respondent*
 *KC Transport, Inc.*

JA 308

# <u>ADDENDUM</u>

# TABLE OF CONTENTS

**Addendum Page**

30 U.S.C. § 802 ...................................................................................Add1

30 U.S.C. § 803 ...................................................................................Add3

30 U.S.C. § 823 ...................................................................................Add3

30 C.F.R. § 75.1200 ...........................................................................Add7

## 30 U.S.C. § 802. Definitions

For the purpose of this chapter, the term—

(a) "Secretary" means the Secretary of Labor or his delegate;

(b) "commerce" means trade, traffic, commerce, transportation, or communication among the several States, or between a place in a State and any place outside thereof, or within the District of Columbia or a possession of the United States, or between points in the same State but through a point outside thereof;

(c) "State" includes a State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, American Samoa, Guam, and the Trust Territory of the Pacific Islands;

(d) "operator" means any owner, lessee, or other person who operates, controls, or supervises a coal or other mine or any independent contractor performing services or construction at such mine;

(e) "agent" means any person charged with responsibility for the operation of all or a part of a coal or other mine or the supervision of the miners in a coal or other mine;

(f) "person" means any individual, partnership, association, corporation, firm, subsidiary of a corporation, or other organization;

(g) "miner" means any individual working in a coal or other mine;

(h)(1) "coal or other mine" means (A) an area of land from which minerals are extracted in nonliquid form or, if in liquid form, are extracted with workers underground, (B) private ways and roads appurtenant to such area, and (C) lands, excavations, underground passageways, shafts, slopes, tunnels and workings, structures, facilities, equipment, machines, tools, or other property including impoundments, retention dams, and tailings ponds, on the surface or underground, used in, or to be used in, or resulting from, the work of extracting such minerals from their natural deposits in nonliquid form, or if in liquid form, with workers underground, or used in, or to be used in, the milling of such minerals, or the work of preparing coal or other minerals, and includes custom coal preparation facilities. In making a determination of what constitutes mineral milling for purposes of this chapter, the Secretary shall give due consideration to the convenience of administration resulting from the delegation to one Assistant Secretary of all

JA 311

authority with respect to the health and safety of miners employed at one physical establishment;

(2) For purposes of subchapters II, III, and IV of this chapter, "coal mine" means an area of land and all structures, facilities, machinery, tools, equipment, shafts, slopes, tunnels, excavations, and other property, real or personal, placed upon, under, or above the surface of such land by any person, used in, or to be used in, or resulting from, the work of extracting in such area bituminous coal, lignite, or anthracite from its natural deposits in the earth by any means or method, and the work of preparing the coal so extracted, and includes custom coal preparation facilities;

(i) "work of preparing the coal" means the breaking, crushing, sizing, cleaning, washing, drying, mixing, storing, and loading of bituminous coal, lignite, or anthracite, and such other work of preparing such coal as is usually done by the operator of the coal mine;

(j) "imminent danger" means the existence of any condition or practice in a coal or other mine which could reasonably be expected to cause death or serious physical harm before such condition or practice can be abated;

(k) "accident" includes a mine explosion, mine ignition, mine fire, or mine inundation, or injury to, or death of, any person;

(*l*) "mandatory health or safety standard" means the interim mandatory health or safety standards established by subchapters II and III of this chapter, and the standards promulgated pursuant to subchapter I of this chapter;

(m) "Panel" means the Interim Compliance Panel established by this chapter; and

(n) "Administration" means the Mine Safety and Health Administration in the Department of Labor.

(*o*) "Commission" means the Federal Mine Safety and Health Review Commission.

(Pub. L. 91–173, §3, Dec. 30, 1969, 83 Stat. 743; Pub. L. 95–164, title I, §102(b), Nov. 9, 1977, 91 Stat. 1290.)

**30 U.S.C. § 803. Mines subject to coverage**

Each coal or other mine, the products of which enter commerce, or the operations or products of which affect commerce, and each operator of such mine, and every miner in such mine shall be subject to the provisions of this chapter.

(Pub. L. 91–173, §4, Dec. 30, 1969, 83 Stat. 744; Pub. L. 95–164, title I, §102(c), Nov. 9, 1977, 91 Stat. 1291.)

**30 U.S.C. § 823. Federal Mine Safety and Health Review Commission**

**(a) Establishment; membership; chairman**

The Federal Mine Safety and Health Review Commission is hereby established. The Commission shall consist of five members, appointed by the President by and with the advice and consent of the Senate, from among persons who by reason of training, education, or experience are qualified to carry out the functions of the Commission under this chapter. The President shall designate one of the members of the Commission to serve as Chairman.

**(b) Terms; personnel; administrative law judges**

(1) The terms of the members of the Commission shall be six years, except that—

(A) members of the Commission first taking office after November 9, 1977, shall serve, as designated by the President at the time of appointment, one for a term of two years, two for a term of four years and two for a term of six years; and

(B) a vacancy caused by the death, resignation, or removal of any member prior to the expiration of the term for which he was appointed shall be filled only for the remainder of such unexpired term.

Any member of the Commission may be removed by the President for inefficiency, neglect of duty, or malfeasance in office.

(2) The Chairman shall be responsible on behalf of the Commission for the administrative operations of the Commission. The Commission shall appoint such employees as it deems necessary to assist in the performance of the Commission's functions and to fix their compensation in accordance with the provisions of chapter 51 and subchapter III of chapter 53 of title 5, relating to classification and

JA 313

general pay rates. Upon the effective date of the Federal Mine Safety and Health Amendments Act of 1977, the administrative law judges assigned to the Arlington, Virginia, facility of the Office of Hearings and Appeals, United States Department of the Interior, shall be automatically transferred in grade and position to the Federal Mine Safety and Health Review Commission. Notwithstanding the provisions of section 559 of title 5, the incumbent Chief Administrative Law Judge of the Office of Hearings and Appeals of the Department of the Interior assigned to the Arlington, Virginia facility shall have the option, on the effective date of the Federal Mine Safety and Health Amendments Act of 1977, of transferring to the Commission as an administrative law judge, in the same grade and position as the other administrative law judges. The administrative law judges (except those presiding over Indian Probate Matters) assigned to the Western facilities of the Office of Hearings and Appeals of the Department of the Interior shall remain with that Department at their present grade and position or they shall have the right to transfer on an equivalent basis to that extended in this paragraph to the Arlington, Virginia administrative law judges in accordance with procedures established by the Director of the Office of Personnel Management. The Commission shall appoint such additional administrative law judges as it deems necessary to carry out the functions of the Commission. Assignment, removal, and compensation of administrative law judges shall be in accordance with sections 3105, 3344, 5362 and 7521 of title 5.

**(c) Delegation of powers**

The Commission is authorized to delegate to any group of three or more members any or all of the powers of the Commission, except that two members shall constitute a quorum of any group designated pursuant to this paragraph.

**(d) Proceedings before administrative law judge; administrative review**

(1) An administrative law judge appointed by the Commission to hear matters under this chapter shall hear, and make a determination upon, any proceeding instituted before the Commission and any motion in connection therewith, assigned to such administrative law judge by the chief administrative law judge of the Commission or by the Commission, and shall make a decision which constitutes his final disposition of the proceedings. The decision of the administrative law judge of the Commission shall become the final decision of the Commission 40 days after its issuance unless within such period the Commission has directed that such decision shall be reviewed by the Commission in accordance with paragraph

(2). An administrative law judge shall not be assigned to prepare a recommended decision under this chapter.

(2) The Commission shall prescribe rules of procedure for its review of the decisions of administrative law judges in cases under this chapter which shall meet the following standards for review:

(A)(i) Any person adversely affected or aggrieved by a decision of an administrative law judge, may file and serve a petition for discretionary review by the Commission of such decision within 30 days after the issuance of such decision. Review by the Commission shall not be a matter of right but of the sound discretion of the Commission.

(ii) Petitions for discretionary review shall be filed only upon one or more of the following grounds:

(I) A finding or conclusion of material fact is not supported by substantial evidence.

(II) A necessary legal conclusion is erroneous.

(III) The decision is contrary to law or to the duly promulgated rules or decisions of the Commission.

(IV) A substantial question of law, policy or discretion is involved.

(V) A prejudicial error of procedure was committed.

(iii) Each issue shall be separately numbered and plainly and concisely stated, and shall be supported by detailed citations to the record when assignments of error are based on the record, and by statutes, regulations, or principal authorities relied upon. Except for good cause shown, no assignment of error by any party shall rely on any question of fact or law upon which the administrative law judge had not been afforded an opportunity to pass. Review by the Commission shall be granted only by affirmative vote of two of the Commissioners present and voting. If granted, review shall be limited to the questions raised by the petition.

(B) At any time within 30 days after the issuance of a decision of an administrative law judge, the Commission may in its discretion (by affirmative vote of two of the Commissioners present and voting) order the case before it for review but only upon the ground that the decision may be contrary to law or Commission policy, or

that a novel question of policy has been presented. The Commission shall state in such order the specific issue of law, Commission policy, or novel question of policy involved. If a party's petition for discretionary review has been granted, the Commission shall not raise or consider additional issues in such review proceedings except in compliance with the requirements of this paragraph.

(C) For the purpose of review by the Commission under paragraph (A) or (B) of this subsection, the record shall include: (i) all matters constituting the record upon which the decision of the administrative law judge was based; (ii) the rulings upon proposed findings and conclusions; (iii) the decision of the administrative law judge; (iv) the petition or petitions for discretionary review, responses thereto, and the Commission's order for review; and (v) briefs filed on review. No other material shall be considered by the Commission upon review. The Commission either may remand the case to the administrative law judge for further proceedings as it may direct or it may affirm, set aside, or modify the decision or order of the administrative law judge in conformity with the record. If the Commission determines that further evidence is necessary on an issue of fact it shall remand the case for further proceedings before the administrative law judge.

(The provisions of section 557(b) of title 5 with regard to the review authority of the Commission are expressly superseded to the extent that they are inconsistent with the provisions of subparagraphs (A), (B), and (C) of this paragraph.)

**(e) Witnesses and evidence; subpoenas; contempt**

In connection with hearings before the Commission or its administrative law judges under this chapter, the Commission and its administrative law judges may compel the attendance and testimony of witnesses and the production of books, papers, or documents, or objects, and order testimony to be taken by deposition at any stage of the proceedings before them. Any person may be compelled to appear and depose and produce similar documentary or physical evidence, in the same manner as witnesses may be compelled to appear and produce evidence before the Commission and its administrative law judges. Witnesses shall be paid the same fees and mileage that are paid witnesses in the courts of the United States and at depositions ordered by such courts. In case of contumacy, failure, or refusal of any person to obey a subpoena or order of the Commission or an administrative law judge, respectively, to appear, to testify, or to produce documentary or physical evidence, any district court of the United States or the United States courts of any territory or possession, within the jurisdiction of which such person is found, or resides, or transacts business, shall, upon the application of the Commission, or the

JA 316

administrative law judge, respectively, have jurisdiction to issue to such person an order requiring such person to appear, to testify, or to produce evidence as ordered by the Commission or the administrative law judge, respectively, and any failure to obey such order of the court may be punished by the court as a contempt thereof.

(Pub. L. 91–173, title I, §113, as added Pub. L. 95–164, title II, §201, Nov. 9, 1977, 91 Stat. 1313; 1978 Reorg. Plan No. 2, §102, eff. Jan. 1, 1979, 43 F.R. 36037, 92 Stat. 3783.)

## 30 C.F.R. § 75.1200 Mine Map.

The operator of a coal mine shall have in a fireproof repository located in an area on the surface of the mine chosen by the mine operator to minimize the danger of destruction by fire or other hazard, an accurate and up-to-date map of such mine drawn on scale.
Such map shall show:
(a) The active workings;
(b) All pillared, worked out, and
abandoned areas, except as provided in this section;
(c) Entries and aircourses with the direction of airflow indicated by arrows;
(d) Contour lines of all elevations;
(e) Elevations of all main and cross or side entries;
(f) Dip of the coalbed;
(g) Escapeways;
(h) Adjacent mine workings within 1,000 feet;
(i) Mines above or below;
(j) Water pools above; and
(k) Either producing or abandoned oil and gas wells located within 500 feet of such mine and any underground area of such mine; and,
(l) Such other information as the Secretary may require. Such map shall identify those areas of the mine which have been pillared, worked out, or abandoned, which are inaccessible or cannot be entered safely and on which no information is available.

JA 317

ORAL ARGUMENT SET FOR DECEMBER 15, 2022

# No. 22-1071

## UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Secretary of Labor,
Mine Safety and Health Administration,
Petitioner

*v.*

KC Transport, Inc. and
Federal Mine Safety and Health Review Commission,
Respondents

On Petition for Review of a Decision of the
Federal Mine Safety and Health Review Commission

Reply Brief for the Secretary of Labor

SEEMA NANDA
Solicitor of Labor

APRIL E. NELSON
Associate Solicitor

EMILY TOLER SCOTT
Counsel for Appellate Litigation

SUSANNAH M. MALTZ
Attorney
U.S. Department of Labor
Office of the Solicitor
Division of Mine Safety & Health
201 12th Street South, Ste. 401
Arlington, VA 22202
(202) 693-5393

JA 318

# Table of Contents

Table of Authorities ........................................................................... iii

Glossary ............................................................................................ vi

Summary of Argument....................................................................... 1

Argument ........................................................................................... 4

  1.  Standard of review ..................................................................... 4

  2.  The definition of "mine" in section 3(h)(1)(C) is based on function and does not require any particular location. ................................................................ 5

    2.1   There is no locational requirement in the statutory text. ......................... 6

    2.2  Previous case law interpretations make clear that location is relevant, but not necessary. ....................................................................... 8

    2.3  There is no support for a locational requirement in the legislative history. 12

  3.  The Secretary's interpretation has been consistent and is reasonable. ......... 14

    3.1  The Secretary's interpretation has been consistent. ............................. 14

    3.2  The statute is broad as written, and if it is ambiguous, the Secretary's interpretation is not arbitrary or unfair; it is simply as broad as the statute is...17

  4.  The Emmett facility and trucks were "used in" mining............................... 22

  5.  The Commission did more than merely "quote the statute" when it announced a new requirement for MSHA to have jurisdiction over independent contractors. ....................................................................... 27

Conclusion ....................................................................................... 28

Certificate of Compliance with Type-Volume Limit,  Typeface Requirements, and Type-Style Requirements ......................................................................... a

Certificate of Service........................................................................ b

Addendum – Pertinent Statutes and Regulations..................................... c

JA 319

# Table of Authorities

## Cases

*Am. Coal Co.* v. *FMSHRC*,
  796 F.3d 18 (D.C. Cir. 2015) ...……………………………………………... 20, 23

*Barbour* v. *Browner*,
   181 F.3d 1342 (D.C. Cir. 1999) ...…………………………………….….... 22

*Bush & Burchett, Inc.* v. *Reich*,
  117 F.3d 932 (6th Cir. 1997) ………………………………………………….. 11

*Director, OWCP* v. *Ziegler Coal Co.*,
  853 F.2d 529 (7th Cir. 1988) ………………………………………………… 11

*Donovan* v. *Carolina Stalite Co.*,
  734 F.2d 1547 (D.C. Cir. 1984) …………………………….….... 2, 3, 10, 12, 17

*Environmental Defense Fund* v. *EPA*,
  82 F.3d 451 (D.C. Cir. 1996) …………………………………………….… 18

*Freeman United Coal Min. Co.* v. *FMSHRC*,
  108 F.3d 358, 362 (D.C. Cir. 1997) …………………………………….….. 20

*Herman* v. *Assoc. Electric Coop., Inc.*,
  172 F.3d 1078 (8th Cir. 1999) ………………………………………… 9, 24, 25

*Jim Walter Res., Inc.* v. *Sec'y of Labor*,
  103 F.3d 1020 (D.C. Cir. 1997) ………………….….……………………... 23

*Mainline Rock & Ballast, Inc.* v. *Sec'y of Labor*,
  693 F.3d 1181 (10th Cir. 2012) ……………………………………………… 23

*Authorities on which this brief chiefly relies are marked with an asterisk.

iii

*Maxxim Rebuild Co., LLC* v. *FMSHRC*,
848 F.3d 737 (6th Cir. 2017) ……………………………………………………. 9

*Pennsylvania Electric Company* v. *FMSHRC*,
969 F.2d 1501 (3d Cir. 1993) …………………………………………….. 24, 26

*Sec'y of Labor* v. *Excel Mining*, LLC,
334 F.3d 1 (D.C. Cir. 2003) ……………………………………………….. 5

*Sec'y of Labor* v. *Nat'l Cement Co. of Cal., Inc.*,
494 F.3d 1066 (D.C. Cir. 2007) …………………………………………….. 15

*\*Sec'y of Labor* v. *Nat'l Cement Co. of Cal., Inc.*,
573 F.3d 788 (D.C. Cir. 2009) …………………………... 1, 3, 5, 7, 8, 16, 17, 19 25

*Sec'y of Labor* v. *Twentymile Coal Co.*,
456 F.3d 151 (D.C. Cir. 2006) …………………………………………….. 4, 5

*U.S.* v. *Menasche*,
348 U.S. 528 (1955) ……………………………………………………….... 7

## Federal Mine Safety and Health Review Commission Decisions

*Austin Powder Co.*,
29 FMSHRC 909 (Nov. 2007) …….....……………………………….. 19, 20, 24

*KenAmerican Res., Inc.*,
42 FMSHRC 1 (Jan. 2020) …………………………………………… 3, 15

*Oliver M. Elam, Jr., Company*,
4 FMSHRC 5 (Jan. 1982) …………………………………….... 10, 24, 25

*Southern Ohio Coal Co.*,
13 FMSHRC 912 (June 1991) ……………………………………….. 26, 27

iv

*State of Alaska, Dep't of Transp.*,
   36 FMSHRC 2642 (Oct. 2014) ……………………...……………….... 11

*U.S. Steel Mining Co., Inc.*,
   10 FMSHRC 146 (Feb. 1988) …………………………………….. 11, 24

*W.J. Bokus Indus., Inc.*,
   16 FMSHRC 704 (Apr. 1994) ……………………………………... 11, 12

**Statutes**

30 U.S.C. 801 ………………………………………………........................ 19

30 U.S.C. 802(h)(1)(A) …………………………...…………............. 2, 6, 7, 8, 9, 14

30 U.S.C. 802(h)(1)(B) …………………………………….............. 6, 8, 15, 16, 25

*30 U.S.C. 802(h)(1)(C) ………... 1, 2, 3, 5, 6, 7, 8, 9, 10, 12, 13, 14, 15, 16, 17, 18, 27

30 U.S.C. 802(i) …………………………………………….................. 9, 26

30 U.S.C. 813(a) ………………………………………………................. 21

30 U.S.C. 814 …………………………………………………..……….... 21

30 U.S.C. 816(a)(1) ………………………………………..…………….... 23

**Miscellaneous**

S. Rep. No. 95-181 (1977) ………………………………………..……… 2, 12, 19

JA 322

## Glossary

| | |
|---|---|
| ALJD | Citations to the Underlying Administrative Law Judge Decision |
| Comm. | Citations to the Underlying Federal Mine Safety and Health Review Commission Decision |
| Mine Act | Federal Mine Safety and Health Act of 1977 |
| MSHA | Mine Safety and Health Administration |
| OSH Act | Occupational Safety and Health Act of 1970 |
| OSHA | Occupational Safety and Health Administration |
| JA | Citations to the Joint Appendix[1] |

---

[1] Per the Court's briefing schedule, the deferred joint appendix will be filed by October 26, 2022 and the final briefs with updated citations to the joint appendix will be filed by November 9, 2022. Citations to the joint appendix in this brief appear in this form: [JA ___] and will be updated with page numbers in the final briefs.

JA 323

## Summary of Argument

The Secretary explained in his opening brief that equipment and facilities used in mining are "mines" within the plain meaning of section 3(h)(1)(C) of the Mine Act. None of KC Transport's arguments undermine that conclusion.

KC Transport is confused about de novo review. Both parties agree that the interpretive question—whether, under section 3(h)(1)(C) of the Mine Act, equipment and facilities used in mining constitute "mines," regardless of location—is reviewed de novo by this Court. But KC Transport suggests that de novo review forecloses deference to the Secretary when appropriate (when the statute is ambiguous, *e.g.*, or when it implicates a policy choice). That is wrong—de novo review means that no deference is given to the underlying decision (here, the Commission's view); it does not mean no deference is given to the Secretary. See *Sec'y of Labor* v. *Nat'l Cement Co. of Cal., Inc.*, 573 F.3d 788, 793 (D.C. Cir. 2009) (deferring to the Secretary on the interpretation of "mine" under section 3(h)(1)(B) after determining that the statutory language was ambiguous).

KC Transport repeats the central tenet of the Commission's incorrect interpretation: that under subsection (C), MSHA has jurisdiction over equipment and facilities only if they have both a functional *and* locational relationship to extraction sites. But the statute has no locational requirement. KC Transport

1

argues that the words "on the surface and underground" mean "on an area of land as described in subsection (A)." But that reading would make subsection (C) pure repetition. And Congress did not write a meaningless subsection. In fact, in addition to writing in subsection (C) that equipment and facilities used in mining are mines, Congress was clear that "what is considered to be a mine and to be regulated under this Act [is to] be given the *broadest possible interpretation*." S. Rep. No. 95-181, at 14 (1977) (emphasis added). And where doubts exist as to jurisdiction, the matter should be "resolved in favor of inclusion . . . within the coverage of the Act." *Ibid.* KC Transport ignores this history.

This Court has been clear that subsection (C) "does not require that… [items included in that subsection] … be located on property where… extraction occurs." *Donovan* v. *Carolina Stalite Co.*, 734 F.2d 1547, 1554 (D.C. Cir. 1984). KC Transport nevertheless relies on case law that it claims demonstrates subsection (C) has a locational requirement. But none of the cited cases do; at most, the case law makes clear that location can be relevant to determining whether something is "used in" mining.  The Secretary agrees—location can be relevant to the inquiry, but it is not required.

None of KC Transport's interpretive arguments overcomes the plain meaning of the statute. The statute's meaning is plain. But if this Court finds the statute

2

ambiguous, the Secretary's interpretation is entitled to deference. KC Transport dedicates most of its response to arguing that, if subsection (C) is ambiguous, the Secretary's interpretation should not get deference because it has been inconsistent and is overbroad. It is not.

The Secretary's interpretation has been consistent over the course of this litigation and over the past decades. KC Transport suggests that because the Secretary asserted jurisdiction initially over the coal trucks, and on appeal over both the trucks and the Emmett facility, the Secretary has "flip-flop[ped]." But the Secretary's interpretation has remained static—the Secretary has consistently argued that subsection (C) is an independent basis for jurisdiction, no matter which item it is applied to. And the Secretary may defend an ALJ's decision based on anything in the record. See *KenAmerican Res., Inc.*, 42 FMSHRC 1, 8 n.13 (Jan. 2020) (citing *Mass. Mut. Life Ins. Co. v. Ludwig*, 426 U.S. 479, 480-481 (1976)). More generally, the Secretary has advanced this independent-basis interpretation for decades. See, *e.g.*, *Nat'l Cement*, 573 F.3d 795; *Carolina Stalite*, 734 F.2d 1551-1552, 1555.

KC Transport complains that the Secretary's interpretation is too broad. It is broad, that is true. It is as broad as the statute is, and no broader. Far from being "limitless," as KC Transport alleges, it is limited to equipment and facilities used

3

in, or to be used in, one of the mining functions listed in the statute (extraction, milling, coal preparation). MSHA regulates the mining industry, but KC Transport insists that OSHA has jurisdiction over the coal trucks and Emmett facility, presumably because it is agency-shopping for the safety-and-health regime it thinks is the least stringent. But Congress has made it clear that MSHA has jurisdiction over equipment and facilities used in mining.

## Argument

### 1. Standard of review

KC Transport misunderstands the Secretary's characterization of the standard of review, suggesting that the Secretary has contrived a more limited standard because the case, at heart, involves a policy dispute. KC Br. 14, [JA___].

What constitutes a "mine" under section 3(h)(1) of the Mine Act is a question of statutory interpretation. Legal questions—such as interpretive questions— are reviewed de novo. *Sec'y of Labor* v. *Twentymile Coal Co.*, 456 F.3d 151, 156 (D.C. Cir. 2006). The Secretary does not suggest, as KC Transport implies, that a different standard of review applies. De novo review requires the Court to examine the issue without deference to the underlying decision; this Court must scrutinize the interpretive question without deference to the Commission's interpretation.

But de novo review does not preclude a court from deferring to an agency when appropriate. If the statute's meaning is plain, the court applies that meaning. If the statute is ambiguous, the Court gives *Chevron* deference to the Secretary's interpretation if it is reasonable. *Sec'y of Labor* v. *Excel Mining,* LLC, 334 F.3d 1, 5-6 (D.C. Cir. 2003). And if differing interpretations come down to different policy preferences, the Court defers to the Secretary's policy choice, because the Secretary has policymaking authority (an authority Congress conferred on the agency). *Twentymile Coal Co.*, 456 F.3d at 160-161. Deference to the policymaker on a question of policy is not inconsistent with de novo review. Interpreting statutory definitions, including the definition of "mine," "clearly involves a policy choice at the core of [the Secretary's] regulatory mission under the Mine Act." *Nat'l Cement*, 573 F.3d at 793. If, as here, the Commission engages in statutory interpretation to reach a desired policy outcome, the Court should reject that and defer to the Secretary's choice.

## 2.  The definition of "mine" in section 3(h)(1)(C) is based on function and does not require any particular location.

KC Transport resurrects some interpretive arguments from the Commission decision, arguing that subsection (C) requires both a "functional nexus" (that the

5

items be "used in" mining[2]) *and* a "locational nexus" (the items must be on an "area of land" as described in subsection (A) or a road as described in subsection (B)). This is wrong. The plain meaning of the statute contains the functional requirement ("used in") but no locational requirement.

### 2.1    There is no locational requirement in the statutory text.

KC Transport argues that because subsection (C) describes items that are "on the surface or underground," equipment and facilities under that section must be "connect[ed] to the land where mining activity [is] occurring." KC Br. 30, [JA ___]. The Secretary addressed this: mining equipment and facilities can be on the surface or underground; this language merely indicates that MSHA has jurisdiction over equipment and facilities regardless of whether they are for surface or underground use. Sec'y Br.  24-25, [JA ___].

KC Transport asserts that this reading violates the rule against surplusage. But it is actually KC Transport's interpretation that violates the surplusage rule. KC Transport repeats the Commission's interpretation: that "on the surface and underground" means "on the surface or underground, on such area of land as

---

[2] In his briefs, the Secretary uses the phrase "'used in' mining" as shorthand for the statutory language "used in, or to be used in, or resulting from, the work of extracting such minerals from their natural deposits… or used in, or to be used in, the milling of such minerals, or the work of preparing coal or other minerals . . . ." 30 U.S.C. 802(h)(1)(C).

6

referred to in subsection (A)." KC Br. 29-30, [JA ___]; Comm. 10, [JA ___]. This reading renders subsection (C) inconsequential; the statute would convey the same meaning without it, because subsection (A) covers not just the actual land on the surface and underground, but also the facilities and equipment on it (because, of course, land can't mine itself). See *Nat'l Cement*, 573 F.3d at 794 ("Subsection (A) concerns an area of land in which almost everything is dedicated to mining."), 795 ("Subsection (A) confers jurisdiction over extraction areas and all activities within their boundaries.").

KC Transport argues that the Secretary cannot read subsection (C) in isolation. KC Br. 25, 27-33, [JA ___]. The Secretary is not reading subsection (C) in isolation. Instead, the Secretary argues that subsection (C), when read in context with the entirety of section 3(h)(1), is not a subordinate, meaningless addendum to subsection (A), but is an independent basis for jurisdiction. Sec'y Br. 22-25, [JA ___]. When KC Transport complains that the Secretary is reading subsection (C) in isolation, what it really means is that the Secretary is reading subsection (C) at all. See *U.S.* v. *Menasche*, 348 U.S. 528, 538-539 (1955) (under the "cardinal principle" of statutory construction, courts "give effect, if possible, to every word and clause").

7

## 2.2 Previous case law interpretations make clear that location is relevant, but not necessary.

In *National Cement*, this Court considered MSHA's jurisdiction over a road (covered under subsection (B)), and equipment on that road—some equipment was "used in" mining, while other equipment was not, and the issue was whether (C) provides an independent basis for jurisdiction over the equipment that was "used in" mining. This Court concluded that the Secretary's interpretation—that subsection (C) is an independent basis for jurisdiction, separate from (B) and (A)—was reasonable and entitled to deference, holding that "subsection (C) reaches vehicles used in mining but not located within an extraction area." *Nat'l Cement*, 573 F.3d at 795. KC Transport suggests that, in *National Cement*, "this Court was simply determining if the Secretary's proffered interpretation was consistent with the statute." KC Br. 40, n.3, [JA ___]. To the extent that that is "simply" what the Court was doing, it *did* accept the Secretary's interpretation—the same interpretation the Secretary advances here.

And because this Court accepted the Secretary's independent-basis interpretation, the law in this Circuit is that subsection (C) is an independent basis for jurisdiction, and that it covers equipment (and, by extension, facilities) not on a subsection (B) (and, by extension, subsection (A)) mine.

8

KC Transport then cites some previous cases that it contends support a locational requirement in subsection (C). *Maxxim Rebuild Co., LLC* v. *FMSHRC*, 848 F.3d 737 (6th Cir. 2017), does say that, but *Maxxim* is both not binding and wrong. Sec'y Br. 28-29, [JA ___]. And the other cases simply illustrate the Secretary's point: that location can be relevant to whether something is used in mining, but is not dispositive. Sec'y Br. 34, [JA ___].

KC Transport cites *Herman* v. *Associated Electric Cooperative, Inc.*, 172 F.3d 1078 (8th Cir. 1999), for the proposition that "there is more to being a mine than simply performing some tasks listed in the Mine Act." KC Br. 37-38, [JA ___]. *Herman* was about whether an electric utility, which purchased coal from nearby mines to burn to generate electricity, was engaged in the work of "preparing coal," 30 U.S.C. 802(i), an activity that gives MSHA jurisdiction. 30 U.S.C. 802(h)(1)(C). The Eighth Circuit reasoned that, under Commission precedent, MSHA has jurisdiction over utilities "(1) where the utility maintains a presence at the mine to assist in transporting coal to its generating facility," or "(2) where the utility performs all processing tasks necessary to convert coal to a marketable product." 172 F.3d 1083. The Eighth Circuit determined that the utility had no locational presence and so was not included in category (1), and that though the utility performed *some* coal preparation tasks, its overall function was more

9

"'manufacturing' than 'mining,'" so MSHA did not have jurisdiction under category (2). 172 F.3d at 1083. The Eighth Circuit's approach aligns with the Secretary's—that a facility's location can be relevant to MSHA jurisdiction, but that its function (regardless of location) gives MSHA jurisdiction regardless of location.

KC Transport also cites *Donovan* v. *Carolina Stalite Co.*, 734 F.2d 1547, in which this Court held that a gravel preparation facility adjacent to but not *on* a quarry was covered by subsection (C). *Id.* at 1554. KC Transport argues that, because the quarry delivered gravel to the facility via conveyor, that case "necessarily relies on location and function…." KC Br. 35, [JA ___]. But this Court explained that location on a subsection (A) mine is not required: "[subsection (C)] defines a 'mine' as including… 'facilities' used in… 'the work of preparing ... minerals.' *It does not require that those structures or facilities … be located on property where such extraction occurs*." 734 F.2d at 1554 (emphasis added).

KC Transport also cites *Oliver M. Elam, Jr., Company*, 4 FMSHRC 5 (Jan. 1982), in arguing that some Commission case law supports the Commission's new view that subsection (C) contains a locational requirement. But *Elam* did not depend on location. In *Elam*, the Commission determined that a stevedoring operation that crushed and loaded the coal it received from non-operator third-

10

party brokers in order to fit the coal onto barges was not engaged in "preparing coal," and thus, MSHA did not have jurisdiction. The Commission based this conclusion on the "nature of the operation," not on the stevedoring company's location. 4 FMSHRC at 8.

KC Transport also cites *Bush & Burchett, Inc.* v. *Reich*, 117 F.3d 932 (6th Cir. 1997), and *Director, OWCP* v. *Ziegler Coal Co.*, 853 F.2d 529 (7th Cir. 1988). The Secretary has explained the irrelevance of these cases. Sec'y Br. 29-30, [JA ___].

KC Transport takes issue with the Secretary's use of three Commission cases: *W.J. Bokus Indus., Inc.*, 16 FMSHRC 704 (Apr. 1994), *State of Alaska, Dep't of Transp.*, 36 FMSHRC 2642 (Oct. 2014), and *U.S. Steel Mining Co., Inc.*, 10 FMSHRC 146 (Feb. 1988). The Secretary cited these to illustrate the Commission's previous agreement with the Secretary's interpretation: that MSHA has jurisdiction over equipment and facilities used in mining, regardless of where they are located. Sec'y Br. 27-28, [JA ___]. KC Transport claims that these are distinguishable from the present case because the equipment and facilities at issue were owned by the same entity that owned the extraction sites that they served, and, in the case of *W.J. Bokus* and *U.S. Steel*, operated by employees of that entity. Of course, ownership and staffing have nothing to do with a locational requirement. And, to the extent that KC Transport argues that MSHA

11

jurisdiction depends on ownership or staffing of an entity, KC Br. 31, 41-42, [JA

___], it does not. See, *e.g.*, *W.J. Bokus*, 16 FMSHRC at 708 (rejecting "insufficient

evidence of ownership" of equipment as a basis to deny jurisdiction; the equipment

was "used in" mining and posed hazards to miners "irrespective of ownership").

In fact, this Court has held that subsection (C) does not require the items in that

subsection "to be owned by a firm that also engages in the extraction of

minerals…." *Carolina Stalite*, 734 F.2d at 1552.

### 2.3    There is no support for a locational requirement in the legislative history.

KC Transport argues that the legislative history of subsection (C) does not suggest

that Congress intended equipment and facilities used in mining to be considered

mines for the purposes of MSHA jurisdiction. KC Br. 33-36, [JA ___]. KC

Transport accomplishes this by ignoring Congress's instruction that "what is

considered to be a mine and to be regulated under this Act [is to] be given the

*broadest possible interpretation*," and that doubts as to jurisdiction should be

"resolved in favor of inclusion . . . within the coverage of the Act." S. Rep. No. 95-

181, at 14 (emphasis added).

Instead, KC Transport focuses on the Mine Act's predecessor statute, arguing

that subsection (C) of the Mine Act only clarifies the former Coal Act definition by

12

specifying that MSHA has jurisdiction over coal processing facilities. KC Br. 34, [JA ___].

The Secretary agrees that MSHA has jurisdiction over coal preparation and processing facilities. The Secretary disagrees, however, that subsection (C) exists solely to add processing plants to the definition of "mine." Subsection (C) says that mine means "equipment" and "facilities" "used in, or to be used in… the work of extracting… minerals… the milling of such minerals… or the work of preparing coal or other minerals, and includes custom coal preparation facilities." 30 U.S.C. 802(h)(1)(C). KC Transport would like to strike all but the last four words; if Congress meant to add only preparation facilities to the definition, subsection (C) would read, "custom coal preparation facilities." But it doesn't. Subsection (C) gives MSHA jurisdiction over equipment and facilities (and other things) used in mining (i.e., in extraction, milling, and preparation). KC Transport does not explain why, if subsection (C) exists only to add preparation/processing, it also refers to equipment and facilities used in extraction.

KC Transport's view of the legislative history is much like its view of subsection (C)—to say what KC Transport argues that it says, one needs to ignore almost all of it.

13

JA 336

### 3.   The Secretary's interpretation has been consistent and is reasonable.

KC Transport's argument is mostly that the Secretary's interpretation should get no deference because is inconsistent, arbitrary, and unfairly broad. Those things would be relevant only if the statute is ambiguous, which it is not. Sec'y Br. 21-38, [JA ___]. But even if it were, the Secretary's interpretation is none of those things.

### 3.1   The Secretary's interpretation has been consistent.

KC Transport argues that the Secretary's interpretation of subsection (C) has changed over the course of this litigation and over the past decades. KC Br. 15-16, 19-20 [JA ___]. KC Transport argues that because of this "unpredictability," the Secretary's interpretation cannot be reasonable. KC Br. 15-16, [JA ___]. But the Secretary's interpretation in this case, and more generally, has been consistent.

The Secretary has not changed his interpretation of subsection (C) over the course of this litigation. KC Transport complains that, at trial, the Secretary asserted MSHA jurisdiction over the equipment (coal haulage trucks) only, without asserting jurisdiction over the facility. The ALJ determined that MSHA had jurisdiction over the facility, but not the trucks. At the Commission, the Secretary asserted *both* bases, arguing that MSHA had jurisdiction over the equipment and the facility. KC Transport views this as a flip-flop, but it is not, because the Secretary advanced the same theory based on the same statutory

14

interpretation: Under subsection (C), the trucks and facility were used in mining, and MSHA had jurisdiction over them regardless of their location on a subsection (A) mine. And the Secretary's facility-based argument at the Commission simply reflects the rule that "a prevailing party may defend a decision based on anything in the record without filing a cross-appeal." *KenAmerican Res.*, 42 FMSHRC at 8 n.13.

Nor has the Secretary changed his interpretation of subsection (C) more generally. KC Transport argues throughout its brief that the Secretary, in *National Cement*, initially advanced a "ad hoc, unworkable and limitless" interpretation of section 3(h)(1)(B) but was instructed by this Court to rein in its interpretation and presented a more palatable one on remand and in the subsequent appeal. KC Br. 15, 19, 20, 24, 25, 39, 46 [JA ___]. That is not what happened. In the first appeal the Secretary argued that the plain meaning of "private" "appurtenant" roads under subsection (B) established that the road at issue was a mine. *Sec'y of Labor* v. *Nat'l Cement Co. of Cal., Inc.*, (*National Cement I*), 494 F.3d 1066, 1075 (D.C. Cir. 2007). The Secretary did not make an alternative argument for *Chevron* deference if the statute was ambiguous. *Ibid.* This Court determined that section 3(h)(1)(B) was ambiguous. The Court found there were two possible constructions of "private": a narrow one (pertaining to "a particular person [or entity]") and a broad one

15

(pertaining to "a class of persons [or entities]"), and two possible constructions of "appurtenant": a narrow one (dedicated exclusively to the use of the mine) and a broad one (subject to a transferrable right-of-way benefiting non-owners). *Id.* at 1074. The Court remanded the case so that the parties could make arguments addressing those alternate constructions. *Ibid.* In the subsequent appeal (*National Cement II*, 573 F.3d 788), this Court accepted the Secretary's reasonable interpretation of the ambiguous terms (advancing the broad constructions). 573 F.3d at 795.

The Secretary explained the coverage of different subsections of section 3(h)(1), addressing the fact that the road at issue was traveled by both mining and non-mining vehicles. 573 F.3d at 790. The Secretary explained that the road came under MSHA jurisdiction through subsection (B), and vehicles used in mining (under the facts in *National Cement*, the vehicles were on that road) came under MSHA jurisdiction through subsection (C). *Id.* at 795. This interpretation covered vehicles used in mining but not vehicles not used in mining. But neither the Secretary nor the Court limited subsection (C) to vehicles *on* the road *and* used in mining. In fact, this Court explicitly rejected that notion: "subsection (C) actually works to expand MSHA jurisdiction…. [S]ubsection (C) reaches vehicles used in mining but not located within an extraction area…. [The] broad statutory definition of "mine" …

16

extends the protections of the Mine Act beyond the actual site where mining takes place." *Ibid.*

KC Transport argues that the Secretary's interpretation has changed from the one advanced on remand in *National Cement.* KC Br. 20, [JA ___]. Not true. The interpretation is the same: subsection (C) gives MSHA jurisdiction over vehicles used in mining.

And more generally, the Secretary has advanced this interpretation—that subsection (C) is an independent basis for jurisdiction—for decades. See, *e.g.*, *Nat'l Cement*, 573 F.3d 795; *Carolina Stalite*, 734 F.2d 1551-1552, 1555.

### 3.2   The statute is broad as written, and if it is ambiguous, the Secretary's interpretation is not arbitrary or unfair; it is simply as broad as the statute is.

KC Transport complains throughout its brief about the breadth of the Secretary's interpretation. But that breadth is simply what the Mine Act requires.

KC Transport complains that, if the statute is read as written, MSHA's jurisdiction will have "no stopping point." But the statute is not limitless; with respect to coal preparation and milling, if equipment and facilities are not "used in" or "to be used in" such activities, MSHA does not have jurisdiction. 30 U.S.C. 802(h)(1)(C); Sec'y Br. 33-38, [JA ___]. In this case, the trucks and the facility were used in coal preparation. "Used in" is in the present continuous tense,

17

as in "is being used in," though not in an overly literal sense; equipment need not

be energized and actively engaged in cutting coal, e.g., to fall under subsection (C).

See *Environmental Defense Fund* v. *EPA*, 82 F.3d 451, 468-469 (D.C. Cir. 1996)

(courts do not accept overly literal constructions if they would frustrate the

statute's purpose).

Also, the question of whether MSHA has permanent jurisdiction over any

equipment or facilities ever once used in coal extraction is irrelevant. KC Br. 32,

[JA ___]. MSHA does have jurisdiction under subsection (C) over items "resulting

from" the work of extracting coal or other minerals, but the statute does not give

MSHA jurisdiction over items "resulting from" the work of preparing coal. 30

U.S.C. 802(h)(1)(C). The trucks and facility at issue were engaged in coal

preparation (loading and transporting) so the "resulting from" inquiry is not

relevant to this case.

KC Transport takes issue with what it calls the Secretary's "ad-hoc" fact-

based analysis. But, as all the cases cited in both parties' briefs show, jurisdiction is

necessarily a fact-intensive inquiry. The Secretary has always addressed

jurisdiction on a case-by-case basis, and an item's location *can* be relevant to the

analysis—whether something is used in mining may well be informed by its

location. Sec'y Br. 34, [JA ___].

<div align="center">18</div>

And as a practical matter, jurisdictional disputes are relatively uncommon. KC Transport suggests that if this Court affirms the Secretary's view, regulation under the Mine Act will explode into chaos. KC Br. 45-46, [JA ___]. But at-the-fringes scenarios that implicate jurisdiction are a small subset of MSHA enforcement actions. And this Court does not reject statutory interpretations "simply because there is a remote chance it may lead to problematic results with regard to a small subset of the Mine Act's enforcement provisions." *Nat'l Cement*, 573 F.3d at 796.

KC Transport does not like the broad contours that Congress outlined and would prefer to constrain jurisdiction more tightly than Congress intended. But Congress was clear that "what is considered to be a mine and to be regulated under this Act [is to] be given the *broadest possible interpretation*." S. Rep. No. 95-181, at 14 (emphasis added). This is because broad and protective jurisdictional coverage furthers the Mine Act's principal purpose—to protect miners. 30 U.S.C. 801. Equipment and facilities used in mining, but not located on an extraction site or private appurtenant road, pose hazards to miners; jurisdiction over those potentially dangerous items allows MSHA to keep miners safe. Sec'y Br. 32-33, [JA ___].

KC Transport argues that a locational requirement furthers the purpose of the Act because it would make it more clear to the regulated community which set of

19

regulations apply. KC Br. 43-44, [JA___]. But the Secretary's interpretation is exactly what the Mine Act says, and that provides clarity enough. Cf. *Austin Powder Co.*, 29 FMSHRC 909, 913 (Nov. 2007) (An operator had adequate notice of a standard's requirements because the plain language of the standard gave adequate notice.) And the uncertainty KC Transport decries would exist even under its interpretation, because the same fact-based analysis would be required to determine whether a facility or equipment satisfied both the locational and functional requirements. Accepting that interpretation does not provide meaningfully more certainty for the regulated community. And any uncertainty about whether a particular facility or piece of equipment is used in mining is simply the inevitable result of applying broad statutory terms to particular circumstances. Cf. *Freeman United Coal Min. Co.* v. *FMSHRC*, 108 F.3d 358, 362 (D.C. Cir. 1997) ("The courts have recognized, however, that specific regulations cannot begin to cover all of the infinite variety of conditions which employees must face, and that by requiring regulations to be too specific courts would be opening up large loopholes allowing conduct which should be regulated to escape regulation.") (cleaned up). Besides, though clear expectations for mine operators are important, that comes second to the Mine Act's "primary purpose… protect[ing] mining's most valuable resource—the miner." *Am. Coal Co.* v. *FMSHRC*, 796 F.3d 18, 23-

20

24 (D.C. Cir. 2015) (citing *Int'l Union, United Mine Workers* v. *MSHA*, 823 F.2d 608, 617 (D.C. Cir. 1987)).

Conspicuously absent from KC Transport's brief is an explanation about why it objects so strenuously to MSHA jurisdiction. But it suggests (KC Br. 43-44, [JA ___]) that it prefers OSHA jurisdiction, and that preference is probably because the OSH Act has a different enforcement scheme. The OSH Act has less stringent inspection requirements than the Mine Act: The Mine Act requires MSHA to inspect in its entirety every surface mine twice a year and every underground mine four times a year, 30 U.S.C. 813(a); the OSH Act has no such requirement. The Mine Act requires MSHA to cite every violation of the Act or standards that the inspector finds, 30 U.S.C. 814(a); the OSH Act has no such requirement. KC Transport's desire for less-frequent enforcement does not advance the protective purpose of the Mine Act (or the OSH Act, for that matter). And in any event, Congress already decided that equipment and facilities used in mining are subject to MSHA jurisdiction, and the Secretary adheres to Congress's instruction in determining which agency has jurisdiction.

KC Transport darkly invokes the "sobering consequences" of MSHA's citation obligation and inspection schedule, 30 U.S.C. 813(a), 814, noting that MSHA must issue citations for violations. KC Br. 20-21, [JA ___]. But citations

JA 344

are issued only for violations, so KC Transport has nothing to fear if it complies with the law.

### 4. The Emmett facility and trucks were "used in" mining.

KC Transport argues that MSHA did not have jurisdiction over its coal trucks or Emmett facility, because they were not located on the areas of land where coal was extracted. KC Br. 19, 20, [JA ___]. The Secretary has explained that the statute does not require equipment and facilities to be located at the extraction site for MSHA jurisdiction to attach. Section 2, *supra*. KC Transport does not bother arguing that the coal trucks were not "used in" mining, evidently conceding that they were and that the Secretary has jurisdiction under the Secretary's interpretation.

Mixed questions of law and fact "require the application of a broad legal standard to particular facts…." *Barbour* v. *Browner*, 181 F.3d 1342, 1345 (D.C. Cir. 1999). Whether the facility was "used in" mining is a mixed question of law and fact that involves applying the legal standard (that equipment and facilities "used in" mining are subject to MSHA jurisdiction) to the facts (that the coal trucks hauled raw coal from extraction sites to a preparation plant and that the Emmett facility was used to maintain those trucks). Cf. *Barbour*, 181 F.3d at 1345.

22

The Emmett facility was "used in" mining and subject to MSHA jurisdiction. The crucial facts are undisputed (and so are supported by substantial evidence, 30 U.S.C. 816(a)(1)): the Emmett facility was used for maintenance of the coal haul trucks, which haul coal from the extraction sites to the coal preparation plant. KC Transport emphasizes the fact that only 60% of the Emmett facility's business was in service of Ramaco's coal mining operation, KC Br. 31, [JA___], but the ALJ determined that this did not detract from the Emmett facility's function. He noted that some of the remaining 40% of business was in service of other coal operators, and, in any event, the maintenance of trucks used for Ramaco's extraction sites was essential to the coal preparation process at those sites. ALJD 18, [JA ___]. KC Transport also argues that MSHA never inspected or cited the facility in the past, KC Br. 9, [JA ___], but that does not matter. See *Mainline Rock & Ballast, Inc.* v. *Sec'y of Labor*, 693 F.3d 1181, 1187 (10th Cir. 2012) (MSHA cannot be estopped from enforcing its regulations simply because it did not previously cite the mine operator). To the extent that KC Transport suggests that, for this reason, it did not have fair notice that MSHA could inspect the facility, it did. *Austin Powder Co.*, 29 FMSHRC at 913 (the plain meaning of a standard gives an operator fair notice).

The ALJ's legal conclusion that maintenance of trucks at the Emmett facility constitutes "use in" mining under precedent is correct. ALJD 13-15, 18 [JA ___];

23

see, *e.g.*, *Pennsylvania Electric Company* v. *FMSHRC*, 969 F.2d 1501, 1503 (3d Cir. 1993) (delivering coal from an extraction site to a processing station was preparation work); *U.S. Steel Mining Co., Inc.*, 10 FMSHRC 146 (Feb. 1988) (a shop used for the repair and maintenance of equipment was a "mine" under Section 3(h)(1)(C) because the repair shop was "used in" the work of extracting or preparing coal, regardless of the fact that the shop was located one-half mile from a cleaning plant and 8.5 miles from the farthest mine it serviced).

To argue that the Emmett facility was not used in mining (specifically, in the preparation of coal), KC Transport cites three cases (*Elam*, *Herman*, and *Pennsylvania Electric*). KC Br. 23-24, 37-38, [JA ___]. Each of those cases is different—and, more significantly, each of those cases highlights the Secretary's point that MSHA jurisdiction questions are fact-specific. KC Transport's fixation on the different (but not legally-significantly different) facts of the cited cases represents an unrealistic expectation that the Secretary's interpretation should speak to every possible scenario; that is not how statutory terms work. This Court did not reject the Secretary's interpretation of subsection (B) "simply because there is a remote chance it may lead to problematic results with regard to a small subset of the Mine Act's enforcement provisions." *Nat'l Cement*, 573 F.3d at 796.

24

The stevedoring operation in *Elam* was not engaged in the "work of preparing coal" despite doing some of the activities described in section 3(i) because those activities were "solely to facilitate its loading business." 4 FMSHRC at 8. The Commission concluded that "the *nature* of the operation" was relevant to determining whether a company is engaged in mining activities. *Ibid.* In *Elam* those activities were incidental to the nature of its work—shipping—whereas here, KC Transport's maintenance of coal trucks at the Emmett facility is not incidental to mining; it is critical to mining. The trucks haul coal between extraction sites and a prep plant. Jt. Stip. 18, [JA ___]. The work of these trucks is the preparation of coal, and the maintenance of the trucks at the facility was crucial to that work.

In *Herman*, the Eighth Circuit held that a utility company that performed some section 3(i) activities was not engaged in the work of preparing coal and was not under MSHA jurisdiction. 172 F.3d 1078. Like *Elam*, the Eighth Circuit in *Herman* emphasized that merely "crushing" coal was not enough to bring a utility under MSHA jurisdiction if the coal was already prepared, and the utility was merely further processing already-processed coal. 172 F.3d at 1083. The court found that this was "manufacturing" and "further processing the coal for combustion." *Ibid.* KC Transport was not performing post-preparation activities. It was hauling raw coal. *Herman* is not relevant.

25

In *Pennsylvania Electric*, the Third Circuit determined that an electric generating plant was engaged in the work of preparing coal as defined under section 3(i). Section 3(i) contains a list of preparation activities ("breaking, crushing, sizing, cleaning, washing, drying, mixing, storing, and loading….") and concludes with a catch-all: "such other work as is usually done by the operator of the coal mine." 30 U.S.C. 802(i). The Third Circuit concluded that MSHA has jurisdiction over the head drives (motors) of conveyor belts that brought coal into the electric plant's processing station. 969 F.3d at 1503.  The court reasoned that delivering coal from an extraction site mine to a processing station was an activity "usually done by the operator of the coal mine" and thus constituted coal preparation under section 3(i). *Ibid*. KC Transport does not explain why *Pennsylvania Electric* supports its position.

To the extent that KC Transport argues that repair and maintenance work is not "usually done by the operator of the coal mine," KC Br. 23-24, [JA___], that is not true. Repairs and maintenance are often done by operators. See, *e.g.*, *Southern Ohio Coal Co.,* 13 FMSHRC 912, 919 (June 1991) (operator's failure to make minor repairs was aggravated conduct).

26

Substantial evidence supports the ALJ's factual findings, and he correctly

concluded that the Emmett facility's maintenance work was "essential to the

coal… preparation process" and thus was "used in" mining. ALJD 18, [JA ___].

### 5. The Commission did more than merely "quote the statute" when it announced a new requirement for MSHA to have jurisdiction over independent contractors.

The Commission did not have jurisdiction to reach the issue of whether

independent contractors must be physically "at the mine" to be considered

operators. Sec'y Br. 44-47, [JA ___]. KC Transport suggests that this portion of

the Commission's decision was merely the Commission "quoting from and

applying" section 3(d) to "help explain the meaning" of subsection (C). KC Br.

48, [JA ___]. But that is not what the Commission held. The Commission added an

on-site requirement to the definition of operator. Comm. 11-12, [JA ___].  That is a

change in the law, which was that an independent contractor can still be considered

an operator for the purposes of MSHA jurisdiction even if it does off-site work.

See *Musser Eng'g, Inc.,* 32 FMSHRC 1257, 1266-1269 (Oct. 2010).

After not raising this issue before the Commission, KC Transport takes this

opportunity to brief the issue for the first time. KC Br. 49-50, [JA ___]. The Court

should disregard that argument and vacate that part of the Commission's decision

because the Commission did not have jurisdiction to reach it.

27

**Conclusion**

MSHA has jurisdiction over equipment and facilities "used in" (or "to be used in") mining. KC Transport's equipment and facilities are and were "used in" and "to be used in" mining.  This Court should determine—as it has in the past—that MSHA jurisdiction extends as far as the statute says it does, and reaches equipment and facilities used in mining, even if they are not located on sites that are themselves defined as extraction or preparation sites. The Court should grant the Secretary's petition for review, vacate the Commission's decision, and affirm the citations.

<div style="margin-left:auto">

Respectfully submitted,

SEEMA NANDA
Solicitor of Labor

APRIL E. NELSON
Associate Solicitor

EMILY TOLER SCOTT
Counsel for Appellate Litigation

s/ SUSANNAH M. MALTZ
Attorney
U.S. Department of Labor
Division of Mine Safety & Health
201 12th Street South, Suite 401
Arlington, VA 22202
(202) 693-5393

Attorneys for the Secretary of Labor

</div>

**Certificate of Compliance with Type-Volume Limit,
Typeface Requirements, and Type-Style Requirements**

This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B)

because, excluding the parts of the document exempted under Fed. R. App. P.

32(f), it contains 6176 words.

    This document complies with the typeface requirements of Fed. R. App. P.

32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has

been prepared in Microsoft Word in 14-point Equity.

                        s/ SUSANNAH M. MALTZ
                         Attorney
                         U.S. Department of Labor
                         Division of Mine Safety & Health
                         201 12th Street South, Suite 401
                         Arlington, VA 22202
                         (202) 693-5393

a

## Certificate of Service

I certify that I electronically filed the foregoing with the Clerk of the Court for the

United States Court of Appeals for the District of Columbia Circuit by using the

appellate CM/ECF system on October 19, 2022 and the following registered users

will be served via the CM/ECF system:

T. Jason Riley
Office of General Counsel
Federal Mine Safety and Health Review Commission
1331 Pennsylvania Ave., NW Suite 520N
Washington, DC 20004
jriley@fmshrc.gov

James P. McHugh
Christopher D. Pence
Hardy Pence PLLC
10 Hale Street, 4th Floor
P.O. Box 2548
Charleston, WV 25329
jmchugh@hardypence.com
cpence@hardypence.com

<div align="right">

s/ SUSANNAH M. MALTZ
Attorney
U.S. Department of Labor
Division of Mine Safety & Health
201 12th Street South, Suite 401
Arlington, VA 22202
(202) 693-5393

</div>

b

## Addendum – Pertinent Statutes and Regulations

All statutes and regulations pertinent to this case but not included here are contained in the addendum to the Secretary's opening brief and the addendum to KC Transport's response brief.

## 30 U.S.C. 813(a)

Inspections, investigations, and recordkeeping

(a) Purposes; advance notice; frequency; guidelines; right of access

Authorized representatives of the Secretary or the Secretary of Health and Human Services shall make frequent inspections and investigations in coal or other mines each year for the purpose of (1) obtaining, utilizing, and disseminating information relating to health and safety conditions, the causes of accidents, and the causes of diseases and physical impairments originating in such mines, (2) gathering information with respect to mandatory health or safety standards, (3) determining whether an imminent danger exists, and (4) determining whether there is compliance with the mandatory health or safety standards or with any citation, order, or decision issued under this subchapter or other requirements of this chapter. In carrying out the requirements of this subsection, no advance notice of an inspection shall be provided to any person, except that in carrying out the requirements of clauses (1) and (2) of this subsection, the Secretary of Health and Human Services may give advance notice of inspections. In carrying out the requirements of clauses (3) and (4) of this subsection, the Secretary shall make inspections of each underground coal or other mine in its entirety at least four times a year, and of each surface coal or other mine in its entirety at least two times a year. The Secretary shall develop guidelines for additional inspections of mines based on criteria including, but not limited to, the hazards found in mines subject to this chapter, and his experience under this chapter and other health and safety laws. For the purpose of making any inspection or investigation under this chapter, the Secretary, or the Secretary of Health and Human Services, with respect to fulfilling his responsibilities under this chapter, or any authorized representative of the Secretary or the Secretary of Health and Human Services, shall have a right of entry to, upon, or through any coal or other mine.

c

## 30 U.S.C. 814

Citations and orders

(a) If, upon inspection or investigation, the Secretary or his authorized representative believes that an operator of a coal or other mine subject to this Act has violated this Act, or any mandatory health or safety standard, rule, order, or regulation promulgated pursuant to this Act, he shall, with reasonable promptness, issue a citation to the operator. Each citation shall be in writing and shall describe with particularity the nature of the violation, including a reference to the provision of the Act, standard, rule, regulation, or order alleged to have been violated. In addition, the citation shall fix a reasonable time for the abatement of the violation. The requirement for the issuance of a citation with reasonable promptness shall not be a jurisdictional prerequisite to the enforcement of any provision of this Act.

(b) If, upon any follow-up inspection of a coal or other mine, an authorized representative of the Secretary finds (1) that a violation described in a citation issued pursuant to subsection (a) has not been totally abated within the period of time as originally fixed therein or as subsequently extended, and (2) that the period of time for the abatement should not be further extended, he shall determine the extent of the area affected by the violation and shall promptly issue an order requiring the operator of such mine or his agent to immediately cause all persons, except those persons referred to in subsection (c), to be withdrawn from, and to be prohibited from entering, such area until an authorized representative of the Secretary determines that such violation has been abated.

(c) The following persons shall not be required to be withdrawn from, or prohibited from entering, any area of the coal or other mine subject to an order issued under this section:

> (1) any person whose presence in such area is necessary, in the judgment of the operator or an authorized representative of the Secretary, to eliminate the condition described in the order;
> (2) any public official whose official duties require him to enter such area;
> (3) any representative of the miners in such mine who is, in the judgment of the operator or an authorized representative of the Secretary, qualified to make such mine examinations or who is

d

accompanied by such a person and whose presence in such area is necessary for the investigation of the conditions described in the order; and

(4) any consultant to any of the foregoing.

(d)(1) If, upon any inspection of a coal or other mine, an authorized representative of the Secretary finds that there has been a violation of any mandatory health or safety standard, and if he also finds that, while the conditions created by such violation do not cause imminent danger, such violation is of such nature as could significantly and substantially contribute to the cause and effect of a coal or other mine safety or health hazard, and if he finds such violation to be caused by an unwarrantable failure of such operator to comply with such mandatory health or safety standards, he shall include such finding in any citation given to the operator under this Act. If, during the same inspection or any subsequent inspection of such mine within 90 days after the issuance of such citation, an authorized representative of the Secretary finds another violation of any mandatory health or safety standard and finds such violation to be also caused by an unwarrantable failure of such operator to so comply, he shall forthwith issue an order requiring the operator to cause all persons in the area affected by such violation, except those persons referred to in subsection (c) to be withdrawn from, and to be prohibited from entering, such area until an authorized representative of the Secretary determines that such violation has been abated.

(2) If a withdrawal order with respect to any area in a coal or other mine has been issued pursuant to paragraph (1), a withdrawal order shall promptly be issued by an authorized representative of the Secretary who finds upon any subsequent inspection the existence in such mine of violations similar to those that resulted in the issuance of the withdrawal order under paragraph (1) until such time as an inspection of such mine discloses no similar violations. Following an inspection of such mine which discloses no similar violations, the provisions of paragraph (1) shall again be applicable to that mine.

(e)(1) If an operator has a pattern of violations of mandatory health or safety standards in the coal or other mine which are of such nature as could have significantly and substantially contributed to the cause and effect of coal or other mine health or safety hazards, he shall be given written notice that such pattern exists. If, upon any inspection within 90 days after the issuance of such notice, an authorized representative of the Secretary finds any violation of a mandatory health or safety standard which could significantly and substantially contribute to

e

the cause and effect of a coal or other mine safety or health hazard, the authorized representative shall issue an order requiring the operator to cause all persons in the area affected by such violation, except those persons referred to in subsection (c), to be withdrawn from, and to be prohibited from entering, such area until an authorized representative of the Secretary determines that such violation has been abated.

(2) If a withdrawal order with respect to any area in a coal or other mine has been issued pursuant to paragraph (1), a withdrawal order shall be issued by an authorized representative of the Secretary who finds upon any subsequent inspection the existence in such mine of any violation of a mandatory health or safety standard which could significantly and substantially contribute to the cause and effect of a coal or other mine health or safety hazard. The withdrawal order shall remain in effect until an authorized representative of the Secretary determines that such violation has been abated.

(3) If, upon an inspection of the entire coal or other mine, an authorized representative of the Secretary finds no violations of mandatory health or safety standards that could significantly and substantially contribute to the cause and effect of a coal or other mine health and safety hazard, the pattern of violations that resulted in the issuance of a notice under paragraph (1) shall be deemed to be terminated and the provisions of paragraphs (1) and (2) shall no longer apply. However, if as a result of subsequent violations, the operator reestablishes a pattern of violations, paragraphs (1) and (2) shall again be applicable to such operator.

(4) The Secretary shall make such rules as he deems necessary to establish criteria for determining when a pattern of violations of mandatory health or safety standards exists.

(f) If, based upon samples taken, analyzed, and recorded pursuant to section 202(a), or samples taken during an inspection by an authorized representative of the Secretary, the applicable limit on the concentration of respirable dust required to be maintained under this Act is exceeded and thereby violated, the Secretary or his authorized representative shall issue a citation fixing a reasonable time for the abatement of the violation. During such time, the operator of the mine shall cause samples described in section 202(a) to be taken of the affected area during each production shift. If, upon the expiration of the period of time as originally fixed or subsequently extended, the Secretary or his authorized representative finds that the period of time should not be further extended, he shall determine the extent of

f

the area affected by the violation and shall promptly issue an order requiring the operator of such mine or his agent to cause immediately all persons, except those referred to in subsection (c), to be withdrawn from, and to be prohibited from entering, such area until the Secretary or his authorized representative has reason to believe, based on actions taken by the operator, that such limit will be complied with upon the resumption of production in such mine. As soon as possible after an order is issued, the Secretary, upon request of the operator, shall dispatch to the mine involved a person, or team of persons, to the extent such persons are available, who are knowledgeable in the methods and means of controlling and reducing respirable dust. Such person or team of persons shall remain at the mine involved for such time as they shall deem appropriate to assist the operator in reducing respirable dust concentrations. While at the mine, such persons may require the operator to take such actions as they deem appropriate to insure the health of any person in the coal or other mine.

(g)(1) If, upon any inspection or investigation pursuant to section 103 of this Act, the Secretary or an authorized representative shall find employed at a coal or other mine a miner who has not received the requisite safety training as determined under section 115 of this Act, the Secretary or an authorized representative shall issue an order under this section which declares such miner to be a hazard to himself and to others, and requiring that such miner be immediately withdrawn from the coal or other mine, and be prohibited from entering such mine until an authorized representative of the Secretary determines that such miner has received the training required by section 115 of this Act.

(2) No miner who is ordered withdrawn from a coal or other mine under paragraph (1) shall be discharged or otherwise discriminated against because of such order; and no miner who is ordered withdrawn from a coal or other mine under paragraph (1) shall suffer a loss of compensation during the period necessary for such miner to receive such training and for an authorized representative of the Secretary to determine that such miner has received the requisite training.

(h) Any citation or order issued under this section shall remain in effect until modified, terminated or vacated by the Secretary or his authorized representative, or modified, terminated or vacated by the Commission or the courts pursuant to section 105 or 106.

g

**30 U.S.C. 816(a)(1)**

Judicial review of Commission orders

(a) Petition by person adversely affected or aggrieved; temporary relief

(1) Any person adversely affected or aggrieved by an order of the Commission issued under this chapter may obtain a review of such order in any United States court of appeals for the circuit in which the violation is alleged to have occurred or in the United States Court of Appeals for the District of Columbia Circuit, by filing in such court within 30 days following the issuance of such order a written petition praying that the order be modified or set aside. A copy of such petition shall be forthwith transmitted by the clerk of the court to the Commission and to the other parties, and thereupon the Commission shall file in the court the record in the proceeding as provided in section 2112 of Title 28. Upon such filing, the court shall have exclusive jurisdiction of the proceeding and of the questions determined therein, and shall have the power to make and enter upon the pleadings, testimony, and proceedings set forth in such record a decree affirming, modifying, or setting aside, in whole or in part, the order of the Commission and enforcing the same to the extent that such order is affirmed or modified. No objection that has not been urged before the Commission shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances. The findings of the Commission with respect to questions of fact, if supported by substantial evidence on the record considered as a whole, shall be conclusive. If any party shall apply to the court for leave to adduce additional evidence and shall show to the satisfaction of the court that such additional evidence is material and that there were reasonable grounds for the failure to adduce such evidence in the hearing before the Commission, the court may order such additional evidence to be taken before the Commission and to be made a part of the record. The Commission may modify its findings as to the facts, or make new findings, by reason of additional evidence so taken and filed, and it shall file such modified or new findings, which findings with respect to questions of fact, if supported by substantial evidence on the record considered as a whole, shall be conclusive. The Commission may modify or set aside its original order by reason of such modified or new findings of fact. Upon the filing of the record after such remand proceedings, the jurisdiction of the court shall be exclusive and its

h

judgment and degree[1] shall be final, except that the same shall be subject to review by the Supreme Court of the United States, as provided in section 1254 of Title 28.

i

## Certificate of Service

I certify that I electronically filed the foregoing with the Clerk of the Court for the

United States Court of Appeals for the District of Columbia Circuit by using the

appellate CM/ECF system on October 25, 2022 and the following registered

users will be served via the CM/ECF system:

T. Jason Riley
Office of General Counsel
Federal Mine Safety and Health Review Commission
1331 Pennsylvania Ave., NW Suite 520N
Washington, DC 20004
jriley@fmshrc.gov

James P. McHugh
Christopher D. Pence
Hardy Pence PLLC
10 Hale Street, 4th Floor
P.O. Box 2548
Charleston, WV 25329
jmchugh@hardypence.com
cpence@hardypence.com

<div align="right">

s/ SUSANNAH M. MALTZ
Attorney
U.S. Department of Labor
Division of Mine Safety & Health
201 12th Street South, Suite 401
Arlington, VA 22202
(202) 693-5393

</div>